

Sealed
Public and unofficial staff access prior arrest
to this instrument are
prohibited by court order.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED
FEB 1 8 2004
Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Cr. No. H-04-25 |
| | § | |
| JEFFREY K. SKILLING and | § | Violations:  15 U.S.C. §§ 78j(b), 78m(a), |
| RICHARD A. CAUSEY, | § | 78m(b)(2), 78ff; 18 U.S.C. §§ 371, 1343, |
| | § | 2 and 3551 et seq. |
| Defendants. | § | |

## SUPERSEDING INDICTMENT

The Grand Jury charges:

## INTRODUCTION

At all times relevant to this Superseding Indictment:

1.         Enron Corp. ("Enron") was an Oregon corporation with its headquarters in

Houston, Texas.  Among other businesses, Enron was engaged in the purchase and sale of natural

gas and power, construction and ownership of pipelines, power facilities and energy-related

businesses, provision of telecommunications services, and trading in contracts to buy and sell

various commodities.  Before it filed for bankruptcy on December 2, 2001, Enron was the

seventh largest corporation in the United States.

2.         Enron was a publicly traded company whose shares were listed on the

New York Stock Exchange and were bought, held, and sold by individuals and entities

throughout the United States and the world.  Enron and its directors, officers, and employees

were required to comply with regulations of the United States Securities and Exchange

Commission ("SEC").  Those regulations protect members of the investing public by, among

other things, requiring that a company's financial information is fully and accurately recorded

and fairly presented to the public.  The regulations require, among other things, that a company submit filings to the SEC in Washington, D.C. that include fair and accurate financial statements and management discussion and analysis of a company's business.

3.	The price of Enron's stock was influenced by factors such as Enron's reported revenue, earnings, debt, cash flow, and credit rating, as well as its growth potential and ability to meet consistently revenue and earnings targets and forecasts.  Enron's management provided guidance to the investing public regarding anticipated revenue and earnings for upcoming reporting periods.  Such guidance was communicated in presentations and conference calls to securities analysts and in other public statements by Enron executives.   Relying in part on the company's guidance, securities analysts disseminated to the public their own estimates of the company's expected performance.  These earnings estimates, or analysts' expectations, were closely followed by investors.  Typically, if a company announced earnings that failed to meet or exceed analysts' expectations, the price of the company's stock declined.

4.	It was critical to Enron's ongoing business operations that it maintain an investment grade rating for its debt, which was rated by national rating agencies.  An investment grade rating was essential to Enron's ability to enter into trading contracts with its counterparties and to maintain sufficient lines of credit with major banks.  In order to maintain an investment grade rating, Enron was required to demonstrate that its financial condition was stable and that the risk that Enron would not repay its debts and other financial obligations was low.  The credit rating agencies relied on, among other things, Enron's public filings, including its financial statements filed with the SEC, in rating Enron's debt.  In addition, members of Enron's senior management met regularly with, and provided financial and other information to, representatives

2

of credit rating agencies. Two primary factors influencing Enron's credit rating and the

willingness of banks to extend loans to Enron were Enron's total amount of debt and other

obligations and its cash flow.

## PRINCIPAL CONSPIRATORS

5.        Defendant JEFFREY K. SKILLING was employed by or acted as a

consultant to Enron from at least the late 1980s through early December 2001. From 1979 to

1990, SKILLING was employed by the consulting firm of McKinsey & Co., where he provided

consulting services to Enron. In August 1990, Enron hired SKILLING. SKILLING held various

executive and management positions at Enron and in January 1997, Enron promoted SKILLING

to President and Chief Operating Officer ("COO") of the entire company, reporting directly to

Enron's CEO and Chairman.

6.        In February 2001, SKILLING was named President and CEO of Enron.

On August 14, 2001, with no forewarning to the public, SKILLING resigned from Enron. As

COO and CEO of Enron, SKILLING was the senior manager of the company's commercial

operations and finances and one of its principal spokespersons with the investing public.

SKILLING closely supervised on a day-to-day basis the activities of each of Enron's business

units and the heads of those business units, as well as the activities of the senior Enron managers

who conducted the company's financial and accounting activities. He routinely led and

participated in presentations and conference calls with securities analysts and in other

communications in which Enron provided the public with guidance concerning the company's

performance. SKILLING signed Enron's annual reports filed on Form 10-K with the SEC and

he signed quarterly and annual representation letters to Enron's auditors.

7.      Defendant RICHARD A. CAUSEY was a certified public accountant and was an employee of Enron from 1991 through early 2002.  From 1986 to 1991, while an employee of the accounting firm Arthur Andersen LLP ("Andersen"), CAUSEY sold audit services to Enron on behalf of Andersen, which served as Enron's outside auditor.  In 1991, Enron hired CAUSEY as Assistant Controller of Enron Gas Services Group.  From 1992 to 1997, CAUSEY served in various executive level positions at Enron.  In 1998, CAUSEY was made Chief Accounting Officer ("CAO") of Enron and an Executive Vice-President.

8.      As Enron's CAO, defendant RICHARD A. CAUSEY managed Enron's accounting practices.  CAUSEY reported to Enron's Chairman and CEO, including to defendant JEFFREY K. SKILLING.  Together with SKILLING, Enron's Chief Financial Officer ("CFO") Andrew S. Fastow, its Treasurer, and others, CAUSEY was a principal manager of Enron's finances.  CAUSEY was also a principal manager of Enron's disclosures and representations to the investing public.  He routinely participated in presentations and conference calls with securities analysts and in other communications in which Enron provided the public with guidance concerning the company's performance.  CAUSEY signed Enron's annual reports filed on Form 10-K and its quarterly reports on Form 10-Q with the SEC and he signed quarterly and annual representation letters to Enron's auditors.

9.      Defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY conspired with numerous Enron executives and senior managers in the scheme to defraud described in this Superseding Indictment.  The coconspirators included, but were not limited to, former Enron CFO Andrew S. Fastow, who was a supervisor of such matters as Enron's structured finance, cash flow, and debt management activities; former Enron Treasurer Ben F.

4

Glisan, Jr., who reported to SKILLING and, at times, Fastow and also was a supervisor of

Enron's structured finance, cash flow and debt management activities; former Enron North

America ("ENA") and Enron Energy Services ("EES") CEO David W. Delainey, who reported to

SKILLING and was a supervisor of the largest part of Enron's wholesale energy business and,

later, of its retail energy business; former ENA CAO Wesley Colwell, who reported to CAUSEY

and Delainey and managed the accounting for Enron's wholesale energy business; former Enron

Global Finance Managing Director Michael Kopper, who reported to Fastow and conducted

structured finance activities for Enron; and others.

## SCHEME TO DEFRAUD

10.      From at least 1999 through late 2001, defendants JEFFREY K. SKILLING

and RICHARD A. CAUSEY and their coconspirators engaged in a wide-ranging scheme to

deceive the investing public, the SEC, credit rating agencies and others (the "Victims") about the

true performance of Enron's businesses by: (a) manipulating Enron's finances so that Enron's

publicly reported financial results would falsely appear to meet or exceed analysts' expectations;

and (b) making public statements and representations about Enron's financial performance and

results that were false and misleading in that they did not fairly and accurately in all material

respects represent Enron's actual financial condition and performance, and omitted to disclose

facts necessary to make those statements and representations truthful and accurate.

11.      The scheme's objectives were, among other things, to report recurring

earnings that falsely appeared to grow smoothly by approximately 15 to 20 percent annually; to

meet or exceed the published expectations of securities analysts forecasting Enron's reported

earnings-per-share and other results; to conceal and avoid publicly reporting any large "write-

downs" or losses; to persuade investors through false and misleading statements that Enron's profitability would continue to grow; to deceive credit rating agencies in order to maintain an investment-grade credit rating; to deceive the investing public about the true magnitude of growing debt and other obligations required to keep the company's varied and often unsuccessful business ventures afloat; to increase artificially Enron's reported cash flow in order to mask a growing disparity between the company's reported revenues and its actual earnings from operations; and to artificially inflate the share price of Enron's stock.

12.      Due to the efforts of defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY and their coconspirators, Enron's publicly reported financial results and filings and its public descriptions of itself, including in public statements made by or with the knowledge of SKILLING and CAUSEY, did not truthfully present the financial position, results from operations, and cash flow of the company and omitted to disclose facts necessary to make the disclosures and statements that were made truthful and not misleading. As a consequence, the financial appearance of Enron that SKILLING, CAUSEY and their coconspirators presented to the investing public concealed the real Enron.

13.      Defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY were among the principal architects and operators of the scheme to manipulate Enron's reported financial results and to present Enron in a misleading manner. Together with their coconspirators, they set annual and quarterly earnings and cash flow targets ("budget targets") for the company as a whole and for each of Enron's business units. In furtherance of the scheme to defraud, SKILLING and CAUSEY, together with their coconspirators and others, predetermined Enron's budget targets and "backed into" those targets through, among other things, the use of

deceptive accounting devices.

14.     Defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY and their coconspirators set the targets by determining the numbers necessary for each Enron business unit to produce in order to meet Enron's mandates for growth and analysts' expectations, rather than by determining how much earnings and cash flow that a particular business unit could reasonably be expected to generate.  On a quarterly and year-end basis, SKILLING and CAUSEY and others assessed Enron's progress toward its budget targets.   When the budget targets were not met through actual results from business operations, the desired targets were achieved through the use of various earnings and cash flow "levers," including but not limited to those described in this Superseding Indictment.  These levers were designed to manipulate Enron's finances and prop up its stock price by, among other things, filling earnings and cash flow shortfalls that were at times in the hundreds of millions of dollars.  These shortfalls were referred to within Enron variously as the "gap," "stretch" or "overview."

15.     As described more fully in this Superseding Indictment, many of the levers used by Enron to fill the shortfall between its budget targets and its actual performance were complex transactions designed primarily to achieve specific accounting results.  The structure of many such transactions was inconsistent with the transactions' underlying economic substance.  Other transactions actually were to Enron's financial detriment but were completed because they achieved desired accounting goals that could improve Enron's apparent performance.  Often these transactions were completed in haste near, and at times after, the close of a financial reporting period.

16.     From time to time, without regard to the actual performance of the

company, defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY and their coconspirators arbitrarily increased budget targets at or near the end of a quarter so that Enron could exceed analysts' expectations by falsely appearing to achieve and publicly reporting a higher than projected earnings-per-share result.  At times, SKILLING and CAUSEY caused these revisions to earnings-per-share results even after the close of a quarter, when they knew that Enron had not in fact achieved the reported results and again without regard to the company's actual business performance for that quarter.  Instead, to meet the increased earnings-per-share targets, Enron would employ one or more of the levers described in this Superseding Indictment.

17.    The levers relied on by defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY and their coconspirators to manipulate Enron's reported financial results included fraudulent accounting devices, as well as the fraudulent use of accounting techniques to create a false and misleading picture of Enron's business operations.  In addition, the conspiracy included, at times, intentionally false and misleading representations, and omissions of material information, in Enron's communications with its outside auditor in order to ensure that the conspiracy's objectives were achieved.  This combination of accounting maneuvers, coupled with misleading public statements and omissions about Enron's business performance by SKILLING, CAUSEY and others, enabled Enron to appear as a healthy and growing company that consistently met or exceeded its projected financial results through a sound business plan.  In fact, as SKILLING and CAUSEY well knew, beginning at least in the fourth quarter of 1999, Enron consistently failed to meet budget targets through normal business operations and was able to appear successful only because of the scheme described in this Superseding Indictment.

8

18.     For a time, the scheme of defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY and their coconspirators to inflate artificially the share price of Enron's stock and to maintain Enron's credit rating at investment grade succeeded. The misleading portrayal of Enron's financial condition supported Enron's stock price and its credit rating. In early 1998, Enron's stock traded at approximately $30 per share. By January 2001, even after a 1999 stock split, Enron's stock had risen to over $80 per share and Enron had become the seventh-ranked company in the United States, according to the leading index of the "Fortune 500." Until late 2001, Enron maintained an investment grade credit rating.

19.     During this time, the rise in Enron's stock price enriched defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY and their coconspirators through salary, bonuses, grants of artificially appreciating stock and stock options, and prestige within their professions and communities. Between 1998 and 2001, SKILLING received approximately $200 million from the sale of Enron stock options and restricted stock, netting over $89 million in profit, and was paid more than $14 million in salary and bonuses. Between 1998 and 2001, CAUSEY received more than $14 million from the sale of Enron stock and stock options, netting over $5 million in profit, and was paid more than $4 million in salary and bonuses. Coconspirators, as well as other Enron executives and senior managers, sold hundreds of millions of dollars worth of Enron stock at artificially inflated prices.

20.     In the end, the scheme of defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY and their coconspirators collapsed. On August 14, 2001, SKILLING suddenly resigned from Enron, according to SKILLING and Enron, for "personal reasons." Enron's stock price, which had been declining since January 2001, fell sharply. On October 16,

9

2001, Enron announced purportedly "nonrecurring" losses of approximately $1 billion. Enron's stock declined further. On October 29 and November 1, 2001, the two leading credit rating agencies downgraded Enron's credit rating. On November 8, 2001, Enron announced its intention to restate its financial statements for 1997 through 2000 and the first and second quarters of 2001 to reduce previously reported net income by an aggregate of $586 million. On November 28, 2001, Enron's credit rating was further downgraded to "junk" status. On December 2, 2001, Enron filed for bankruptcy, making its stock, which less than a year earlier had been trading at over $80 per share, virtually worthless.

<u>DEVICES EMPLOYED IN FURTHERANCE OF SCHEME</u>

21.        Defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY and their coconspirators employed various devices in furtherance of the fraudulent scheme, including but not limited to:

        a.        manufacturing and manipulating earnings through fraudulent use of reserve accounts to mask volatility in Enron's wholesale energy trading earnings and conceal and retain large amounts of those trading earnings for later use in order to achieve desired earnings results;

        b.        manufacturing earnings and artificially improving Enron's balance sheet through fraudulent over-valuation of assets in Enron's merchant investment portfolio;

        c.        concealing large losses and failures in Enron's two highly-touted new businesses, EES and Enron Broadband Services ("EBS"), by manipulating Enron's "segment reporting" and using its reserved energy trading earnings to hide EES's losses, and by

manipulating expense accounting to hide the extent of EBS's losses;

    d.  manufacturing earnings by falsely touting Enron's EBS business in order to drive up Enron's stock price, then misleadingly presenting earnings from the resulting increase in Enron's share price as recurring earnings from energy operations;

    e.  structuring financial transactions in a misleading manner in order to achieve earnings objectives, avoid booking of large losses in asset values, and conceal debt, including through the fraudulent use of a purportedly third-party investment entity that in fact was not truly independent from Enron and which was used to achieve Enron's financial reporting objective and to enrich Enron executives and senior managers; and

    f.  structuring financial transactions in a misleading manner in order to conceal the amount of Enron's debt and to create the false appearance of greater cash flows.

   22.  Through the use of these devices, as well as others, defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY and their coconspirators presented and described Enron's financial results, which had been engineered to appear far more successful than they actually were, in a false and misleading manner in conferences with securities analysts, press releases, media statements, and other forms of communication with the investing public.

Manufacturing and Manipulating Reported Earnings through Improper Use of Reserves

   23.  Third Quarter 2000 through Third Quarter 2001:  During 2000 and 2001, the profitability of Enron's wholesale energy trading business, primarily based in its Enron Wholesale business unit, dramatically increased for reasons including rapidly rising energy prices in the western United States, especially in California.  This sudden and large increase in trading

profits, which exceeded $1 billion, if disclosed to the public, would have made it apparent that Enron Wholesale's revenues were closely tied to the market price for energy, and that Enron therefore was exposed to the risk of a decline in such prices.  Such disclosure would have undermined Enron's description and presentation of itself as the dominant "intermediator" in the energy markets, rather than as a speculative (and therefore risky) trading company whose stock would trade at a much lower price-to-earnings ratio.

24.     From the third quarter of 2000 through the third quarter of 2001, defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY and their coconspirators fraudulently used reserve accounts within Enron Wholesale to mask the extent and volatility of Enron Wholesale's windfall trading profits, particularly its profits from the California energy markets, to avoid reporting large losses in other areas of its business, and to preserve the earnings for use in later quarters in which Enron could improperly use them to meet analysts' expectations.  By early 2001, undisclosed reserve accounts within Enron Wholesale, which prior to mid-2000 had held only tens of millions of dollars of Enron's energy trading earnings, contained over $1 billion in unreported earnings.  SKILLING, CAUSEY and their coconspirators improperly planned to and did use hundreds of millions of dollars of those undisclosed reserved earnings for, among other things, ensuring that budget targets were met and that hundreds of millions of dollars in losses within Enron's EES business unit were successfully concealed from the investing public.

25.     Second Quarter 2000:  In mid-July 2000, well after the second quarter 2000 was over, defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY and others conceived and executed a plan artificially to support and inflate Enron's share price by

fraudulently reporting an earnings-per-share figure of 34 cents, as opposed to the 32 cents per share that analysts predicted Enron would report. SKILLING and CAUSEY were aware that Enron's performance for the quarter, even after Enron's use of earnings levers and manipulation of its budget targets, did not support an earnings per share figure of 34 cents.

   26.  In order to help achieve the earnings-per-share target that defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY wanted to report publicly, a senior Enron executive improperly released into earnings millions of dollars from a "prudency" reserve account in Enron's energy trading business, which purportedly existed so that Enron would not report more energy trading earnings than it actually expected to collect. This release of millions of dollars from the prudency reserve account was not done for legitimate business or accounting objectives. It was done solely to accomplish defendants SKILLING's and CAUSEY's desire to publicly report a higher earnings per share number than expected by securities analysts for the second quarter 2000, and thereby artificially inflate and support Enron's share price.

Manufacturing Earnings by Fraudulently Manipulating Asset Values

   27.  Enron executives and senior managers, including defendant RICHARD A. CAUSEY, engaged in a pattern of fraudulent conduct designed to generate earnings needed to meet targets by artificially increasing the book value of certain assets in Enron's large "merchant asset portfolio." This portfolio included interests in many energy-related businesses that were not publicly traded and, therefore, were valued by Enron according to its own internal valuation "models." Enron at times manipulated these models in order to produce results desired to meet earnings targets. For example, in the fourth quarter of 2000, under the direction of CAUSEY and others, Enron personnel fraudulently increased the value of one of the largest of Enron's

merchant assets, Mariner Energy, by $100 million in order to help close a budget shortfall.

Concealing EES Failures

      28.      In presentations to the investing public, defendants JEFFREY K.

SKILLING and RICHARD A. CAUSEY and their coconspirators heavily emphasized the

performance and potential of EES as a major reason for past and projected increases in the value

of Enron's stock, at one time attributing as much as half of Enron's total stock value to EES and

EBS combined. To support what Enron already had said about EES, SKILLING, CAUSEY and

their coconspirators concealed massive losses in EES's business through fraudulently

manipulating Enron's "business segment reporting."

      29.      They accomplished this at the close of the first quarter of 2001 through a

reorganization designed to conceal the existence and magnitude of EES's unexpectedly severe

business failure. Enron hid that failure from the investing public by moving large portions of

EES's business – which defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY and

others knew at the time otherwise would have to report hundreds of millions of dollars in losses –

into Enron Wholesale, which was the Enron business segment housing most of the company's

wholesale energy trading operations and income. As SKILLING, CAUSEY and others knew,

Enron Wholesale would have ample earnings, including in the massive reserve accounts

described above, to ensure that Enron Wholesale could absorb the huge losses that in fact were

attributable to EES while at the same time continuing to meet Enron's budget targets. In public

statements to securities analysts and others, SKILLING, CAUSEY and others acting at their

direction explained the change in segment reporting solely as a means to improve efficiency.

They omitted to disclose that the purported "efficiency" maneuver in fact concealed from the

public and other failures in the touted EES business unit, including huge losses in that business. Instead, SKILLING, CAUSEY and others stated publicly that EES was continuing to perform profitably and as expected.

Promoting EBS to Manufacture Earnings and Concealing Failure of EBS

30. "Rollout" of EBS: Beginning in 1999, defendant JEFFREY K. SKILLING and others sought artificially to support and inflate Enron's stock price by falsely characterizing Enron as a company whose earnings and future prospects were determined to a substantial extent by its telecommunications business, EBS. At that time, stocks of technology sector companies, commonly known as "dot-coms," generally traded at a significant premium on public securities markets. SKILLING and others referred to this plan as giving "dot-com luster" to Enron's share price. A centerpiece of this strategy to promote EBS as a major factor in Enron's earnings and share value was a dramatic presentation about EBS.

31. "Project Grayhawk": Knowing that Enron's presentation about EBS at its January 20, 2000 conference with securities analysts was designed to, and likely would, cause an immediate increase in Enron's stock price, defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY and their coconspirators constructed and approved a scheme to allow Enron to record and report as earnings from operations $85 million of what in reality was just the increase in Enron's share price caused by the EBS presentation. Through its energy trading and assets business, Enron recorded earnings from a partnership interest it held in a large energy investment named JEDI. JEDI's capital consisted, in part, of Enron stock. When Enron's stock price rose, the value of JEDI rose. In September 1999, JEDI hedged its Enron stock through a transaction with Enron that fixed the value of the Enron stock at a set price. Just before the January 20, 2000

15

analyst conference, Enron executed a series of transactions, in a project known as "Grayhawk," that temporarily removed the fixed hedge and replaced it with an open one that did not limit the upside gain to JEDI from increases in value of the Enron stock. After the conference, the fixed hedge was then reinstated at Enron's then higher share price. The purpose and effect of temporarily removing the fixed hedge was to enable Enron to capture increased value of JEDI from the dramatic increase in Enron's stock price as a result of its January 20, 2000 analyst conference. Enron then improperly reported and publicly described this gain as recurring operating income in its energy business and failed to disclose to the investing public the manipulative manner in which it had been able to recognize as income the appreciation of its own stock.

32.     January 20, 2000 Analyst Conference: At the January 20, 2000 analyst conference, defendant JEFFREY K. SKILLING and his coconspirators knowingly made false and misleading statements about EBS. SKILLING stated, among other things, that EBS "has already established the superior broadband delivery network"; that EBS has "built this network . . . and we are turning on the switch"; that the critical "network control software" was in Enron's possession and incorporated and used in its network; and that Enron valued the business at $30 billion, which SKILLING called a "conservative" valuation. In SKILLING's presence, EBS's co-CEO Joseph Hirko stated that EBS possessed advance network control software and that it was no "pipe dream." In reality, EBS had neither the claimed broadband network in place, nor the critical proprietary network control software to run it. The claims about EBS remained only unproven concepts and laboratory demonstrations that SKILLING was advised would take years to complete and might never be realized. In addition, the valuation of the business was inflated

16

by billions of dollars over what internal and external valuations had advised SKILLING might be supportable.

33.     First Quarter 2000 Earnings:  SKILLING's and others' plan to boost Enron's stock price by aggressively touting EBS and to record earnings from that boost succeeded.  On January 11, 2000, the date on which Enron removed the fixed hedge on the Enron stock in JEDI as part of "Project Grayhawk," Enron stock traded at approximately $47 per share. After the analyst conference on January 20, 2000, Enron stock rose to approximately $67 per share.  The "Project Grayhawk" maneuver allowed Enron to recognize, through JEDI, approximately $85 million in earnings as a result of the manufactured bounce in the stock from the false and misleading presentation to analysts about EBS.  Enron then misleadingly described these earnings in later presentations to analysts and in SEC filings as ordinary and recurring operating earnings from its energy business.  Enron did not disclose its manipulation of the hedge on the Enron stock in JEDI to the investing public, nor did it disclose that approximately 20-percent of the earnings of Enron's largest business segment and the unit in which major Enron energy businesses were housed resulted not from business operations but solely from an increase in Enron's own stock price.

34.     Concealment of EBS Failure:  By late 2000, defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY and others well knew that EBS was a struggling business that was losing far larger than expected amounts of money.  However, they took steps to ensure that EBS's financial results did not publicly reflect its problems.  For example, during 2000, Enron structured a series of misleading, one-time financial transactions in EBS that were designed to manufacture earnings that Enron used to present the false impression that EBS was

progressing towards generating operating profits.  Even with these transactions, EBS still was

facing much larger than expected losses during the first quarter 2001.  In order to ensure that

EBS did not record in the first quarter 2001 losses that exceeded Enron's annual budgeted loss

target for EBS, and in order to ensure that the quarterly budgeted loss target dictated by

SKILLING and CAUSEY for the first quarter 2001 was met, CAUSEY and others acting at his

direction fraudulently reduced, and caused to be fraudulently reduced, EBS's expenses for the

first quarter of 2001.

Use of Special Purpose Entities and LJM Partnership to Manipulate Financial Results

      35.    Special Purpose Entities:   One of the levers by which defendants

JEFFREY K. SKILLING and RICHARD A. CAUSEY and their coconspirators ensured that

Enron met financial reporting targets was the creation and use of Special Purpose Entities

("SPEs").  SPEs were used to achieve "off-balance-sheet" accounting treatment of assets and

business activities so that Enron could present itself more attractively as measured by criteria

favored by securities analysts, credit rating agencies, and others.  Under applicable accounting

rules, if a company conducted a transaction with an SPE that included at least a three-percent

equity investment that was at risk and from an independent source, a company could, under

certain conditions, treat the results of such a transaction as "deconsolidated," or excluded, from

its own financial results.  This meant that a company could record the earnings and cash flow

from such a deal in its own results, but did not have to record liabilities such as debt in the

transaction on its own balance sheet.

      36.    Creation of LJM Partnership:  In June 1999, in order to have a purportedly

independent third party available to provide this outside equity funding so that Enron could more

easily create and use SPEs to achieve its desired financial reporting results, defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY and others sought and obtained the approval of Enron's Board of Directors (the "Board") for CFO Fastow to create and serve as the managing partner of an investment partnership named LJM1 that would invest in SPEs for Enron. The Board later approved Fastow's participation in another even larger entity used to fund SPEs by Enron, LJM2 (the LJM entities are collectively referred to as "LJM" unless otherwise noted). LJM's business activity principally involved transactions with Enron and Enron affiliates.

37.       As defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY well knew, LJM was not a legitimate third party acting independently from Enron. Instead, LJM was controlled by Fastow acting simultaneously in his capacity both as Enron's CFO and as the general partner in LJM. SKILLING, CAUSEY, Fastow and others then exploited Fastow's dual role as a means to ensure that LJM did not act as a truly independent third party investor would have, but rather as Enron's own vehicle to achieve its financial reporting objectives and as a means for Fastow and others to be heavily compensated for contributing to Enron's success in meeting its financial reporting objectives.

38.       From approximately July 1999 through October 2001, Enron entered into transactions with LJM that defrauded the Victims. The transactions with LJM enabled Enron, among other things, to: (a) manipulate its reported financial results by readily and unobtrusively moving poorly performing assets off balance sheet, when in fact such off-balance-sheet treatment was improper; (b) conceal Enron's poor operating performance by engaging in transactions designed to close gaps between Enron's actual business results and its stated financial reporting goals; (c) manufacture earnings through sham transactions when Enron was having trouble

19

otherwise meeting its goals for a quarter or year; and (d) improperly inflate the value of Enron's investment portfolio by backdating documents when advantageous to Enron.

39. "Raptor" Hedges: Beginning in the spring of 2000, Enron and LJM engaged in a series of financial transactions with four SPEs called Raptor I, Raptor II, Raptor III and Raptor IV (collectively referred to as the "Raptors"). Defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY, Fastow, Enron Treasurer Ben F. Glisan, Jr., and their coconspirators used the Raptors to manipulate fraudulently Enron's reported financial results. They designed and approved Raptor I, among other things, to protect Enron from having to report publicly in its financial results decreases in value in large portions of its energy merchant asset portfolio and technology investments by hedging the value of those investments with an allegedly independent third party created by Enron and LJM, known as Talon.

40. As defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY well knew, however, the Raptor I structure was invalid under applicable accounting rules because Talon was not independent from Enron, and LJM's investment in Talon was not sufficiently at risk to qualify as outside equity. CAUSEY and Fastow had an oral side deal that LJM would receive its initial investment of $30 million in Talon plus a profit of $11 million from Enron, all prior to Talon engaging in any of the hedging transactions for which it was created. As a quid pro quo for this payment to LJM, Fastow agreed with CAUSEY that Enron employees could use Raptor I to manipulate Enron's balance sheet, including by allowing Enron employees, without negotiation or due diligence on behalf of LJM, to select the values at which the Enron assets were hedged with Talon. Defendant JEFFREY K. SKILLING was informed of and approved Fastow's deal with CAUSEY in order to ensure that Enron achieved the financial reporting goals

for which Raptor I was designed, even though it was clear that the Raptor I structure was not properly off Enron's balance sheet.

41.     The defendant RICHARD A. CAUSEY, Fastow, Glisan, and others satisfied CAUSEY's and Fastow's side deal by manufacturing a transaction between Enron and Talon that generated a $41 million payment to LJM but had no legitimate business purpose for Enron. After satisfying the conditions of the side deal by providing LJM with a guaranteed return on its investment, Enron began to use Raptor I to hedge the value of Enron's assets. Enron employees manipulated the book values of Enron assets, many of which were expected to decline in value, before they were hedged, knowing that the Raptor I structure ensured that Enron would not suffer the financial reporting consequences of subsequent declines or large fluctuations in the value of those assets. CAUSEY and Fastow further used Raptor I fraudulently to promote Enron's financial position by back-dating a hedge to Enron's advantage, capturing an inflated stock value of one of the Enron assets at a time when they knew that value already had declined. The basic structure used in Raptor I, including CAUSEY's and Fastow's oral side deal, was repeated in the three successor fraudulent hedging devices known as Raptors II, III and IV.

42.     Manufacturing Earnings and Concealing Debt through Purported Sales to LJM: In addition to the fraudulent Raptor hedging devices, defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY, and other Enron senior managers, used LJM to conduct other transactions in order to achieve financial reporting objectives, usually purported asset sales that yielded reported earnings and cash flow and moved poorly performing assets temporarily off Enron's balance sheet. SKILLING, CAUSEY, Fastow, and others made undisclosed side agreements that guaranteed LJM against risk in certain of its transactions with Enron. These

included side agreements that CAUSEY, Fastow and others termed "Global Galactic," pursuant to which CAUSEY and Fastow rigged Enron-LJM deals so as to safeguard Enron's scheme to manipulate its reported financial results.

43.     One such transaction involved LJM's "purchase" of Enron's interest in a company that was building a power plant in Cuiaba, Brazil (the "Cuiaba project"). On September 30, 1999, when no true third-party buyer could be found, Enron "sold" a portion of its interest in the Cuiaba project to LJM for $11.3 million. LJM agreed to "buy" this interest only because defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY, Fastow and others, in an undisclosed side deal, agreed that Enron would buy back the interest, if necessary, at a profit to LJM. Based on this purported "sale," which was in fact an asset parking or warehousing arrangement, Enron improperly recognized approximately $65 million in income in the third and fourth quarters of 1999, when it was straining to meet budget targets designed to ensure that it achieved its earnings-per-share goals.

44.     By 2001, the Cuiaba project was approximately $200 million over budget. Nonetheless, in the spring of 2001, defendants JEFFREY K. SKILLING, RICHARD A. CAUSEY and Fastow caused Enron to agree to buy back LJM's interest in the Cuiaba project at a considerable profit to LJM, in keeping with the undisclosed oral side deal. After agreeing to execute the repurchase, SKILLING, CAUSEY, Fastow and others decided to delay publicly consummating the deal until Fastow sold his interest in LJM so that Fastow's role in the transaction would not be disclosed. Because Fastow's role at LJM was coming under increased scrutiny, SKILLING, CAUSEY, Fastow and others sought ways to circumvent public disclosures about Fastow's dual roles in LJM and as Enron's CFO. Consequently, the repurchase was not

22

effected until after Enron filed its second quarter 2001 financial reports, in which no repurchase or agreement to repurchase was disclosed. In fact, Enron had agreed to the repurchase all along and it was accomplished just weeks after the second quarter filing with the SEC on the same terms as those agreed upon earlier.

45.     Nigerian Barges:  In the fourth quarter 1999 Enron pushed through several end-of-the-quarter transactions that were designed solely to achieve budget targets at a time when the company was struggling to produce earnings sufficient to ensure that Enron met analysts' expectations and Enron's predictions for earnings growth.  One transaction used by Enron to ensure that its target was met in the fourth quarter of 1999 was a deal whereby Enron "sold" Merrill Lynch an interest in electricity-generating power barges moored off the coast of Nigeria. When Enron was unable to find a true buyer for the barges by December 1999, it parked the barges with Merrill Lynch so that Enron could record $12 million in earnings and $28 million in cash flow needed to meet budget targets.

46.     Enron was able to induce Merrill Lynch to enter into the Nigerian barges transaction by promising that Merrill Lynch would receive a return of its investment plus an agreed-upon profit within six months.  Enron conveyed this promise in the form of an oral "handshake" side-deal with Merrill Lynch that was concealed from Enron's auditor and the public.  Because Merrill Lynch's supposed equity investment was not sufficiently "at risk," accounting rules prohibited Enron from treating the transaction as a sale from which it could record earnings and cash flow.  In June 2000, Enron in fact delivered on its "handshake" promise to Merrill Lynch by producing LJM as a buyer for the Nigerian barges.  Defendant RICHARD A. CAUSEY and Fastow agreed to include LJM's repurchase of the Nigerian barges from Merrill

Lynch at the agreed-upon profit to Merrill Lynch in their "Global Galactic" agreement concerning LJM deals designed to assist Enron in achieving its financial reporting objectives. In turn, CAUSEY assured that LJM would be bought out at a profit and paid a large fee for taking Merrill Lynch out of the transaction by the agreed-upon June 30, 2000 deadline.

False and Misleading Representations to Investing Public

47.     In furtherance of the scheme to manipulate Enron's financial results and inflate its stock price, defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY and others presented and participated in the presentation of knowingly false and misleading statements about Enron's financial results, the performance of its businesses, and the manner in which its stock was and should be valued. These statements were disseminated to the investing public in conferences, conference calls, press releases, interviews, statements to members of the media, and SEC filings. They included, but were not limited to, those described in paragraphs 48 through 62 below.

48.     First Quarter 2000 Analyst Call:  On April 12, 2000, Enron held its quarterly conference call to discuss its earnings for the first quarter of 2000. Defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY were among the senior Enron managers who participated in the call and Enron's preparation for the call. SKILLING knowingly made false and misleading statements about Enron's operating earnings for the quarter and omitted to disclose facts necessary to make his statements not misleading. SKILLING stated that Enron's wholesale energy "assets and investments" business recorded earnings of $220 million for the quarter; that those earnings were "attributable to increased earnings from Enron's portfolio of energy-related and other investments"; that "this was a pretty good quarter for the energy-related

24

investment business in contrast to the drag it was over the last year"; and that the upswing in earnings in that portion of Enron's business was "basically the performance of the existing asset portfolios." Those statements were materially misleading because SKILLING omitted to disclose that, in reality, approximately $85 million of the $220 million in earnings were unrelated to the operating performance of Enron's energy business. Rather, as SKILLING well knew, through "Project Grayhawk," they were solely attributable to a scheme to generate earnings by manufacturing an increase in Enron's own stock price by heavily touting EBS at Enron's January 20, 2000 analyst conference.

49.     Fourth Quarter 2000 Analyst Call: On January 22, 2001, Enron held its quarterly conference call with securities analysts to discuss its earnings for the fourth quarter of 2000. Defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY were among the senior Enron managers who participated in the call and Enron's preparation for the call. SKILLING knowingly made false and misleading statements about Enron's wholesale and retail energy trading businesses and omitted to disclose facts necessary to make his statements not misleading, including that "for Enron, the situation in California had little impact on fourth quarter results. Let me repeat that. For Enron, the situation in California had little impact on fourth quarter results." He further stated that "nothing can happen in California that would jeopardize" Enron's earnings targets for 2001 and that California business was "small" for Enron. In reality, as SKILLING well knew, Enron reaped huge profits in 2000 from energy trading in California and concealed hundreds of millions of dollars of those earnings in undisclosed reserve accounts for later use. Also, as SKILLING well knew, by late January 2001, California utilities owed EES hundreds of millions of dollars that EES could not collect and Enron had concealed large

reserves that it was forced to book for those uncollectible receivables within Enron Wholesale's books.

50.     In support of Enron's claims that EBS continued to be successful and a major positive factor contributing to Enron's current and future stock price, a senior Enron manager misled analysts during the call about the source of EBS's earnings in the fourth quarter of 2000. After being directed by defendant JEFFREY K. SKILLING to answer a question about the source of EBS's revenues, the senior manager said that one-time, nonrecurring transactions such as sales of "dark fiber" and a "monetization," or sale, of part of EBS's nascent video-on-demand venture with the Blockbuster company accounted for only "a fairly small amount" of EBS's revenues. In truth, as Enron executives and senior managers including defendant RICHARD A. CAUSEY well knew, the sale of projected future revenues from the Blockbuster video-on-demand venture, which Enron abandoned just a quarter later, accounted for $53 million of EBS's fourth quarter 2000 revenues of $63 million.

51.     January 25, 2001 Analyst Conference: Enron held its annual conference in Houston with securities analysts on January 25, 2001. At that conference, defendant JEFFREY K. SKILLING and coconspirators under his supervision, as a focal point of Enron's case for an increased stock value, knowingly made false and misleading presentations about the performance and potential of EBS and EES and omitted to disclose facts necessary to make his statements not misleading. SKILLING called all of Enron's major businesses, including EBS and EES, "strong franchises with sustainable high earnings power." With regard to EBS, he said that "our network's in place." He asserted that Enron's stock, which was then trading at over $80 per share, should be valued at $126 per share, attributing $63 of that alleged stock value to EBS and

EES.  He stated that Enron was "not a trading business."

52.      These statements were false and misleading and omitted facts necessary to make them not misleading.  In reality, as defendant JEFFREY K. SKILLING well knew, EBS was performing very poorly and had made little commercial progress in 2000; EBS personnel had recommended shutting down or selling EBS's network; EBS had few revenue prospects for the upcoming year; and EBS had an unsupportable cost structure that, without correction, could potentially lead to substantial losses well in excess of those Enron had publicly forecast.  Also, as SKILLING well knew, EES too was an unsuccessful business.  Its modest earnings during 2000 largely resulted from one-time sales of investments unrelated to its retail energy contracting business; its existing retail energy contracts were overvalued by hundreds of millions of dollars; and it was owed hundreds of millions of dollars by the California utilities that it could not collect and that Enron was concealing within Enron Wholesale.  In addition, as SKILLING well knew, Enron had made huge profits from speculative wholesale energy trading during 2000, particularly in the western United States, and had concealed hundreds of millions of dollars of those earnings in reserve accounts.

53.      March 23, 2001 Analyst Call:  Enron held a special conference call with securities analysts on March 23, 2001 in an effort to dispel growing public concerns about Enron's stock, which had fallen from over $80 per share to under $60 per share in less than two months.  Defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY were among the senior Enron managers who participated in the call and Enron's preparation for the call. SKILLING knowingly made false and misleading statements, and omitted to disclose facts necessary to make his statements not misleading, in an effort to prop up Enron's stock.  Among

other things, he stated that "Enron's business is in great shape" and "I know this is a bad stock market but Enron's in good shape," even though, as SKILLING well knew, both of Enron's showpiece new businesses, EBS and EES, were failing.  He stated that Enron was "highly confident" of its income target of $225 million for the year for EES and that EES was seeing the "positive effect" of "the chaos that's going on out in California."  In reality, even EES's existing contracts were overvalued by hundreds of millions of dollars.  EES was owed hundreds of millions of dollars by the California utilities that it could not collect and Enron had concealed reserves it was forced to book for those receivables within Enron Wholesale.  EES's new management was predicting that it would take a year or more for EES to become truly profitable.

54.     Defendant JEFFREY K. SKILLING further stated that EBS "is coming along just fine" and that the company was "very comfortable with the volumes and targets and the benchmarks that we set for EBS."  He said that EBS's two profit-and-loss centers, intermediation and content services, were "growing fast" and that EBS was not laying off employees but rather "moving people around inside EBS" and that this was "very good news."  In reality, as SKILLING well knew, EBS was continuing to fail.  Senior personnel at EBS had reported that the unit had an unsupportable cost structure and unproven revenue model.  One senior EBS executive estimated that Enron would need to write-off, that is record as a loss, approximately half of EBS's $875 million book value.  EBS was laying off employees and SKILLING had told employees based in Portland, Oregon that EBS would be centralized in Houston and jobs would be cut because of a "total meltdown" in the broadband industry.

55.     First Quarter 2001 Analyst Call:  Enron held its conference call with securities analysts to discuss its first quarter 2001 results on April 17, 2001.  Defendants

JEFFREY K. SKILLING and RICHARD A. CAUSEY were among the senior Enron managers
who participated in the call and Enron's preparation for the call.  SKILLING made false and
misleading statements in the call and omitted to disclose facts necessary to make his statements
not misleading.  SKILLING talked about continued "big, big numbers" in EES's energy
contracting business.  He falsely explained Enron's movement of EES's energy contract portfolio
into Enron Wholesale by omitting any reference to EES's large losses or their transfer to Enron
Wholesale and stating, "[W]e have such capability in our wholesale business that we were -- we
just weren't taking advantage of that in managing our portfolio at the retail side.  And this retail
portfolio has gotten so big so fast that we needed to get the best -- the best hands working risk
management there."  While Enron reported modest first quarter earnings for EES of $40 million,
in reality, as SKILLING well knew, EES was facing losses approaching one billion dollars,
including overvalued contracts, uncollectible receivables with the California utilities, and huge
costs from an increased California regulatory surcharge.  As alleged in this Superseding
Indictment, Enron had moved EES's energy trading portfolio into Enron Wholesale to conceal
those losses.

      56.      Defendant JEFFREY K. SKILLING made further knowingly false and
misleading statements about Enron's wholesale energy trading business, and omitted to disclose
facts necessary to make his statements not misleading, including that "we remain confident that
the situation in California will have no material impact on our financial condition and no adverse
impact on 2001 earnings."  He refused, when pressed by analysts, to provide any detail or
specific numbers regarding Enron's reserves and to explain how Enron's reserves were allotted
between EES and Enron Wholesale, stating only that "we have adequate reserves and other credit

offsets in place" to cover any exposure in California.  In reality, as SKILLING well knew, Enron

had concealed for later use hundreds of millions of dollars of year 2000 energy trading profits,

much of them from the California market, in reserve accounts within Enron Wholesale that

exceeded $1 billion, and had used those reserves to conceal hundreds of millions of dollars of

potential losses to EES, much of them incurred in the California market.

57.    Defendant JEFFREY K. SKILLING also made knowingly false and

misleading statements, and omitted to disclose facts necessary to make his statements not

misleading, about the success of EBS.  He stated that "[o]ur network is now substantially

complete" and that it "is just not the case" that Enron was reducing staff of EBS because it was

getting out of the content services business.  SKILLING also stressed that the reported losses in

the unit were on target and "anticipated" and that the unit's capital expenditures were being

reduced because it was "able to get access to connectivity without having to build it."  In reality,

as SKILLING well knew, the cost-cutting measures at EBS were instituted because the unit was

continuing to fail and to lay off employees rather than redeploy them, and was incurring much

larger than expected losses that could not be offset with projected future revenues.

58.    A senior Enron manager made further false and misleading statements

about EBS in the call, and omitted to disclose facts necessary to make his statements not

misleading, including that revenues from selling portions of EBS's content business, as opposed

to recurring earnings from operations, were only "about a third" of EBS's overall earnings and

that EBS had only done "a little bit" of such sales in the past two quarters.  In reality, as

defendant JEFFREY K. SKILLING well knew, the sale of a portion of EBS's content business

was the principal mechanism by which the unit had generated revenue in the last two quarters

and accounted for the majority of EBS's earnings for the first quarter of 2001. Only a very small percentage of the unit's revenues in either quarter was due to operations that could be expected to recur. Moreover, EBS had only been able to meet its target of $35 million in losses for the first quarter of 2001 through the combined efforts of the sale of portions of its content services business and the manipulation of the accounting for many of its expenses and allocations under the supervision of defendant RICHARD A. CAUSEY.

59.    Second Quarter 2001 Analyst Call: Enron held its conference call with securities analysts to discuss its second quarter 2001 results on July 12, 2001. Defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY were among the senior Enron managers who participated in the call and Enron's preparation for the call. SKILLING made further knowingly false and misleading statements about the condition of Enron, and omitted to disclose facts necessary to make his statements not misleading, including that Enron had a "great quarter." He further stated that EES "had an outstanding second quarter" and was "firmly on track to achieve our 2001 target of $225 million" in earnings; that losses in EBS were due to "industry conditions" and "dried up" revenue opportunities; and that Enron's "new businesses are expanding and adding to our earnings power and valuation, and we are well positioned for future growth." A senior Enron manager also misled analysts about the movement of EES's energy contracting portfolio into Enron Wholesale, stating, "We just took the risk management functions and combined them because we just -- we were trying to get some more efficiency out of management of the overall risk management function."

60.    In reality, as defendant JEFFREY K. SKILLING well knew, by the close of the second quarter of 2001, EBS had failed and its increased losses were because it had

stopped the one-time sales of portions of its business that had previously been the only

significant source of its earnings.  EES was facing hundreds of millions of dollars in concealed

losses and was a year or more away from any prospect of success.  As a whole, Enron was less

than five months from bankruptcy and the accelerating pace of the company's decline was well

known to SKILLING, who abruptly resigned on August 14, 2001.

      61.     <u>Third Quarter 2001 Analyst Call</u>:  Enron held its quarterly conference call

to discuss its third quarter 2001 earnings results with securities analysts on October 16, 2001.

Defendant RICHARD A. CAUSEY was among the senior Enron managers who participated in

the call and Enron's preparation for the call.  For the first time during the duration of the scheme

to manipulate its reported financial results, Enron conceded that it had suffered large losses,

totaling approximately $1 billion, in certain segments of its business.  These areas included many

declining assets that had been concealed in the "Raptor" hedges as well as EBS.  However,

CAUSEY and others knowingly attempted to mislead the investing public about these losses in

order to prevent the bad news from further devaluing Enron's stock price.

      62.     Enron misleadingly described the hundreds of millions of dollars in losses

stemming from the "unwind," or abandonment, of the "Raptors" as "nonrecurring" losses, that is,

a one-time or unusual earnings event.  However, as defendant RICHARD A. CAUSEY well

knew, over the course of prior quarters, Enron had characterized the positive earnings that it

previously recognized, and then hedged, from these same assets as ordinary operating earnings

that could be expected to recur.  In addition, Enron did not disclose in its third quarter press

release a substantial reduction in shareholder equity.  Instead, Enron's Chairman/CEO only

briefly mentioned in the call that "[i]n connection with the early termination [of the Raptor

structures], shareholders' equity will be reduced approximately $1.2 billion." In reality and as defendant RICHARD A. CAUSEY well knew, this disclosure, which immediately alarmed securities analysts because of its size and abnormality, resulted not from the termination of the "Raptor" structures, but principally from a huge accounting error by Enron in prior earnings results that Enron shortly would be forced to concede and correct.

False and Misleading Representations to Victims

63.     In furtherance of the scheme to manipulate Enron's financial results and inflate its stock price, defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY and their coconspirators filed and caused to be filed with the SEC false annual 10-K reports for the years ending December 31, 1999 and December 31, 2000, and false quarterly 10-Q reports for the quarters ending September 30, 1999, March 31, 2000, June 30, 2000, September 30, 2000, March 31, 2001 and June 30, 2001. Among other things, those filings contained materially false and misleading financial statements that misstated Enron's actual revenues and earnings and understated Enron's actual debt and expenses and materially false and misleading management descriptions and analysis of Enron's business, and they omitted to disclose facts necessary in order to make the disclosures made, in light of the circumstances under which they were made, not misleading. In addition, in furtherance of the scheme, SKILLING, CAUSEY and others knowingly misrepresented, concealed and hid, and knowingly caused to be misrepresented, concealed and hidden, the existence, goals and acts done in furtherance of the scheme, including by providing false, misleading and inaccurate information and making false representations to, among others, the Victims.

33

## COUNT ONE
(Conspiracy to Commit Securities and Wire Fraud:
Scheme to Manipulate Reported Financial Results)

64.      The allegations in paragraphs 1 through 63 are realleged as if fully set forth here.

65.      In or about and between late 1999 and December 2001, both dates being approximate and inclusive, within the Southern District of Texas and elsewhere, defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY, and others, did knowingly and intentionally conspire (1) to willfully and unlawfully use and employ manipulative and deceptive contrivances and directly and indirectly (i) to employ devices, schemes and artifices to defraud; (ii) to make untrue statements of material fact and omit to state facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) to engage in acts, practices, and courses of conduct which would and did operate as a fraud and deceit upon members of the investing public, in connection with the purchase and sale of Enron securities and by use of the instruments of communication in interstate commerce and the mails, in violation of Title 15, United States Code, Sections 78j(b) and 78ff and Rule 10b-5 of the SEC, Title 17, Code of Federal Regulations, Section 240.10b-5, and (2) to devise a scheme and artifice to defraud and obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and, for the purpose of executing such scheme and artifice, to cause interstate wire communications in violation of Title 18, United States Code, Section 1343.

## OVERT ACTS

66.      In furtherance of the conspiracy and in order to carry out the objectives

34

thereof, on or about the dates listed below, in the Southern District of Texas and elsewhere, defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY, and others, committed and caused to be committed the following overt acts, among others:

a.      In or about 1999, SKILLING, CAUSEY and others obtained the approval of Enron's Board at a Board meeting held in Houston, Texas for Enron's CFO Fastow to conduct transactions between Enron and LJM

b.      On or about September 30, 1999, SKILLING, CAUSEY and others enabled Enron to "sell" to LJM for $11.5 million a portion of Enron's interest in a company that was building a power plant in Cuiaba, Brazil;

c.      On or about November 15, 1999, SKILLING and CAUSEY caused to be filed via electronic transmission from Houston, Texas to the SEC in Washington, D.C. Enron's quarterly report on Form 10-Q for the period ending September 30, 1999;

d.      In or about the fourth quarter of 1999, Enron employees caused Merrill Lynch to buy Enron electricity barges moored off the coast of Nigeria that Enron had been unable to sell, so that Enron could record $12 million in earnings and $28 million in cash flow needed for budget targets;

e.      In or about January 2000, SKILLING, CAUSEY and others planned and approved the alteration of "hedges" on certain Enron stock held by the JEDI investment partnership so that Enron could record as operating earnings the increased value of JEDI's Enron stock holdings that SKILLING, CAUSEY and others planned to cause by Enron's announcements about its telecommunications business at its annual conference for securities analysts in Houston, Texas;

35

f.      On or about January 20, 2000, SKILLING and others made false and misleading statements about Enron's telecommunications business at Enron's annual conference for securities analysts held in Houston, Texas;

g.      On or about January 21, 2000, CAUSEY sold 45,000 shares of Enron stock, generating gross proceeds of $3,220,000;

h.      On or about March 13, 2000, SKILLING and CAUSEY signed and caused to be delivered an annual management representation letter addressed to Enron's accountants in Houston, Texas;

i.      On or about March 30, 2000, SKILLING and CAUSEY signed and caused to be filed via electronic transmission from Houston, Texas to the SEC in Washington, D.C. Enron's annual report on Form 10-K for the period ending December 31, 1999;

j.      On or about April 12, 2000, SKILLING, CAUSEY and others conducted a quarterly conference call from Houston, Texas with securities analysts;

k.      On or about April 25 and 26, 2000, SKILLING sold 96,217 shares of Enron stock, generating gross proceeds of $7,077,076.75;

l.      On or about May 12, 2000, CAUSEY and SKILLING signed and caused to be delivered a quarterly management representation letter addressed to Enron's accountants in Houston, Texas;

m.      On or about May 15, 2000, SKILLING and CAUSEY caused to be filed via electronic transmission from Houston, Texas to the SEC in Washington, D.C. Enron's quarterly report on Form 10-Q for the period ending March 31, 2000;

36

n.      In or about the spring of 2000, SKILLING, CAUSEY and others designed and approved Enron's use of the Raptor structure in order to ensure that Enron would not have to report expected losses in the value of certain of its assets;

o.      On or about and between July 17 and 19, 2000, after the second quarter ended, SKILLING, CAUSEY and others caused entries to be made in Enron's books and records in Houston, Texas, which entries improperly released funds from a reserve account solely to ensure that Enron reported a better earnings per share number than Enron actually achieved for the second quarter;

p.      In or about the summer of 2000, in an undocumented side deal, CAUSEY and Fastow agreed that LJM would receive a guaranteed return of its $30 million investment in the first Raptor structure, together with a profit of $11 million on that investment, in exchange for which Enron would be permitted unilaterally to determine the value of the assets hedged in Raptor without negotiation or due diligence by LJM;

q.      On or about August 11, 2000, SKILLING and CAUSEY signed and caused to be delivered a quarterly management representation letter addressed to Enron's accountants in Houston, Texas;

r.      On or about August 14, 2000, SKILLING and CAUSEY caused to be filed via electronic transmission from Houston, Texas to the SEC in Washington, D.C. Enron's quarterly report on Form 10-Q for the period ending June 30, 2000;

s.      In or about September 2000, CAUSEY and others caused Enron to purchase a "put" on its own stock from an entity involved in the Raptor structure, which had no business purpose for Enron but ensured that LJM received the complete return of its $30

37

million investment in the first Raptor structure, together with a profit of $11 million on that investment;

   t.  In or about September 2000, CAUSEY and others back-dated a portion of the Raptor I transaction to Enron's advantage, capturing a stock value of one of the Enron assets hedged in Raptor I at a time when they knew that value already had declined;

   u.  On or about September 6, 2000, CAUSEY and Fastow held a meeting in Houston, Texas to discuss Enron's and LJM's undocumented "Global Galactic" side agreement that LJM would be guaranteed against loss in certain of its transactions with Enron, and that other losses to LJM would be made up through other transactions with Enron;

   v.  On or about and between August 30, 2000 and September 5, 2000, SKILLING sold 86,441 shares of Enron stock, generating gross proceeds of $7,484,360;

   w.  On or about September 28, 2000, CAUSEY sold 80,753 shares of Enron stock, generating gross proceeds of $7,096,807.83;

   x.  On or about and between November 1 and November 7, 2000, SKILLING sold 138,668 shares of Enron stock, generating gross proceeds of $11,492,412.63;

   y.  On or about November 13, 2000, SKILLING and CAUSEY signed and caused to be delivered a quarterly management representation letter addressed to Enron's accountants in Houston, Texas;

   z.  On or about November 14, 2000, SKILLING and CAUSEY caused to be filed via electronic transmission from Houston, Texas to the SEC in Washington, D.C. Enron's quarterly report on Form 10-Q for the period ending September 30, 2000;

   aa.  On or about and between November 15, 2000 and June 13,

2001, pursuant to a written plan providing for sales of 10,000 shares per week, SKILLING sold 310,000 shares of Enron stock, generating gross proceeds of $20,985,247.42;

        bb.      In or about November 2000, CAUSEY and others approved Enron employees' manipulating the value of Mariner Energy on Enron's books in order to produce approximately $100 million in reported earnings;

        cc.      On or about January 22, 2001, SKILLING, CAUSEY and others conducted a quarterly conference call from Houston, Texas with securities analysts;

        dd.      On or about January 25, 2001, SKILLING and others planned and delivered an annual presentation in Houston, Texas to securities analysts;

        ee.      On or about February 23, 2001, SKILLING and CAUSEY signed and caused to be delivered an annual management representation letter addressed to Enron's accountants in Houston, Texas;

        ff.      On or about March 23, 2001, SKILLING, CAUSEY and others conducted a conference call from Houston, Texas with securities analysts;

        gg.      In or about March 2001, SKILLING, CAUSEY and others approved the transfer of large portions of EES's business, including areas where hundreds of millions of dollars in losses would need to be recorded, from EES into Enron Wholesale;

        hh.      On or about April 2, 2001, SKILLING and CAUSEY signed and caused to be filed via electronic transmission from Houston, Texas to the SEC in Washington, D.C. Enron's annual report on Form 10-K for the period ending December 31, 2000;

        ii.      On or about April 17, 2001, SKILLING, CAUSEY and others

conducted a quarterly conference call with securities analysts;

        jj.        On or about May 15, 2001, SKILLING and CAUSEY signed and caused to be delivered a quarterly management representation letter addressed to Enron's accountants in Houston, Texas;

        kk.        On or about May 15, 2001, SKILLING and CAUSEY caused to be filed via electronic transmission from Houston, Texas to the SEC in Washington, D.C. Enron's quarterly report on Form 10-Q for the period ending March 31, 2001;

        ll.        In or about the spring of 2001, SKILLING, CAUSEY and others caused Enron to agree to buy back LJM's interest in the Cuiaba project at a considerable profit to LJM;

        mm.        On or about July 12, 2001, SKILLING, CAUSEY and others conducted a quarterly conference call from Houston, Texas with securities analysts;

        nn.        On or about August 14, 2001, CAUSEY signed and caused to be delivered a quarterly management representation letter addressed to Enron's accountants in Houston, Texas;

        oo.        On or about August 14, 2001, CAUSEY caused to be filed via electronic transmission from Houston, Texas to the SEC in Washington, D.C. Enron's quarterly report on Form 10-Q for the period ending June 30, 2001;

        pp.        On or about September 17, 2001, SKILLING sold 500,000 shares of Enron stock, generating gross proceeds of $15,587,305.10;

qq.　　　On or about October 16, 2001, CAUSEY and others conducted a quarterly conference call from Houston, Texas with securities analysts.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## COUNT TWO
### (Securities Fraud: Raptor Fraud)

67.　　　The allegations in paragraphs 1 through 63 are realleged as if fully set forth here.

68.　　　In or about and between spring 2000 and October 2001, both dates being approximate and inclusive, within the Southern District of Texas and elsewhere, defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY, and others, in a course of conduct involving the construction and use of Enron financial devices known as the Raptors, did willfully and unlawfully use and employ manipulative and deceptive devices and contrivances and directly and indirectly (i) employ devices, schemes and artifices to defraud; (ii) make untrue statements of material facts and omit to state facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engage in acts, practices, and courses of conduct which would and did operate as a fraud and deceit upon members of the investing public, in connection with purchases and sales of Enron securities and by the use of the instruments of communication in interstate commerce and the mails.

(Title 17, Code of Federal Regulations, Section 240.10b-5; Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNTS THREE THROUGH TEN
### (Wire Fraud: Raptor Fraud)

69.     The allegations of paragraphs 1 through 63 are realleged as if fully set forth here.

70.     On or about the dates set forth below, each such date constituting a separate count of this Superseding Indictment, within the Southern District of Texas and elsewhere, defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY, and others, having devised a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, did for the purposes of executing such scheme and artifice transmit and cause to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures, and sounds, specifically the wire transfers of funds specified below among Enron, LJM and entities involved in the Raptor hedging structures.

| Count | Defendant(s) | Date | Wire Transfer |
|---|---|---|---|
| 3 | JEFFREY K. SKILLING  RICHARD A. CAUSEY | September 7, 2000 | $41,000,000 from Enron Citibank account no. 00076486, New York, New York, to Talon 1 LLC Wilmington Trust Co. account no. 51419, Wilmington, Delaware |
| 4 | JEFFREY K. SKILLING  RICHARD A. CAUSEY | September 7, 2000 | $41,000,000 from Talon 1 LLC Wilmington Trust Co. account no. 51419, Wilmington, Delaware, to LJM2-Talon LLC Chase Manhattan account no. 323-156479, Houston, Texas |

| 5 | RICHARD A. CAUSEY | September 19, 2000 | $6,000,000 from LJM2-Talon LLC Chase Manhattan account no. 323-156479, Houston, Texas, to Talon 1 LLC Wilmington Trust Co. account no. 51419, Wilmington, Delaware |
|---|---|---|---|
| 6 | RICHARD A. CAUSEY | September 19, 2000 | $6,000,000 from Talon 1 LLC Wilmington Trust Co. account no. 51419, Wilmington, Delaware, to Enron Citibank account no. 00076486, New York, New York |
| 7 | JEFFREY K. SKILLING RICHARD A. CAUSEY | October 3, 2000 | $41,000,000 from Enron Citibank account no. 00076486, New York, New York, to Timberwolf I LLC Wilmington Trust Co. account no. 51971, Wilmington, Delaware |
| 8 | JEFFREY K. SKILLING RICHARD A. CAUSEY | October 4, 2000 | $41,000,000 from Timberwolf I LLC Wilmington Trust Co. account no. 51971, Wilmington, Delaware, to LJM2-Timberwolf LLC Chase Manhattan account no. 323-864104, Houston, Texas |
| 9 | RICHARD A. CAUSEY | October 13, 2000 | $1,100,000 from LJM2-Timberwolf LLC Chase Manhattan account no. 323-864104, Houston, Texas, to Timberwolf I LLC Wilmington Trust Co. account no. 51971, Wilmington, Delaware |

| 10 | RICHARD A. CAUSEY | October 13, 2000 | $1,100,000 from Timberwolf I LLC Wilmington Trust Co. account no. 51971, Wilmington, Delaware, to Enron Citibank account no. 00076486, New York, New York |
|---|---|---|---|

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

## COUNTS ELEVEN THROUGH SEVENTEEN
### (Securities Fraud: Financial Statements)

71.      The allegations of paragraphs 1 through 63 and 66(a) through 66(qq) are realleged as if fully set forth here.

72.      On or about the dates set forth below, each such date constituting a separate count of this Superseding Indictment, within the Southern District of Texas and elsewhere, defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY, and others, in Enron Forms 10-K and 10-Q filed with the SEC in Washington, D.C., did willfully and unlawfully use and employ manipulative and deceptive devices and contrivances and directly and indirectly (i) employ devices, schemes and artifices to defraud; (ii) make untrue statements of material facts and omit to state facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engage in acts, practices, and courses of conduct which would and did operate as a fraud and deceit upon members of the investing public, in connection with purchases and sales of Enron securities and by the use of the instruments of communication in interstate commerce and the mails.

| Count | Date | Report |
|-------|------|--------|
| 11 | March 30, 2000 | Form 10-K for Enron for the Fiscal Year 1999 |
| 12 | May 15, 2000 | Form 10-Q for Enron for the First Quarter 2000 |
| 13 | August 14, 2000 | Form 10-Q for Enron for the Second Quarter 2000 |
| 14 | November 14, 2000 | Form 10-Q for Enron for the Third Quarter 2000 |
| 15 | April 2, 2001 | Form 10-K for Enron for the Fiscal Year 2000 |
| 16 | May 15, 2001 | Form 10-Q for Enron for the First Quarter 2001 |
| 17 | August 14, 2001 | Form 10-Q for Enron for the Second Quarter 2001 |

(Title 17, Code of Federal Regulations, Section 240.10b-5; Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

### COUNTS EIGHTEEN THROUGH TWENTY-THREE
(Securities Fraud: Presentations to Securities Analysts)

73.    The allegations of paragraphs 1 through 63 are realleged as if fully set forth here.

74.    On or about the dates set forth below, each such date constituting a separate count of this Superseding Indictment, within the Southern District of Texas and

elsewhere, defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY, and others, in presentations to securities analysts, did willfully and unlawfully use and employ manipulative and deceptive devices and contrivances and directly and indirectly (i) employ devices, schemes and artifices to defraud; (ii) make untrue statements of material facts and omit to state facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engage in acts, practices, and courses of conduct which would and did operate as a fraud and deceit upon members of the investing public, in connection with purchases and sales of Enron stock and by the use of the instruments of communication in interstate commerce and the mails.

| Count | Defendant(s) | Date | Presentation |
|-------|--------------|------|--------------|
| 18 | JEFFREY K. SKILLING RICHARD A. CAUSEY | April 12, 2000 | First Quarter 2000 Analyst Conference Call |
| 19 | JEFFREY K. SKILLING RICHARD A CAUSEY | January 22, 2001 | Fourth Quarter 2000 Analyst Conference Call |
| 20 | JEFFREY K. SKILLING | January 25, 2001 | Annual Analyst Conference in Houston, Texas |
| 21 | JEFFREY K. SKILLING RICHARD A. CAUSEY | March 23, 2001 | Analyst Conference Call to Discuss Enron Stock Price |
| 22 | JEFFREY K. SKILLING RICHARD A. CAUSEY | April 17, 2001 | First Quarter 2001 Analyst Conference Call |

| 23 | JEFFREY K. SKILLING<br><br>RICHARD A. CAUSEY | July 12, 2001 | Second Quarter 2001 Analyst Conference Call |

(Title 17, Code of Federal Regulations, Section 240.10b-5; Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

COUNTS TWENTY-FOUR AND TWENTY-FIVE
(False Statements to Auditors in Connection With Annual Representation Letters)

75.     The allegations in paragraphs 1 through 63 are realleged as if fully set forth here.

76.     On or about the dates set forth below, each such date constituting a separate count of this Superseding Indictment, within the Southern District of Texas and elsewhere, defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY, and others, knowingly and willfully made and caused to be made materially false and misleading statements, and omitted to state material facts necessary in order to make statements made, in light of the circumstances under which the statements were made, not misleading, to accountants of Enron, an issuer of a class of securities registered pursuant to Section 12 of the Securities Exchange Act of 1934, in connection with the audit and examination of the financial statements of Enron as required by law to be made, and the preparation and filing of documents and reports required to be filed with the SEC pursuant to rules and regulations enacted by the SEC.

77.     Specifically, while agreeing that they were "responsible for the fair presentation of the financial statements," SKILLING and CAUSEY falsely represented to Enron's accountants that, among other things, (a) the statements and representations made in

47

Enron's financial statements were true; (b) Enron properly recorded or disclosed in its financial statements all agreements to repurchase assets previously sold; (c) Enron properly recorded or disclosed in its financial statements guarantees, whether written or oral, under which Enron was contingently liable; (d) Enron's unaudited quarterly financial data fairly summarized, among other things, the operating revenues, net income and per share data based upon that income for each quarter; (e) there was no material fraud or any other irregularities that, although not material, involved management or other employees who had a significant role in Enron's system of internal control, or fraud involving other employees that could have a material effect on the financial statements; (f) all related party transactions, including sales and guarantees (both oral and written), were properly recorded and disclosed; and (g) Enron made available to the accountants all financial records and related data; well knowing that these statements were false.

| Count | Defendant(s) | Date | Statement to Auditors |
|-------|--------------|------|-----------------------|
| 24 | JEFFREY K. SKILLING<br><br>RICHARD A. CAUSEY | March 13, 2000 | Annual Representation Letter in Connection with Enron Form 10-K for Year 1999 |
| 25 | JEFFREY K. SKILLING<br><br>RICHARD A. CAUSEY | February 23, 2001 | Annual Representation Letter in Connection with Enron Form 10-K for Year 2000 |

(Title 15, United States Code, Sections 78m(a), 78m(b)(2), 78ff; Title 17, Code of Federal Regulations, Section 240.13b2-2; and Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNTS TWENTY-SIX THROUGH THIRTY
### (False Statements to Auditors in Connection With Quarterly Representation Letters)

78.     The allegations in paragraphs 1 through 63 are realleged as if fully set forth here.

79.     On or about the dates set forth below, each such date constituting a separate count of this Superseding Indictment, within the Southern District of Texas and elsewhere, defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY, and others, knowingly and willfully made and caused to be made materially false and misleading statements, and omitted to state material facts necessary in order to make statements made, in light of the circumstances under which the statements were made, not misleading, to accountants of Enron, an issuer of a class of securities registered pursuant to Section 12 of the Securities Exchange Act of 1934, in connection with the review of the financial statements of Enron as required by law to be made, and the preparation and filing of documents and reports required to be filed with the SEC pursuant to rules and regulations enacted by the SEC.

80.     Specifically, while agreeing that they were "responsible for the fair presentation of the financial statements," SKILLING and CAUSEY falsely represented to Enron's accountants that, among other things, (a) the financial statements were presented in accordance with generally accepted accounting principles; (b) Enron properly recorded or disclosed in its financial statements guarantees, whether written or oral, under which Enron was contingently liable; (c) there was no fraud involving management or employees who had a significant role in internal control, or fraud involving others that could have a material effect on the financial statements; (d) all related party transactions, including sales and guarantees (both

oral and written), were properly recorded and disclosed; and (e) Enron made available to the accountants all financial records and related data; well knowing that these statements were false.

| Count | Defendant(s) | Date | Statement to Auditors |
|---|---|---|---|
| 26 | JEFFREY K. SKILLING<br><br>RICHARD A CAUSEY | May 12, 2000 | Quarterly Representation Letter in Connection with Enron Form 10-Q for First Quarter 2000 |
| 27 | JEFFREY K. SKILLING<br><br>RICHARD A. CAUSEY | August 11, 2000 | Quarterly Representation Letter in Connection with Enron Form 10-Q for Second Quarter 2000 |
| 28 | JEFFREY K. SKILLING<br><br>RICHARD A. CAUSEY | November 13, 2000 | Quarterly Representation Letter in Connection with Enron Form 10-Q for Third Quarter 2000 |
| 29 | JEFFREY K. SKILLING<br><br>RICHARD A. CAUSEY | May 15, 2001 | Quarterly Representation Letter in Connection with Enron Form 10-Q for First Quarter 2001 |
| 30 | RICHARD A. CAUSEY | August 14, 2001 | Quarterly Representation Letter in Connection with Enron Form 10-Q for Second Quarter 2001 |

(Title 15, United States Code, Sections 78m(a), 78m(b)(2), 78ff; Title 17, Code of Federal Regulations, Section 240.13b2-2; and Title 18, United States Code, Sections 2 and 3551 et seq.)

50

## COUNTS THIRTY-ONE THROUGH FORTY
### (Insider Trading: JEFFREY K. SKILLING)

81.     The allegations in paragraphs 1 through 63 are realleged as if fully set forth here.

82.     On or about the dates set forth below, each such date constituting a separate count of this Superseding Indictment, within the Southern District of Texas and elsewhere, defendant JEFFREY K. SKILLING knowingly and willfully used and employed manipulative and deceptive devices and contrivances, by use of means and instrumentalities of interstate commerce, in violation of Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission (Title 17, Code of Federal Regulations, Section 240.10b-5), in that he engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon members of the investing public in connection with the purchase or sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.  Specifically, while in possession of material non-public information that Enron and its executives and senior managers, including SKILLING, had supplied and were continuing to supply materially false and misleading information to the investing public, including but not limited to Enron's publicly reported financial results and public statements of Enron's executives and senior managers, SKILLING sold shares of Enron stock and generated total proceeds of $62,626,401.90.

| Count | Date | Shares | Sale Price(s) | Gross Proceeds |
|-------|------|--------|---------------|----------------|
| 31 | April 25, 2000 | 10,000 | $73.875<br>$73.9375 | $738,893.75 |

51

| 32 | April 26, 2000 | 86,217 | $74.00<br>$73.875<br>$72.50 | $6,338,183.00 |
|----|----------------|--------|-----------------------------|---------------|
| 33 | August 30, 2000 | 15,000 | $86.125 | $1,291,875.00 |
| 34 | September 1, 2000 | 60,000 | $87.00<br>$86.875<br>$87.25 | $5,220,000.00 |
| 35 | September 5, 2000 | 11,441 | $85.00 | $972,485.00 |
| 36 | November 1, 2000 | 72,600 | $83.2406<br>$83.0625 | $6,041,023.50 |
| 37 | November 2, 2000 | 20,000 | $82.3381 | $1,646,762.00 |
| 38 | November 7, 2000 | 46,068 | $82.5872 | $3,804,627.13 |
| 39 | November 15, 2000 | 10,000 per week for 31 weeks per written sales plan | $84.00 to $49.90 | $20,985,247.42 |
| 40 | September 17, 2001 | 500,000 | $31.5061<br>$31.0822 | $15,587,305.10 |

(Title 17, Code of Federal Regulations, Section 240.10b-5; Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNTS FORTY-ONE AND FORTY-TWO
### (Insider Trading: RICHARD A. CAUSEY)

83.     The allegations in paragraphs 1 through 63 are realleged as if fully set

forth here.

84.     On or about the dates set forth below, each such date constituting a

separate count of this Superseding Indictment, within the Southern District of Texas and

elsewhere, defendant RICHARD A. CAUSEY knowingly and willfully used and employed

manipulative and deceptive devices and contrivances, by use of means and instrumentalities of

interstate commerce, in violation of Rule 10b-5 of the Rules and Regulations of the United States

Securities and Exchange Commission (Title 17, Code of Federal Regulations, Section 240.10b-

5), in that he engaged in acts, practices, and courses of business which would and did operate as a

fraud and deceit upon members of the investing public in connection with the purchase or sale of

securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.  Specifically,

while in possession of material non-public information that Enron and its executives and senior

managers, including CAUSEY, had supplied and were continuing to supply materially false and

misleading information to the investing public, including but not limited to Enron's publicly

reported financial results and public statements of Enron's executives and senior managers, CAUSEY sold shares of Enron stock and generated total proceeds of $10,316,807.83.

| Count | Date | Shares | Sale Price(s) | Gross Proceeds |
|-------|------|--------|---------------|----------------|
| 41 | January 21, 2000 | 45,000 | $72.00<br>$71.00 | $3,220,000.00 |
| 42 | September 28, 2000 | 80,753 | $87.8829 | $7,096,807.83 |

(Title 17, Code of Federal Regulations, Section 240.10b-5; Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

FORFEITURE ALLEGATIONS
(18 U.S.C.§§ 981 and 982, 28 U.S.C. § 2461)

85.     As a result of the conspiracy, securities fraud and wire fraud offenses alleged in the Superseding Indictment, herein alleged and incorporated by reference for the purpose of alleging forfeitures to the United States of America pursuant to the provisions of Title 18, United States Code, Section 981, and Title 28, United States Code, Section 2461, defendants JEFFREY K. SKILLING and RICHARD A. CAUSEY shall, upon conviction of each such offense alleged in the Superseding Indictment, forfeit to the United States all property, real and personal, which constitutes or is derived from proceeds traceable to the alleged conspiracy and securities fraud offenses, wherever located, and in whatever name held, including, but not limited to the following:

86.     With respect to defendant JEFFREY K. SKILLING, the following property:

54

(A)     a sum of money equal to the amount of proceeds obtained as a result of the conspiracy, securities fraud and wire fraud offenses, for which the defendants are jointly and severally liable;

(B)     real property known as 1999 McKinney Ave., #1008, Dallas, Texas;

(C)     real property known as 10 North Briarwood Court, Houston, Texas;

(D)     $50,000 in cash in MML Investors Services, Inc., BMA account number 251518;

(E)     securities, listed in Attachment A, worth approximately $49,342,462.98, and $808,643.74 in cash, contained in Charles Schwab account number 8110-6773;

(F)     $132,544.65 contained in Mass Mutual Financial Group Policy account number 11502764;

(G)     $91,800.51 in cash contained in Southwest Bank account number 3229351 in the name of Veld Interests, Inc.

87.     With respect to defendant RICHARD A. CAUSEY, the following property:

(A)     a sum of money equal to the amount of proceeds obtained as a result of the conspiracy, securities fraud and wire fraud offenses, for which the defendants are jointly and severally liable;

(B)     real property known as 39 North Regent Oak, The Woodlands, Texas;

(C)     securities listed in Attachment B, worth approximately $2,589,020.98, contained in First Union account number 2005-0471;

(D)     approximately $274,305.69 in Manulife North America Annuity account number 2107848;

(E)        approximately $219,434.87 in Manulife North America Annuity account number 2106714;

88.      In the event that any property described above as being subject to forfeiture, as a result of any act or omission by either defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to or deposited with a third person;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of defendants JEFFREY K. SKILLING and

RICHARD A. CAUSEY up to the value of the above described property in paragraphs 86 and

87.

Dated:    Houston, Texas
          February 18, 2004

                                             A TRUE BILL

                                             FOREPERSON

JOSHUA R. HOCHBERG
Acting United States Attorney

LESLIE R. CALDWELL
Director, Enron Task Force

By:
          SAMUEL W. BUELL
          SEAN M. BERKOWITZ
          LINDA A. LACEWELL
          KATHRYN H. RUEMMLER
          Special Attorneys, Enron Task Force

          LAUREL LOOMIS
          PATRICK MURPHY
          Trial Attorneys, Enron Task Force

# Attachment A

List of Bonds held in SKILLING's Charles Schwab 8110-6673:

| Description | Par Value | Value as of 12/31/2003 |
|---|---|---|
| Alamo tex cmnty college 5.375% 17 due 11/1/17 | 3,355,000.00 | $3,709,422.20 |
| Allianceber multi mkt strategy A | 1,505.85 | $8,628.51 |
| Delaware transn auth transn 4.50% 7/1/16 | 3,485,000.00 | $3,616,210.25 |
| Houston tex 5.375% 13 cmnty due 4/15/13 | 3,000,000.00 | $3,349,560.00 |
| Jefferson la 5.25% 18 sales tax due 12/1/18 | 2,770,000.00 | $3,025,421.70 |
| Minnesota pub facs 5%13 auth wtr due 3/1/13 | 2,000,000.00 | $2,198,020.00 |
| Minnesota pub facs 5% 15 auth wtr due 3/1/15 | 3,000,000.00 | $3,259,440.00 |
| Montgomery cnty 5.25% 13 genl oblig due 10/1/13 | 2,500,000.00 | $2,835,850.00 |
| New jersey st 6% 15 transn tr due 12/15/15 | 2,000,000.00 | $2,400,500.00 |
| Pasadena tex indpt genl oblig 5.0% 15 due 2/15/15 | 2,485,500.00 | $2,696,920.80 |
| Pflugerville tex 5.5% 13 genl oblig due 8/15/13 | 2,265,000.00 | $2,557,411.50 |
| Spartanburg cnty 4.25% 14 genl oblig due 3/1/14 | 3,320,000.00 | $3,502,234.80 |
| Standish Mellon Intl fixed income fund II | 82,524.96 | $1,895,598.22 |
| University ala univ 5% 16 revs due 10/1/16 | 2,500,000.00 | $2,700,875.00 |

| | | |
|---|---|---|
| University ala univ 5% 17 revs due 10/1/17 | 2,500,000.00 | $2,680,075.00 |
| Williamson cnty 5% 18 genl oblig due 4/1/18 | 2,500,000.00 | $2,683,125.00 |
| Wisconsin st 4.50% 16 transn rev due 7/1/16 | 3,000,000.00 | $3,122,550.00 |
| Wisconsin st 4.50% 17 transn rev due 7/1/17 | 3,000,000.00 | $3,100,620.00 |
| **Total** | 43,764,530.81 | $49,342,462.98 |

# Attachment B

List of Securities held in CAUSEY's First Union Account No. 2005-0471:

| Description | Shares | Value as of 12/31/2003 | Type |
|---|---|---|---|
| Evergreen FBO Hedge Equities | 2,719.67 | $ 48,294.48 | Mutual Fund |
| Clark Cnty Wash Pub Util Dist #001 Generation Sys dtd 12/1/00 FC 07/01/01 | 250,000 | $280,537.50 | Bond |
| District Columbia CTFS Partn Dists Pub Safety & Emergency cpn 4.75% | 100,000 | $100,792.00 | Bond |
| E-470 Pub Hwy Auth Colo Rev Sr Ser A dtd 08/01/97 fc 03/01/98 | 120,000 | $122,124.00 | Bond |
| Elgin Ill Corp Purp G/O Unltd dtd 05/01/00 fc 01/01/01 | 100,000 | $112,117.00 | Bond |
| Harris Cnty Tex Ref Toll 5.125% | 275,000 | $297,896.50 | Bond |
| Harris Cnty Tex Ref Toll 5.000% | 225,000 | $235,219.50 | Bond |
| Howell Mich Pub Schs Ref G/O Unltd OID dtd 02/07/01 fc 11/01/01 | 250,000 | $264,007.50 | Bond |
| Huntsville Ala Health Care Auth Ser A B/E MBIA dtd 11/15/97 fc 06/01/98 | 100,000 | $109,310.00 | Bond |
| Lyon Cnty Nev Sch Dist Permanent Sch dtd 02/01/01/ fc 06/01/01 | 200,000 | $223,854.00 | Bond |
| Phoenix Ariz Civic Impt Corp Wstewtr Sys dtd 10/01/93 fc 01/01/94 | 275,000 | $284,586.50 | Bond |
| Rhode Island St & Providence Plantation Ctfs dtd 12/01/00 dfc 04/01/01 | 225,000 | $247,887.00 | Bond |
| Texas St Wtr Dev - Ser E & F dtd 08/01/97 fc 02/01/98 | 250,000 | $262,395.00 | Bond |