United States District Court
Southern District of Texas
FILED

DEC - 3 2004

Michael N. Milby, Clerk

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Crim. No. H-04-25 |
| | ) | |
| RICHARD A. CAUSEY, JEFFREY K. | ) | |
| SKILLING, and KENNETH L. LAY | ) | |
| | ) | |
| Defendants. | ) | |

**GOVERNMENT'S MEMORANDUM OF LAW IN RESPONSE TO DEFENDANTS'
JOINT MOTION TO TRANSFER VENUE**

## <u>TABLE OF CONTENTS</u>

Table of Authorities ................................................................................................ iii

Preliminary Statement ......................................................................................... 1

ARGUMENT ........................................................................................................ 5

I.     THE EXTRAORDINARY STANDARD OF PRESUMED PREJUDICE
       JUSTIFYING A CHANGE OF VENUE ...................................................... 5

       A.     Change of Venue from the District in Which the Crime Occurred Due to
              Pretrial Publicity  is Granted Only in Extreme Circumstances Absent
              in This Case ........................................................................................ 5

       B.     Change of Venue Is Not Justified in Climate of Intense Pretrial Publicity
              When, As in Previous Enron-Related Cases, Fair and Impartial Juries
              May Be Selected With Appropriate Voir Dire ................................... 17

II.     A FAIR AND IMPARTIAL JURY CAN BE EMPANELED IN THIS CASE .............. 19

       A.     The <u>Andersen</u> and <u>Bayly</u> trials Demonstrate that a Large Metropolitan
              Area Such as the Houston Division Ameliorates the Effect of Extensive
              Publicity Regarding Enron ................................................................ 20

              1.     <u>Houston's Large and Diverse Division Readily Absorbs Extensive</u>
                     <u>Pretrial Publicity and Permits the Selection of a Fair and</u>
                     <u>Impartial Jury</u> ........................................................................ 20

              2.     <u>The Arthur Andersen Trial Court Successfully Mitigated Extensive</u>
                     <u>Pretrial Publicity by Conducting a Searching and Thorough Voir Dire</u> .. 21

              3.     <u>The Bayly Trial Court Selected a Fair and Impartial Jury Which</u>
                     <u>Carefully Rendered Individual Justice</u> ................................... 24

       B.     The Press Coverage of the Defendants' Case Has Not Been Inflammatory and
              Prejudicial ......................................................................................... 29

       C.     The Defendants' Survey Does Not Demonstrate Presumed Prejudice in
              Houston ............................................................................................. 35

       D.     Defendants' Alternative Venues Provide No Assurance of a Substantially
              Better Panel ....................................................................................... 38

i

## TABLE OF CONTENTS (CONTINUED)

**PAGE**

    E.    Voir Dire Will Ensure Selection of an Impartial Jury as It has in Previous Enron-related Cases and Other High Profile Trials ............................................ 41

CONCLUSION ..................................................................................................................... 45

# TABLE OF AUTHORITIES

**FEDERAL CASES**            **PAGE**

Application of Cohn,
    332 F.2d 976 (2nd Cir. 1964) ...................................................................... 44, 45

Associated Press v. U.S. District Court for the Central District of California,
    705 F.2d 1143 (9th Cir. 1983) ................................................................... 20, 21

Bearden v. United States,
    320 F.2d 99 (5th Cir. 1963) ........................................................................ 11

Bronstein v. Wainwright,
    646 F.2d 1048 (5th Cir. 1981) ............................................................... 11, 42

Calley v. Callaway,
    519 F.2d 184 (5th Cir. 1975) .................................................................. passim

Coleman v. Kemp,
    778 F.2d 1487 (11th Cir. 1985) ............................................................... 7, 17

Columbia Broadcasting Systems, Inc. v. U.S. District Court for the Central District of California,
    729 F.2d 1174 (9th Cir. 1984) ...................................................................... 20

Dennis v. United States,
    302 F.2d 5 (10th Cir. 1962) ........................................................................ 8

Irvin v. Dowd,
    366 U.S. 717 (1961) ...................................................................... 8, 18, 42

Johnson v. Beto,
    337 F. Supp. 1371 (S.D. Tex. 1972) ........................................................ 13, 14

Marshall v. United States,
    360 U.S. 310 (1959) .................................................................................. 8

Mayola v. Alabama,
    623 F.2d 992 (5th Cir. 1980) ............................................................ 7, 10, 12

Murphy v. Florida,
    495 F.2d 553 (5th Cir. 1974) ...................................................................... 11

iii

## TABLE OF AUTHORITIES (CONTINUED)

**PAGE**

Nevers v. Killinger,
    990 F. Supp. 844 (E.D. Mich. 1997) ............................................................ 16

Pamplin v. Mason,
    364 F.2d 1 (5th Cir. 1966) .......................................................................... 13

Patton v. Yount,
    467 U.S. 1025 (1984) ................................................................................ 42

Rideau v. Louisiana,
    373 U.S. 723 (1963) ............................................................................. 9, 10

Sheppard v. Maxwell,
    384 U.S. 333 (1966) ............................................................................. 9, 10

Stafford v. Saffle,
    34 F.3d 1557 (10th Cir. 1994) ..................................................................... 7

United States ex. Rel. Bloeth v. Denno,
    313 F.2d 364 (2d Cir. 1963) ...................................................................... 17

United States v. Abello-Silva,
    948 F.2d 1168 (10th Cir. 1991) .................................................................... 8

United States v. Arthur Andersen, LLP,
    374 F.3d 281 (5th Cir. 2004) ............................................................... passim

United States v. Avants,
    367 F.3d 433 (5th Cir. 2004) ...................................................................... 5

United States v. Capo,
    595 F.2d 1086 (5th Cir. 1979) ................................................................. 7, 11

United States v. Chagra,
    669 F.2d 241 (5th Cir. 1982) ...................................................................... 6

United States v. Cooper,
    464 F.2d 648 (10th Cir. 1972) ..................................................................... 8

United States v. Dischner,
    974 F.2d 1502 (9th Cir. 1992) .................................................................... 31

iv

## TABLE OF AUTHORITIES (CONTINUED)

PAGE

United States v. Dozier,
    672 F.2d 531 (5th Cir. 1982) ............................................................ 10, 11, 43

United States v. Ebens,
    654 F. Supp. 144 (E.D. Mich. 1987) ............................................................ 16

United States v. Engleman,
    489 F. Supp. 48 (E.D. Mo. 1980) ............................................................ 16

United States v. Haldeman,
    559 F.2d 31 (D.C. Cir. 1976) ............................................................ 34, 43

United States v. Harrelson,
    754 F.2d 1153 (5th Cir. 1985) ............................................................ 11, 43

United States v. John Walker Lindh,
    212 F. Supp. 2d 541 (E.D. Va. 2002) ............................................................ 42

United States v. Lea Fastow,
    292 F. Supp. 2d 914 (S.D. Tex. 2003) ............................................................ 18

United States v. Lehder-Rivas,
    955 F.2d 1510 (11th Cir. 1992) ............................................................ 31

United States v. Lipscomb,
    299 F.3d 303 (5th Cir. 2002) ............................................................ 42

United States v. Maldonaldo-Rivera,
    922 F.2d 934 (2d Cir. 1990) ............................................................ 45

United States v. Malmay,
    671 F.2d 869 (5th Cir. 1982) ............................................................ 11

United States v. McVeigh,
    153 F.3d 1166 (10th Cir. 1998) ............................................................ 6, 10

United States v. McVeigh,
    918 F. Supp. 1467 (W.D. Okla. 1996) ............................................................ 15, 16

United States v. Means,
    409 F. Supp. 115 (D.N.D. 1976) ............................................................ 5

v

## TABLE OF AUTHORITIES (CONTINUED)

PAGE

United States v. Mitchell,
551 F.2d 1252 (D.C. Cir. 1976) ..................................................... 43

United States v. Moody,
762 F. Supp. 1485 (N.D. Ga. 1991) .............................................. 16

United States v. Myers,
635 F.2d 945 (2d Cir. 1980) ......................................................... 43

United States v. North,
713 F. Supp. 1444 (D.D.C. 1989) ........................................... 34, 43

United States v. O'Keefe,
722 F.2d 1175 (5th Cir. 1983) ................................................... 6, 11

United States v. Parker,
877 F.2d 327 (5th Cir. 1989) .................................................... 8, 11

United States v. Parr,
17 F.R.D. 512 (S.D. Tex. 1955) ................................................... 13

United States v. Partin,
320 F. Supp. 275 (E.D. La. 1970) ................................................. 5

United States v. Rewald,
889 F.2d 836 (9th Cir. 1989) ....................................................... 31

United States v. Ricardo,
619 F.2d 1124 (5th Cir. 1980) .................................................... 31

United States v. Rodriguez-Cardona,
924 F.2d 1148 (1st Cir. 1991) ..................................................... 42

United States v. Salameh,
1993 WL 364486 1 (S.D.N.Y. Sept. 15, 1993) .............................. 43

United States v. Smith-Bowman,
76 F.3d 634 (5th Cir. 1996) .......................................................... 7

United States v. Tokars,
839 F. Supp. 1578 (N.D. Ga. 1993) ............................................. 17

## <u>TABLE OF AUTHORITIES (CONTINUED)</u>

**PAGE**

<u>Wansley v. Miller,</u>
     353 F. Supp. 42 (E.D. Va. 1973) ..................................................................... 17

**STATE CASES**

<u>People v. Charles Manson,</u>
     61 Cal. App. 3d 102 (1976) ......................................................................... 21

**UNITED STATES CONSTITUTION**

U.S. Const., Amend. VI .................................................................................... 5

U.S. Const., Art. III ......................................................................................... 5

**FEDERAL STATUTES**

18 U.S.C. § 3771 (2004) ................................................................................... 6

**RULES**

Fed. R. Crim. P. 18 ......................................................................................... 5

Fed. R. Crim. P. 21(a) ..................................................................................... 6

**MISCELLANEOUS**

Wright, Federal Practice and Procedure, § 301 ........................................................... 5

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Crim. No. H-04-25 |
| | ) | |
| RICHARD A. CAUSEY, JEFFREY K. | ) | |
| SKILLING, and KENNETH L. LAY | ) | |
| | ) | |
| Defendants. | ) | |

## GOVERNMENT'S MEMORANDUM OF LAW IN RESPONSE TO DEFENDANTS' JOINT MOTION TO TRANSFER VENUE

### Preliminary Statement

The government respectfully submits this memorandum of law in response to Defendants' Motions to Transfer Venue ("Joint Motion"). Defendants seek to move their trial from Houston to Denver, Phoenix, Atlanta or New Orleans in light of pretrial publicity. This motion is without merit and should be denied.[1]

The United States Constitution, Federal Rules of Criminal Procedure, and the courts have established that trials, absent extraordinary circumstances not present here, are to be conducted in the district in which the crimes occurred. Accordingly, as the Fifth Circuit has explained, defendants face an "extremely heavy" burden to show that this case presents "extreme

---

[1] Wherever this case is tried, we respectfully submit that this Court should remain with the case. In view of the complexity of the multi-defendant indictment, the advanced stage of the case, and its lengthy procedural history with which this Court is familiar, it would be contrary to the interests of justice and a hardship on the parties for a new judge to be assigned in place of this Court, which has extensive knowledge of the case and prior proceedings.

circumstances" in which the Court must apply the "rarely applicable" presumption of juror prejudice, and that such prejudice renders obtaining a jury through the voir dire process "virtually impossible." The defendants fall far short of meeting this rigorous standard.

Defendants have selected singular facts from an otherwise distinguishable hodgepodge of cases and attempted to reconfigure them as a roadmap requiring the court to transfer venue. However, application of governing principles in this Circuit establish that venue in this district – the locus of the criminal acts – is proper. Indeed, judges in this district have found venue proper in other Enron-related trials time and again.

In a far more compelling test than a telephone survey embellished with expert opinions, the process of jury selection in the Andersen and Bayly trials demonstrates that even during peak periods of Enron pretrial publicity, fair and impartial juries can be empaneled efficiently by conducting a thorough and searching voir dire. Jurors in those cases, drawn from the large and diverse Houston division, demonstrated that Houstonians have been largely impervious to negative pretrial publicity: only a handful of prospective jurors in each case indicated that they were angry over the collapse of Enron or believed that the collapse involved criminal acts, and those jurors were readily excused from the jury venire. In each instance, a jury was selected in a single day, and the court successfully identified and excused for cause jurors unable to set aside prejudicial opinions or biases. The Bayly jury, in a trial branded by the press as the "first trial of Enron executives," proceeded dispassionately to dissect the evidence, to acquit a former Enron executive and to find separate and different sentencing enhancements for each of the convicted defendants who submitted these issues to the jury.

2

Press coverage of the collapse of Enron and of the instant case has not been inflammatory and prejudicial, as demonstrated even by defendants' handpicked collection of news items. The majority of the proffered examples of press coverage are objective, factual, and contain no mention of defendants by name. A good proportion of the coverage is of ordinary court proceedings and motion practice, and include myriad quotes from defense counsel for Skilling and Lay, who now move for a change of venue based on pretrial publicity. Furthermore, most of the cited coverage is not comprised of widely read front-page articles, but rather internal stories, internet postings, letters to the editor and other items of low or at best uncertain readership. Finally, as measured by defendants' citations in their moving papers, the most objectionable and vitriolic coverage occurred primarily in 2002, a passage of time recognized by this Circuit as fundamental to the consideration of venue transfer. More recently, defendants themselves have initiated substantial and favorable coverage, including pieces recounting defense press conferences and protestations of innocence.

Lacking a sound basis for claiming a poisoned media environment, defendant Skilling proffers survey results that merely confirm the evidence adduced from the voir dire conducted in Andersen and in Bayly: enormous numbers of Houston residents have scant knowledge of Skilling, much less negative sentiments that would disqualify the entire community from being able to provide twelve fair and impartial jurors and alternates. Approximately nine of ten respondents in a telephone survey failed to cite Skilling when asked to name all former Enron executives whom the respondents believed to have committed a crime; seven of ten could not summon even a single negative word about defendant Skilling, with most professing not to know

3

the name "Skilling" at all.  Defendants Causey and Lay have not even submitted polling results or any other data in support of their respective motions to transfer venue.

Surveys of potential jurors in different venues likewise provide no basis for a transfer and additionally demonstrate that media coverage for this case has been nationwide, even global. Enron was the nation's seventh largest corporation, with individual shareholders and institutional investors, such as pension funds, spread across the country and the world.  Accordingly, and not surprisingly, both the government and the defense have determined through polling that substantial numbers of jurors in multiple venues are familiar with the case.  Among those with knowledge about the case – a number that would increase dramatically with the inevitable eruption in local publicity accompanying a transfer of venue – at least as many potential jurors in defendants' favored venue of Phoenix as in Houston tentatively believe defendants are guilty.

Of course, the mere fact that more people have *heard* of the case in Houston is not a basis for exclusion.  The Constitution does not require a jury comprised of people who do not read the newspaper; it requires a jury of people who have not formed unshakeable opinions and will base their verdict on the evidence and the law.  Those who suffered directly from the fall of Enron, such as employees and significant shareholders, and who quite correctly stand to gain by way of restitution of their losses upon the defendant's conviction and forfeiture of ill-gotten gains, can be readily excluded from the jury through a jury questionnaire.  Accordingly, the government opposes a change of venue and believes that any improper biases in a venire from among Houston's 4.7 million citizens can be cured through voir dire, as it has in previous Enron-related prosecutions.

## ARGUMENT

I.  **THE EXTRAORDINARY STANDARD OF PRESUMED PREJUDICE JUSTIFYING A CHANGE OF VENUE**

A.  **Change of Venue from the District in Which the Crime Occurred Due to Pretrial Publicity is Granted Only in Extreme Circumstances Absent in This Case**

The United States Constitution, Federal Rules of Criminal Procedure, and the courts establish the principle that trials are to be held in the district where the offense was committed. See U.S. Const., Art. III ("The Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed . . . ."); U.S. Const., Amend. VI (all criminal trials are to be conducted "by an impartial jury of the State and district wherein the crime shall have been committed . . . ."); Fed. R. Crim. P. 18 ("Unless a statute or these rules permit otherwise, the government *must* prosecute an offense in a district where the offense was committed . . . with due regard for the convenience of the defendant and the witnesses, and the prompt administration of justice.") (emphasis added); United States v. Avants, 367 F.3d 433, 451-52 (5th Cir. 2004). Though founded on the defendant's right to a fair trial, considerations of venue extend to the interests of the community directly affected by the crime. See, e.g., United States v. Means, 409 F. Supp. 115, 117 (D.N.D. 1976) (citing Wright, Federal Practice and Procedure, § 341) ("The interest of a community that those charged with violations of its laws, be tried in that community, is not a matter to be case aside lightly. . . . [V]ery rarely, and only in extreme cases, is a Rule 21(a) motion to be granted.").[2]

_____

[2] As explained in Wright, venue in criminal cases involves "important considerations of policy, with deep historical roots, that cannot be ignored in determining where venue lies." Wright, Federal Practice and Procedure, § 301; see also United States v. Partin, 320 F. Supp. 275, 278 (E.D. La. 1970) ("Venue in criminal cases involves far more than mere procedural

However, a criminal defendant is entitled "to a fair and impartial jury which will render its verdict based on the evidence and arguments presented in court without being influenced by outside, irrelevant sources." United States v. Chagra, 669 F.2d 241, 249 (5th Cir. 1982).  Rule 21(a) of the Federal Rules of Criminal Procedure provides that a change of venue is appropriate if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a).  To justify transfer based on pre-trial publicity, the defendant shoulders the heavy burden of establishing that the publicity in essence displaced the judicial process, thereby denying the defendant his constitutional right to a fair trial.  See United States v. McVeigh, 153 F.3d 1166, 1181 (10th Cir. 1998) (citing Sheppard v. Maxwell, 384 U.S. 333, 342-45 (1966)).  Such a presumption generally has been applied "only in cases 'wherein the press saturated the community with sensationalized accounts of the crime and court proceedings, and was permitted to overrun the courtroom, transforming the trial into an event akin to a three-ring circus.'"  United States v. O'Keefe, 722 F.2d 1175, 1180 (5th Cir. 1983) (quoting United States v. Capo, 595 F.2d 1086, 1090-91 (5th Cir. 1979)).  The presumption thus does not apply where the "news accounts complained of are 'straight news stories rather than invidious articles which would tend to arouse ill will and vindictiveness.'"  O'Keefe, 722 F.2d at 1180 (quoting Calley v. Callaway, 519 F.2d 184, 206 (5th Cir. 1975)).

---

niceties; it is a matter of constitutional import.").  The policy considerations behind venue are substantial.  For example, victims of crime have "[t]he right not to be excluded from any [] public court proceeding . . . ." and "the court shall make every effort to permit the fullest attendance possible by the victim. . . ." 18 U.S.C. § 3771 (2004). Uprooting these proceedings and moving them to Phoenix, Denver, or Atlanta would force the victims to travel over 1000 miles.  This expense and hardship would prevent at least some of the victims from being able to exercise their right to be present at the proceedings.

As the Fifth Circuit has repeatedly explained, pretrial prejudice may only be presumed under "extreme circumstances."  See, e.g., Calley, 519 F.2d at 204 (5ᵗʰ Cir. 1975).  A showing of pervasive media coverage, extensive knowledge of the case, or even community prejudice will not support a transfer of venue; a defendant seeking transfer of venue must show that "prejudicial, inflammatory publicity so saturated the community jury pool as to render it virtually impossible to obtain an impartial jury."  See United States v. Smith-Bowman, 76 F.3d 634, 637 (5ᵗʰ Cir. 1996) (quoting United States v. Parker, 877 F.2d 327, 330 (5ᵗʰ Cir. 1989)); Capo, 595 F.2d at 1090 (defendants must demonstrate that "community prejudice actually invaded the jury box infecting the opinions of the prospective jurors.").

Given the long-standing Constitutional principle of trying criminal cases in the district in which the crime occurred, the Fifth Circuit has recognized that the "principle of presumptive juror prejudice is only 'rarely' applicable."[3]  Mayola v. Alabama, 623 F.2d 992, 997 (5ᵗʰ Cir. 1980) (noting the "rigorous path" that the defendant must travel to seek transfer of venue on the basis of pretrial publicity); accord Coleman v. Kemp, 778 F.2d 1487, 1537 (11ᵗʰ Cir. 1985) ("[T]he presumptive prejudice standard recognized in Rideau is only rarely applicable, and is reserved for an extreme situation.  In short, the burden placed upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one.") (quotations and citations omitted); Stafford v. Saffle, 34 F.3d 1557, 1566 (10ᵗʰ Cir.

---

[3] The "rarely applicable" standard is starkly demonstrated by defendants' survey of published and unpublished cases in which courts have found a change of venue warranted.  The defendants are able point to fewer than 30 such cases in the United States and its territories as far back as almost 50 years ago.  (Joint Motion at 9 -10 n.26).  Moreover, as discussed below, most of these cases presented situations clearly dissimilar to those here (e.g., violent crimes in small rural towns).

1994) ("[Defendant] must establish that 'an irrepressibly hostile attitude pervaded the

community.' This is a difficult standard, even in cases in which there has been extensive media

coverage . . . .") (quoting <u>United States v. Abello-Silva</u>, 948 F.2d 1168, 1176 (10th Cir. 1991));

<u>United States v. Cooper</u>, 464 F.2d 648, 655 (10th Cir. 1972) ("'[T]he mere fact of unfavorable

publicity does not of itself raise a presumption of prejudice . . . . The prejudice must have

manifested itself so as to corrupt due process.'") (quoting <u>Dennis v. United States</u>, 302 F.2d 5, 8

(10th Cir. 1962) (reversed on other grounds, 384 U.S. 855 (1966)).  As no jury has yet been

selected in this case, defendants bear the "extremely heavy" burden to show that this case

presents the "extreme circumstances" in which the court must apply the "rarely applicable"

presumption of juror prejudice, and that such prejudice renders obtaining a jury through the voir

dire process "virtually impossible."

   Defendants claim that courts "consistently" grant venue motions under Rule 21 when a

list of fourteen facts are present, all of which, defendants claim, are present in this case.  (Joint

Motion at 10-12).  This claim is contrary to the approach courts employ to analyze venue

motions and is patently misleading.  First, the district court is vested with "substantial discretion"

regarding transfer of venue, based on a consideration of *all* facts specific to *each* case.  <u>See</u> <u>Irvin</u>

<u>v. Dowd</u>, 366 U.S. 717, 721 (1961) ("necessity for transfer will depend upon the totality of the

surrounding facts"); <u>Calley</u>, 519 F.2d at 204 ("each case must turn on its special facts") (quoting

<u>Marshall v. United States</u>, 360 U.S. 310, 312 (1959)); <u>Parker</u>, 877 F.2d at 330 ("The rule vests

substantial discretion in the district court as to the granting or denying of such a motion . . . .").

The Supreme Court and Fifth Circuit have rarely found a transfer of venue justified by pretrial

publicity, and those cases in which transfer has been granted have been based upon extreme factors, none of which is present here.

Defendants rely principally on language deriving from <u>Rideau v. Louisiana</u>, 373 U.S. 723 (1963) and <u>Sheppard v. Maxwell</u>, 384 U.S. 333 (1966). (<u>See</u> Joint Motion at 7-8). These decisions involved state courts allowing trials to proceed in the locale of the crime under egregious circumstances wholly absent this case. In <u>Rideau</u>, the defendant confessed to robbing a bank in a small parish in Louisiana, kidnaping three of its employees, and killing one of them. This videotaped confession, which lasted approximately twenty minutes, was broadcast three times by a local television news station days after the murder and was seen, respectively, by 24,000, 53,000, and 29,000 people in the community of 150,000 where the crime had occurred. <u>Rideau</u>, 373 U.S. at 724. The defendant's motion for a change of venue was denied, and he was convicted by a jury that included two deputy sheriffs. <u>Id</u>. at 725. Characterizing the trial as a "kangaroo court proceeding[]," the Supreme Court held that the failure to change venue violated the defendant's due process rights. <u>Id</u>. at 727. The spectacle of the televised confession "to the tens of thousands of people who saw and heard it, in a very real sense was Rideau's trial -- at which he pleaded guilty. Any subsequent proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." <u>Id.</u> at 726. In stark contrast to a case involving repeated airing of a confession to a series of brutal crimes in a small community prior to a "kangaroo court proceeding," defendants Skilling and Lay have vigorously and publicly refuted accusations of criminal wrongdoing within a division of 4.7 million persons. <u>See</u> discussion at <u>infra</u> section II.B.

Defendants' reliance on Sheppard is similarly unavailing. The Sheppard case involved the prosecution of Dr. Sam Sheppard for the murder of his pregnant wife. Newspaper articles and editorials excoriated the defendant as a murderer and called for him to be taken to jail immediately. The media not only orchestrated public denunciation of the defendant but also was allowed to interfere with the trial itself. Sheppard, 384 U.S. at 342-43. "Newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially Sheppard." Id. at 355. Reporters were even allowed to sit inside the bar of the court, making confidential exchanges between the defendant and his counsel almost impossible during the proceedings. Id. at 343. The Supreme Court found that "bedlam reigned at the courthouse," id. at 355, and that the trial court's failure "to control disruptive influences in the courtroom" required reversal. Id. at 363. The government is confident that no such "bedlam" or "kangaroo court proceeding" will be permitted during this trial. Indeed, the Fifth Circuit has recognized explicitly that pretrial publicity "creates a smaller danger of prejudice than does sensationalism occurring throughout a proceeding," United States v. Dozier, 672 F.2d 531, 546 (5th Cir. 1982), as was the case in Sheppard.

The Fifth Circuit has recognized the rarity of venue transfers based on pretrial publicity, noting the limitations of the Rideau and Sheppard holdings to their particular facts. See, e.g., Mayola, 623 F.2d at 997 (noting that the only case in which the Supreme Court has ever reversed a state conviction solely on the basis of improper venue from pretrial publicity is Rideau itself, the case setting forth the standard, and that only one case since Rideau has applied the standard to grant habeas corpus relief to a state prisoner); see also McVeigh, 153 F.3d at 1181 ("Indeed,

despite the proliferation of the news media and its technology, the Supreme Court has not found

a single case of presumed prejudice in this country since the watershed case of Sheppard.").

The Fifth Circuit also has repeatedly underscored the rarity of presumed prejudice and

found that venue was properly not transferred despite pretrial publicity much more graphic and

prejudicial than that presented here.[4]  For example, in Mayola, a defendant was charged in

_____

[4] See, e.g., Bearden v. United States, 320 F.2d 99 (5th Cir. 1963) (denial of transfer of
venue based on pretrial publicity where defendant used a firearm to hijack an airplane, with live
television coverage of the attempted take-off of the aircraft, followed by defendant's arrest,
which had been viewed by the venire either on television or in person); Murphy v. Florida, 495
F.2d 553 (5th Cir. 1974) (affirming denial of transfer of venue where there was extensive pretrial
publicity of defendant's prior convictions for the Whiskey Creek Murders the year before and for
his theft of the 'Star of India' Sapphire from the New York Museum of Natural History, and
where all of the jurors selected were aware of one of these highly-publicized convictions and
most had heard media accounts of the present case, but jurors assured their impartiality through
the voir dire process); United States v. Capo, 595 F.2d 1086, 1089-92 (5th Cir. 1979) (defendant
charged with drug possession, where an estimated 90% of prospective jurors were aware of
separate charges against defendant in highly publicized "sinkhole murders," the facts of which
were inadmissible at his present drug trial, but local television station had broadcast 120 reports
linking the two charges, each reaching over 200,000 people, and each juror selected had some
knowledge of the sinkhole murders; court found voir dire process "produced a fair and
disinterested panel of jurors" and affirmed denial of venue transfer); United States v. Dozier, 672
F.2d 531, 545-46 (5th Cir. 1982) (no transfer of venue warranted where three-fourths of venire
were familiar with charges against defendant, who was an elected official charged with bribery
and racketeering, because "detection of actual prejudice is not accomplished through juggling
statistics, nor is a prospective juror's mere awareness of the allegations or facts to be presented
conclusive of his or her unfitness.  Our focus must rest upon a juror's willingness and ability to
put aside any preconceived notions of guilt or innocence and return a verdict based strictly on
admissible evidence."); United States v. Harrelson, 754 F.2d 1153, 1159-60 (5th Cir. 1985) (no
venue change in prosecution of the murder of United States District Judge John H. Wood, Jr.);
United States v. O'Keefe, 722 F.2d 1175, 1180 (5th Cir. 1983) (denial of transfer of venue based
on pretrial publicity for state senator charged with mail fraud and obstruction); United States v.
Malmay, 671 F.2d 869 (5th Cir. 1982) (denial of intradistrict transfer of venue even though polls
showed that almost half of those surveyed felt the charges were true, but jurors who showed any
prejudice from pretrial publicity were excluded in voir dire); Bronstein v. Wainwright, 646 F.2d
1048, 1051 (5th Cir. 1981) (denial of transfer of venue based on inflammatory pretrial publicity
where proper voir dire excluded jurors with any prejudice from such publicity); United States v.
Parker, 877 F.2d 327, 330 (5th Cir. 1989) (denial of transfer of venue in white slavery prosecution
despite defendant's showing that the case received extensive pretrial publicity, because the

Oneonta, Alabama with the kidnaping and murder of an 11-year-old boy.  623 F.2d at 997.

Newspapers recounted graphic confessions of the defendant, published erroneous reports that the

boy was sexually assaulted and mutilated and announced the defendant's prior conviction for

sodomy.  Id. at 997-98.  Emphasizing that presumed prejudice is only "rarely applicable" and in

"extreme situations," the Fifth Circuit denied relief.  Id. at 996.  Although the court found that

the publicity "certainly was prejudicial and may very well have been sufficiently so," the

defendant "failed to prove that the prejudicial newspaper coverage so saturated and tainted the

Blount County populace that any subsequent proceeding in that county would have been

unavoidably poisoned by it."  Id. at 998.

Similarly, the Fifth Circuit found no due process violation despite the extensive pretrial

publicity in the prosecution of Lieutenant William Calley for his role in the My Lai massacre.

Calley v. Callaway, 519 F.2d 184, 204 (5th Cir. 1975).  In Calley, the "massive" and "intense"

pretrial publicity was demonstrated in the record by volumes of clippings, reports, extracts, and

television broadcasts.  Id. at 205.  The district court found that defendant Calley had been so

persecuted by the media and the prejudicial revelations about the incident that a fair and unbiased

hearing was impossible.  The district judge concluded that "it was not humanly possible for the

jurors not to be improperly influenced by prior exposure," and that "[n]o person, however honest

minded he might try to be, could avoid the lasting emotional impact."  Id. at 204-05.  The Fifth

Circuit reversed, holding that pretrial publicity did not deprive defendant of a fair trial.  Id. at

205.  In so ruling, the Fifth Circuit noted that a great part of the publicity surrounding the

---

publicity did not involve a confession or criminal record and defendant had "not demonstrated
that this publicity was in excess of the sensationalism inherent in the crime or that pervasive
community prejudice resulted from this publicity").

incident was in November and December of 1969, while the trial commenced almost one year

later in November 1970, after the peak of publicity. Id. at 208. Moreover, not all of the publicity

was adverse to the defendant and many reports consisted of objective facts about the My Lai

incident or the war in Vietnam. Id. at 206. Finally, the court found that venue was proper

because of the judge's "searching and sensitively conducted voir dire." Id. at 208. Thus the Fifth

Circuit held that the prejudicial publicity noted by the district court did not render it impossible

to find fair and impartial jurors Id. at 208-09 (concluding that "there have been a few cases

which have equated pretrial exposure with prejudice, but this is not such a case."). The instant

case obviously involves less heinous acts and, as demonstrated infra at section II.B., the publicity

has been mixed, has included defendants' vigorous denials of culpability, and is two years

removed from its peak.

Tellingly, defendants are able to point to only one case in this district in which a court has

held that transfer of venue was warranted based on pretrial publicity: Johnson v. Beto, 337 F.

Supp. 1371 (S.D. Tex. 1972), a habeas corpus action involving a highly inflammatory and

racially charged atmosphere coupled with a grossly disproportionate sentence at the conclusion

of the proceedings. (Joint Motion at 9 n.26).[5] The defendant in Johnson was convicted of the

sale of a small amount of marijuana and was sentenced to 30 years imprisonment. Extensive

_____

[5] Defendant also cites two cases emanating from this district which did not involve Rule
21 transfer of venue. Pamplin v. Mason, 364 F.2d 1, 7 (5th Cir. 1966) (faulting the state court for
denying the defendant a hearing on venue, expressly stating that the court "[did] not decide
whether the petitioner [was] entitled to a change in venue."); United States v. Parr, 17 F.R.D. 512
(S.D. Tex.1955) (tax fraud case emanating from the Corpus Christi Division in the 1950s, in
which the court engaged in little analysis but noted that pretrial publicity associated defendant
with the killing of a young man and that the case was enmeshed in "political controversy"; this
case did not involve a change of venue but rather an intra-district transfer to the Laredo
Division).

pretrial publicity centered upon defendant's leadership role in "racially-oriented" militant activities and demonstrations. Specifically, defendant was closely associated with a widely publicized race riot at Texas Southern University ("TSU"), which had resulted in the death of a Houston police officer. Defendant had been in jail on another charge at the time of the riot and therefore was not charged for that crime, but five others were charged and the District Attorney for Harris County and the Houston Bar Association made the unprecedented decision to file a motion requesting a hearing on change of venue in that case due to the intense publicity. Defendant's organization was reported as the cause of the riot and defendant was named as a "hard-core militant." Id. at 1373-74.

Moreover, the Mayor of Houston testified at a hearing in Johnson that the defendant's many speeches in the months prior to his trial were highly inflammatory to numerous white citizens of Houston and that demonstrations against defendant had been held in response. The District Attorney similarly testified that defendant had a reputation in the community as a dangerous black militant who was associated as much as any other person with the TSU race riot, which had received as much publicity as any other case of which he was aware. The District Attorney stated that the TSU riot trial was the only case in which his office and the Houston Bar Association had requested a hearing on change of venue because of possible prejudice to the accused. In deciding that a new trial was warranted, the Johnson court noted that the trial court failed to employ any of the recognized safeguards in voir dire to insure a fair trial, and underscored defendant's "unduly severe sentence" of 30 years as indicia of the "community's climate of opinion at the time." Id. at 1378-79. The case at bar bears no resemblance to this collateral attack on a racially-charged trial resulting in a grossly disproportionate sentence.

14

Finding no support in the Supreme Court or Fifth Circuit, defendants attempt to liken their case to the Oklahoma City bombing case, United States v. McVeigh, 918 F. Supp. 1467 (W.D. Okla. 1996). The bombing of the Alfred P. Murrah Federal Office Building in Oklahoma City, which resulted in the deaths of 168 men, women, and children, was perceived as an "Oklahoma tragedy" in which every citizen of Oklahoma had a stake. The horror of the deaths of numerous infants and toddlers in the day care center permeated the public psyche. The relentless nationwide media coverage of the Oklahoma City bombing event was eclipsed only by the comparable disasters at the World Trade Center in New York and the Pentagon in Washington, D.C. on September 11, 2001. The ensuing manhunt and pretrial publicity focused almost exclusively on McVeigh and Nichols. The federal courthouse in Oklahoma City was itself damaged by the blast, and the judges in the Western District of Oklahoma were recused from the case, necessitating not only a transfer of venue but a transfer to a judge from another judicial district. Id. at 1469-72. In light of this extreme situation, the prosecution agreed that venue was not appropriate in the Western District of Oklahoma and requested transfer to Tulsa, Oklahoma. Id. at 1470.[6] In addition, the fact that a successful prosecution of McVeigh could result in the imposition of the death sentence clearly played a part in the reasoning of the district court, which was concerned that a community suffering from such massive loss of life might be predisposed to return a verdict of death. See, e.g., McVeigh, 918 F. Supp. at 1473-74 ("Because the penalty of death is by its very nature different from all other punishments in that it is final and irrevocable,

_____

[6]In an apparent attempt to analogize McVeigh with this case, defendant Skilling cites the recusal of the Houston Office of the United States Attorney as a reason for transfer of venue. See Joint Motion at 62. This recusal, however, has no specific connection with the instant case, and preceded the indictment of all cases related to the collapse of Enron, including those in which defendants have repeatedly and unsuccessfully moved for change of venue.

15

the issue of prejudice raised by the present motions must include consideration of whether there is a showing of a predilection toward that penalty.").

Given this extreme fact pattern, the defendants' repeated attempts to analogize Houston's experience in the Enron case with Oklahoma City's experience of "survival and recovery from [] tragedy" in the Oklahoma bombing case is not persuasive. (Defendants' Motion at 7, 11-13, 30, 32, 60, 62, 63 and corresponding footnotes); see McVeigh, 918 F. Supp. at 1471-72 (noting that "[t]he tragic sense is heightened by the deaths of infants and very young children in the day care center" leading to shouts of "murderer" and "baby killer" from an angry crowd after McVeigh's arrest) . The defendants in the instant case have not and cannot come anywhere close to demonstrating this type of extreme circumstance, which is essential if they are to defeat the presumption that venue is appropriate in this District.  Economic loss, while serious, cannot compare to the senseless loss of lives of men, women and children due to an act of domestic terrorism, which damaged the very courthouse in which the defendant would otherwise be tried.

The remainder of defendant's purported authority represents a hodgepodge of extra-circuit decisions, consisting largely of violent, horrific crimes, unlike the case presented here.[7]

---

[7] See, e.g., Nevers v. Killinger, 990 F. Supp. 844 (E.D. Mich. 1997) (beating death of black suspect by white police officer, where the pretrial publicity included prejudicial statements by the city's popular mayor and police chief that the police officer had murdered the suspect, inadmissible evidence such as police squad deaths of 17 other young black men, press warnings of the danger of riots in the aftermath of an acquittal, and where there was no time gap between pretrial publicity and trial); United States v. Ebens, 654 F. Supp. 144 (E.D. Mich. 1987) (Chinese-American beaten to death with baseball bat, for which defendants received sentence of probation after which rallies were held and a day of mourning declared by public officials, resulting in trial of defendants on federal civil rights charges); United States v. Moody, 762 F. Supp. 1485 (N.D. Ga. 1991) (multiple murders from mail bombing of Eleventh Circuit Court of Appeals Judge, city alderman, and civil rights attorney, where pretrial publicity included defendant's criminal record, conviction for obstruction, and prior insanity defense); United States v. Engleman, 489 F. Supp. 48 (E.D. Mo. 1980) (capital murder from bombing with published

For example, <u>Coleman v. Kemp</u>, 778 F.2d 1487 (11th Cir. 1985) (cited in Joint Motion at 9-10, 12, 33, 44-45, 48, 54, 55-56, 58, 64 and corresponding footnotes), involved a capital multiple-murder and rape case in rural Georgia where the defendant was convicted in the brutal murder of six family members.  In finding that the defendant's showing of adverse pretrial publicity was sufficient to entitle him to a presumption of prejudice, the court cited the small community – population 7,059 – which was the audience for press accounts that included graphic details of the crime, members of law enforcement pronouncing the defendant's guilt, and a jury pool that included friends of the murdered family.  <u>Coleman</u>, 778 F.2d at 1539.  Such factual patterns have no relationship to the case at bar, which involves primarily securities fraud and mail fraud charges and attendant publicity on a national basis.

**B.      Change of Venue Is Not Justified in Climate of Intense Pretrial Publicity When, As in Previous Enron-Related Cases, Fair and Impartial Juries May Be Selected With Appropriate Voir Dire**

Largely absent from defendants' exhaustive survey and discussion are closely analogous Enron cases in which defendants have raised similar claims.  Three Houston district courts have previously rejected arguments urging presumptive juror prejudice based on pretrial publicity

---

reports of a confession and the prosecutor seeking the death penalty); <u>United States v. Tokars</u>, 839 F. Supp. 1578 (N.D. Ga. 1993) (former Assistant District Attorney charged with arranging wife's murder and co-defendant alleged to have tortured and tried to kill an alleged member of a drug ring, where pretrial publicity included interview of individual who claimed to have murdered the wife at the request of defendant, but who was not, in fact, the murderer to testify at trial); <u>United States ex. Rel. Bloeth v. Denno</u>, 313 F.2d 364 (2d Cir. 1963) (multiple murders where pretrial publicity included statements from defense counsel prosecutor and others regarding defendant's confession, failed lie detector test, contemplated insanity defense, and death penalty); <u>Wansley v. Miller</u>, 353 F. Supp. 42 (E.D. Va. 1973) (black defendant charged with rape of married white woman in Lynchburg, Virginia, where pretrial publicity included consistent reference to defendant as twice-convicted rapist – although the convictions had been set aside – and reports of Communist affiliations of defense counsel).  (Defendants' Motion at 9-12).

regarding the collapse of Enron.  In the case of <u>United States v. Lea Fastow</u>, 292 F. Supp. 2d 914

(S.D. Tex. 2003), Judge David Hittner rejected claims that excessive publicity regarding the

collapse of Enron had so affected the Houston community as to prevent the selection of an

impartial jury.  The court found that defendant Lea Fastow, the wife of former Enron Chief

Financial Officer Andrew S. Fastow, had not met the burden of demonstrating pretrial publicity

so inflammatory as to establish a presumption of prejudice, and noted that any community

prejudice could be dealt with in jury selection, which would necessarily draw upon the large

Houston metropolitan area.  <u>Id</u>. at 919.[8]

Likewise, in <u>United States v. Joseph Hirko, et al.</u> (H-03-0093), Judge Vanessa Gilmore

on November 26, 2004 rejected similar claims of presumed prejudice based on allegations of

excessive publicity and data indicating that 80% of Houstonians believe that accused Enron

executives must be guilty.  <u>See</u> Order, Government's Exhibit ("Govt. Exh.") 3.  The court found

---

[8]Judge Hittner subsequently ordered an intradistrict transfer from Houston to
Brownsville, Texas, <u>sua sponte</u> after Lea Fastow entered and then withdrew a plea of guilty.  The
protracted proceedings surrounding Lea Fastow's guilty plea engendered enormous publicity
over a period of months because her plea agreement was related to that of her husband Andrew S.
Fastow, who had just agreed to cooperate with the government but had not yet pled guilty.  In
January 2004, Judge Hittner refused to allow Lea Fastow to enter a guilty plea and instead
directed counsel to meet prospective jurors who had assembled in the courthouse to pick up jury
questionnaires.  Several days later, after the jurors filled out the questionnaires, Judge Hittner
allowed Lea Fastow to enter a guilty plea, and reserved ruling until sentencing as to whether the
Court would accept the plea agreement.  Lea and Andrew Fastow both entered guilty pleas on
January 14, 2004.  On the day of Lea Fastow's sentencing in April 2004, Judge Hittner rejected
the plea agreement and Lea Fastow withdrew her plea of guilty under Rule 11(e)(4).  At this
point, there had been blanket media coverage of Lea Fastow's confession of guilt through her
plea allocution, which would have been inadmissible at her trial.  Therefore, Judge Hittner
transferred venue to Brownsville.  The parties renegotiated the plea agreement, and Lea Fastow
pled guilty again and was sentenced on May 7, 2004.  Thus, the intradistrict transfer of Lea
Fastow's case was based on facts starkly different from those of this case, in that a sufficiently-
publicized inadmissible confession is a permissible basis for transferring venue.  <u>See</u> <u>Irvin v.</u>
<u>Dowd</u>, 366 U.S. 717, 724 & 726-27 (1961).

that much of the Enron media coverage did not cite the case or the defendants themselves, see id. at 5, was comprised of "'straight news stories,'" id. at 6 (quoting Calley, 519 F.2d at 206), and otherwise lacked the hallmarks of prejudicial publicity found most commonly in cases involving heinous crimes in small venues.  Id.  Additionally, defendants failed to demonstrate the possibility of improving the quality of jury selection by citing surveys of other cities showing differences in citizen awareness of Enron ranging from merely 67% to 81%.  Id. at 6-7.  Judge Gilmore therefore found that use of appropriate jury selection safeguards including a detailed juror questionnaire with a jury pool drawn from the large and diverse Houston division would result in the impanelment of a fair and impartial jury pool.  Id. at 8.[9]

## II.   A FAIR AND IMPARTIAL JURY CAN BE EMPANELED IN THIS CASE

To date, fair and impartial juries have been selected in two Enron-related trials during peak periods of pretrial publicity.  In each instance, the court employed a questionnaire and conducted a thorough but efficient voir dire.  From the diverse and large pool of jurors available in the Houston Division, the parties in each case completed jury selection in a single day.  The voir dire process in both the Andersen and Bayly trials provides direct evidence that a similar process may be successfully employed in this case.

---

[9]Although Arthur Andersen at no time moved to transfer venue, Judge Melinda Harmon rejected Arthur Andersen's oral motion requesting a special hearing on pretrial publicity. See Govt. Exh. 4 (April 26, 2002 Minute Order, United States v. Arthur Andersen, Crim. No. H-02-0121).  The correctness of this decision was shown when a fair and impartial jury was empaneled.  The defendant did not appeal this issue.  See United States v. Arthur Andersen, LLP, 374 F.3d 281 (5th Cir. 2004).

No defendant in Bayly moved to transfer venue.  The fact that no defendant challenged the panel or moved for transfer of venue at any time confirms the impanelment of a fair and impartial jury in that case.

A. **The <u>Andersen</u> and <u>Bayly</u> trials Demonstrate that a Large Metropolitan Area Such as the Houston Division Ameliorates the Effect of Extensive Publicity Regarding Enron**

1. <u>Houston's Large and Diverse Division Readily Absorbs Extensive Pretrial Publicity and Permits the Selection of a Fair and Impartial Jury</u>

A large metropolitan area such as the Houston Division provides a large jury pool from which to draw and can more readily absorb extensive publicity. Courts have long held that in large metropolitan areas, prejudicial publicity is less likely to endanger a defendant's right to a fair trial. <u>Columbia Broadcasting Systems, Inc. v. U.S. District Court for the Central District of California,</u> 729 F.2d 1174, 1181 (9th Cir. 1984). As the Ninth Circuit explained:

> [I]n a populous metropolitan area, the pool of potential jurors is so large that even in cases attracting extensive and inflammatory publicity, it is usually possible to find an adequate number of untainted jurors. The case of former Attorney General John Mitchell, for instance, was very heavily publicized in Washington, D.C., where the trial was held, and a private study conducted by Mr. Mitchell's attorney's revealed that 84% of those who had heard of the case thought Mr. Mitchell guilty. Yet, Mr. Mitchell was eventually acquitted.

<u>Id</u>. at 1181 (citation omitted).[10]

The Houston Division has a potential jury pool of over 4.5 million people. Houston is the fourth-largest city in the United States, with a vast potential jury pool of 2,009,834 residents,

---

[10] As the Ninth Circuit noted in language directly applicable here:

> In a large metropolitan area such as Los Angeles, with its millions of potential jurors, it is unlikely that searching questions of prospective jurors . . . to screen out those with fixed opinions as to guilt or innocence and 'the use of emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court,' will fail to produce an unbiased jury . . . .

<u>Associated Press v. U.S. District Court for the Central District of California,</u> 705 F.2d 1143, 1146 (9th Cir. 1983) (discussing pretrial publicity in the John DeLorean prosecution) (citation omitted).

20

according to current estimates of the U.S. Census Bureau.  See Govt. Exh. 5 (U.S. Census Bureau Press Release, July 10, 2003, "Large Suburban Cities in West Are Fastest-Growing, Census Bureau Reports").  The Houston Division is comprised not only of Houston and Harris County (3.5 million people), but several other counties with a total population of over 1 million.  This pool is large enough to yield twelve fair and impartial jurors.  There is certainly little reason to **presume** that a fair and impartial jury cannot be drawn from this significant and diverse jury pool.  See Associated Press v. U.S. District Court for the Central District of California, 705 F.2d 1143, 1146 (9th Cir. 1983) (large metropolitan area of Los Angeles likely to produce unbiased jury); People v. Charles Manson, 61 Cal. App. 3d 102, 190 (1976) ("[a] metropolitan setting with its diverse population tends to blunt the penetrating effect of publicity").

2.     The Arthur Andersen Trial Court Successfully Mitigated Extensive<br>Pretrial Publicity by Conducting a Searching and Thorough Voir Dire

The extraordinarily large jury pool explains in part the relative ease by which impartial and fair juries were selected in the first two Enron-related trials.  The Arthur Andersen trial commenced on May 6, 2002, less than six months after Enron's bankruptcy and in the midst of intense media coverage of the Enron collapse and its causes.  See Declaration of David A. Zagorski ("Zagorski Decl.") at ¶ 15.  As shown even in some of defendant Skilling's selected news clippings, Arthur Andersen was frequently portrayed as a contributor to Enron's collapse, an entity from which victims might seek restitution as well as a means for obtaining justice.[11]

---

[11]See, e.g., Marroso Decl., Exh. 49 (in article entitled, "Living in a House of Cards: Rank and File employees suspected something was wrong at Enron.  Now they want someone to pay," describes current congressional inquiry "on the actions of Lay, Fastow and Skilling; the company's auditor, Arthur Andersen LLP, which was indicted March 14 on federal charges of obstructing justice . . ." and later quotes a former employee stating that she "wants money" from Arthur Andersen, Vinson & Elkins, Jeff Skilling, Andy Fastow, the Board of Directors, and "I

Judge Melinda Harmon assembled a venire of 300 potential jurors for the trial of Arthur

Andersen.  See Govt. Exh. 1, Transcript of Jury Voir Dire, United States v. Arthur Andersen,

LLP, May 6, 2002.  To aid voir dire, each of the jurors completed a lengthy questionnaire

prepared by both the government and defense that asked numerous questions regarding, among

other things, sources of knowledge about the case, and whether or not the prospective juror, a

family member or friend (1) had been employed with Enron, (2) had been employed by a

company affected by Enron's financial difficulties or the layoffs of Enron employees, (3) had

ever owned stock in Enron, (4) had lost a job or money as a result of Enron's financial

difficulties.  The questionnaire additionally asked about any opinion the prospective juror may

have formed about the conduct of Enron, or any person or entity connected to Enron.  After each

such question, the prospective juror was required to state whether the juror could "impartially

consider evidence presented about Enron and its directors, officers and other present and former

employees."  See Govt. Exh. 8 (Joint Submission of Proposed Juror Questionnaire).

Having already denied defendant's motion for change of venue, Judge Harmon

nonetheless acknowledged the venire's exposure to extremely high levels of pretrial publicity:

"this case has gotten so much publicity that you've obviously heard something about it."  Id. at

28-29.  In later ordering selected jurors to neither read or listen to any news coverage whatsoever,

---

want somebody to go to jail."); Exh. 55 (article describing satirical Gridiron Show quotes
producer as stating, "We are definitely highlighting Ken Lay and his top management, as well as
Arthur Andersen's role in the scandal . . . We are jabbing them pretty hard"); Exh. 218 (quoting
former employee as stating, "Andy Fastow, Jeff Skilling, Arthur Andersen, Vinson & Elkins – I
blame them all for the collapse").  See also Govt. Exh. 6 (headline: "THE FALL OF ENRON /
Snowball Effect in Enron Case? / Andersen Indictment May Pay Many Dividends to
Prosecutors"); Govt. Exh. 7 (describing Enron's request for removal of Andersen partner who
"raised serious questions about Enron's finances").

Judge Harmon explained, "Do whatever it is to get away from media coverage.  And I'm saying that because . . . this case has been so covered by the media that we don't know.  It could be in the Lifestyle section, as well as the business page or the front page and it could be during some kind of interview with someone and Katie Couric could be doing a human interest [story] on somebody." Id. at 32.

The defense in voir dire explored the public perception that the Andersen trial concerned events inextricably intertwined with the collapse of Enron: "this is the whole Enron event.  No secret that everybody – I mean, there's so many people in this city that were tremendously affected by it, have been and will be." Id. at 87.  Like defendants Skilling and Causey, counsel for Andersen was clearly concerned that the impact of the collapse on the Houston population affected the venire: "So, we have this tremendous event that's had an incredible impact on our community.  All of you are from this community.  Now, the question is, is whether you, because of people close to you, because of friends . . . how many of you are angry about what happened in the Enron matter?" Id. at 98.  Despite the fact that trial was commencing during a peak of the media's attention to the nature, causes and victims of Enron's collapse, only twelve of 300 indicated that they were angry.  Id. at 99; see Zagorski Decl. at ¶ 15.  Upon further questioning of these twelve, most indicated that they could serve as fair and impartial jurors.  Id. at 100-30.

The Court conducted individual voir dire primarily devoted to those jurors who had indicated exposure to media coverage involving Arthur Andersen and Enron.  Id. at 141-246.  Jurors who were exposed to publicity almost uniformly believed that the news coverage would not affect their ability to serve as fair and impartial jurors.  Id.  The Court struck for cause the

few jurors who indicated that they were unable to put aside feelings of prejudice arising from pretrial publicity.  See id. at 174-77, (juror no. 40), 194 (juror no. 57).

After dismissing jurors for reasons of hardship, the Court identified 38 jurors that neither the government nor the defense had struck for cause.  See id. at 275.  Although the Court had ordered a venire of 300, the parties required only the first 130 members of the venire to obtain a sufficient number of jurors for purposes of exercising their respective peremptory strikes.  The Court needed only a single day to seat a fair and impartial jury during the peak of Enron media attention.

3.      The Bayly Trial Court Selected a Fair and Impartial Jury Which Carefully Rendered Individual Justice

The recently concluded trial of United States v. Daniel Bayly, et al. (H-CR-03-363), accused Enron and Merrill Lynch executives of conspiring to allow Enron improperly to record earnings and cash flow in connection with the Nigerian Barge transaction and thus make Enron appear more profitable than it was in 1999.  As clearly shown in defendant Skilling's sampling of media coverage, the Bayly case was routinely referred to as the "first Enron criminal trial."  See Marroso Decl., Exh. 20 ("the first Enron criminal trial"); Exh. 236 ("the first Enron criminal trial"); Exh. 237 ("the first Enron criminal trial"); Exh. 252 ("the first Enron criminal trial"); Exh. 287 ("the first Enron criminal trial"); Exh. 288 ("the first Enron criminal trial").  The media repeatedly highlighted the fact that the trial involved former "Enron executives," see id. at Exh. 99 ("the first criminal trial involving former executives" of Enron); Exh. 292 ("the first criminal trial against former executives of the fallen energy trader"); Govt. Exh. 9 (headline: "Former Enron Executives headed to trial today"); Govt. Exh. 10 ( "first trial of Enron executives"), a fact

24

that Judge Ewing Werlein, Jr. underscored in his summary of the case during voir dire.  Govt.

Exh. 1 at 62-63 ("The United States in this case has charged certain executives, employees of

two separate companies, Enron and Merrill Lynch, with conspiring to violate federal law and

wire fraud.").  In addition, the media often cast the trial as a litmus test of the cases against

defendants Skilling, Causey and Lay.  See, e.g., Marroso Exh. 252 ("the first test of its

accusations . . . against others at Enron, including former Chairman Ken Lay and ex-CEO Jeff

Skilling"); Exh. 255 ("This was the first time a jury had heard evidence in a criminal case

involving Enron . . . . That is bad news for former Enron Chairman Ken Lay and former CEO

Jeff Skilling"); Exh. 287 ("This is the first acid test for the government . . . . Prosecutors will trot

out their stable of cooperating witnesses, and the lawyers for all the defendants awaiting trial will

be watching closely").  Counsel for Skilling and Lay were in attendance throughout much of the

trial, and spoke to reporters who then featured quotes from them in the coverage of the Bayly

case.  See Govt. Exh. 11 (noting presence of counsel for Lay and Skilling; quotations from

Skilling counsel).

Despite its billing as the "first Enron trial" involving "Enron executives," and the "first

test of accusations" against defendants Lay and Skilling, Judge Ewing Werlein, Jr. presided over

the selection of a jury in a single day with the use of questionnaires previously distributed to the

venire.  Beginning with a venire of 150, counsel for the government and the defense agreed to

excuse for cause 28 potential jurors based on their answers to three questions regarding, among

other things (1) whether respondent, a family member or close friend had ever been employed by

Enron; (2) whether respondent, a family member or close friend owned Enron stock or

participated in a retirement plan or 401-K plan that owned Enron stock at any time in the past ten

25

years; and (3) whether respondent, a family member or personal acquaintance was negatively

affected as a result of either the Enron bankruptcy or the fact that Arthur Andersen ceased doing

business.  See Govt. Exh. 12 (Supplemental Juror Questionnaire); Govt. Exh. 2 (Transcript of

voir dire) at 6, 28 - 57.

The Court repeatedly probed for, and identified only a smattering of jurors possessing any

formed opinions regarding general criminal wrongdoing at Enron.  Early in the voir dire, the

Court acknowledged to the venire the extensive media coverage of Enron-related matters:

> [I]f I were to ask you if you had read or heard or seen anything about the bankruptcy of
> Enron Corporation or the closure of the accounting firm of Arthur Andersen in the past
> three years or so, I imagine that just about all of you would have read or heard or seen
> something about some of those events that have been widely and publicly reported.
> That's not surprising.  We expect when citizens come down to serve on juries, that they
> don't come from out of some hole somewhere; but they come with the kind of ordinary
> knowledge that people acquire in the community.

Govt. Exh. 2 at 99-100.  Subsequently, the Court asked whether any juror had "an opinion about

the guilt or innocence of any of these six charged persons in this case simply because the charges

in some way relate to Enron Corporation?"  Id. at 103.  Two jurors affirmatively responded.  Id.

at 104-05.  To further identify possible prejudice, the Court presented the panel with a long list of

potential party witnesses that included Causey, Skilling and Fastow.  Id. at 104-06.  Only one

juror professed any acquaintance with or knowledge of the listed persons, and that juror was later

excused for cause when she identified a "sense of favor" toward Causey.  Id. at 223-26.  Still

later, at the repeated urging of defense counsel, see id. at 119-20, 123, the Court inquired in

open-ended fashion, "is there any person on the panel who just believes that, you know, there

was just criminal things going on at Enron."  Id. at 252-53.  Only four jurors of the 150 indicated

that they harbored such a belief.  Id. at 253-54.

The Court conducted individual voir dire devoted in large part to determine the extent of prejudicial exposure to pretrial publicity and prejudice derived from knowledge of others who suffered losses stemming from Enron's demise. Id. at 114-307. The Court properly identified and excused for cause multiple jurors who indicated an inability to set aside formed opinions and biases. See, e.g., id. at 130-35 (juror excused who stated that he would receive the testimony of either Skilling or Fastow with a "grain of salt"); id. at 136-38 (juror excused who indicated that "Enron is probably a case where . . . there's smoke, there's fire," and thus that "Enron and Merrill people must prove they're innocent"); id. at 139-41 (juror excused who stated he could not set aside what he read in the newspapers); id. at 177-80 (juror excused who indicated his knowledge of persons who had lost their Enron pensions); id. at 209-210 (juror excused after indicating bias in case in which "executives are charged"); id. at 254-57 (juror excused based in part on sympathies for persons "hurt" by Enron); id. at 258-59 (juror excused who lost substantial money on Enron contracts and who admitted to "hard time being unbiased"); id. at 260-62 (juror excused who described "strike against" defendants because "this [had been] allowed to happen for corporate America"); id. at 262-64 (juror excused because of knowledge of acquaintance's loss of substantial money and the case's "association with Enron").

After questioning only the first 100 jurors of the 150-person venire, the Court and the parties in one day had identified 53 unbiased jurors: more than necessary to constitute a panel after accounting for anticipated peremptory strikes. Id. at 307.

The deliberation and subsequent verdicts of the jury reflected a methodical, careful approach to the evidence devoid of prejudicial influences. Far from delivering knee-jerk or uniform guilty verdicts tending to reflect vengeance, a personal stake in the outcome, or pressure

27

from a community desiring justice from those enmeshed in the Enron scandal as alleged by

defendants, see Joint Motion at 58-63, the jury after days of deliberation acquitted former Enron

executive Sheila Kahanek while finding the other Enron executive and the Merrill Lynch

defendants guilty on all counts.  The jury's verdict thus reflected a careful parsing of the evidence

without apparent regard to defendants' employment at Enron.

      In the sentencing phase of the trial, the jurors again demonstrated an individual rather

than categorical approach to assessing complicity with respect to each defendant.  The jury found

separate and different sentencing factors applicable to each defendant who submitted sentencing

issues to the jury.  See Govt. Exh. 13 (Supplemental Verdict).  With respect to role in the

offense, the jury found that defendant Bayly had no aggravating role, that defendant Brown was a

manager and supervisor of a criminal activity, and that defendant Furst was an organizer or

leader of a criminal activity.  Id.  After finding that Bayly, Brown and Furst abused positions of

private trust, the jury declined to find that defendant Brown had used a special skill in a manner

that significantly facilitated the commission or concealment of the offenses.  Id.  The jury

rendered split verdicts with respect to application of enhancements for more than minimal

planning and the use of sophisticated means.  Id.  In addition, the jury declined to find that

defendant Brown substantially interfered with the administration of justice.  Id.  Perhaps most

importantly, and directly contrary to defendants' speculation regarding the financial motives of

Houston juries, see Joint Motion at 46-48, the jury found a loss amount of $13,708,000, despite

the fact that the government had urged a finding of $40,000,000 in losses.  See Govt. Exh. 13.

**B.      The Press Coverage of the Defendants' Case Has Not Been Inflammatory and Prejudicial**

The defendants claim that press coverage of the case has been strident and inflammatory. A careful review of the exhibits, however, reveals that the vast majority of the significant press coverage of this and other Enron cases has been objective, factual, and has contained no mention of the defendants by name.  Most of defendant Skilling's cited coverage comes not from the front page of the <u>Houston Chronicle</u>, but rather the internet, internal news stories, letters to the editor and editorials or opinion-based columns of uncertain or low readership.  Moreover, defendant Skilling's own exhibits indicate that media coverage peaked in 2002, particularly with respect to the victims of Enron's collapse and the most objectionable coverage of Skilling.  Conversely, the media coverage in 2004 increasingly contains favorable press regarding defendants, most of which remain archived and accessible on the very <u>Chronicle</u> website repeatedly criticized by defendants.  <u>See</u> www.chron.com/content/chronicle/special/01/enron/index.html; Zagorski Decl. at ¶ 13(f) (citing examples of favorable coverage).

A review of the front page articles in the most widely read newspaper, the <u>Houston Chronicle</u>, reveals that profile news coverage of Enron and the instant case has been objective and factual.  <u>See</u> Zagorski Decl. at ¶ 13(g) (majority of front page articles selected by defendants are factual accounts of indictments, trials and legal developments).  In addition, a vast majority of the media exhibits contain no mention of the names of the three defendants, much less negative personal references.  <u>See</u> <u>id</u>. at ¶ 14 (37% (110 exhibits) mention Skilling by name, 33% (98 exhibits) cite Lay by name, and 10 % (29 exhibits) cite Causey by name).  Moreover, much of the recent media coverage cited by defendants consists of factual reporting such as the procedural

29

posture of the case.  See, e.g., Marrosso Exh. 238 ("Judge delays setting Skilling Trial: Mountains of paperwork cited in decision"); Exh. 240 ("Partial victory for Skilling in details about grand jury").  And much of the cited media coverage in 2003 and 2004 centered on the Rice and Bayly cases, which often do not refer to these defendants or draw distinctions from the case against defendants.  See, e.g., Marrosso Exh. 236 (headline:  "Jurors to Hear Closing Arguments Today in Barge Case," containing reference to Fastow but no mention of Lay, Skilling, or Causey); Exh. 224 ("Caginess in Broadband Claims May Benefit Enron Defendants," explaining that it would be "difficult to bring a case against [Skilling]").

Defendant Skilling's media presentation is additionally bloated with citations to articles and websites with relatively low readership.  Excluding the front page articles, 247 of the 297 media exhibits include web-only content (41), letters to the editor (6), editorials and opinion-based columns (21), inside feature articles and articles that include only passing references to Enron (177).  See id. at ¶¶ 17-18.  None of the defendants has proffered data demonstrating that a significant number of the potential jurors from the Houston division glanced at these articles and websites, much less read them and retained those characterized by the defense as "inflammatory."  Indeed, the most potentially inflammatory pieces cited by the defendant are from the Houston Press, an alternative weekly newspaper with a circulation of approximately 100,000 per issue.  See Zagorski Decl. at ¶ 16(b) (Houston Press circulation); see Joint Motion at 19-20 (citing Houston Press articles), Marroso Decl., Exhibits 7, 8, 10, 49, 58.  Press coverage in the Houston Chronicle, which has a more extensive circulation, has generally been far more subdued.  Even with that larger circulation, however, less than 40% of adults in the Houston area read the Houston Chronicle daily and less than 50% read the Sunday edition.  (Audit Bureau of

Circulations, Readership Research Verification Service, <u>Houston Chronicle</u> Reader Profiles for the period March 2001 through February 2004).[12] <u>See</u> <u>United States v. Ricardo</u>, 619 F.2d 1124, 1131, 1132 (5th Cir. 1980) (failure to adduce newspaper circulation statistics instrumental in court's rejection of appellant's pretrial publicity claims).

Defendants' survey merely groups all media accounts of the last four years. However, one factor that courts are to consider when examining pretrial publicity – which was omitted from defendants' purported list of factors – is the time that has elapsed since the peak of the publicity surrounding the incident. The more time that has passed, the less prejudicial the impact of the media coverage. <u>See, e.g.</u>, <u>United States v. Dischner</u>, 974 F.2d 1502, 1524 (9th Cir. 1992); <u>United States v. Rewald</u>, 889 F.2d 836, 864 (9th Cir. 1989); <u>United States v. Lehder-Rivas</u>, 955 F.2d 1510, 1524 (11th Cir. 1992). As demonstrated by defendant Skilling's own media publication collection, 2002 represented the year of most intense news coverage of the circumstances surrounding Enron's collapse and subsequent investigations. <u>See</u> Zagorski Decl. at ¶ 15. News coverage of the victims of the Enron fraud, which defendants' experts speculate as fueling a sense of vengeance among the potential jurors of the Houston venire, <u>see</u> Joint Motion at 22-23, ran almost exclusively in early 2002. <u>Id</u>. at ¶ 19. In fact, 28 of the 34 cited articles discussing victims of the Enron collapse were published from December 2001 through March 2002, prior to the commencement of the Arthur Andersen trial. <u>Id</u>.

---

[12]These surveys can be located on the internet at:
<u>http://www.accessabc.com/reader/145950_0202e_RPRD.pdf</u>;
<u>http://www.accessabc.com/reader/145950_0203_RPRD.pdf</u>; and
<u>http://www.accessabc.com/reader/145950_0204_RPRD.pdf</u>.

Likewise, defendant Skilling's handpicked collection of the most objectionable media coverage indicates that more than two years have passed since the peak of the alleged vitriol against Skilling.  Of the 256 media reports and letters selected by defendant Skilling for citation in the Joint Motion, 150 date from 2002 or earlier.  (Joint Motion, passim).  More specifically, at the outset of the Joint Motion, defendant Skilling highlights "inflammatory stories and letters about Skilling, signaling that the community has already made up their minds" and lists excerpts from editorials and letters in bullet points.  (Joint Motion at 3).  With the exception of one letter regarding Skilling's "night on the town" in New York in 2004, all of these letters and editorials are from the period of January through August of 2002, at a peak in the Enron reporting.  Defendant Skilling also devotes three pages of the Joint Motion to listing excerpts from the Houston Chronicle in an attempt to show the community's vindictiveness.  (Joint Motion at 17-19).  However, of the 21 excerpts in defendant Skilling's list, all but four are from no later than 2002.  Moreover, as is the case with much of the reporting on Enron during this period, some of the reports and letters cited by defendants also express support for Lay and Skilling.  See Marroso Exh. 18 ("By appearing [before Congress], [Skilling] sends the message: 'I have nothing to hide'" "I think [Skilling] gave a command performance."); Exh. 21 ("Ken Lay belongs in the 'capitalist hall of fame'").[13]

_____

[13]Indeed, some of the publicity cited by defendants is publicity of their own creation.  For example, defendants claim in their motion that the Houston media "can't wait" for the trial of Skilling and his co-defendants.  (Joint Motion at 5 and 14).  However, the media quote to which defendants refer is found in a short blurb in the Houston Chronicle reporting Skilling's proclamations of innocence.  See Marroso Decl., Exh. 28 ("As the only top Enron official to testify before lawmakers in Washington, D.C., Skilling has proclaimed his innocence.  'I have nothing to hide,' he said.").