UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

DEC 2 0 2004

Michael N. Milby, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Crim. No. H-04-25 (Lake, J.) |
| | ) | |
| v. | ) | |
| | ) | |
| RICHARD A. CAUSEY, JEFFREY K. | ) | |
| SKILLING, and KENNETH L. LAY | ) | |
| | ) | |
| Defendants. | ) | |

**REPLY MEMORANDUM OF DEFENDANTS JEFFREY SKILLING
AND RICHARD CAUSEY IN SUPPORT OF
<u>JOINT MOTION TO TRANSFER VENUE</u>**

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION.................................................................................1

II.  TO AVOID ADDRESSING THE FACTS, THE TASK FORCE
    MISCHARACTERIZES THE LAW..............................................................3

III.  ENRON'S COLLAPSE AFFECTED HOUSTON'S PSYCHE IN PROFOUND,
     PERVASIVE, AND UNIQUE WAYS.........................................................9

    A.  Community Experience is Critical to Understanding the
        Prejudice in Houston...............................................................9

    B.  The Record is Unrebutted That Houston, Unlike Any Other Venue, Suffered
        Unique Economic, Emotional, and Social Fallout From the Collapse of
        Enron...............................................................................10

    C.  Unlike Other Enron Criminal Defendants, Houstonians Hold Skilling and
        His Co-Defendants *Responsible* For Causing the Community's
        Suffering...........................................................................12

IV.  PERVASIVE CONTINUING NEGATIVE PRE-TRIAL PUBLICITY
     WARRANTS A TRANSFER OF VENUE.....................................................14

    A.  The Houston Media Reflects and Reinforces Pre-Existing Prejudicial
        Sentiment Unique to Houston.....................................................14

    B.  The Task Force's Media Analysis Is Deficient and Misleading.....................15

V.  INDEPENDENT POLLS CONDUCTED BY DEFENDANTS AND THE TASK
    FORCE DEMONSTRATE THAT HOUSTON IS AN UNFAIR VENUE.................20

    A.  Defendants Need Only Show They Cannot Obtain a Fair Trial in
        Houston............................................................................20

    B.  The Task Force's Criticisms of Defendants' Survey Are Unfounded...............21

    C.  The Task Force's Own Survey Compels a Change of Venue........................23

VI.  VOIR DIRE CANNOT PROTECT THE FAIRNESS OF THIS TRIAL...................24

    A.  All Houstonians Share a Unique Subconscious Prejudice...........................24

    B.  Members of the Houston Community Cannot Reasonably Be Expected to Set
        Aside Their Preconceived Opinions and Be Impartial...............................26

    C.  Houstonians Will Be Under Strong Social Pressure to Convict.....................27

**TABLE OF CONTENTS**

**Page**

D.    Relying on Voir Dire Will Pose an Intolerable Risk................................27

E.    The Nigerian Barges and Arthur Andersen Trials Prove That Voir Dire Cannot
      Guarantee a Fair Jury in This Case....................................................28

VII.   CONCLUSION.................................................................................29

# TABLE OF AUTHORITIES
## CASES

*Bronstein v. Wainwright,*
   646 F.2d 1048 (5th Cir. 1982) .......................................................................... 4, 6

*Calley v. Callaway,*
   519 F.2d 184 (5th Cir. 1979) ................................................................................. 8

*Coleman v. Kemp,*
   778 F.2d 1487 (11th Cir. 1985) ......................................................................... 6, 9

*Delaney v. United States,*
   199 F.2d 107 (1st Cir. 1952) ................................................................................ 25

*Irvin v. Dowd,*
   366 U.S. 717 (1961) ..................................................................................... 25, 26

*Johnson v. Beto,*
   337 F. Supp. 1371 (S.D. Tex. 1972) ......................................................... 4, 6, 7, 10

*Marshall v. United States,*
   360 U.S. 310 (1959) ............................................................................................. 8

*Nevers v. Killinger,*
   990 F. Supp. 844 (E.D. Mi. 1997) ........................................................... 6, 20, 26

*Pamplin v. Mason,*
   364 F.2d 1 (5th Cir. 1966) .............................................................................. 4, 6, 7

*People v. Boss,*
   261 A.D.2d 1 (N.Y. App. Div. 1999) ................................................................. 27

*Rideau v. Louisiana,*
   373 U.S. 723 (1963) ............................................................................................ 7

*Sheppard v. Maxwell,*
   384 U.S. 333 (1966) ......................................................................................... 4, 6

*United States ex rel. Bloeth v. Denno,*
   313 F. 2d 364 (2d Cir. 1963) ............................................................................. 25

*United States v. Abrahams,*
   453 F. Supp. 749 (D. Mass. 1978) ....................................................... 4, 6, 16, 20

*United States v. Abrahams,*
   466 F. Supp. 552 (D. Mass. 1978) ....................................................................... 6

*United States v. Anguilo,*
   497 F.2d 440 (1st Cir. 1972) ................................................................................ 6

*United States v. Capo,*
   595 F.2d 1086 (5th Cir. 1979) ............................................................................. 4

*United States v. Ebens,*
   654 F. Supp. 144 (E.D. Mi. 1987) ....................................................................... 6

*United States v. Engleman,*
   489 F. Supp. 48 (E.D. Mo. 1980) ........................................................................ 6

*United States v. Faulkner,*
   17 F.3d 745 (5th Cir. 1994) .............................................................................. 6, 7

*United States v. Florio*,
   13 F.R.D. 296 (S.D.N.Y. 1998) ................................................................. 6, 25

*United States v. Hirko*,
   Crim. No. H-03-0093, Nov. 26, 2004 ............................................................. 13

*United States v. Hoffa*,
   205 F. Supp. 710 (S.D. Fl. 1962) ................................................................. 6, 7

*United States v. Holder*,
   399 F. Supp. 220 (D. S.D. 1975) ............................................................... 4, 26

*United States v. Lea Fastow*,
   292 F. Supp. 2d 914 (S.D. Tex. 2003) ............................................................ 13

*United States v. Livoti*,
   8 F. Supp. 2d 246 (S.D.N.Y. 1998) ................................................................. 4

*United States v. Maad*,
   2003 WL 22098002 (9th Cir. Sept. 10, 2003) ............................................... 7, 10

*United States v. Maldonado-Rivera*,
   922 F.2d 934 (2d Cir. 1990) ........................................................................ 4

*United States v. Marcello*,
   280 F. Supp. 510 (E.D. La. 1968) ........................................................... passim

*United States v. Mazzei*,
   400 F. Supp. 17 (W.D. Pa. 1975) ................................................................. 6, 7

*United States v. Moody*,
   762 F. Supp. 1485 (N.D. Ga. 1991) ................................................................. 6

*United States v. Parker*,
   877 F.2d 327 (5th Cir. 1989) ...................................................................... 5, 7

*United States v. Parr*,
   17 F.R.D. 512 (S.D. Tex. 1955) ................................................................... 7, 8

*United States v. Partin*,
   320 F. Supp. 275 (E.D. La. 1970) ............................................................. 4, 5, 8

*United States v. Salameh*,
   1993 WL 364486 (S.D.N.Y. Sept. 15, 1993) ..................................................... 12

*United States v. Saya*,
   980 F. Supp. 1157 (D. Hi. 1997) ................................................................... 6

*United States v. Walker*,
   890 F. Supp. 954 (D. Kan. 1995) ................................................................... 4

*United States v. Williams*,
   523 F.2d 1203 (5th Cir. 1975) ................................................................. 4, 7, 26

*Wansley v. Miller*,
   353 F. Supp. 42 (E.D. Va. 1973) ................................................................... 26

## OTHER AUTHORITIES

U.S. CONST. amends. V, VI ................................................................................. 3

FED. R. CRIM. P. 21(a) .................................................................................. 3, 20

FED. PRAC. & PROC.: CRIM. § 342 ....................................................................... 4

## I.     INTRODUCTION

A juror from the Nigerian Barges trial summed it up best.  After learning of defendants'

motion to change venue in this case, Juror No. 5 wrote an email to Sheila Kahanek's lawyer

published on the website of the *Houston Chronicle*:

> You and Sheila left those NY lawyers choking in your dust.  They probably
> scratched their heads over that one while telling everyone how stupid we are
> down here in Texas. *I noticed the big boys want to change their trial location.*
> *DON'T MESS WITH TEXAS!*[1]

To no surprise, the Task Force chose to remain silent on this email, as it did with most of

defendants' evidence and arguments.  Defendants presented irrefutable evidence exposing the

profound and deep-seated prejudice against them in Houston.  The Task Force addresses little of

it.[2]  Instead, the Task Force's opposition treats defendants' motion as an ordinary request to

change venue and responds with ordinary, generic arguments.  But this is no ordinary case.

Skilling, Lay, and Causey are no ordinary defendants.  And this is no ordinary venue motion.

Enron's collapse was the most important and defining event in Houston's recent history.

Like the Oklahoma City bombing, Enron's bankruptcy was more than a news story in Houston—it

was a community tragedy.  The Houston financial and business community, the Houston

workforce, the Houston cultural and charitable community, the Houston name, reputation, and

image *all* suffered as a result of Enron's failure.  To a significant degree, Houston sees itself as the

ultimate victim in this case.  And it is the defendants in this case, above all others, who are blamed

for Houston's tragedy.  Reduced to its core, this is a trial between *Houston* and the defendants.

The Task Force's opposition strains to avoid this inescapable reality.  In so doing, it

focuses entirely on *pretrial publicity* and fails to even address the root causes of prejudice

---

[1] Marroso Supp. Exs. 40, 76 (Nov. 10, 2004 email; emphasis added).  The email also appeared in *Texas Lawyer*.
[2] Skilling submitted five expert reports providing in-depth media, polling, sociological, and economic analyses
of juror attitudes and conditions in Houston.  The Task Force ignored four of them completely.

1

identified in defendants' motion.  Unable to deny the pervasive bias in Houston, the Task Force

offers its own media analysis and poll purporting to demonstrate that Houston is no more biased

than any other venue.  Both fail.  As to the media analysis, the Task Force's expert examined less

than 10% of the relevant media sources; for the small subset of materials he did review, the

expert failed to conduct any *qualitative* assessment of the content of the coverage.  In contrast,

Skilling's media expert reviewed thousands of articles, television abstracts, and other sources,

performed a rigorous qualitative analysis, and provided dozens of examples of inflammatory

press, including several from the last six weeks alone.[3]

As for the Task Force's poll, it only *reinforces* Skilling's survey data.  First, the Task

Force's expert, Dr. David Zagorski, found that nearly *64%* of Houstonians aware of this case

already believe Skilling and his co-defendants are guilty, confirming Houston is an unfair venue.

The founder of Dr. Zagorski's firm has gone on record stating that predisposition rates of "65%

and more [are] *quite convincing*" evidence for a venue transfer.[4]  Federal courts agree, and have

transferred criminal cases from major metropolitan venues like Atlanta when a defendant's poll

shows even *less* bias than the Task Force's poll shows here.[5]  Second, Dr. Zagorski's survey, just

like Skilling's, confirms the presence of greater prejudice in Houston than in Phoenix, the only

other venue he surveyed.[6]

Faced with a unique, enveloping, and undeniable level of community prejudice in

Houston, the Task Force ultimately looks to voir dire as the answer.  Voir dire can expose

obvious grounds for exclusion, such as financial ties and family connections.  It may also reveal

a degree of conscious emotional bias.  But voir dire cannot unearth the powerful subconscious

---

[3] Armstrong Decl. ¶¶ 8, 37, Exs. 14-20A, 23, 25-27; Armstrong Supp. Decl. ¶¶ 7, 10-21; Marroso Supp. Exs. 7, 8, 10, 12, 15, 16, 20, 80-82, 84, 85.
[4] Marroso Supp. Ex. 71 (*Sacramento Bee*).
[5] *United States v. Tokars*, 839 F. Supp. 1578, 1583 (N.D. Ga. 1993); *see infra*.
[6] Anthony Supp. Decl. at Table 1.

biases that exist in this case, where the alleged crimes deeply and profoundly affected an entire community—the very community being asked to sit in judgment of the accused. Judge Matsch's observation from the Oklahoma City bombing case is equally applicable here:

> The existence of such a prejudice is difficult to prove. *Indeed it may go unrecognized in those who are affected by it*. The prejudice that may deny a fair trial is not limited to a bias or discriminatory attitude. It includes an impairment of the deliberative process of deductive reasoning from evidentiary facts resulting from an attribution to something not included in the evidence. That something has its most powerful effect if it generates strong emotional responses and fits into a pattern of normative values.[7]

That juries were selected in the Arthur Andersen and Nigerian Barges cases, or that Enron accountant Sheila Kahanek was acquitted, does nothing to dispel the presence of bias against *these defendants*. Juror No. 5's email underscores this. Unlike any other Enron defendant, Skilling, Lay, and Causey are the personification of Enron and target of Houston's ire.

Defendants' lives are at stake. Any Houston jury called upon to decide their fate—men and women who are supposed to be dispassionate judges of the evidence—will necessarily have a personal, emotional, and community stake in their own verdict. Unless there is a change of venue, any guilty verdict in this case will be forever tainted.[8]

## II.   TO AVOID ADDRESSING THE FACTS, THE TASK FORCE MISCHARACTERIZES THE LAW.

This motion presents one legal question: can Skilling, Lay, and Causey receive a fair trial in Houston.[9] The answer to that question is found by analyzing the overwhelming evidence before the Court, which shows a fair trial in Houston is not possible. For that reason, the Task Force tries to avoid this analysis altogether.

In its place, the Task Force presents a lengthy discussion of venue opinions designed to

---

[7] *U.S. v. McVeigh*, 918 F. Supp. 1467 (W.D. Okla. 1996) (emphasis added).
[8] Given the importance of this motion, defendants request a hearing, at the Court's convenience, to present evidence and argument.
[9] FED. R. CRIM. P. 21(a); U.S. CONST. amends. V, VI.

3

suggest a legal burden that is virtually impossible to satisfy.[10]  Yet *nowhere* in its discussion does

the Task Force address the actual standard that governs this motion.  Relying almost exclusively

on post-conviction decisions, the Task Force overlooks the critical distinction between hindsight

and foresight.  Hindsight cases, involving appeals and habeas petitions, employ strict standards

of review; only a clear constitutional violation or abuse of discretion justifies reversal of a jury

verdict.  At the *pre-trial* stage, where the Court has to ability to look forward, the standard is

"anticipatory" and "preventative":

> [Rule 21] evokes foresight, always a more precious gift than hindsight, and for
> this reason the same certainty which warrants the reversal of a conviction will not
> always accompany the change of venue.  Succinctly, then, it is the well-grounded
> fear that the defendant will not receive a fair and impartial trial which warrants
> the application of the rule.[11]

As both the Supreme Court and the Fifth Circuit have held, a change of venue is

appropriate when there is a "*reasonable likelihood*" that pretrial publicity or other "outside

influences" will prevent a fair trial.[12]  "Reasonable likelihood" of an unfair trial is the legal test

applied by district courts throughout the federal system, and it is the test that must be applied

here.[13]  Indeed, the Task Force has conceded as much, during the hearing on the venue motion

filed in *United States v. Andrew Fastow*:

---

[10] Opp. at 5-17.

[11] *United States v. Marcello*, 280 F. Supp. 510, 513-14 (E.D. La. 1968).

[12] *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966); *Pamplin v. Mason*, 364 F.2d 1, 5-6 (5th Cir. 1966)
(emphasis added).  The Task Force dismisses *Pamplin* because the court ultimately did not decide whether the
petitioner was entitled to a change of venue.  Opp. at 13 n.5.  However, *Pamplin* has long been considered one
of the leading Fifth Circuit authorities on the legal standard for transferring venue.  *Pamplin*, 364 F.2d at 4-7;
*see also, e.g., Bronstein v. Wainwright*, 646 F.2d 1048, 1051 (5th Cir. 1982) (citing *Pamplin*); *United States v.
Capo*, 595 F.2d 1086, 1090 (5th Cir. 1979) (same); *United States v. Williams*, 523 F.2d 1203, 1208 (5th Cir.
1975) (same); *Johnson v. Beto*, 337 F. Supp. 1371, 1376 (S.D. Tex. 1972) (same); *United States v. Partin*, 320
F. Supp. 275, 281 (E.D. La. 1970) (same).

[13] *See, e.g., Marcello*, 280 F. Supp. at 513-14; *Partin*, 320 F. Supp. at 279; *United States v. Livoti*, 8 F. Supp.
2d 246, 248-49 (S.D.N.Y. 1998), *aff'd*, 196 F.3d 322, 326 (2d Cir. 1999); *United States v. Walker*, 890 F.
Supp. 954, 959 (D. Kan. 1995); *United States v. Abrahams*, 453 F. Supp. 749, 751 (D. Mass. 1978); *United
States v. Holder*, 399 F. Supp. 220, 227 (D. S.D. 1975); 2 CHARLES A. WRIGHT, FED. PRAC. & PROC.: CRIM. §
342; *see also United States v. Maldonado-Rivera*, 922 F.2d 934, 966-67 (2d Cir. 1990) (citing district court).

THE COURT:  You, I gather, agree with Mr. Keker [counsel for Fastow]
that the standard is reasonable likelihood?

MS. LACEWELL:  Yes, your honor.[14]

Despite this acknowledgement, the Task Force's opposition fails even to mention the applicable standard, let alone apply it to the facts of this case.[15]

Of course, "reasonable likelihood" of an unfair trial is not an easy burden, and venue motions are not commonly granted. However, the infrequency results not because there is an insurmountable legal test, but because rarely is there a case in which an entire community is affected by the alleged crimes or tainted by inflammatory publicity. Yet that is precisely the case here. When the "totality of the circumstances" indicates such widespread community prejudice, venue changes are mandatory: "[A]ny defendant who seeks a change of venue is presented with a formidable task. . . . Yet it is equally clear that it is not to be denied when the facts of the case warrant it."[16]

The thrust of the Task Force's opposition is that venue transfers are appropriate only in cases involving "violent, horrific crimes," "heinous acts," "small rural towns," and "kangaroo court" proceedings "akin to a three-ring circus."[17] This sort of simplistic formulation has no basis in law or logic. The size of the community, while relevant, is never dispositive. Cases have been transferred from large metropolitan areas, including *Houston* itself, Dallas, New York City, Atlanta, Boston, Detroit, Pittsburgh, St. Louis, Cleveland, New Orleans, Oklahoma City,

---

[14] Marroso Ex. 113 at 32-33.
[15] The Task Force's misplaced emphasis on hindsight is also evident in its claim that Defendants must show that "prejudice actually invaded the jury box" and "in essence displaced the judicial process." Opp. at 6-7. At the pre-trial stage no such "actual prejudice" is possible, nor is it required by law. *United States v. Parker*, 877 F.2d at 330 ("It is no longer necessary... to show [that] prejudice permeated the jury box"); *Partin*, 320 F. Supp. at 281 (same).
[16] *Marcello*, 280 F. Supp. at 515; *see also Irvin*, 366 U.S. at 721; *Murphy v. Florida*, 421 U.S. 794, 799 (1975).
[17] Opp. at 6, 7, 9-10, 13, 15-17.

Orlando, and Honolulu.[18] Pervasive community prejudice can overcome big cities and small towns alike. Nor must "bedlam reign[] at the courthouse" to justify a change of venue.[19] Pretrial transfers may be necessary to ensure a fair trial even when everyone expects the Court to conduct proceedings "with decorum and dignity."[20]

Similarly, the decision to change venue does not hinge on the nature of the alleged crime, but on "the community's climate of opinion" about the case and about the defendant.[21] Violent or nonviolent, felony or misdemeanor, it is not the character of the crime that matters.[22] For example, in *United States v. Abrahams*, 466 F. Supp. 552 (D. Mass. 1978), the government charged the defendant, head of a "now defunct" commodities firm, with mail and wire fraud, resulting in economic harm to his victims. Because of hostile publicity and fears of community prejudice, fueled by widespread accusations that defendant was a "con man" and "swindler" who ran financial "scams," the Court transferred the case from Boston (where the firm was headquartered) to Phoenix.[23] In other cases, courts changed venue for defendants charged with such nonviolent crimes as fraud, perjury, extortion, false tax returns, and the "unlawful sale or

---

[18] *Sheppard*, 384 U.S. at 335-36 (Cleveland); *United States v. Faulkner*, 17 F.3d 745, 754-55 (5th Cir. 1994) (Dallas; noting district court changed venue); *Johnson*, 337 F. Supp. at 1371 (Houston); *Marcello*, 280 F. Supp. at 510 (New Orleans); *United States v. Florio*, 13 F.R.D. 296 (S.D.N.Y. 1998) (New York City); *United States v. Saya*, 980 F. Supp. 1157 (D. Hi. 1997) (Honolulu); *Nevers v. Killinger*, 990 F. Supp. 844 (E.D. Mi. 1997) (Detroit); *United States v. McVeigh*, 918 F. Supp. 1467 (W.D. Okla. 1996) (Oklahoma City); *Tokars*, 839 F. Supp. at 1578 (Atlanta); *United States v. Moody*, 762 F. Supp. 1485 (N.D. Ga. 1991) (Atlanta); *United States v. Ebens*, 654 F. Supp. 144 (E.D. Mi. 1987) (Detroit); *United States v. Engleman*, 489 F. Supp. 48, 49 (E.D. Mo. 1980) (St. Louis); *United States v. Abrahams*, 466 F. Supp. 552 (D. Mass. 1978) (Boston); *United States v. Abrahams*, 453 F. Supp. 749, 751 (D. Mass. 1978) (Boston); *United States v. Mazzei*, 400 F. Supp. 17 (W.D. Pa. 1975) (Pittsburgh); *United States v. Anguilo*, 497 F.2d 440 (1st Cir. 1972) (Boston; noting district court changed venue); *United States v. Hoffa*, 205 F. Supp. 710 (S.D. Fl. 1962) (Orlando).
[19] Opp. at 10.
[20] *Coleman v. Kemp*, 778 F.2d 1487, 1540 n.23 (11th Cir. 1985).
[21] *Bronstein*, 646 F.2d at 1051; *Pamplin*, 364 F.2d at 5-6.
[22] *Pamplin*, 364 F.2d at 7 ("the same constitutional safeguard of an impartial jury is available ... for a misdemeanor as for a felony").
[23] *Abrahams*, 466 F. Supp. at 557-58; *Abrahams*, 453 F. Supp. at 751 (D. Mass. 1978) (companion case).

gift of one marijuana cigarette."[24]  Skilling cited all these cases in his moving papers.  Having no

response, the Task Force simply ignored them, choosing instead to generally—and wrongly—

characterize Skilling's authorities as "consisting largely of violent, horrific crimes."[25]

Nor should the Task Force's pejorative rhetoric deter the Court from examining the

factors other courts have judged relevant in deciding motions to transfer venue.  Far from being

"patently misleading," Skilling's non-exhaustive list of 14 factors gives tangible *context* to the

otherwise amorphous "totality of the circumstances" standard, to help guide the Court's

discretion.[26]  By contrast, the Task Force seeks only to *restrict* the Court's discretion.  Over and

over again, the Task Force isolates particular facts and argues their absence here precludes a

change of venue.  So, for example, to distinguish *Rideau v. Louisiana*, 373 U.S. 723 (1963), the

Task Force says defendants cannot show the "repeated airing of a confession to a series of brutal

crimes in a small community."[27]  To distinguish *Johnson v. Beto*, 337 F. Supp. 1371 (S.D. Tex.

1972), the Task Force observes "[t]he case at bar bears no resemblance to [a] collateral attack on

a racially-charged trial resulting in a grossly disproportionate sentence."[28]  These distinctions are

unhelpful because, as the Task Force concedes, every case is based on the "totality of the

circumstances."[29]  Not every highly publicized murder trial demands a transfer; conversely, not

every case lacking a televised confession or racially-charged environment stays put.  Generic

assertions that this case is not "extreme" or "egregious" mean nothing, for "generalizations are

---

[24] *Faulkner*, 17 F.3d at 751-55 (bank fraud); *Johnson*, 337 F. Supp. at 1373 (sale of marijuana cigarette); *United States v. Parr*, 17 F.R.D. 512, 514 (S.D. Tex. 1955) (false income tax returns); *Mazzei*, 400 F. Supp. at 18 (perjury, extortion); *Hoffa*, 205 F. Supp. at 713 (mail fraud, wire fraud); *United States v. Maad*, 2003 WL 22098002 (9th Cir. Sept. 10, 2003) (bank fraud).  Courts have also transferred cases involving violent crimes that can hardly be characterized as "heinous."  *See Pamplin*, 364 F.2d at 2-3 (misdemeanor assault); *Williams*, 523 F.2d at 1204-05 (kidnapping; victim released unharmed); *Marcello*, 280 F. Supp. at 512 (assault).
[25] Opp. at 16.
[26] Opp. at 8; Mot. at 10-12, n.42; *Parker*, 877 F.2d at 330; *Irvin*, 366 U.S. at 721; *United States v. Williams*, 523 F.2d 1203, 1208 (5th Cir. 1975); *Marcello*, 280 F. Supp. at 513, 515.
[27] Opp. at 9.
[28] Opp. at 14.
[29] Opp. at 8.

not helpful . . . each case must turn on its special facts."[30]

The Task Force's flawed approach is best illustrated by its attempt to distinguish *United States v. McVeigh*, 918 F. Supp. 1467 (W.D. Okla. 1996). Many parallels exist between *McVeigh* and this case—the alleged crime powerfully and uniquely affected an entire community; the community and its media rallied together to support those who suffered, while vilifying those perceived to be responsible; and the community viewed itself as an "extended family" against the alleged perpetrators, with a personal stake in the outcome.[31] In the face of such striking similarities, the Task Force offers one conclusory response: "[e]conomic loss, while serious, cannot compare to the senseless loss of lives of men, women and children due to an act of domestic terrorism."[32] That is no answer. The issue cannot be reduced to whether the crime is gruesome. As *Abrahams* illustrates, cases involving only economic loss may well require a venue change to ensure a fair trial.[33] Transfer of venue was required in *McVeigh* because, as the Task Force said, the crime "permeated the public psyche."[34] The collapse of Enron has permeated the Houston psyche in the same way.

Finally, the Task Force claims there is a "presumption" that trial must be held in the district where the alleged crime occurred.[35] This overstates the law. The constitutional right to a trial in this district is personal to the *defendants*, who can waive it by seeking a change of venue.[36] The interest of the community in having this case tried in Houston, while not irrelevant, does not overcome the defendants' due process right to a fair trial. Indeed, a transfer is

---

[30] *Calley v. Callaway*, 519 F.2d 184, 204 (5th Cir. 1979), citing *Marshall v. United States*, 360 U.S. 310, 312 (1959). *See also* Opp. at 1-2, 5, 7-9, 12, 15-16.
[31] Mot. at 31-32, 61; Armstrong Decl. ¶¶ 62, 93; Armstrong Supp. Decl. ¶¶ 49-52.
[32] Opp. at 15-16.
[33] *Abrahams*, 466 F. Supp. at 556-57.
[34] Opp at 15.
[35] Opp. at 5, 16.
[36] *Partin*, 320 F. Supp. at 278; *Marcello*, 280 F. Supp. at 519-20 ("this right is a personal privilege, which may be waived by the accused"); *Parr*, 17 F.R.D. at 518-19; *McVeigh*, 918 F. Supp. at 1469-70.

8

necessary precisely *because* Houston's interest in this case is too great.[37]

## III.   ENRON'S COLLAPSE AFFECTED HOUSTON'S PSYCHE IN PROFOUND, PERVASIVE, AND UNIQUE WAYS.

### A.   Community Experience is Critical to Understanding the Prejudice in Houston.

From the outset, the Task Force mischaracterizes this motion as seeking a change of

venue "in light of pretrial publicity."[38]   But publicity is only part of the story.   This is not a run-

of-the-mill case that just happened to receive negative media coverage in Houston.   This is a case

where the community perceives itself to have been victimized by the alleged crimes,

economically, emotionally, and psychologically.[39]   People in Houston did not merely read about

these events in the media as detached observers—they lived through them.   Thousands of their

friends, families, and neighbors were directly affected, countless more indirectly, and there is an

unshakeable perception that Enron's top executives perpetrated a "horrible betrayal of the

city."[40]   Houstonians have compared Enron to September 11, the Kennedy assassination, and

natural disasters.[41]   Understanding Houston's community experience is the lynchpin to assessing

whether defendants can receive a fair trial here.   Yet the Task Force skirts the issue at every turn.

The importance of community experience as the root of prejudice cannot be

underestimated.   In *McVeigh*, the crime "was perceived as an 'Oklahoma tragedy,' in which

---

[37] *McVeigh*, 918 F. Supp. at 1472 ("Many Oklahomans view a trial of this case as an additional challenge and want the opportunity to demonstrate their ability to be fair in spite of this extraordinary provocation of their emotions of anger and vengeance.   They seek participation in the trial to demonstrate an ability to overcome a tragedy with such powerful emotional impact," but "it is easy" for them "to develop a prejudice.").   The fallacy of the Task Force's contention is further evidenced by its indictment of ex-WorldCom chairman Bernard Ebbers in New York, rather than Mississippi where Worldcom was headquartered, and its *opposition* to Ebbers' motion to transfer the case to Mississippi.   Marroso Supp. Ex. 72 (Govt. Opp. to Ebbers' Motion to Transfer).

[38] Opp. at 1.

[39] *Coleman*, 778 F.2d at 1489 ("[t]he trial court may be unable to seat an impartial jury because of prejudicial publicity *or an inflamed community atmosphere*.") (emphasis added).

[40] Mot. at 28-31; Marroso Exs. 12, 82, 277; Klineberg Decl. ¶¶ 14, 17.

[41] Mot. at 31, 42; Marroso Exs. 12, 13, 44.

every citizen of Oklahoma had a stake."[42]  In *Johnson*, the court was concerned that the

defendant's association with racial unrest in Houston would lead to juror bias.[43]  In *United States*

*v. Maad*, 2003 WL 22098002 at *1-2 (9th Cir. Sept. 10, 2003), the community "came together in

an outpouring of support" for an Arab-American storeowner who was supposedly the victim of a

vandalism hate crime, but then turned against him when he was accused of vandalizing the shop

himself.  The shared experience of Enron's rise and fall, and its real and perceived effects on the

community, make Houston a singularly inappropriate venue for the trial of this case.

### B.   The Record is Unrebutted That Houston, Unlike Any Other Venue, Suffered Unique Economic, Emotional, and Social Fallout From the Collapse of Enron.

Virtually all of the facts in defendants' motion showing that Houstonians have too great a

stake in this case to be impartial are undisputed by the Task Force.  Unlike any other venue:

- Skilling has been demonized with a high level of emotional intensity in Houston. Once a local "god," he is now called "pig," "snake," "evil," "fraud," "liar," "crook," "criminal," "guilty as sin," "conniving," "weasel," "deceitful," "despicable," "amoral," and "economic terrorist."[44]

- Lay has been similarly vilified.  The man once compared to legendary Houston forefathers and touted as a potential candidate for mayor is now described as a "dishonest," "dirty," "deceitful" "fat cat" with "no conscience," a "sleazy," "sneaky," "swindling" "scam artist," who "should go to jail and stay there for a long time because he is no better than a murderer."[45]

- Enron's bankruptcy had devastating effects on Houston's local economy. Thousands lost their jobs, others lost their savings, local restaurants, shops, hotels, and charities suffered, and the commercial real estate market plummeted.  As the *Chronicle* recently put it, "[w]hen Enron went into its death spiral . . . the reverberations were felt throughout Houston."[46]

---

[42] Opp. at 15.

[43] *Johnson*, 337 F. Supp. at 1373-79; Opp. at 14.

[44] Anthony Decl. Ex. 3; Mot. at 3-4, 23-24.

[45] Anthony Decl. in Support of Lay Ex. 3.

[46] Mot. at 34-38; Marroso Exs. 71, 115, 116, 120, 122, 123, 125-137, 174, Supp. Ex. 9 (*Houston Chronicle*).

- Houstonians rallied together and united behind the victims, offering whatever assistance they could, such as job fairs, training and networking opportunities, retail discounts, and donations for food, housing, and healthcare.  In the words of one local businessman, "[t]hey are citizens of Houston, and we are concerned."[47]

- Houstonians feel that Enron "hoodwinked the entire city."  Once Houston's most successful and most important company, Enron and its promise of prosperity in the new century are now seen as a sham, "as if something of the city's very image of itself has been found fraudulent."  Enron has become a "black eye" on Houston's reputation, a source of stigma and humiliation instead of pride.[48]

- Houstonians have expressed a fervent desire for justice, reflected in, among many things, T-shirts bearing the slogan "Investigate 'Em, Prosecute 'Em, Incarcerate 'Em," and in repeated calls for Skilling to "go to jail and give [his] assets back."[49]

- Houston jurors will feel strong societal pressures to convict Skilling, Lay, and Causey.  Importantly, the Task Force is deafeningly silent on the expert opinion of Houston's preeminent sociologist, Dr. Stephen Klineberg, that Houston is a "city with a deep and pervasive emotional stake in seeing [the] defendants convicted" and jurors will know that when the trial is over "they will return to the community ... and will have to live with the personal and social consequences of their verdict."[50]

- Houstonians are more likely to have an actual or perceived financial stake in the outcome of the case, according to economist Roy Weinstein (whose opinions the Task Force also ignores).  In a city predisposed to helping Enron's victims, there will be more jurors who believe they, their family or friends, or their community will benefit from the Victims' Fund, giving them an economic motive to convict.[51]

*The Task Force does not challenge any of this evidence.*  In fact, the Task Force's own expert says, "[m]ost anyone would concede that the Houston area was more directly affected by the collapse of Enron than any other area, particularly in light of the massive job loss that

---

[47] Mot. at 38-46; Marroso Exs. 8, 122, 140-157, 162.
[48] Mot. at 25-33; Marroso Exs. 12, 82, 103.
[49] Mot. at 17-19, 22-24, 40, 47; Marroso Exs. 8, 25, 42, 45, 48, 71-78, 158, 160, 216, 218; Anthony Decl. Ex. 3.
[50] Mot. at 25-33; Klineberg Decl. ¶¶ 16-20.
[51] Mot. at 46-48; Weinstein Decl. ¶¶ 12, 20.

accompanied the firm's demise."[52] Unable to dispute Houston's profound sense of victimization,

the Task Force sidesteps it by saying this is just another high profile case, where the "risk of jury

taint from media coverage" is the only external influence in play.[53] Such empty verbalisms do

not substitute for evidence or analysis and do not respond to the critical issues in this motion.

Again missing the point, the Task Force notes that transfers were denied in other "matters of

substantial public interest," like Watergate, the Oliver North Iran-Contra scandal, Abscam, the

assassination of Judge John H. Wood, Jr., American Taliban John Walker Lindh, and John

DeLorean.[54] But *none* of those cases involved defendants accused of defrauding and devastating

the very city in which the trial was to be held.[55] None involved defendants once championed as

local heroes, "revered" as "legend[s]" with "rock-star status," who are now blamed for the most

disgraceful acts of betrayal in the city's history.[56] As in *McVeigh*, Houston is not merely aware

of this case, it is emotionally invested in it, and feels victimized by the defendants facing trial.

No fair trial can occur in these circumstances.

C.    **Unlike Other Enron Criminal Defendants, Houstonians Hold Skilling and His Co-Defendants *Responsible* For Causing the Community's Suffering.**

The Task Force's heavy emphasis on the trials and proceedings in the Nigerian Barges,

Arthur Andersen, Enron Broadband Services and Lea Fastow cases only underscores the need to

change venue in this case.[57] Houstonians exhibit an intense hostility towards Skilling and his co-

---

[52] Zagorski Decl. ¶ 12.
[53] Opp. at 45.
[54] Opp. at 20, 43-44.
[55] The 1993 World Trade Center bombing may have affected the New York community, but neither the defense nor the Court in *United States v. Salameh* addressed the community experience concerns raised here. 1993 WL 364486 (S.D.N.Y. Sept. 15, 1993) ("Counsel for Salameh advances the argument that a change of venue may be warranted *due to the publicity* incident to the crimes charged..."; emphasis added). Opp. at 43.
[56] Mot. at 25-33; Marroso Exs. 9, 12.
[57] Opp. at 17-19.

defendants not directed towards any other Enron-related individuals or entities.[58]  No other

Enron defendant has drawn comparisons to Satan, Osama Bin Laden, Adolf Hitler, murderers,

rapists, and child molesters.[59]  No other Enron defendant has had his life threatened in a rap

song, his Congressional testimony publicly characterized as "unbelievable," "inconceivable,"

and "b.s.," or been called a liar by the *Houston Chronicle* sports page—*twice*.[60]  No other Enron

defendant has had his defense belittled in the *Chronicle* as a "smoke screen" and a "fantasy

world."[61]  By contrast, the Barges and EBS defendants, Lea Fastow, and the principals of Arthur

Andersen were hardly known to the public at all.  Indeed, it was precisely because those

defendants are relatively anonymous that Houston courts denied their motions to transfer

venue.[62]  The defendants here are anything but anonymous.[63]

　　　　As the survey data show, Houstonians blame Enron's highest officials for causing the

company's bankruptcy.  Skilling and Lay, the company's chief executives and most public faces,

have been portrayed as the ultimate "villains."[64]  This is not remotely the case for the Barges

defendants, the EBS defendants, Lea Fastow, or Arthur Andersen.  As Scott Armstrong explains,

those earlier prosecutions were only pieces of the puzzle; in the eyes of the Houston public and

media, the puzzle will not be complete, the story not fully told, and the community not fully

---

[58] The only Enron defendant regularly mentioned in the press is former Chief Financial Officer Andrew Fastow.  As the Task Force points out, Fastow filed a motion for change of venue but pled guilty before it was decided.  Opp. at 40; Mot. at 33.

[59] Mot. at 2-4; Marroso Exs. 6, 7, 9; Anthony Decl. Ex. 3.

[60] Mot. at 14-20; Marroso Exs. 18, 60, 61, 75.

[61] Mot. at 14-20; Marroso Exs. 35, 37.

[62] *United States v. Lea Fastow*, 292 F. Supp. 2d 914, 918 (S.D. Tex. 2003) ("Many of the articles submitted by Mrs. Fastow do not even mention her or the captioned matter"); *United States v. Hirko*, Crim. No. H-03-0093, Nov. 26, 2004 Order at 5-6 (Govt. Ex. 3) ("Most of the Enron-related media coverage referenced by Defendants does not even mention any of the EBS Defendants in particular, or the EBS case as a whole.").

[63] Armstrong Decl. ¶¶ 38, 40, 44; Armstrong Supp. Decl. ¶¶ 16; Bronson Supp. Decl. ¶¶ 8, 26, 34; Causey's name recognition is not as high as that of Skilling or Lay.  However, his job title, Chief Accounting Officer of Enron, will make him a target of similar bias when selecting a jury.  Further, given that the Court denied Causey's severance request, his ability to receive a fair trial is inextricably linked to that of his co-defendants.

[64] Mot. at 14-15; Marroso Exs. 41, 71; Marroso Supp. Exs. 8 (*Houston Chronicle*).

healed, until the "big fish" are brought to justice.[65]

To be clear, it is not, as the Task Force suggests, that Skilling and Lay rely on only their "relative prominence" to distinguish themselves from other Enron defendants.[66]  Rather, it is that Houston believes Enron's collapse to be *their fault*.  Even more to the point, the community believes Skilling and his co-defendants brought Enron down by *criminal* conduct.  Because Skilling, Lay, and Causey are blamed for the betrayal and suffering felt by Houston, the risk of those strongly held views interfering with a fair trial is exponentially greater in this case than in any other Enron prosecution.[67]

## IV.   PERVASIVE CONTINUING NEGATIVE PRE-TRIAL PUBLICITY WARRANTS A TRANSFER OF VENUE.

### A.   The Houston Media Reflects and Reinforces Pre-Existing Prejudicial Sentiment Unique to Houston.

Contrary to the Task Force's claim, defendants do not contend that publicity was the primary cause of Houston's prejudice.[68]  Though not the root, the media has certainly played a critical role in *reflecting, developing, and reinforcing* the prejudicial mindset.

Again, *McVeigh* is instructive.  Just as the Oklahoma media responded to the bombing of the Alfred P. Murrah Federal Building, the Houston media reacted to the Enron tragedy with an equal display of "civic journalism."  Endeavoring to identify *the community's beliefs and*

---

[65] Mot. at 21-23; Marroso Supp. Ex. 74 (*Houston Chronicle*); Marroso Exs. 220-222; Armstrong Decl. ¶¶ 13, 64; Armstrong Supp. Decl. ¶¶ 27, 40, 51-53.  The Task Force holds the same view.  The indictment against Skilling, Lay, and Causey spans the entire rise and fall of Enron.  Count One alleges a sprawling conspiracy to fabricate Enron's success over several years and explicitly ties that conspiracy to the company's collapse.  The indictments in all other Enron prosecutions have been substantially more narrow.  None includes the broad conspiracy alleged in Count One, nor are the other indictments explicitly linked with Enron's bankruptcy.  Superseding Indictment at ¶¶ 18-26; Marroso Supp. Exs. 77, 78, 79 (*Lea Fastow* Indictment; *Hirko* Indictment; *Bayly* Indictment).

[66] Opp. at 34.

[67] Moreover, as discussed below, there is a strong likelihood that these views have affected other Enron cases already, despite efforts at excluding jurors who hold them through voir dire.

[68] *See, e.g.,* Opp. at 6, 10, 13 ("To justify transfer *based on pre-trial publicity*, the defendant shoulders the heavy burden of establishing that the publicity in essence displaced the judicial process.") (emphasis added).

*informational needs*, for 36 months—and counting, the *Chronicle*, other local papers, television and radio stations, websites, and residents on symbolic soapboxes have sought to help their community grieve and seek closure.[69]  This has taken the form of daily coverage of every Enron detail, from the bombshells (indictment of key figures) to the trivial (Barges defense lawyer's heart rate doubled as verdict was read);[70] human interest pieces chronicling the tragedy and triumph of victims;[71] fiery editorials excoriating defendants as "desperate" "liars" living in a "fantasy world";[72] fueling an "us vs. them" mentality[73]; all but guaranteeing Houstonians that they, not outsiders, will host the trial of the men perceived to have wrought the devastation;[74] and constant reassurance, through "experts," that the "all star team of prosecutors" is building a force of "star witnesses" to testify against these defendants.[75]

This media blitz reflects and reinforces the community's empathy for the victims, fury at defendants, and yearning for closure.  Every Houstonian seated as a juror in this case will consciously or subconsciously view the evidence through these prejudicial prisms.  At the same time, they will be acutely aware that their peers demand justice and long for finality, neither of which, they perceive, can be achieved unless Skilling, Lay, and Causey "wind up in jail."[76]

**B.**     **The Task Force's Media Analysis Is Deficient and Misleading.**

Positing this is an ordinary "publicity only" case, Dr. David Zagorski purports to analyze

---

[69] Armstrong Supp. Decl. ¶¶ 47, 51.

[70] Armstrong Supp. Decl. ¶¶ 8, 27; Marroso Supp. Ex. 23; Armstrong Decl. ¶¶ 58, 60-62, Exs. 18, 19.

[71] Armstrong Supp. Decl. ¶¶ 9, 51; Armstrong Decl. ¶¶ 71-72; Marroso Exs. 184-190, 192, Supp. Exs. 7, 9.

[72] Armstrong Supp. Decl. ¶ 51; Armstrong Decl. ¶¶ 74-78, 82; Marroso Exs. 17, 18, 35, 37, Supp. Ex. 15.

[73] Armstrong Supp. Decl. ¶¶ 8, 27; Armstrong Decl. ¶ 61; Marroso Exs. 212, 239, 241, 250, 251, 281, Supp. Ex. 23.

[74] Armstrong Supp. Decl. ¶ 51; Marroso Supp. Ex. 20; Armstrong Decl. ¶ 91; Marroso Ex. 255.

[75] Mot. at 12; Armstrong Supp. Decl. ¶¶ 41-45, 51; Marroso Supp. Exs. 8, 10, 84; Armstrong Decl. ¶¶ 80-84, Ex. 23; Marroso Exs. 220, 289.

[76] Marroso Exs. 21-25 ("I hope [Skilling] winds up in jail . . . .  My guess is he will be led off in handcuffs, and when that happens the people who worked at Enron will feel that it didn't come soon enough.").

the publicity in Houston.[77]  He does so by reviewing less than 10% of the relevant materials, performing a deficient quantitative-only analysis on that minimal subset, and reporting inaccurate results.  Each error contributed to insupportable conclusions by the Task Force.

Most importantly, Dr. Zagorski's report is bereft of any *qualitative* assessment of the media coverage.  Counting articles by source and year and pigeonholing them into categories like "front-page" or "op-ed piece" is a quantitative exercise.[78]  Dr. Zagorski failed to examine any aspect of the *content* of the media coverage in Houston—including the depth of coverage, intensity of language, or repeated thematic threads.[79]  Indeed, Dr. Zagorski *never once* mentions Skilling's media expert, Scott Armstrong, or the work and findings detailed in his 40-page declaration.  Having elected not to perform any qualitative analysis, the Task Force has no sound basis to conclude that Houston's media coverage has not been "inflammatory."[80]  That claim is instantly undermined by the most cursory look at the inflammatory articles, television abstracts, and broadcasts about Skilling and about this case, including more examples from just the last six weeks.[81]

To make things worse, even the analysis that Dr. Zagorski did perform was based on a flawed premise—he analyzed only the 297 articles "*cited in* the memorandum in support of [defendants'] motion."[82]  Yet Skilling's media expert reviewed more than *3,000* articles from the *Chronicle* alone, not to mention hundreds more from national papers of record and the four

---

[77] Nothing in Dr. Zagorski's qualifications qualifies him to analyze pretrial publicity. Zagorski Decl. ¶¶ 1-6.
[78] Zagorski Decl. ¶¶ 13-19.
[79] *Compare* Opp. at 34 *with* Zagorski Decl. ¶¶ 13-19.
[80] Opp. at 29-30.
[81] Armstrong Decl. ¶¶ 74-78, 82, 93, Ex. 26; Marroso Exs. 35, 37, 60, 196, 197, 290, 293, 294. *See Abrahams*, 453 F. Supp. at 753 (transferring venue based in part on "38 pages of broadcast transcripts from Channel 5 WCVB-TV (Boston) ... [and] a videotape of a Channel 4 WBZ-TV (Boston) television newscast...").
[82] Zagorski Decl. ¶ 13; Opp. at 29-34. Dr. Zagorski's count of articles mentioning each defendant is more than 10% deficient for each Skilling and Lay. Zagorski Decl. ¶ 14; Armstrong Supp. Decl. ¶ 16; Marroso Supp. Ex. 73 (Table). Skilling's expert "cannot recall any situation where a corporate executive's name was reported more often and more negatively than Jeff Skilling by the local news media." Armstrong Supp. Decl. ¶ 16; Marroso Decl. ¶ 2.

dominant newspapers in Phoenix, Denver, and Atlanta.[83]  Dr. Zagorski also failed to perform any review or analysis of television and Internet reports.[84]

Relying on Dr. Zagorski's "quick and dirty" review, the Task Force concluded that coverage of Enron and these defendants, while rampant in 2002, faded to back-page news, if newsworthy at all, in 2004.[85]  That is demonstrably untrue: "[i]n the first 10 months of 2004, the *Chronicle* ran 129 stories related to Skilling, *5 times* as many stories about Skilling than ran in the other 4 papers *combined*."[86]  Likewise untrue is the Task Force's assertion that the 2004 coverage has been "objective," "factual," and increasingly "favorable."[87]  Inflammatory articles abound in 2004.[88]  In the past six weeks alone, *three years after Enron's collapse*, the *Chronicle* ran highly prejudicial pieces—about Enron, about the defendants and their families, and even about this motion:

- On November 7, the *Chronicle* ran a column commending the Barges jury for using "common sense" to "cut through Enron's financial smoke screen ... concocted ... to gussy up Enron's finances."  The column intimated that if the jury in the trial of Skilling, Lay, and Causey applies common sense, it too will convict.  Moreover, even though defendants' motion had not yet been filed, the *Chronicle* reassured Houston that "Sheila Kahanek's acquittal will make it difficult for other defendants, former Chairman Ken Lay and former executive Jeff Skilling among them, to argue an impartial jury can't be found here."[89]

- On November 10, after this motion was filed, the *Chronicle* characterized Skilling as "desperate," and left no doubt about Houstonians' desire to see him in jail: "FROGGY GOES A-COURTING: Did once powerful Enron CEO Jeff Skilling

---

[83] Armstrong Supp. Decl. ¶ 3; Armstrong Decl. ¶ 8.

[84] Armstrong Supp. Decl. ¶ 7; Armstrong Decl. ¶¶ 60-61, Exs. 18, 19, 20A, 26.

[85] Opp. at 31-34.

[86] Armstrong Decl. ¶ 40 (emphasis in original).  Similarly, "[t]here were 637 Enron related articles in the Chronicle (not including sports-related Enron Field mentions), *5.2 times* the number of such stories in the Atlanta Journal-Constitution (121), *7.3 times* the number that appeared in the Rocky Mountain News (87), *10.4 times* the number that appeared in the Denver Post (61) and *15.5 times* the number that appeared in the Arizona Republic (41)." *Id.*  The disparity is even greater for 2004 television news, and no media anywhere approaches the volume and depth of chron.com's SPECIAL REPORT: ENRON.  Armstrong Decl. ¶¶ 43-44, 45-49.

[87] Opp. at 29-33.

[88] Armstrong Decl. ¶ 82; *see, e.g.*, Marroso Exs. 2, 15, 23, 28, 29, 35-39, 45, 54, 60, 66-68, 77, 87, 106, 162, 196-97, 217, 225, 230, 234, 239, 241, 248, 255, 276, 280, 293, 294.

[89] Marroso Supp. Ex. 20 (*Houston Chronicle*); Armstrong Supp. Decl. ¶¶ 35-37.

really need pollsters to prove Houstonians want a change of venue for him worse than he does?"[90]

- On November 20, another article, again using "desperate" in the headline, began: "Federal prosecutors seem to have hit on the perfect technique for cracking those tough, macho Enron executives indicted after the company's collapse: just use an investigation of the alleged perp's spouse as a rubber hose to break down his will to fight it out in court." The article also cites Lay's attorney as saying prosecutors "believe they were anointed by the Lord to do what they please," but then rebukes him: "If so, maybe they got that way by studying the behavior of their quarry."[91]

- On November 24, 2004, another *Chronicle* column mocked Lay's wife for her national "sobfest," noting that her tears "are a mere puddle compared with the sea of suffering and sorrow her husband and his cronies bestowed on so many others"; teased Lay's attorney's strategy as "part Sgt. Shultz—Ken Lay knew nothing—and part Coasters—why's everybody always picking on his clients?"; and claimed "hardball fraud" and "terrible evil" brought down Enron.[92]

- Yesterday, the *Chronicle* reported on its "s[i]t down" conversation with the "all star team" of federal prosecutors. One Task Force prosecutor described as "priceless" the "ability to stand before a Houston jury in the first Enron trial and say that this case is about the integrity of our public markets." The Task Force director was quoted as saying: "The barge case was a microcosm of all Enron cases. It's about a company on steroids, artificially enhanced with side deals and other methods, appearing to be something it wasn't. But unlike steroids in the sports world, there are many, many more victims here."[93]

- The *Chronicle*'s website includes a link to the email from the Barges juror to Ms. Kahanek's attorney, epitomizing Houston's "us vs. them" mentality and hatred for these defendants: "You and Sheila left those NY lawyers choking in your dust. They probably scratched their heads over that one while telling everyone how stupid we are down here in Texas. I noticed the big boys want to change their trial location. DON'T MESS WITH TEXAS!"[94]

---

[90] Marroso Supp. Ex. 15, (*Houston Chronicle*). On the same day, the *Austin American-Statesman* ran an editorial— "Let them stew in Houston"—echoing Houston's attitude: "What the defendants fear is the wrath of people who were harmed by the collapse of Enron after it was found to be a shell game. In Houston, it wasn't just investors who lost their shirts; thousands of employees lost jobs, savings accounts and pension plans, and institutions from the Astros to local charities were left in the lurch when the company failed. From a legal perspective, it makes sense that Skilling, Lay and Causey would want to be tried in a city where the damage wasn't so great and so personal. But from the standpoint of pure justice, the wealthy executives really should be judged right where their economic hurricane struck with the most force. . . . It seems unfair to the Enron victims to have the disgraced executives living the high life in a top hotel in a great city while on trial for serious crimes." Marroso Supp. Ex. 41 (*Austin American-Statesman*).
[91] Marroso Supp. Ex. 10 (*Houston Chronicle*).
[92] Marroso Supp. Ex. 8 (*Houston Chronicle*).
[93] Marroso Supp. Ex. 84 (*Houston Chronicle*).
[94] Marroso Supp. Ex. 76 (*Houston Chronicle* website).

Resorting again to rhetoric over analysis, the Task Force characterizes Skilling's submission as "bloated" because it included editorials, letters to the editor, sports articles, humorous "similes," and other "non-front page" references to defendants.[95]  To the contrary, this material is *essential* to a qualitative assessment of media, because it helps understand how the media reflects and amplifies community feelings.[96]  These articles show not only the existence of Houston's prejudice, but also the intensity and extent to which it has permeated popular culture.[97]

The Task Force also insinuates that the *Chronicle*'s 40%-50% circulation rate is too low for a venue transfer.[98]  The Task Force is wrong.  By its own account, the *Chronicle* has "the 2nd highest daily- and Sunday-issue readership penetration in the nation among the nation's top DMAs."[99]  Not surprisingly, courts have transferred cases from venues served by papers with similar circulation rates,[100] and even the Task Force concedes that the circulation of Houston's "media coverage of Lea Fastow's confession of guilt through her plea allocution" was sufficient to warrant a venue transfer.[101]  Moreover, market penetration includes not only newspaper circulation, but also saturation of other media sources.[102]  Ratings data establish that hundreds of thousands of Houstonians view local television news every day, and over 750,000 people visit

---

[95] Opp. at 30-32.

[96] Armstrong Decl. ¶ 9(c); Armstrong Supp. Decl. ¶¶ 51, 52.  *See also Coleman*, 778 F.2d at 1492-95 (quoting several "editorials" to support transfer of venue); *McVeigh*, 918 F. Supp. at 1467.

[97] Mot. at 21-22; Marroso Exs. 60-61.

[98] Opp. at 30-31; Zagorski Decl. ¶ 16.

[99] Marroso Supp. Ex. 5 (*Houston Chronicle* website).  DMA, or Designated Market Area, is Nielsen's market design used to provide information to advertisers and broadcasters.  The Houston venue falls within one of the 10 largest DMAs in the country.

[100] Armstrong Supp. Decl. ¶ 17 (Daily Oklahoman (*McVeigh*) had a 30%-45% circulation rate; Atlanta Journal-Constitution (*Tokars*) had a 40%-58% circulation rate).

[101] Opp. at 18 n.8.

[102] *Coleman*, 778 F.2d at 1492-95 ("To convey an accurate picture of the sentiment in this small rural community, we have found it necessary to provide a comprehensive description of the publicity, beginning with the printed media, then the broadcast media, and finally, word-of-mouth communication."); *McVeigh*, 918 F. Supp. at 1467 (citing newspaper and television coverage as basis for transferring venue); *United States v. Tokars*, 839 F. Supp. 1578, 1582-83 (N.D. Ga. 1993) (describing song played on radio).

the *Chronicle* website per month.[103]

While pervasive reporting is not sufficient *by itself* to warrant a transfer of venue, that is not what occurred here. In Houston, the media has "combin[ed] extraordinary volume of coverage (virtually all of which is highly negative to the Defendants) with the emotional nature of some coverage," precisely the sort of additive atmosphere necessary to "infer that a widespread bias exists which could interfere with a fair trial."[104]

## V.   INDEPENDENT POLLS CONDUCTED BY DEFENDANTS AND THE TASK FORCE DEMONSTRATE THAT HOUSTON IS AN UNFAIR VENUE.

The Task Force's polling analysis applies the wrong legal standard, levels specious attacks on Skilling's survey, and presents misleading results from its own poll. Nevertheless, the Task Force's poll, like Skilling and Lay's, proves the same irrefutable fact: Houston is intolerably biased against these defendants.

### A.   Defendants Need Only Show They Cannot Obtain a Fair Trial in Houston.

Without citation to authority, the Task Force imposes upon defendants the burden of proving not only that a trial in Houston would be unfair, but also that an alternate venue "provides a substantially greater likelihood of selecting a fair and impartial jury."[105] No such burden exists. Under Rule 21, a transfer "shall" be granted if "there exists *in the district where the prosecution is pending* so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial."[106] Courts have transferred venue without mentioning—let alone

---

[103] Amrstrong Decl. ¶ 15-17; Armstrong Exs. 3-13; Armstrong Supp. Decl. ¶¶ 19-21; Marroso Supp. Ex. 5 (*Houston Chronicle* website).

[104] *See Tokars*, 839 F. Supp. at 1582-83 (song and best "Local Villain" award); *Abrahams*, 453 F. Supp. at 753 ("Turkey of the Year" award). *Compare* Marroso Exs. 75-78 (rap song: "Drop the 'S' Off Skilling"); 29, 33-34, 77 ("Best Local Boy Gone Bad" and "Bum Steer of the Year" awards). *See also Nevers*, 990 F. Supp. at 863 (E.D. Mich. 1997) ("Although many of the articles written about the Green incident were factual, a significant portion of the pre-trial publicity contained prejudicial information that so saturated the Detroit community, it became impossible for the defendants to receive a fair trial within the city").

[105] Opp. at 41.

[106] FED. R. CRIM. P. 21(a) (emphasis added).

20

comparing—the absence of prejudice in alternate venues.[107]

In any event, defendants have shown a "substantially greater likelihood" of an unfair trial in Houston.[108]  Skilling's survey, like the Task Force's, establishes statistically significant differences between Houston and Phoenix.  Skilling's survey also showed statistically significant differences between Houston, Denver, and Atlanta.  That showing is *unrebutted*.

### B.     The Task Force's Criticisms of Defendants' Survey Are Unfounded.

Question 4 of Skilling's poll asked respondents to "name all former top executives of Enron who you believe are guilty of crimes."  Slightly more than 12% identified Skilling. Question 5 asked respondents "what words come to mind when you hear the name Jeff Skilling?"  Roughly one-third provided negative words.[109]  Observing that "approximately nine of ten respondents ... failed to cite Skilling" and "seven out of ten could not summon even a single negative word about" him,[110] the Task Force concludes Skilling has the "opportunity to select 12 fair and impartial jurors from the Houston division."[111]

The Task Force does not understand the data.  Skilling's poll does not mean that 90% of Houston is impartial towards these defendants.  Questions 4 and 5 did not test, and were not intended to test, the raw number of Houstonians who are biased against Skilling.  Instead, those questions probed the *intensity* of animus towards Skilling.  Had Skilling's survey questions included information (a) identifying Skilling as being the former CEO of Enron; (b) elaborating on the criminal charges alleged; or (c) providing closed-ended choices, the prejudicial results

---

[107] *Tokars*, 839 F. Supp. at 1583 (defendant's survey tested prejudice of Atlanta only); *Johnson*, 337 F. Supp. at 1376-77; *Nevers*, 990 F. Supp. at 862-64; *Holder*, 399 F. Supp. at 228.

[108] Opp. at 41.

[109] Anthony Decl. ¶ 12.  The results from Lay's independent poll support Skilling's data: 32.8% of people identified Lay in response to the prompt "name all former top executives of Enron who you believe are guilty of crimes."  More than 40% described him negatively when asked "what words come to mind when you hear the name Ken Lay?"  Anthony Supp. Decl. ¶ 8.

[110] Opp. at 3-4, 36-38.

[111] Opp. at 36-38.

would have been dramatically higher. In fact, the Task Force's own poll—exhibiting each of the characteristics just described—revealed that nearly *six in ten* Houstonians already believe defendants are probably or definitely guilty of the crimes charged.[112]

In contrast, Question 4 in Skilling's poll was open-ended and required respondents to both recall Skilling's name *and* make the judgment that he is guilty. Approximately 12% did. Skilling's experts, Drs. Anthony and Bronson, agree that a response rate over 10% for such a two-pronged open-ended question is "remarkable."[113] Dr. Zagorski does not dispute this. Indeed, Dr. Zagorski made no attempt to address or assess the significance of the results derived from an open-ended, two-tiered question requiring unaided memory retrieval.

Similarly, Skilling's experts agree that in response to Question 5, a free association question asking respondents to conjure up words to describe a corporate executive, a 31.8% negative response rate is significant.[114] Even more significant was the extent, intensity, and anger of Houston's negative responses, including lengthy diatribes using words like "pig," "devil," and "evil."[115] Again, Dr. Zagorski neither disputed nor assessed these conclusions.

Moreover, the responses to Skilling's Questions 4 and 5 cannot be viewed in isolation from the other two questions in his poll or from the data obtained from other cities. Doing so takes the data out of context. Skilling tested not only for direct animus, but also for the existence of perceived victimization due to Enron's collapse. The results are staggering: approximately *33%* of Houstonians personally know someone harmed by Enron's collapse; and approximately

---

[112] Zagorski Decl., Table 4 at 18. Perhaps this is why Judge Matsch observed, "surveys are but crude measures of opinion at the time of the interviews. Human behavior is far less knowable and predictable than chemical reactions or other subjects of study by scientific methodology." *McVeigh*, 918 F. Supp. at 1473.
[113] Anthony Decl. ¶ 38; Bronson Decl. ¶¶ 58, 59; Anthony Supp. Decl. ¶ 17(d).
[114] Anthony Decl. ¶¶ 16, 18; Bronson Decl. ¶ 62; Anthony Supp. Decl. ¶¶ 18, 27.
[115] Anthony Decl. ¶¶ 17, 18; Bronson Decl. ¶ 64; Anthony Supp. Decl. ¶ 27.

22

*70%* believe that they were hit harder by Enron's collapse than anyone else in the country.[116]

### C.    The Task Force's Own Survey Compels a Change of Venue.

The Task Force's own polling data show that *90.8%* of respondents in Houston are aware

of the indictments in this case, and *63.6%* of those people believe Skilling is probably or

definitely guilty.[117]  As before, Dr. Zagorski offers no opinion as to whether a 63.6%

predisposition level is modest, average, or intolerably high.  And for good reason.  Recently, the

president of Dr. Zagorski's own consulting firm stated publicly that a predisposition level of "50

percent is marginal, *while 65 percent and more is quite convincing*."[118]

Courts agree.  In *United States v. Tokars*—one of the cases cited by Skilling but ignored

by the Task Force—polling data nearly *identical* to Dr. Zagorski's supported a venue change:

| Task Force Data vs. *Tokars* Data | *Tokars* (Atlanta) | Skilling (Houston) |
|---|---|---|
| Percentage with knowledge of case | 86.1% | 90.8% |
| Of those with knowledge, percentage who formed an opinion about defendant's guilt | 66.0% | 66.6% |
| Of those with an opinion, percentage who believed defendant is guilty | 97.9% | 95.5% |
| Percentage of venue who believed defendant is guilty | 55.6%[119] | 57.8%[120] |

Perhaps because its own poll exposed Houston as a biased venue, the Task Force

obfuscates the true results.  Only by looking at a subset of the populations (*i.e.*, persons who

have heard of the indictments, as opposed to the venue as a whole) does the Task Force claim

---

[116] *See* Anthony Supp. Decl. ¶ 21.  The Task Force tries to sidestep the importance of these questions, arguing that voir dire easily identifies jurors with "personal knowledge" of victims, and it is merely a statement of "fact" that 70% of Houston believes it was more impacted by Enron's collapse than other places.  Opp. at 39 n.20; Zagorski Decl. ¶ 12.  It is highly significant that *one-third* of the Houston jury pool is subject to *automatic exclusion*, especially when compared to the markedly lower percentages in Phoenix, Denver, and Atlanta.  Anthony Decl. ¶ 15.  Similarly, the conceded "fact" that 70% of Houston feels victimized by Enron also corroborates the conclusion that Houston is an unfair venue.

[117] Zagorski Decl. ¶¶ 25-26.

[118] Marroso Supp. Ex. 71 (*Sacramento Bee*) (emphasis added).

[119] *Tokars*, 839 F. Supp. at 1583 (86.1% * 66.0% * 97.9% = 55.6%).

[120] Anthony Supp. Decl. ¶ 7; Zagorski Decl. ¶¶ 25-26 & p.14.

23

that people in Phoenix were "actually *more likely* than their counterparts in Houston [66% to 63%] to believe that Skilling, Causey, and Lay are guilty of the charges against them."[121]   That subset is irrelevant.[122]   If one views the proper measure—the percentage of the *venue as a whole* who believe these defendants is guilty—it becomes clear why the Task Force sought to bury it. By a statistically significant margin, Houston is more likely than Phoenix to have prejudged the guilt of Skilling, Lay, and Causey:

### Zagorski Data:  Expressing Belief That Defendants Are Guilty[123]

|  | **Houston** | **Phoenix** | **Statistically Significant Difference?** |
|---|---|---|---|
| Skilling | 57.8% | 48.0% | Yes |
| Lay | 57.8% | 48.2% | Yes |
| Causey | 55.0% | 45.2% | Yes |

## VI.   VOIR DIRE CANNOT PROTECT THE FAIRNESS OF THIS TRIAL.

Instead of conducting a thorough analysis of community prejudice in Houston, the Task Force relies heavily on the curative power of voir dire.[124]   Voir dire is not a panacea:  there are some prejudices and social forces that voir dire is powerless to expose.

### A.     All Houstonians Share a Unique Subconscious Prejudice.

Because they lived proudly through Enron's rise and endured the suffering of its fall, the citizens of Houston cannot help but harbor a subconscious bias against defendants.  Houston jurors will view this trial as a case about community tragedy.  They will view themselves as occupying special historic roles to vindicate the community and punish the accused.  Through that "lens," each juror will see, hear, and assimilate the evidence.  As in *McVeigh*, this

---

[121] Zagorski Decl. ¶ 35 (emphasis added); Opp. at 40.

[122] For example, if only three people in Phoenix heard of the indictment and two of those (66.6%) thought Skilling was guilty, the Task Force could advance the same argument made in its opposition.  The Task Force's survey suffers from other deficiencies and misleading data presentation, as detailed in Dr. Anthony's Supplemental Declaration.  Anthony Supp. Decl. ¶¶ 2, 7, 12-16.

[123] Anthony Supp. Decl. at Table 1.

[124] Opp. at 4, 19-28, 41-45.

psychological filter will influence every aspect of a Houston jury's decision-making process—including how they weigh competing evidence, their willingness to reject prosecution evidence and accept defense evidence, how they resolve credibility differences, and their overall receptivity to the arguments of each side.[125] Juries in other venues will judge this case through a more objective, dispassionate lens. The critical difference is that while other venues are certainly aware of the Enron story, *only* the jury pool in Houston lived it.

Voir dire cannot uncover or eliminate this prejudice. Each juror's perceptive "lens" is subconscious, unknowable even to the jurors themselves; it is part of how their minds work and react to outside stimuli. Even if jurors tell the Court they have no preconceptions about the defendants—even if they sincerely believe it—their deliberative process will still be affected by the community trauma they have internalized as members of the Houston community. Courts have explicitly recognized this danger:

- "One cannot assume that the average juror is so endowed with a sense of detachment, so clear in his introspective perception of his own mental processes, that he may confidently exclude even *the unconscious influence of his preconceptions. . . .* This is particularly true in the determination of issues involving the credibility of witnesses."[126]

- "[Prejudice] *may go unrecognized in those who are affected by it.* The prejudice that may deny a fair trial is not limited to a bias or discriminatory attitude. *It includes an impairment of the deliberative process of deductive reasoning from evidentiary facts resulting from an attribution to something not included in the evidence.* That something has its most powerful effect if it *generates strong emotional responses.*"[127]

- "The influence that lurks in an opinion once formed is so persistent that it *unconsciously fights detachment from the mental processes.*"[128]

- "[T]he outside influences ... had been so pervasive prior [to sequestration] that the insulation could not eliminate impressions they may have prior thereto, *at least subconsciously*, formed. *What the ears hear and the eyes*

---

[125] *McVeigh*, 918 F. Supp. at 1471; Armstrong Supp. Decl. ¶¶ 51-53; Mot. at 21-23, 34-37.
[126] *Delaney v. United States*, 199 F.2d 107, 112-13 (1st Cir. 1952) (emphasis added); *United States ex. rel. Bloeth v. Denno*, 313 F. 2d 364, 373 (2d Cir. 1963); *Marcello*, 280 F. Supp. at 514; *Florio*, 13 F.R.D. at 298.
[127] *McVeigh*, 918 F. Supp. at 1472 (emphasis added).
[128] *Irvin*, 366 U.S. at 727 (emphasis added).

25

*see, the mind retains.*"[129]

In most cases, the jury's "lens" poses no problem; of necessity, jurors in every case bring their experience to bear as they weigh the evidence. But in most cases that experience is detached from the alleged crimes and issues to be tried. That is not possible in this case.

**B.    Members of the Houston Community Cannot Reasonably Be Expected to Set Aside Their Preconceived Opinions and Be Impartial.**

Given the community's vital stake in this case, voir dire will not ensure that Houston jurors will set aside even their consciously held preconceived opinions. As the Task Force points out, citing *Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961), the law does not require that jurors be ignorant, only that they be able to set aside their preconceptions.[130] But *Irvin* itself recognized the distinction between "*any* preconceived notion ... *without more*," and "strong and deep impressions" rooted in "a wave of public passion."[131] "[T]he efficacy of voir dire in screening the prospective jurors is diminished" when "deeply-rooted passions" have permeated the community.[132] The *intensity* of the preconception is paramount. If an opinion is intertwined with strong emotions, the "court may disregard prospective jurors' assurances of impartiality" as unreliable,[133] even if they are well-intentioned:

> Extensive publicity before trial does not, in itself, preclude fairness. . . . Properly motivated and carefully instructed jurors can and have exercised the discipline to disregard that kind of prior awareness. *Trust in their ability to do so diminishes when the prior exposure is such that evokes strong emotional responses or such an identification with those directly affected by the conduct at issue that the jurors feel a personal stake in the outcome.*[134]

---

[129] *Wansley v. Miller*, 353 F. Supp. 42, 50 (E.D. Va. 1973) (emphasis added).

[130] Opp. at 41-42.

[131] *Irvin*, 366 U.S. at 722 n.3, 723, 728 (emphasis added).

[132] *Holder*, 399 F. Supp. at 227.

[133] *Marcello*, 280 F. Supp. at 514-15; *see also Murphy*, 421 U.S. at 800 ("the juror's assurances that he is equal to [the] task cannot be dispositive of the accused's rights"); *Williams*, 523 F.2d at 1209 n.10 ("continual protestations of impartiality from prospective jurors are best met with a healthy skepticism from the bench"); *Nevers*, 990 F. Supp. at 864 ("jurors' claims that they can be impartial should not be believed").

[134] *McVeigh*, 918 F. Supp. at 1471 (emphasis added).

Houston's preconceived opinions are deep-seated and emotionally charged.[135] They derive from feelings of betrayal, anger, sympathy for the victims, and an "us vs. them" hostility towards the Enron executives perceived to be responsible for the collapse—the defendants in this case.[136] Though Houston jurors may *say* they can be impartial, their feelings are simply too deep and powerful to be set aside. By contrast, preconceptions in other venues lack the same depth and intensity.[137]

### C.   Houstonians Will Be Under Strong Social Pressure to Convict.

Voir dire cannot eliminate the community pressures to convict that exist only in Houston. The Task Force does not dispute or even address Dr. Klineberg's opinion that these pressures are "likely to be a powerful influence on the jury's decision-making process."[138] No amount of voir dire can protect Houston jurors—or the integrity of their verdict—from such pressures, since they know an acquittal would be condemned or viewed harshly by their friends, co-workers, and the community at large. As in *McVeigh*, voir dire is unreliable "when there is such identification with a community point of view that jurors feel a sense of obligation to reach a result which will find general acceptance in the relevant audience."[139]

### D.   Relying on Voir Dire Will Pose an Intolerable Risk.

Attempting to search for 12 needles in a deeply tainted haystack presents an unacceptable

---

[135] *See, e.g.,* Marroso Ex. 6 ("It would be easier to convince the Jews that Hitler had nothing to do with the Holocaust than it would be to convince me that Ken Lay is innocent"); Anthony Decl. Ex. 3 (Houston).

[136] Klineberg Decl. ¶¶ 16, 17; Armstrong Decl. ¶¶ 71, 72, 74-76, 81, 82; Armstrong Supp. Decl. ¶¶ 8, 27, 34-38; Anthony Decl. Ex. 3 (Houston Responses); Anthony Supp. Decl. ¶¶ 17, 18.

[137] Anthony Decl. Ex. 3 (*see generally* Phoenix, Denver, Atlanta Responses).

[138] Klineberg Decl. ¶ 18.

[139] *McVeigh*, 918 F. Supp. at 1471. In fact, "[t]he very asking of such questions [about whether they could resist "a public cry for conviction"] carries the danger of implanting or reinforcing in the jurors' minds the fear of the consequences of reaching an unpopular verdict." *People v. Boss*, 261 A.D.2d 1, 6 (N.Y. App. Div. 1999). For the same reason, voir dire also cannot fully screen out those who have financial motives to convict because of the Enron Victims' Fund. Weinstein Decl. ¶¶ 17-21. Shareholders, employees, and other direct beneficiaries will be easily identifiable. As for everyone else, the very asking whether a juror is aware that, if convicted, the defendants' assets could be distributed to the victims will plant this incentive in the juror's mind. At best, this will further cloud the subconscious "lens" of a jury pool already aligned with the victims.

27

risk of violating defendants' fair trial rights. The Task Force emphasizes that the Houston jury pool consists of 4.5 million people.[140] While it may be theoretically possible to find 12 impartial people among them, "the difficult task would be *ascertaining* which prospective jurors in fact are unbiased."[141] It is always *theoretically* possible to find 12 fair jurors, even in communities of only a few thousand. But a change of venue does not require proof of impossibility. Instead, transfers are necessary where the outside influences are so widespread in the community that relying on voir dire to weed them out is not only inefficient, but extremely dangerous. Given the pervasive prejudices in Houston, there is no room for error. The slightest flaw, mistake, or oversight in jury selection will compromise the fairness and integrity of the trial.

### E. The Nigerian Barges and Arthur Andersen Trials Prove That Voir Dire Cannot Guarantee a Fair Jury in This Case.

The Task Force argues that the jury selection process in the Andersen and Barges trials demonstrates that Houstonians have been "largely impervious" to the Enron tragedy.[142] Just the opposite is true—those proceedings show that voir dire will not accurately identify and measure Houston's true feelings about Enron or the defendants. Every available piece of evidence indicates that large percentages of the Houston venire have strong feelings of anger, betrayal, victimization, and predisposition about Enron and its executives. Armstrong's media analysis confirms this.[143] So does Dr. Klineberg's sociological analysis.[144] Dr. Anthony's poll shows 31.8% gave negative responses about Skilling (many using "anger words"); the EBS defendants' poll showed 81.4% believe most accused "Enron executives" are guilty; even the Task Force's

---

[140] Opp. at 4, 9, 20-21.
[141] *Tokars*, 839 F. Supp. at 1584 (transfer granted, despite poll showing 30% of massive Atlanta jury pool had no opinion about case, and conclusion that there were technically "sufficient unbiased jurors" in the district).
[142] Opp. at 2, 19-28.
[143] Armstrong Decl. ¶¶ 71, 72, 74-76, 81, 82; Armstrong Supp. Decl. ¶¶ 47, 51, 53.
[144] Klineberg Decl. ¶¶ 16, 17.

poll shows 57.8% believe Skilling to be guilty.[145]

Yet, at the 2002 Andersen trial, only *12 of the 300 veniremen—just four percent—* expressed anger at Enron's collapse.[146]  At the Barges trial, only *six* of 150—also *four percent—* said they believed there were "criminal things" going on at Enron.[147]  In light of the vast objective evidence indicating that the true levels of these feelings range anywhere from *eight to 20 times higher*, it is clear that the voir dire in the prior trials was a radically unreliable measure of community bias in Houston.[148]

Most importantly, voir dire in the Andersen and Barges trials did not test for biases against Skilling, Lay, and Causey, who are the principal targets of community animus and prejudice stemming from the Enron disaster.[149]  In short, the jury selection process in those cases offers the Task Force no basis to conclude voir dire will be effective in this case.[150]

## VII.   CONCLUSION

Defendants have demonstrated far beyond a "reasonable likelihood" that they cannot receive a fair trial in Houston.  Absent a change of venue, constitutional doubt will overshadow every witness, every document, and every argument at trial.  When the choice is between an

---

[145] Anthony Decl. ¶ 12; Marroso Ex. 114; Zagorski Decl. at Table 4; Anthony Supp. Decl. ¶ 7F; *see infra.*

[146] Opp. at 23.

[147] Opp. at 26; Bronson Supp. Decl. ¶ 21.  Similarly, although 33% of respondents to Skilling's survey claimed to know someone harmed by Enron's collapse, only 5% of the Barges venire raised their hands when asked the same question. Bronson Supp. Decl. ¶ 24.

[148] The Task Force's suggestion that no Barges veniremen "professed any acquaintance with or knowledge of" Skilling is highly misleading.  Opp. at 26.  The transcript itself makes clear that the Court instructed the jurors to respond only if they knew potential witnesses "as a personal acquaintance" or "friend."  Govt. Ex. 2 at 104. *See also* Bronson Supp. Decl. ¶¶ 6, 22-23.

[149] Bronson Supp. Decl. ¶¶ 26-27.  Nor can the transcripts reveal subconscious juror biases or social pressures that voir dire did *not* expose.  Marroso Supp. Ex. 75 (*Washington Post*) (according to Andersen's attorney, "I've never seen jurors as aware and possessed of opinions as in the Andersen case.  People would stand up and express their opinions about Enron *and they would be literally shaking*", emphasis added); *Irvin*, 366 U.S. at 728 ("No doubt each juror was sincere when he said that he would be fair and impartial… but the psychological impact of requiring such a declaration before one's fellows is often its father"); *Wansley*, 353 F. Supp. at 51 ("[i]t is not unusual to anticipate that certain veniremen would express, in sincere belief, an impartiality when faced with the duty of sitting on a jury, despite conscious or unconscious reservations").

[150] Bronson Supp. Decl. ¶¶ 28-32.

unfair trial in Houston or a fair trial elsewhere, it really is no choice at all.  Defendants

respectfully urge this Court to grant their motion to change venue.


Dated: December 20, 2004

                                        Respectfully submitted,


                                        By: _____

Of Counsel:                                 Daniel M. Petrocelli
                                            M. Randall Oppenheimer
Ronald G. Woods                             Mark Holscher
Texas State Bar No. 21964000                Carla J. Christofferson
Federal Bar No. 657                         O'MELVENY & MYERS LLP
5300 Memorial, Suite 1000                   1999 Avenue of the Stars, 7th Floor
Houston, TX 77007                           Los Angeles, CA 90067
Office: 713-862-9600                        Office:  (310) 553-6700
Facsimile: 713-864-8738                     Facsimile:  (310) 246-6779

                                        *Attorneys in Charge for Jeffrey K. Skilling*

                                        Reid Weingarten / By DMP

                                        Reid Weingarten
                                        Mark Hulkower
                                        STEPTOE & JOHNSON LLP
                                        1330 Connecticut Avenue, NW
                                        Washington D.C.  20036
                                        Facsimile:  (202) 429-3902

                                        *Attorneys in Charge for Richard Causey*


                                        30

## CERTIFICATE OF SERVICE

This is to verify that true and correct copies of the following documents (Reply Memorandum of Defendants Jeffrey Skilling and Richard Causey In Support Of Joint Motion To Transfer Venue; Declarations and Exhibits in Support Thereof) have been served on this 20th day of December, 2004 on counsel listed below.

David Marroso

| | |
|---|---|
| Sean Berkowitz<br>Linda Lacewell<br>Kathy Ruemmler<br>Enron Task Force<br>DOJ Criminal Division<br>1400 New York Avenue, NW<br>10th Floor<br>Washington, D.C. 20530<br>Facsimile: (202) 353-3165<br>*Enron Task Force*<br>1400 New York Avenue, NW<br>10th Floor<br>Washington, D.C. 20530<br>Facsimile: (202) 353-3165<br>*Enron Task Force* | |
| Michael Ramsey<br>River Oaks/Welch Building<br>2120 Welch<br>Houston, Texas 77019<br>Facsimile: (713) 523-7887<br>*Counsel for Kenneth L. Lay* | |