IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
ENTERED

JAN 1 9 2005

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CRIMINAL NUMBER H-04-025 |
| | § | |
| RICHARD A. CAUSEY, JEFFERY K. | § | |
| SKILLING, and KENNETH L. LAY, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

Pending before the court are the Joint Motion of Defendants Jeffery K. Skilling and Richard A. Causey to Transfer Venue (Docket Entry No. 196) and Defendant Kenneth L. Lay's Declaration of Adoption of Jeffrey Skilling's Motion to Transfer Venue (Docket Entry No. 195). Defendants argue that this case should be transferred to another venue (e.g., Atlanta, Denver, or Phoenix) because they will be unable to receive a fair and impartial trial in Houston. For the reasons explained below, the motion will be denied.

## I.   Introduction

The defendants in this action are charged in a 53-count Second Superseding Indictment (SSI) (Docket Entry No. 97) -- either jointly or individually -- with conspiracy, securities fraud, wire

fraud, bank fraud, insider trading, money laundering, and making false statements to banks.  The SSI alleges that the defendants served in various executive positions at Enron, i.e., that:  Lay served as Chief Executive Officer (CEO) and Chairman of the Board of Directors from Enron's formation in 1986 until February of 2001 when he stepped down as CEO and continued as Chairman; Skilling served as President and Chief Operating Officer (COO) from January of 1997 until February of 2001, and served as President and CEO from February of 2001 until August of 2001 when he resigned; and Causey served in various positions from 1992 until 1998 when he became Enron's Chief Accounting Officer (CAO).  (SSI ¶¶ 6-8)  The offenses charged in the SSI arise from an alleged scheme to deceive the investing public, including Enron's shareholders, the Securities Exchange Commission (SEC), and others

> about the true performance of Enron's businesses by:
> (a) manipulating Enron's publicly reported financial
> results; and (b) making public statements and
> representations about Enron's financial performance and
> results that were false and misleading in that they did
> not fairly and accurately reflect Enron's actual
> financial condition and performance, and they omitted to
> disclose facts necessary to make those statements and
> representations fair and accurate.

(SSI ¶ 5)

## II.  <u>Transfer to Another District</u>

Defendants argue that this case should be transferred to Atlanta, Denver, Phoenix, or another comparable venue because

"[a]bsent a change in venue, Skilling and his co-defendants cannot receive a fair trial."[1]  The government disagrees.[2]

## A.   Applicable Law

### 1.   United States Constitution

Article III § 2 cl. 3 of the United States Constitution provides that "[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."  The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Constitution, Amend. VI.  Nevertheless, since the Due Process Clause of the Fifth Amendment requires that the prosecution of federal crimes be fundamentally fair, the place of trial provisions in Article III and the Sixth Amendment must yield to the right to an impartial jury.  See United States v. Valenzuela-Bernal, 102 S.Ct. 3440, 3449 (1982) ("Due process guarantees that a criminal defendant will be treated with 'that fundamental fairness essential to the very concept of justice.'") (quoting Lisenba v. People of State of California, 62 S.Ct. 280, 290 (1941)).

---

[1]Memorandum in Support of Joint Motion to Transfer Venue, Docket Entry No. 197, p. 1.

[2]See Government's Memorandum of Law in Response to Defendants' Joint Motion to Transfer Venue, Docket Entry No. 231.

2.   <u>Federal Rule of Criminal Procedure 21(a)</u>

In situations where community prejudice threatens to deprive a criminal defendant of a fair trial, Federal Rule of Civil Procedure 21(a) provides for a change of venue.  The rule states that

> [u]pon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

Fed. R. Civ. P. 21(a).  Since the constitutional requirement for trial in the state and district where the offense is alleged to have been committed is a right provided to the defendant by Article III and the Sixth Amendment, a change of venue may be granted on a defendant's motion.  <u>See</u> Notes to Subdivisions (a) and (b) following Rule 21, ¶ 3 (recognizing that filing of motion waives right to trial in the state and district where the offense was committed).  The decision to transfer venue is "committed to the sound discretion of the trial court."  <u>United States v. Harrelson</u>, 754 F.2d 1153, 1159 (5th Cir.), <u>cert. denied</u>, 106 S.Ct. 277 and 599 (1985).  Every claim of potential jury prejudice due to publicity must turn upon its own facts.  <u>See</u> <u>Irvin v. Dowd</u>, 81 S.Ct. 1639, 1642 (1961) ("necessity for transfer will depend upon the totality of the surrounding facts").  Defendants bear the burden of showing that their motion for change of venue to another district should be

-4-

granted.  See United States v. Smith-Bowman, 76 F.3d 634, 637 (5th

Cir.), cert. denied, 116 S.Ct. 2537 (1996).

> 3.   Supreme Court Precedent

Jury selection has not started and no trial date has been set

in this case.  The only case that the court has found in which the

Supreme Court has reversed a conviction solely on the basis of

community prejudice arising from pretrial publicity without

examining the voir dire record for actual jury prejudice is Rideau

v. State of Louisiana, 83 S.Ct. 1417 (1963).

> In Rideau the Supreme Court, "without pausing to examine
> a particularized transcript of the voir dire examination
> of members of the jury," 83 S.Ct. at 1419-1420,
> overturned the conviction of a habeas petitioner whose
> uncounselled confession had been filmed, recorded, and
> then broadcast three times by the local television
> station to large audiences in the Louisiana parish from
> which the jury was drawn and in which he was tried two
> months later.  The principle distilled from this holding
> by courts subsequently discussing the case is that where
> a defendant adduces evidence of inflammatory, prejudicial
> pretrial publicity that so pervades or saturates the
> community as to render virtually impossible a fair trial
> by an impartial jury drawn from that community, "[jury]
> prejudice is presumed and there is no further duty to
> establish bias."

Mayola v. State of Alabama, 623 F.2d 992, 996-997 (5th Cir. 1980),

cert. denied, 101 S.Ct. 1986 (1981) (quoting United States v. Capo,

595 F.2d 1086, 1090 (5th Cir. 1979), cert. denied sub nom Lukefar

v. United States, 100 S.Ct. 660 (1980)).  Relying on principles

distilled from Rideau the Fifth Circuit has explained that

> [g]iven that virtually every case of any consequence will
> be the subject of some press attention . . . the Rideau

> principle of presumptive prejudice is only rarely
> applicable, and is confined to those instances where the
> petitioner can demonstrate an extreme situation of
> inflammatory pretrial publicity that literally saturated
> the community . . .

United States v. Lipscomb, 299 F.3d 303, 344-345 (5th Cir. 2002)

(citing Mayola, 623 F.2d at 997). See also Capo, 595 F.2d at 1090-

1091 & n.4 ("The cases in which such presumptive prejudice has been

found are those where prejudicial publicity so poisoned the

proceedings that it was impossible for the accused to receive a

fair trial by an impartial jury."). Moreover, in all but the most

extreme cases, the Rideau presumption is rebuttable, and the

government may demonstrate at voir dire that an impartial jury can

be impaneled. See Mayola, 623 F.2d at 1000-1001. See also

United States v. Blom, 242 F.3d 799, 803 (8th Cir.), cert. denied,

122 S.Ct. 184 (2001) ("When pretrial publicity is the issue,

[courts] engage in a two-tiered analysis. At the first tier, the

question is whether pretrial publicity was so extensive and

corrupting that a reviewing court is required to presume unfairness

of constitutional magnitude. . . . Because our democracy

tolerates, even encourages, extensive media coverage of crimes

. . . the presumption of inherent prejudice is reserved for rare

and extreme cases. In all other cases, the change-of-venue

question turns on the second tier of . . . analysis, whether the

voir dire testimony of those who bec[o]me trial jurors

demonstrate[] such actual prejudice that it [i]s an abuse of

discretion to deny a timely change-of-venue motion.") (citations omitted)). <u>Sheppard v. Maxwell</u>, 86 S.Ct. 1507, 1522 (1966).

**B.   Analysis**

Defendants argue that this case should be transferred because "unlike any other venue, voir dire and other lesser remedies will be wholly inadequate to eliminate the pervasive latent biases that exist in Houston against Skilling and his co-defendants."[3]   The government argues that defendants' evidence is not sufficient to raise a presumption of prejudice because Houston, as the United States' fourth largest city, provides a sizable jury pool from which twelve fair and impartial people can be found to serve on the jury.[4]   Meticulous review of all of the evidence and arguments presented by the defendants persuades the court that they have failed to raise a presumption of prejudice consistent with the principles established by <u>Rideau</u> and its progeny.

**1.   <u>Presumption of Prejudice</u>**

"Prejudice will be presumed when the defendant produces evidence of pervasive community prejudice in the form of highly inflammatory publicity or intensive media coverage." <u>United States v. O'Keefe</u>, 722 F.2d 1175, 1180 (5th Cir. 1983) (citing <u>Capo</u>, 595

---

[3]Memorandum in Support of Joint Motion to Transfer Venue, Docket Entry No. 197, p. 1.

[4]See Government's Memorandum of Law in Response to Defendants' Joint Motion to Transfer Venue, Docket Entry No. 231, pp. 19-20.

F.2d at 1090).  <u>See also</u> <u>Spivey v. Head</u>, 207 F.3d 1263, 1270 (11th Cir.), <u>cert. denied</u>, 121 S.Ct. 660 (2000) ("To establish that pretrial publicity prejudiced [defendant] without an actual showing of prejudice in the jury box, he must show first that the pretrial publicity was sufficiently prejudicial and inflammatory and second that the prejudicial pretrial publicity saturated the community where the trial was being held.").

> When pretrial publicity is the basis for a defendant's motion to transfer to another district under Rule 21, a trial court errs as a matter of law in denying such a motion only if the defendant can show that pretrial publicity inflamed the jury pool, pervasively prejudiced the community against the defendant, probatively incriminated the defendant, or exceeded "the sensationalism inherent in the crime."

<u>Lipscomb</u>, 299 F.3d at 343 (quoting <u>United States v. Parker</u>, 877 F.2d 327, 331 (5th Cir.), <u>cert. denied</u>, 110 S.Ct. 199 (1989).

Asserting that they have been demonized in Houston, that Enron's rise and fall has special symbolic and cultural importance for the Houston area, and that Enron's collapse has had serious negative effects on the local economy, defendants argue that the Houston jury pool has an emotional and potentially economic interest in supporting the victims of Enron and making them whole by convicting the defendants. Defendants' assertions are supported by affidavits from expert witnesses[5] and hundreds of exhibits drawn

---

[5]See Declaration of Dr. Stephen Klineberg, Docket Entry No. 200 (a sociologist who has analyzed Enron's bankruptcy and social pressures alleged to influence local jurors); Amended Declaration and Supplemental Declaration of Dr. Phillip K. Anthony,
(continued...)

primarily from local news reports.[6]  Defendants argue that the
effect of Enron's collapse on members of the local jury pool was
immediate and devastating:   Thousands lost their jobs, many more
lost their savings, local businesses suffered, creditors went
unpaid, employees in related or dependent businesses lost their
jobs, local charities lost funding, and everyone felt betrayed.[7]
Defendants argue that because a high percentage of victims and
witnesses of Enron's collapse reside in Houston, the collapse of
Enron and the lawsuits that it has generated, including <u>inter alia</u>
this case, have received extensive publicity from local news
outlets.

_____

[5](...continued)
Docket Entry Nos. 217 and 252 (a polling and jury research expert
who has conducted a comparative study of relevant community
attitudes in Houston, Phoenix, Denver, and Atlanta); Declaration
and Supplemental Declaration of Mr. Russell Scott Armstrong, Docket
Entry Nos. 203 and 251 (a media expert who has compared Houston
news coverage to coverage in other venues); Declaration and
Supplemental Declaration of Dr. Edward Bronson, Docket Entry
Nos. 199 and 254 (a social science expert who has analyzed jury
attitudes towards defendants in Houston, Atlanta, Denver, and
Phoenix); and Declaration of Mr. Roy Weinstein, Docket Entry
No. 201 (an economist who discusses the vested economic interest
members of the local jury pool may have -- or perceive they have --
in convicting the defendants).  See also Declaration of Phillip K.
Anthony in Support of Ken Lay's Motion to Transfer Venue, Docket
Entry No. 253.

[6]See Declaration and Supplemental Declaration of David J.
Marroso, Docket Entry Nos. 202 and 256, consecutively numbered
exhibits consisting of copies of newspaper articles cited in
defendants' memorandum in support of motion to transfer venue.

[7]Memorandum in Support of Joint Motion to Transfer Venue,
Docket Entry No. 197, pp. 1-2.

(a)  Inflammatory Publicity

Publicity is "inflammatory" if it "[t]end[s] to cause strong feelings of anger, indignation, or other type of upset; [or] tend[s] to stir the passions." Black's Law Dictionary, 782 (7th ed. 1999). Courts have characterized "inflammatory publicity" as publicity that "prejudiced the community against the defendant, probatively incriminated the defendant, or exceeded 'the sensationalism inherent in the crime.'" Lipscomb, 299 F.3d at 343 (quoting Parker, 877 F.2d at 331). See also Murphy v. Florida, 95 S.Ct. 2031, 2035 (1975) ("In Irvin v. Dowd the rural community in which the trial was held had been subjected to a barrage of inflammatory publicity . . . including information on the defendant's prior convictions, his confession to 24 burglaries and six murders including the one for which he was tried, and his unaccepted offer to plead guilty in order to avoid the death sentence."); Patton v. Yount, 104 S.Ct. 2885, 2889 (1984) (characterizing inflammatory publicity as publicity capable of creating a "wave of public passion").

Unlike many of the cases cited by defendants, the facts of this case are neither heinous nor sensational. Defendants have, however, documented incidents in which less-than-objective language was used in news reports either about them or about this case. Examples relating to Skilling include the Houston Chronicle's

-10-

characterization of Skilling as the "Ultimate Enron Defendant,"[8] and the Houston Press's characterization of him as "Best Local Boy Gone Bad."[9] Examples relating to Lay include the Texas Monthly's award of the "Bum Steer of the Year" to him in 2002,[10] and former Enron employees' comparison of him to Satan, Osama Bin Laden, and Adolf Hitler.[11] Additional examples include a story by the Houston Chronicle's business columnist that ridiculed Lay's "doofus defense" and speculated that when his lawyers' "smoke screen clears, they may have succeeded in arguing Lay was not guilty by reason of ignorance. We all know better."[12] Defendants argue that the Houston Chronicle has ridiculed Skilling's explanations for the cause of Enron's collapse and published statements from former Enron employees who have accused Skilling of lying to Congress.[13]

---

[8]Id. at 14 (citing a September 12, 2004, special section of the Houston Chronicle titled "Ultimate Houston," Marroso Exhibit No. 28).

[9]Id. at 14-15 (citing the September 23, 2004, edition of the Houston Press, Marroso Exhibit No. 29).

[10]Id. (citing January 2003 edition of Texas Monthly, Marroso Exhibit No. 34).

[11]Id. at 13 (citing July 8, 2004, article in the San Antonio Express-News, Marroso Exhibit No. 6).

[12]Id. at 15-16 (citing a July 9, 2004, Houston Chronicle column written by Loren Steffy titled "What of Lay's claims? Answers lie in Valhalla," Marroso Exhibit No. 35).

[13]Id. (citing February 8, 2002, Houston Chronicle article titled "The Fall of Enron; It's Kind of Hard to Believe; Ex-Enron Workers Rip Skilling's Story," Marroso Exhibit No. 17).

But isolated incidents of intemperate commentary about the alleged crimes and their perpetrators do not rise to the level of "inflammatory" where, as here, for the most part, the reporting appears to have been objective and unemotional.  See <u>United States v. Allee</u>, 299 F.3d 996, 1000 (8th Cir. 2002) (finding no inherent prejudice in press coverage despite "understandable emotionalism").  For example, the text accompanying the <u>Houston Chronicle</u>'s characterization of Skilling as the "Ultimate Enron Defendant" illustrates the largely fact-based tone of most of the articles cited by the defendants:

> Rather than lying low, former Enron CEO Jeff Skilling keeps making news.  In April he was arrested after a drunken scuffle in New York.  A federal judge ordered him to stop drinking alcohol, find a job or volunteer work, and obey a curfew.  Skilling has pleaded not guilty to 35 felony counts accusing him of manipulating earnings reports at Enron to inflate the company's value.  As the only top Enron official to testify before lawmakers in Washington, D.C., Skilling has proclaimed his innocence, "I have nothing to hide," he said.  We can't wait for the trial.[14]

Having carefully reviewed defendants' evidence, the court concludes that the pretrial publicity in this case does not approach the egregiousness present either in <u>Rideau</u> or other cases on which defendants rely.  In <u>Rideau</u> a local television station aired three broadcasts of the defendant's taped confession to robbing a bank, kidnapping three of the bank's employees, and

---

[14]See September 12, 2004, special section of the <u>Houston Chronicle</u> titled "Ultimate Houston," Marroso Exhibit No. 28.

killing one of them, and the broadcasts were viewed by at least one-third and possibly as many as two-thirds of the local populace. 83 S.Ct. at 1417. In <u>United States v. Abrahams</u>, 453 F.Supp. 749, 751-753 (D. Mass. 1978), which defendants cite as an example of a case in which defendants' motion to transfer venue was granted,[15] the news reports painted

> a black and bleak picture of Mr. Abrahams. Repeatedly, in great detail, and often with lurid language, these stories describe, usually as if they were indisputable facts, all of the following alleged activity (and more) of the defendant: (1) his use of half a dozen aliases; (2) the startling discovery of his true identity; (3) his characterization by the FBI as an "armed and dangerous" fugitive; (4) his convictions for income tax fraud, defrauding another commodities dealer, and writing a $3,000 bad check; (5) the charges against him, pending in two other federal courts, three state courts, and Canada, for contempt, prison escape, passport fraud, obtaining money under false pretenses, issuing worthless checks, probation violation for bond default, contributing to the delinquency of a minor, and writing numerous bad checks for large amounts; (6) his failure to appear for various court proceedings; (7) the consequent denial of bail . . .

<u>Id.</u> at 752. The news accounts in this case simply do not constitute the type of inflammatory reporting of inherently prejudicial facts (e.g., prior convictions, escapes, arrests, prior and/or subsequent indictments, and/or confessions) needed to support a claim of presumptive prejudice.

---

[15]See Reply Memorandum of Defendants Jeffrey Skilling and Richard Causey in Support of Joint Motion to Transfer Venue, Docket Entry No. 249, pp. 5-6 & n.18, p. 8 & n.33, and p. 20 & n.104.

(b)   Pervasive Publicity

Courts have characterized "pervasive publicity" capable of raising a presumption of jury prejudice as publicity that has "saturated the community with sensationalized accounts of the crime and court proceedings." See Capo, 595 F.2d at 1090.

Defendants argue that a presumption of prejudice arises in this case because of extensive Enron-related coverage by the Houston Chronicle, the Houston Press, local television networks, and other news outlets including, e.g., the Texas Observer, the Houston Business Journal, Texas Monthly, and internet sites. Defendants argue that a telephone survey of the Houston jury pool shows that six in ten potential jurors who have heard of this case think that the defendants are guilty.[16] Defendants present evidence showing dramatic differences, both qualitatively and quantitatively, between news coverage of Enron's collapse and at least two of the defendants in this case (Lay and Skilling) by news outlets in Houston and comparable news outlets in Atlanta, Denver, and Phoenix.[17]

Notoriety alone does not indicate that a change of venue is warranted. See United States v. Dozier, 672 F.2d 531, 545-546 (5th Cir.), cert. denied, 103 S.Ct. 256 (1982) (mere awareness of the

---

[16]Id. at 2.

[17]See Declaration of Russell Scott Armstrong, Docket Entry No. 203, p. 5 ¶ 10.

-14-

allegations does not constitute prejudice); <u>Parker</u>, 877 F.2d at 330 ("[e]xposure to pretrial publicity . . . does not necessarily destroy a juror's impartiality . . . [c]onsequently . . . a change of venue should not be granted on the mere showing of widespread publicity"). The Fifth Circuit has explained that

> [i]f, in this age of instant, mass communication, we were to automatically disqualify persons who have heard about an alleged crime from serving as a juror, the inevitable result would be that truly heinous or notorious acts will go unpunished. The law does not prohibit the informed citizen from participating in the affairs of justice. In prominent cases of national concern, we cannot allow widespread publicity concerning these matters to paralyze our system of justice.

<u>Calley v. Callaway</u>, 519 F.2d 184, 210 (5th Cir. 1975), <u>cert. denied sub nom Calley v. Hoffmann</u>, 96 S.Ct. 1505 (1976). <u>See also Irvin</u>, 81 S.Ct. at 1642 ("It is not required, however, that the jurors be totally ignorant of the facts and issues involved."). To satisfy their burden of showing that there is a reasonable likelihood that prejudicial news coverage prior to trial will prevent a fair trial, defendants must demonstrate that the populace from which their jury will be drawn is widely infected by <u>prejudice</u> apart from mere <u>familiarity</u> with the case. <u>Mayola</u>, 623 F.2d at 999.

Unlike the petitioner in <u>Rideau</u>, who adduced evidence that his televised confession had been seen by up to two-thirds of the citizens in the Louisiana parish of 150,000 from which the jury had been drawn, defendants' evidence of adverse publicity is much less extensive. The <u>Houston Chronicle</u>, which defendants describe as the

-15-

"major local paper" and whose lead on Enron-related news has largely been followed by Houston-area television stations, reaches less than "one-third of occupied households in Houston."[18] Although defendants assert that this circulation rate reaches 40%-50% of the adult population in Houston,[19] the court is not persuaded that the material published in the Houston Chronicle about Enron is either pervasive or largely prejudicial as opposed to factual. Although defendants cite news reports from other outlets such as the Houston Press, which they describe as an alternative weekly paper that reaches 300,000 readers per week, they provide no circulation figures for the other print media that they cite as having infected the local jury pool with prejudicial reports, e.g., Texas Monthly and the Texas Observer. See Mayola, 623 F.2d at 998 (failure to produce circulation figures or other evidence of the scope of that county's exposure to the prejudicial publicity instrumental in the court's rejection of petitioner's pretrial publicity claim); United States v. Ricardo, 619 F.2d 1124, 1131, 1132 (5th Cir. 1980) (failure to adduce newspaper circulation statistics instrumental in court's rejection of appellant's pretrial publicity claims).

---

[18]Memorandum in Support of Joint Motion to Transfer Venue, Docket Entry No. 197, p. 14 n.45.

[19]See Reply Memorandum of Defendants Jeffrey Skilling and Richard Causey in Support of Joint Motion to Transfer Venue, Docket Entry No. 249, p. 19.

Moreover, while defendants' evidence shows that each of the local television news programs reach between 8 and 15% of the local population,[20] these figures do not come close to those in <u>Rideau</u> where one of the three televised broadcasts of the defendant's confession reached over one-third of the local population and the three broadcasts together could have reached almost two-thirds of the local population.  Nor have defendants shown that the reports aired by the local television stations are any more prejudicial than the reports that appear in the local print media.  The court concludes that defendants' evidence is insufficient to show that prejudicial publicity about this case has so saturated the local populace that defendants are unlikely to receive a fair trial from an impartial jury.

In addition to reports published by local news outlets, defendants rely on data from telephone surveys of the local jury pool to demonstrate the scope of the prejudice against them in the Houston community.[21]  Evidence adduced from the telephone survey conducted on defendants' behalf suggests that some people in each venue surveyed have formed preliminary opinions regarding their guilt or innocence.  Defendants assert that

---

[20]See Exhibit 15 attached to Declaration of Russell Scott Armstrong, Docket Entry No. 203.

[21]See Declaration of Philip K. Anthony, Ph.D., in Support of Defendant Jeffrey Skilling's Motion to Transfer Venue, Docket Entry No. 217.

Questions 4-7, set forth below, comprised the "substance" of the survey:

- Question #4: Please name all of the former executives of Enron who you believe are guilty of crimes.

- Question #5: What words come to mind when you hear the name, Jeff Skilling?

- Question #6: Do you personally know anyone who has been harmed by what happened at Enron?

- Question #7: In your opinion, was the economy of the [interviewee's venue] area more affected by the collapse of Enron than other cities in the United States?[22]

Not surprisingly, responses to these four questions show that "[r]espondents in Houston were twice as likely as respondents in Atlanta and almost three times as likely as respondents in Denver and Phoenix to personally know someone who has been harmed by what happened to Enron,"[23] and "almost 70% of Houston-area residents feel their region has been harmed more [by the collapse of Enron] than any other region of the country." Although "[t]he proportion of residents mentioning Mr. Skilling [as a former Enron executive known to be guilty of crimes] in the Houston venue (12.3%) was almost five times higher than in Denver (2.7%), and Atlanta (2.6%), and nine times higher than in Phoenix (1.4%),"[24] 87.7% of the survey's Houston-area respondents did not identify Skilling when

---

[22]Id. at 14-15.

[23]Id. at 22.

[24]Id. at 19.

they were asked to "name all the former Enron executives you know of who are guilty of crimes."[25]  Moreover, none of the data adduced by the survey presents any estimate of bias towards Causey or Lay.

While public opinion polls are sometimes introduced to show that community prejudice raises a presumption of prejudice that requires a change of venue, courts have commonly rejected such polls as unpersuasive in favor of effective voir dire as a preferable way to ferret out any bias.  See United States v. Collins, 972 F.2d 1385, 1398 & n.19, and 1400 & n.24 (5th Cir. 1992), cert. denied, 113 S.Ct. 1812 (1993) (concluding that voir dire was adequate to ferret out jury bias even in face of poll indicating that 57% of those surveyed had heard of the case and that 90% of those who had heard of the case thought the defendant was probably or definitely guilty).  See also United States v. Malmay, 671 F.2d 869, 876 (5th Cir. 1982) (affirming district court's denial of motion to transfer where approximately 50% of those polled believed that the charges against the defendants were true).

The Supreme Court has explained that

> [t]o hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

---

[25] Id.

<u>Irvin</u>, 81 S.Ct. at 1642-1643.   Although in a few rare cases pretrial publicity has been held to be so inherently prejudicial that judicial instructions to the jury were insufficient to satisfy the mandate of due process, the court is not persuaded that the publicity in this case is sufficiently pervasive to raise such a presumption of jury prejudice.   Broad and intensive public aware- ness was held not to have triggered the <u>Rideau</u> presumption, or to have deprived defendants of fair trials, in some of the most notorious and widely publicized cases of the last century, e.g., the My Lai murders, <u>Calley</u>, 519 F.2d at 203-213, and the high- level conspiracy to cover up the Watergate break-in, <u>United States v. Haldeman</u>, 559 F.2d 31, 60-69 (D.C. Cir. 1976), <u>sub nom</u> <u>Ehrlichman v. United States</u>, and <u>Mitchell v. United States</u>, <u>cert. denied</u>, 97 S.Ct. 2641 (1977).

Whether a jury is biased is a question of fact for the court to decide.   <u>See</u> <u>Wainwright v. Witt</u>, 105 S.Ct. 844, 854-855 (1985) (juror bias determination is a question of fact, even though "[t]he trial judge is of course applying some kind of legal standard to what he sees and hears"); <u>Patton</u>, 104 S.Ct. at 2891 & n.12 (juror bias is a question of fact although "[t]here are, of course, factual and legal questions to be considered in deciding whether a juror is qualified").   Defendants have failed to persuade the court that prospective jurors who have formed preliminary opinions about the defendants' guilt or who are connected to the case in a way

-20-

that would render them biased cannot be identified and excused during voir dire.  The court is not persuaded that there exists a reasonable likelihood that the court will be unable to impanel an impartial jury despite widespread knowledge of the case.

### III.  Defendants' Request for a Hearing

"In addition to their written submissions, defendants [Skilling and Causey] request a hearing on . . . [their motion to transfer venue] to present argument and live witness testimony."[26] Skilling and Causey reassert their request for a hearing in their reply memorandum.[27]  Lay, too, requests a hearing on the joint motion to transfer venue.[28]

Evidentiary hearings are not granted as a matter of course, but are held only when the defendant alleges sufficient facts which, if proven, would justify relief.  United States v. Smith, 546 F.2d 1275, 1279-1280 (5th Cir. 1977);  United States v. Poe, 462 F.2d 195 (5th Cir. 1972), cert. denied, 94 S.Ct. 107 (1973). Whether a hearing must be granted is a matter within the sound discretion of the district court.  Poe, 462 F.2d at 197.  "An

---

[26]Joint Motion of Defendants Jeffrey Skilling and Richard Causey to Transfer Venue, Docket Entry No. 196, first page.

[27]Reply Memorandum of Defendants Jeffrey Skilling and Richard Causey in Support of Joint Motion to Transfer Venue, Docket Entry No. 249, p. 3 n.8.

[28]See Kenneth Lay's Declaration of Adoption of Jeffrey Skilling's Motion to Transfer Venue, Docket Entry No. 195, p. 2, and Ken Lay's Reply and Request for a Hearing on the Issue of Venue, Docket Entry No. 257.

evidentiary hearing is not required where none of the critical facts are in dispute and the facts as alleged by the defendant if true would not justify the relief requested." <u>Smith</u>, 546 F.2d at 1279-1280.

To show that their motion to transfer venue should be granted at this stage of the proceedings (i.e., before voir dire), defendants must show that "prejudicial, inflammatory publicity so saturated the community jury pool as to render it virtually impossible to obtain an impartial jury." <u>Smith-Bowman</u>, 76 F.3d at 637 (citing <u>Parker</u>, 877 F.2d at 330). <u>See also</u> <u>Sheppard</u>, 86 S.Ct. at 1522 ("[W]here [defendants show that] there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should . . . transfer it to another . . . [venue] not so permeated with publicity.").

Skilling and Causey have alleged with specificity the facts from which they argue that prejudicial, inflammatory publicity has so saturated the community that it will be impossible to impanel an impartial jury in Houston, and have supported their allegations with affidavits and other documentary evidence. Although Lay has neither alleged specific facts nor submitted documentary evidence in support of his motion to transfer, he has joined and adopted the motion and supporting evidence submitted by Skilling and Causey. For the reasons explained above, the court is not persuaded either that the facts alleged by the defendants are sufficiently

prejudicial to raise a presumption that it will be impossible to impanel an impartial jury in Houston, or that there exists a reasonable likelihood that community prejudice will prevent a fair trial here.  Because the court is not persuaded that defendants have alleged facts capable of raising a presumption of jury prejudice, the court concludes that a hearing is not warranted on defendants' motion to transfer venue. See Smith, 546 F.2d at 1279-1280 ("An evidentiary hearing is not required where none of the critical facts are in dispute and the facts as alleged by the defendant[s] if true would not justify the relief requested.").

## IV.   Conclusions and Order

For the reasons explained above, the court concludes that defendants have failed to allege facts capable of establishing either that the defendants' assertions of pretrial publicity and/or community prejudice raise a presumption of inherent jury prejudice. Although news coverage about Enron's collapse, this case, and these defendants has been extensive, the court is not persuaded that it has been so inflammatory or pervasive as to create a presumption that there exists a reasonable likelihood that pretrial publicity will prevent a fair trial. Accordingly, defendants' request for a hearing on their joint motion to transfer venue is **DENIED**, and the Joint Motion of Defendants Jeffery K. Skilling and Richard A. Causey to Transfer Venue (Docket Entry No. 196), which has been

adopted by defendant Kenneth L. Lay via his Declaration of Adoption of Jeffrey Skilling's Motion to Transfer Venue (Docket Entry No. 195), is **DENIED.**

      **SIGNED** at Houston, Texas, on this 19th day of January, 2005.

SIM LAKE
UNITED STATES DISTRICT JUDGE