UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Crim. No. H-04-25 (Lake, J.) |
| | ) | |
| RICHARD A. CAUSEY, | ) | |
| JEFFREY K. SKILLING, and | ) | |
| KENNETH LAY, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT RICHARD A. CAUSEY'S MOTION TO DISMISS COUNTS 21, 22, 24, 25, 26, 28 & 29 (THE ANALYST CALL COUNTS) FOR FAILURE TO STATE AN OFFENSE AND FAILURE TO ALLEGE AN OFFENSE WITH SPECIFICITY
### (Defense Motion No. 7)

TO THE HONORABLE JUDGE LAKE:

Defendant Richard A. Causey, by and through undersigned counsel, hereby moves this

Court, pursuant to the Fifth and Sixth Amendments to the United States Constitution and Rules 7

and 12 of the Federal Rules of Criminal Procedure, to dismiss Counts 21, 22, 24, 25, 26, 28 & 29

for failure to state an offense and, *alternatively*, for failure to allege an offense with specificity.

Pursuant to Local Rule 12.2 counsel for Mr. Causey state that they have conferred with

counsel for the United States, who oppose the relief sought in this motion.

Respectfully submitted,

/s/ Mark J. Hulkower
Reid H. Weingarten (S.D. Texas No. 37660)
Mark J. Hulkower (S.D. Texas No. 37282)
STEPTOE & JOHNSON, LLP
1330 Connecticut Ave. NW
Washington, DC 20036

Dated: July 1, 2005                    *Counsel for Defendant Richard A. Causey*

TABLE OF CONTENTS

I.     Introduction ..................................................................................................................1

II.    Background - The Analyst Call Charges ...................................................................2

III.   Argument ......................................................................................................................7

       A.     The Court Should Dismiss the Analyst Call Counts as to Mr. Causey
              Because the SSI Fails to State an Offense Under Section 10(b)...............................7

              1.     Mr. Causey's Silence Did Not Create Primary Liability Under
                     Section 10(b). .................................................................................................8

              2.     Mr. Causey's Silence Did Not Create Secondary Aiding and
                     Abetting Liability Under 18 U.S.C. Section 2. ..............................................10

       B.     The Court Should Dismiss the Analyst Call Counts Because the SSI Fails
              to Provide Mr. Causey Fair Notice of the Facts Allegedly Constituting an
              Offense Under Section 10(b). ...................................................................................13

IV.    Conclusion ...................................................................................................................16

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)....................................................................................9

*Berger v. Beletic*, 248 F. Supp.2d 597 (N.D. Tex. 2003) .........................................................9, 10

*Broad v. Rockwell Int'l Corp.*, 642 F.2d 929 (5th Cir. 1981)........................................................13

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164
(1994)...........................................................................................................................................9

*Chiarella v. United States*, 445 U.S. 222 (1980) ......................................................................9, 13

*Lan View v. United States*, 321 F.2d 664 (5th Cir. 1963) ..............................................................14

*R2 Investments v. Phillips*, No. Civ. A. 302CV0323N, 2003 WL 22862738 (N.D. Tex.
Mar. 26, 2003)..............................................................................................................................9

*Russell v. United States*, 369 U.S. 749 (1962) ..............................................................................14

*Taylor v. First Union Corp. of South Carolina*, 857 F.2d 240 (4th Cir. 1988) ..............................9

*United States v. Cabrera-Teran*, 168 F.3d 141 (5th Cir. 1999)......................................................7

*United States v. Colwell*, 764 F.2d 1070 (5th Cir. 1985)............................................................. 11

*United States v. Cruikshank*, 92 U.S. (2 Otto) 542 (1976) ...........................................................13

*United States v. Gordon*, 780 F.2d 1165 (5th Cir. 1986)..............................................................13

*United States v. Hall*, 845 F.2d 1281 (5th Cir. 1988) ..................................................................10

*United States v. Lavergne*, 805 F.2d 517 (5th Cir. 1986) .............................................................13

*United States v. Martiarena*, 955 F.2d 363 (5th Cir. 1992)................................................... 11, 12

*United States v. Morales-Rosales*, 838 F.2d 1359 (5th Cir. 1988) .................................................8

*United States v. Ortiz-Loya*, 777 F.2d 973 (5th Cir. 1985)...........................................................11

*United States v. Santos-Rivera*, 183 F.3d 367 (5th Cir. 1999)........................................................7

*United States v. Shelton*, 937 F.2d 140 (5th Cir. 1991) ................................................................13

*United States v. Trevino*, 491 F.2d 74 (5th Cir. 1974)........................................................................7

*United States v. Triplett*, 922 F.2d 1174 (5th Cir. 1991) ............................................................11

## STATUTES

15 U.S.C. § 78j(b) (2000) ..........................................................................................................8

17 C.F.R. § 240.10b-5...........................................................................................................8, 10

18 U.S.C. § 2 ........................................................................................................................2, 10

Fed. R. Crim. P. 7(c)(1) .......................................................................................................1, 13

Fed. R. Crim. P. 12(b)(3) ................................................................................................1, 7, 13

## RULES

Federal Rule of Criminal Procedure 12(b)(3)....................................................................1, 7, 13

Federal Rule of Criminal Procedure 7(c)(1) ..........................................................................1, 13

Rule 10b-5 ..................................................................................................................8, 9,13

Local Rule 12.2 ..............................................................................................................1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Crim. No.  H-04-25 (Lake, J.) |
| | ) | |
| RICHARD A. CAUSEY, | ) | |
| JEFFREY K. SKILLING, and | ) | |
| KENNETH LAY, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT RICHARD A. CAUSEY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS COUNTS 21, 22, 24, 25, 26, 28 & 29 (THE ANALYST CALL COUNTS) FOR FAILURE TO STATE AN OFFENSE AND FAILURE TO ALLEGE AN OFFENSE WITH SPECIFICITY
### (Defense Motion No. 7)

### I.     INTRODUCTION

The Court should dismiss Counts 21, 22, 24, 25, 26, 28 and 29, all charging Richard A. Causey with securities fraud in connection with presentations to securities analysts and rating agency representatives, because the Second Superseding Indictment ("SSI") fails to state an offense under Rule 12(b)(3) of the Federal Rules of Criminal Procedure and, *alternatively*, fails to allege these claims with the specificity required under Rule 7(c)(1) of the Federal Rules of Criminal Procedure.[1]

The Analyst Call Counts alleged against Mr. Causey fail to state an offense because they do not allege that Mr. Causey committed a primary securities fraud violation. The Enron Task

---

[1]   These counts are charged jointly under the heading "Counts Twenty-One Through Thirty" (hereinafter "the Analyst Call Counts") and addressed in paragraphs 102 and 103 of the SSI. The counts incorporate by reference factual allegations from the "Introduction" section purportedly supporting each count. See SSI ¶¶ 63-83.

Force ("ETF") has not alleged that Mr. Causey made any actual false statements or omitted to disclose facts that would have kept prior statements from being false or misleading. In effect, the ETF is criminalizing Mr. Causey's silence. As set forth below, in the absence of a specific duty to speak during these analyst calls, Mr. Causey's silence did not violate the criminal securities laws.

Failing to allege a primary violation, the ETF, with nothing more than a bare citation to the statute, 18 U.S.C. § 2, apparently also charges Mr. Causey with aiding and abetting the securities fraud of his co-defendants. The SSI nonetheless fails to allege facts that, if proven, would sustain an aiding and abetting conviction. With this secondary liability theory also precluded, the ETF has further failed to state an offense under the securities laws.

Alternatively, the Analyst Call Counts fail to allege the charges against Mr. Causey with the requisite factual specificity. The charges merely track the language of the statute without alleging specific conduct which the ETF contends constituted criminal activity. The ETF has, thus, failed to give Mr. Causey constitutionally adequate notice of the offenses charged.

For these reasons, as fully described below, Counts 21, 22, 24, 25, 26, 28 and 29 of the SSI must be dismissed as to Mr. Causey.

## II.    BACKGROUND - THE ANALYST CALL CHARGES

On July 7, 2004, the ETF obtained the SSI against Mr. Causey and his co-defendants. As to Mr. Causey, the SSI alleges seven counts of securities fraud in connection with presentations to securities analysts and rating agency representatives.

The factual allegations supporting each count state as follows:

### Count 21:

First Quarter 2000 Analyst Conference Call. On April 12, 2000, Enron held its quarterly conference call to discuss its earnings for the first quarter of 2000.

SKILLING and **CAUSEY prepared for and participated in the call**. *SKILLING stated that* Enron's wholesale energy "assets and investments" business recorded earnings of $220 million for the quarter; that those earnings were "attributable to increased earnings from Enron's portfolio of energy-related and other investments"; that "this was a pretty good quarter for the energy-related investment business on contrast to the drag it was over the last year"; and that the upswing in earnings in that portion of Enron's business was "basically the performance of the existing asset portfolios." *SKILLING omitted to disclose that*, in fact approximately $85 million of the $220 million in earnings were unrelated to the operating performance of Enron's energy business. Rather, as SKILLING and CAUSEY knew, through "Project Grayhawk," they were solely attributable to a scheme to generate earnings by manufacturing an increase in Enron's own stock price. (SSI ¶ 63 (emphasis added).)

**Count 22**:

Fourth Quarter 2000 Analyst Conference Call. On January 22, 2001, Enron held its quarterly conference call to discuss its earnings for the fourth quarter of 2000. SKILLING and **CAUSEY prepared for and participated in the call**. *SKILLING stated that* "for Enron, the situation in California had little impact on fourth quarter results. Let me repeat that. For Enron, the situation in California had little impact on fourth quarter results." *He further stated that* "nothing can happen in California that would jeopardize" Enron's earnings targets for 2001 and that California business was "small" for Enron. In fact, as SKILLING and CAUSEY knew, Enron reaped huge profits in 2000 from energy trading in California and concealed hundreds of millions of dollars of those earnings in undisclosed reserve accounts. As SKILLING and CAUSEY also knew, by late January 2001, California utilities owed EES hundreds of millions of dollars that EES could not collect, and Enron personnel had concealed large reserves that Enron was forced to use to offset those uncollectible receivables within Enron Wholesale's books. (SSI ¶ 64 (emphasis added).)

In support of *SKILLING's claims* that EBS continued to be successful and a major positive factor contributing to Enron's stock price, a conspirator misled analysts during the call about the source of EBS's earnings in the fourth quarter of 2000. After being *directed by SKILLING* to answer a question about the sources of EBS's revenues, the conspirator said that one-time, nonrecurring transactions such as sales of "dark fiber" and part of EBS's nascent video-on-demand venture with the Blockbuster company accounted for "a fairly small amount" of EBS's revenues. In fact, as SKILLING and CAUSEY knew, the sale of projected future revenue from the Blockbuster video-on-demand venture accounted for $53 million of EBS's fourth quarter 2000 revenue of $63 million. (SSI ¶ 65 (emphasis added).)

**Count 24**:

March 23, 2001 Analyst Call. Enron held a special conference call with securities analysts on March 23, 2001 in an effort to dispel growing public concerns about Enron's stock, which had fallen from over $80 per share to under $60 per share in less than two months. SKILLING and **CAUSEY prepared for and participated in the call**. *SKILLING stated that* "Enron's business is in great shape" and "I know this is a bad stock market but Enron's in good shape," even though, as SKILLING and CAUSEY knew, both of Enron's showpiece new businesses, EBS and EES, were failing. *SKILLING stated that* Enron was "highly confident" of its income target of $225 million for the year for EES and that EES was seeing the "positive effect" of "the chaos that's going on out in California." In fact, as SKILLING and CAUSEY knew, EES's existing contracts were overvalued by hundreds of millions of dollars. EES was owed hundreds of millions of dollars by the California utilities that it could not collect and Enron personnel had concealed. EES's new management privately was predicting that it would take a year or more for EES to become truly profitable. (SSI ¶ 68 (emphasis added).)

*SKILLING further stated that* EBS "is coming along just fine" and that the company was "very comfortable with the volumes and targets and the benchmarks that we set for EBS." *He said that* EBS's two profit-and-loss centers, intermediation and content services, were "growing fast" and that EBS was not laying off employees but rather "moving people around inside EBS" and that this was "very good news." In fact, *as SKILLING knew*, EBS was continuing to fail. Senior personnel at EBS privately had reported that the unit had an unsupportable cost structure and unproven revenue model. One senior EBS executive estimated the Enron would need to record as a loss approximately half of EBS's $875 million book value. EBS was laying off employees and *SKILLING had told employees* based in Portland, Oregon that EBS would be centralized in Houston and jobs would be cut because of a "total meltdown" in the broadband industry. (SSI ¶ 69 (emphasis added).)

**Count 25**:

First Quarter 2001 Analyst Call. Enron held its conference call with securities analysts to discuss its first quarter 2001 results on April 17, 2001. SKILLING and **CAUSEY prepared for and participated in the call**. *SKILLING talked about* continued "big, big numbers" in EES's energy contracting business. *He falsely explained* Enron's movement of EES's energy contract portfolio into Enron Wholesale by omitting any reference to EES's large losses or their transfer to Enron Wholesale and stating, "[W]e have such capability in our wholesale business that we were -- we just weren't taking advantage of that in managing out portfolio at the retail side. And this retail portfolio has gotten so big so fast that we needed to get the best -- the best hands working risk management there." While Enron reported modest first quarter earnings for EES of $40 million, in fact, as SKILLING and CAUSEY knew, EES was facing losses approaching one billion dollars, including overvalued contracts, uncollectible receivables with the

4

California utilities, and huge costs from an increased California regulatory surcharge. (SSI ¶ 70 (emphasis added).)

*SKILLING also stated* regarding EBS that "[o]ur network is now substantially complete" and that it "is just not the case" that Enron was reducing staff of EBS because it was getting out of the content services business. *SKILLING stressed that* the reported losses in the unit were on target and "anticipated" and that the unit's capital expenditures were being reduced because it was "able to get access to connectivity without having to build it." In fact, *as SKILLING knew*, the cost-cutting measures at EBS were instituted because the business was continuing to fail and lay off employees rather than redeploy them, and was incurring much larger than expected losses that could not be offset with projected future revenues. (SSI ¶ 71 (emphasis added).)

## Count 26:

Second Quarter 2001 Analyst Call. Enron held its conference call with securities analysts to discuss its second quarter 2001 results on July 12, 2001. SKILLING and **CAUSEY prepared for and participated in the call**. *SKILLING stated that* Enron had a "great quarter" and that EES "had and outstanding second quarter" and was "firmly on track to achieve out 2001 target of $225 million" in earnings; that losses in EBS were due to "industry conditions" and "dried up" revenue opportunities; and that Enron's "new businesses are expanding and adding to out earnings power and valuation, and we are well positioned for future growth." (SSI ¶ 72 (emphasis added).)

In fact, *as SKILLING knew*, by the close of the second quarter of 2001, EBS had failed and its increased losses were because it had stopped the one-time sales of portions of its business that had previously been the only significant source of its earnings. EES was facing hundreds of millions of dollars in concealed losses and was a year or more away from any prospect of success. (SSI ¶ 73 (emphasis added).)

## Count 28:

Third Quarter 2001 Analyst Call. On October 16, 2001, Enron held its quarterly conference call with securities analysts to discuss its third quarter 2001 earnings results. LAY and **CAUSEY prepared for and participated in the call**. For the first time during the duration of the scheme to manipulate its reported financial results, Enron conceded that it had suffered large losses, totaling approximately $1 billion, in certain segments of its business. These areas included many declining assets that had been concealed in the "Raptor" hedges, as well as EBS. However, LAY and CAUSEY attempted to mislead the investing public and omit information about these losses in order to minimize the negative effect on Enron's stock price. *LAY described* the losses as "nonrecurring," that is, a one-time or unusual earnings event. However, and LAY and CAUSEY knew, the losses were not properly characterized as non-recurring. (SSI ¶ 77 (emphasis added).)

In addition, *LAY stated*: "In connection with the early termination [of the Raptor structures], shareholders' equity will be reduced approximately $1.2 billion." In fact, as LAY and CAUSEY knew, the reduction in equity resulted not from the termination of the "Raptor" structures, but principally from a huge accounting error by Enron. In a further effort to deflect attention from equity reduction, LAY, CAUSEY and others chose not to disclose the problem in Enron's third quarter press release. (SSI ¶ 78 (emphasis added).)

*LAY further stated that* after review by its [sic] outside auditors, we currently estimate, based upon this recent review, that up to $200 million goodwill adjustment may be necessary, and will be recorded as required by the accounting principles in the first quarter of 2002." In fact, as LAY and CAUSEY knew, the adjustment did not account for the impact on Enron of the impaired Wessex goodwill of approximately $700 million, due to misrepresentations by LAY and CAUSEY and others. (SSI ¶ 79 (emphasis added).)

In response to questions regarding the value of Elektro, a Brazilian power plant, which Enron carried on its books as worth in excess of $2 billion, *LAY stated that* "[w]e may well have that asset and operate that asset for quite some time. It's not a bad asset, it's a good asset, just like a lot of other assets in this portfolio." In fact, as LAY knew, Elektro was overvalued by as much as $1 billion and was classified by Enron's Risk Assessment and Control group as "troubled." (SSI ¶ 80 (emphasis added).)

**Count 29**:

October 23, 2001 Analyst Call. Enron held a special conference call with securities analysts on October 23, 2001 in an effort to dispel growing public concerns about Enron's stock, which had lost 25% of its value in the week following the October 16, 2001, third quarter earnings announcement. LAY and **CAUSEY prepared for and participated in the call**. *LAY stated that* "[w]e're not trying to conceal anything. We're not hiding anything." "We're really trying to make sure that the analysts and the shareholders and the debt holders really know what's going on here. So, we are not trying to hold anything back." "I'm disclosing everything we've found." In fact, while professing candor, *LAY failed to disclose numerous* dire facts about the state of Enron's business that he knew and that are outlined in this indictment. (SSI ¶ 82 (emphasis added).)

*LAY further stated that* "we [sic], in fact both we and our outside auditors had already looked at all of our assets to determine if we had impairments under the new goodwill accounting rules that take effect first quarter next year. And as you probably recall, out of that review, indeed there was somewhat less than $200 million of adjustments that will be required in the first quarter of our whole portfolio. And clearly, if there are impairments other than that, why then of course Arthur Andersen as well as out internal accounting staff would require that we write that down also." In fact, as LAY and CAUSEY knew, the adjustment did not include the impact on Enron of the impaired Wessex goodwill of

approximately $700 million, due to misrepresentations by LAY and CAUSEY and others.  (SSI ¶ 83 (emphasis added).)[2]

In this extensive narrative, covering nearly ten pages in the SSI, the ETF describes seven different conference calls with analysts, during which Mr. Causey allegedly committed securities fraud.  In these *ten pages*, the ETF captures the extent of Mr. Causey's conduct in one eight-word phrase, repeated over and over: "Causey prepared for and participated in the call."  Each allegation, save for Count 26 (discussed *infra* Section III.B. footnote 4), then ends with a conclusory assertion that Mr. Causey knew the statements uttered by Mr. Skilling or Mr. Lay were false.  Noticeably absent is any allegation that Mr. Causey personally made any statement, let alone a false one.[3]

## III.  **ARGUMENT**

### A.    **The Court Should Dismiss the Analyst Call Counts as to Mr. Causey Because the SSI Fails to State an Offense Under Section 10(b).**

A motion to dismiss an indictment for failure to state an offense is a challenge to the sufficiency of the indictment, which may be reviewed any time while the case is pending.  See United States v. Santos-Rivera, 183 F.3d 367, 369 (5th Cir. 1999) (stating that the question of "whether an indictment sufficiently alleges the elements of an offense is a question of law"); Fed. R. Crim. P. 12(b)(3).  As a matter of law, an indictment must be dismissed if it fails to charge an offense.  See United States v. Trevino, 491 F.2d 74, 76 (5th Cir. 1974) (dismissing an

---

[2] Mr. Causey has separately joined motions by co-defendants Skilling and Lay to dismiss or strike the various securities fraud counts on materiality grounds.

[3] When pressed to provide a bill of particulars, the ETF produced, on November 18, 2004, a Statement in Compliance, which purported to provide defendants with notice of all the particular alleged false statements at issue.  Pushed to lay bare the complete universe of allegedly false statements made during the calls, the ETF cited another long litany of purportedly false statements made by the defendants.  Again, not a single word, false or otherwise, was attributed to Mr. Causey.

indictment that improperly charged as an offense conduct which was not covered by the statute).

In order to survive a motion to dismiss, an indictment must allege each material element of the

offense.  See United States v. Cabrera-Teran, 168 F.3d 141, 143 (5th Cir. 1999) (vacating a

conviction because the indictment failed to charge an element of the offense).  In reviewing for

sufficiency, "[t]he starting place … is a reading of the language of the charging instrument and

the statute itself."  United States v. Morales-Rosales, 838 F.2d 1359, 1361 (5th Cir. 1988)

(reversing a conviction because the indictment failed to charge the second element of the

offense, which was clearly laid out in the statue).

### 1.     Mr. Causey's Silence Did Not Create Primary Liability Under Section 10(b).

The ETF has charged Mr. Causey with violating Section 10(b) of the Securities Exchange

Act of 1934, which states that, "[i]t shall be unlawful for any person directly or indirectly, … to

use or employ, in connection with the purchase or sale of any security… any manipulative or

deceptive device or contrivance in contravention of such rules and regulations as the

Commission may prescribe as necessary or appropriate . . . ." 15 U.S.C. § 78j(b) (2000).  Rule

10b-5, which grew out of  Section 10(b), provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means
> or instrumentality of interstate commerce, or of the mails or of any facility of any
> national securities exchange,… (b) to make any untrue statement of material fact
> or to omit to state a material fact necessary in order to make the statements made,
> in light of the circumstances under which they were made, not misleading . . . .

17 C.F.R. § 240.10b-5 (2004).  In order to state an offense under Rule 10b-5(b), the ETF must

allege, as a baseline matter, that Mr. Causey made a statement.  The ETF does not allege that Mr.

Causey played any active role in the conference calls with securities analysts and rating agency

representatives.  The ETF cannot identify a single relevant comment made by Mr. Causey during

the course of any of the seven calls at issue -- and yet, he is charged with committing a felony

during each call.  Failing to hook Mr. Causey with his own words, the ETF nonetheless strains to

charge Mr. Causey based on his mere presence in the room while *others* allegedly made false

statements.  In essence, the ETF seeks to hold Mr. Causey criminally liable for very serious

felonies based on his silence, and as one of many Enron employees present for each call.

The United States Supreme Court has repeatedly affirmed the proposition that silence

cannot create liability under Rule 10b-5 in the absence of a duty to speak.  Central Bank of

Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 174 (1994) ("When an

allegation of fraud is based [on] nondisclosure, there can be no fraud absent a duty to speak.");

Basic Inc. v. Levinson, 485 U.S. 224, 239 (1988) ("Silence, absent a duty to disclose, is not

misleading under Rule 10b-5."); Chiarella v. United States, 445 U.S. 222, 230 (1980) (Liability

for silence is "premised upon a duty to disclose.").

Further, "Rule 10b-5 imposes such a duty to disclose only when silence would make

other statements misleading or false."  Taylor v. First Union Corp. of South Carolina, 857 F.2d

240, 243-44 (4th Cir. 1988) (holding that the plaintiff had failed to state a claim under Rule 10b-

5 because she had not identified any of the defendant's statements made misleading by the non-

disclosure); Berger v. Beletic, 248 F. Supp. 2d 597, 603-04 (N.D. Tex. 2003) (citing Taylor)

(dismissing complaint that failed to allege that non-disclosure had rendered the defendant's prior

statements false or misleading); R2 Investments v. Phillips, No. Civ. A. 302CV0323N, 2003 WL

22862738, at *5 (N.D. Tex. Mar. 26, 2003) [Attachment A] (citing Taylor) (dismissing

complaint failing to identify prior statements made untrue or misleading as a result of

defendant's silence).  This is essentially a restatement of what Rule 10b-5 explicitly makes

unlawful, i.e., omitting "to state a material fact necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading." 17 C.F.R. §
240.10b-5.

   The SSI fails to identify any statement made by Mr. Causey that would serve as the basis
for an allegation that his omissions violated Rule 10b-5. Counsel for Mr. Causey have been
unable to find any cases in this circuit holding a defendant liable for silence while others made
false statements. Rather, liability for omissions has turned on an analysis of the defendants *own*
prior statements. See, e.g., Berger, 248 F. Supp. 2d at 603-04 ("Berger did not allege in the
complaint that Beletic's delay in releasing the information made *Beletic's* other statements
misleading or false.") (emphasis added). The ETF has made no allegation that Mr. Causey's
silence made *his* previous statements false or misleading. As a result, the charges that Mr.
Causey is primarily liable in the Analyst Call Counts fail as a matter of law.

### 2.   Mr. Causey's Silence Did Not Create Secondary Aiding and Abetting Liability Under 18 U.S.C. Section 2

   Absent a colorable primary liability claim against Mr. Causey under Section 10(b), the
ETF may seek to proceed against him with a charge of aiding and abetting his co-defendants in
their allegedly fraudulent conduct.  The only notice of this alternate theory is a bare citation to
18 U.S.C. § 2, the general criminal aiding and abetting statute. The SSI otherwise fails to allege
the elements of an aiding and abetting violation. It also fails to allege facts, which, if proven,
would produce an aiding and abetting conviction.

   In order to sustain an aiding and abetting charge, the government must "prove that the
defendant (1) associated with a criminal venture, (2) participated in the venture as something he
wished to bring about, and (3) sought by his actions to make it succeed." United States v. Hall,
845 F.2d 1281, 1285 (5th Cir. 1988). The Fifth Circuit has repeatedly held that "[p]articipation
means that the defendant engaged in some affirmative conduct designed to aid the venture."

10

United State v. Martiarena, 955 F.2d 363, 366 (5th Cir. 1992) (quotations omitted); United States v. Triplett, 922 F.2d 1174, 1178 (5th Cir. 1991); United States v. Ortiz-Loya, 777 F.2d 973, 980 (5th Cir. 1985); United States v. Colwell, 764 F.2d 1070, 1072 (5th Cir. 1985).

The "affirmative conduct" that has passed muster as "participation" in Fifth Circuit cases reflects an expectation that the defendant has actively engaged in bringing about the crime. For instance, in Ortiz-Loya, 777 F.2d at 981, the court affirmed the defendant's conviction for aiding and abetting various firearm offenses because the evidence at trial showed that he had provided money for the operation, asked others to accompany him to falsify ATF forms, ordered the firearms to be picked up, and ultimately carried the firearms to the border himself. In Colwell, 764 F.2d at 1072, the defendant was convicted of aiding and abetting the procurement of false birth documents in association with illegally transporting Mexican mothers and infants over the U.S. border. The Fifth Circuit found the proof at trial that she had handled the logistical arrangements and provided financing to be sufficient support to sustain her conviction. Id. In these cases, the Fifth Circuit could point to specific acts as the basis for finding that each defendant had "participated" in a criminal venture. They stand in stark contrast to Mr. Causey's entirely passive role with respect to Skilling's and Lay's statements in the conference calls with analysts.

In fact, the Fifth Circuit specifically reversed the conviction of a defendant whose role in the criminal activity was insufficient to rise to the level of "participation." See Martiarena, 955 F.2d at 367. In Martiarena, the defendant had been convicted of aiding and abetting her father's failure to file a currency transaction report for exchanging currency in excess of $10,000. Id. The defendant's father managed a gas station and was approached by an IRS investigator about exchanging $12,000 for pesos. Id. at 365. Her father agreed and arranged to cross the border,

11

exchange the currency, and work with the defendant's boyfriend to transport the money in two caches so as not to trigger the $10,000 reporting requirement.  Id.

The defendant's role in the scheme involved calling her father to let him know the IRS agents (who were undercover) wished to see him, calling her boyfriend to relay the message from her father about meeting him to transport the pesos, and waiting with the agents for her father's return with the pesos.  Id. at 367.  The court considered whether this conduct constituted "participation" for purposes of aiding and abetting liability and concluded that it did not.  Id.  As the court explained, "the supposed inculpatory conduct, fairly viewed, was composed of no more than routine actions normally expected of an employee…."  Id.  The court reinforced the rule that "mere presence and association alone are insufficient to sustain a conviction of aiding and abetting."  Id. at 366.

For each of the Analyst Call Counts, the SSI provides only that Mr. Causey "prepared for and participated in the call."   Significantly, the ETF does not allege that Mr. Causey's "prepar[ation]" resulted in the generation of any false materials, nor does the ETF allege that he scripted the alleged false statements of his co-defendants.   The allegations that Mr. Causey "participated" in the calls, like in Martiarena, amount to "no more than routine actions normally expected" of Mr. Causey in his capacity as Chief Accounting Officer.  The ETF can point to no specific conduct by Mr. Causey suggesting that he actively participated in and furthered a criminal offense.  Given that the SSI makes no allegation that Mr. Causey even spoke during the calls, the ETF seeks to criminalize his "mere presence" on the calls, in contravention of the Fifth Circuit ruling in Martiarena.

*     *     *     *     *

The SSI has failed to state an offense as to Mr. Causey for Section 10(b) securities fraud under either a primary or aiding and abetting theory of liability. Thus, the Analyst Call Counts should be dismissed as to Mr. Causey.

**B.     The Court Should Dismiss the Analyst Call Counts Because the SSI Fails to Provide Mr. Causey Fair Notice of the Facts Allegedly Constituting an Offense Under Section 10(b)**

Assuming, *arguendo*, that the ETF has alleged a colorable theory of criminal liability for Mr. Causey's silence under Section 10(b), this Court should nonetheless dismiss the Analyst Call Counts against Mr. Causey for failure to provide notice of facts constituting a securities fraud violation under the statute. A criminal indictment "must be a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). A challenge to the sufficiency of the indictment is a question of law to be reviewed in advance of trial. See United States v. Shelton, 937 F.2d 140, 142 (5th Cir. 1991); Fed. R. Crim. P. 12(b)(3). The sufficiency of the indictment is measured "by whether (1) each count contains the essential elements of the offense charged, (2) the elements are described with particularity, without any uncertainty or ambiguity, and (3) the charge is specific enough to protect the defendant against a subsequent prosecution for the same offense." United States v. Lavergne, 805 F.2d 517, 521 (5th Cir. 1986).

The SSI alleges all ten Analyst Call Counts, including the seven charged against Mr. Causey, in a single paragraph that merely recites the language of Sections 78j(b) and 78ff and Rule 10b-5. "[I]t is an elementary principle of criminal pleading that where the definition of an offence, whether it be at common law or by statute, includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species -- it must descend to particulars." United States v. Gordon, 780 F.2d 1165,

1171 (5th Cir. 1986) (quoting United States v. Cruikshank, 92 U.S. (2 Otto) 542, 558 (1876)).

The language of Section 10(b) is exceedingly generic in that it was meant to serve as a "catch-all" for securities fraud.  Broad v. Rockwell Int'l Corp., 642 F.2d 929, 963 (5th Cir. 1981) (citing Chiarella) ("Section 10(b) is aptly described as a catch-all provision.").  As a result, an indictment that limits itself to the words of the statute fails to "fairly inform[] the defendant what charge he must be prepared to meet."  Gordon, 780 F.2d 1169.

As noted previously, the Analyst Call Counts against Mr. Causey are captured in a single assertion that fails to inform Mr. Causey of his purported criminal activity: "***Mr. Causey prepared for and participated in the call***."  This vague phrase, repeated verbatim in the supporting factual allegations associated with the various calls, represents the entirety of Mr. Causey's notice with respect to his alleged criminal conduct in connection with the analyst calls. As the SSI is written, Mr. Causey is unable to ascertain, let alone defend against, these charges. The ETF was required to provide Mr. Causey notice as to what supposedly improper "prepar[ations]" the ETF alleges he engaged in, and the manner in which he is alleged to have unlawfully "participated" in the calls.  Only with additional detail could the ETF's allegations even arguably support criminal charges under Section 10(b).  The ETF has utterly failed to "descend to particulars" in alleging the facts underlying the Analyst Call Counts against Mr. Causey.[4]

---

[4] The deficiency here cannot be cured with a bill of particulars, as it is a "settled rule that a bill of particulars cannot save an invalid indictment."  Russell v. United States, 369 U.S. 749, 770 (1962) (citations omitted); see also Lan View v. United States, 321 F.2d 664, 673 (5th Cir. 1963) (citing Russell and holding that the government's use of a bill of particulars to supply "evidentiary detail as to a few of the missing pieces" was insufficient for the purposes of apprising the defendants of the charges made by the grand jury).  In any event, as noted above, the Statement in Compliance fails to cure this defect.

The lack of specificity in the analyst call allegations against Mr. Causey is especially glaring when juxtaposed against the factual allegations associated with the identical charges alleged against Messrs. Skilling and Lay. The ETF sets out in great detail the factual allegations supporting the Analyst Call charges against Mr. Causey's co-defendants.[5] In fact, in its Statement in Compliance, the ETF further proceeds to identify with completeness and particularity the false statements allegedly made by Mr. Causey's co-defendants. See Government Statement in Compliance of November 2, 2004 at 18-28. Nowhere in the ten single-spaced pages of "particulars" is there any additional information apprising Mr. Causey of the specific facts constituting the crimes he is alleged to have committed in the Analyst Call Counts. Thus, the extent of the ETF's allegations against Mr. Causey remains that he "prepared for and participated in" the calls and knew that certain statements made by his co-defendants were false.[6]

A fair reading of the SSI, with consideration for the utter lack of detail in these charges against Mr. Causey, leads to the inescapable conclusion that Mr. Causey was brought into these counts with the intention of merely piling on. The vague, unclear and repetitive refrain that Mr. Causey "prepared for and participated in" the calls -- absent any specifics -- reflects that these charges lack substance and should be dismissed. The ETF should not be permitted to inflate the

---

[5] By calling attention to this contrast, Mr. Causey does not mean to validate the ETF's charges against his co-defendants or suggest that the allegations against them are true or legally sufficient. He merely accepts the extent of these allegations for purposes of evaluating the sufficiency of the notice provided to the various defendants on these counts.

[6] Count 26 fails even to allege that Mr. Causey knew Mr. Skilling's statements were false. The allegation is simply that *Mr. Skilling* knew they were false. Consequently, the *only* allegation pertaining to Mr. Causey in Count 26 is that he "prepared for and participated in the call," making the charge even more deficient for purposes of a criminal indictment. (SSI ¶ 73.)

extent of Mr. Causey's criminal exposure, the potential penalties he faces, and the scope of his trial defense through the use of constitutionally-deficient allegations that lack factual support.

## IV.   **CONCLUSION**

For the reasons set forth above, the Court should dismiss counts 21, 22, 24, 25, 26, 28 and 29 as to Mr. Causey.

Respectfully submitted,

/s/ Mark J. Hulkower
Reid H. Weingarten (S.D. Texas No. 37660)
Mark J. Hulkower (S.D. Texas No. 37282)
STEPTOE & JOHNSON, LLP
1330 Connecticut Ave. NW
Washington, DC 20036

*Counsel for Defendant Richard A. Causey*

Dated:  July 1, 2005

# ATTACHMENT A



Not Reported in F.Supp.2d

Page 1

2003 WL 22862738 (N.D.Tex.)

**(Cite as: 2003 WL 22862738 (N.D.Tex.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas, Dallas Division.
R2 INVESTMENTS, Plaintiff,
v.
John D. PHILLIPS, et al. Defendants.
**No. Civ.A. 302CV0323N.**

March 26, 2003.

Craig Smyser, Asim Bhansali, Larry R. Veselka, Smyser Kaplan & Veselka, Houston, TX, A. Erin Dwyer, Bill E. Davidoff, Figari Davenport & Graves, Dallas, TX, for Plaintiff.

John Hess McElhaney, Locke Liddell & Sapp, Karen L. Hirschman, Vinson & Elkins-Dallas, Dallas, TX, for Defendants.

*ORDER*

GODBEY, J.

*1 Before the Court are Defendants John D. Phillips, Bryan D. Yokley, Martin D. Kidder, W. Tod Chmar, Walter J. Burmeister, Kirby J. Campbell, Bryan Cipoletti, Stephen J. Clearman, John P. Imlay, Jr., Massimo Prelez Oltramonti, John P. Rigas, Carl E. Sanders, Dru A. Sedwick, Lawrence C. Tucker, Michael F. Mies, and Henry C. Lyon's ("Individual Defendants") Motion to Dismiss Plaintiff's First Amended Complaint and Ernst & Young LLP and Ernst & Young U.S. LLP's ("E & Y") Motion to Dismiss Plaintiff's Second Amended Complaint. The Individual Defendants' Motion to Dismiss is GRANTED IN PART; R2 shall have 30 days from the date of this Order to file an amended complaint in compliance with this Order. Additionally, for the reasons stated below E & Y's Motion to Dismiss is also GRANTED, and R2's case against E & Y is DISMISSED WITH PREJUDICE.

I. FACTUAL BACKGROUND

R2, an investment company, purchased over $52 million worth of World Access, Inc.'s ("World Access") bonds [FN1] ("Senior Notes") between October 12, 2000 and February 13, 2001. The indenture for the Senior Notes required World Access to make a tender offer to purchase back some or all of the Senior Notes on a pro rata basis on or before January 2, 2001 using the proceeds of a sale of certain business equipment and assets, including the assets of Telco Systems, Inc. ("Telco"). World Access represented in several SEC filings filed between May and December 2000 that it would redeem $160 million worth of the Senior Notes after the Telco sale. The Individual Defendants, each of whom are officers or directors of World Access, signed the SEC filings that included statements discussing World Access's obligation to redeem $160 million of the Senior Notes after the Telco sale. In addition, E & Y assented to the inclusion of an unqualified 1999 audit letter and its designation as an expert in the same SEC filings. [FN2]

> FN1. World Access issued $300 million in Senior Notes due in 2008.

> FN2. The E & Y Defendants performed completed audits of World Access in 1998 and 1999 but did not complete an audit in 2000.

R2 began purchasing Senior Notes in October of 2000. By the end of the month, R2 owned close to $7 million worth of Senior Notes. The Telco sale occurred in April of 2000. On January 2, 2001, World Access made a tender offer to repurchase $160 million worth of the Senior Notes as required

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 22862738 (N.D.Tex.)

**(Cite as: 2003 WL 22862738 (N.D.Tex.))**

Page 2

under the bond indenture. Between January 9 and February 13 2001, R2 purchased an additional $45 million worth of Senior Notes. Only days after R2's last purchase, World Access announced that because of a cash deficiency, the company reached an agreement with certain Senior Note holders that it would redeem only $70.6 million of the Senior Notes. R2 would not agree to the decreased tender offer. World Access gave R2 the opportunity to perform a forensic investigation of its financial records. During that investigation, R2 found information indicating that World Access knew on January 2, 2001, when it made its initial tender offer, that it would not have the cash to follow through with it. Ultimately, World Access filed bankruptcy, and R2 lost its entire investment, other than anything it may recover through the bankruptcy.

*2 In its complaint, R2 urges that the Individual Defendants and E & Y violated federal and state securities laws by signing and/or assenting to SEC filings which included the description of World Access's $160 million obligation to purchase the Senior Notes when they knew that World Access did not have the resources to go through with the tender offer. R2 argues that it relied on the SEC filings and the January 2, 2001 tender offer when making the decision to purchase Senior Notes. In addition, R2 asserts state law fraud, civil conspiracy and negligent misrepresentation claims against both the Individual Defendants and E & Y.

## II. THE INDIVIDUAL DEFENDANTS' MOTION TO DISMISS

This securities fraud case is governed by the Private Securities Litigation Reform Act ("PSLRA"), which imposes increased pleading requirements for plaintiffs. 15. U.S.C. § 78u-4(b)(1)(1995). The PSLRA codifies a ban on group pleading. *Coates v. Heartland Wireless Communications, Inc.,* 26 F.Supp.2d 910, 916 (N.D.Tex.1998); 15. U.S.C. § 78u-4(b)(1) (1995). Because the PSLRA allows plaintiffs to plead on information and belief and requires a certain level of scienter for each defendant, group pleading is not allowed in securities fraud cases. *Coates,* 26 F.Supp.2d at 916. The PSLRA requires plaintiffs'

complaints to distinguish among the defendants and inform each defendant of his or her particular role in the alleged fraud. *Schiller v. Physicians Res. Group,* 2002 WL 318441, at *5 (N.D.Tex. Feb.26, 2002).

In this case, R2's complaint repeatedly refers to the "Individual Defendants" ' behavior rather than the specific individuals involved. *See* R2's Complaint, ¶ ¶ 28, 45, 52, 65 & 73. The complaint fails to inform each of the Individual Defendants what R2 claims were his or her specific roles in the alleged fraud, and it violates the pleading requirements of the PSLRA. Accordingly, the Individual Defendants' Motion to Dismiss is GRANTED IN PART, and R2 has thirty days from the date of this order to amend its complaint in compliance with this Order. The Court declines to address the Individual Defendants' other grounds for dismissal until R2 has had an opportunity to address this group pleading problem.

## III. E & Y'S MOTION TO DISMISS
### A. 12(b)(6) & 9(b) Standards
A complaint should not be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45--46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Generally, courts must accept a plaintiff's factual allegations as true. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir.1982) . However, to avoid dismissal, the plaintiff "must come forward with specific supporting factual allegations, not mere conclusory allegations or mischaracterizations of defendants' actual statements." *Alcina v. Pcorder.Com, Inc.,* 230 F.Supp.2d 732, 736 (W.D.Tex.2002). When portions of a statement are discussed in a complaint, the court can consider the statement in its entirety when deciding a motion to dismiss. *See Melder v. Morris,* 27 F.3d 1097, 1100-1101 (5th Cir.1994). In addition, the court may take judicial notice of documents of public record, such as documents filed with the SEC. *In re Sec. Litig. BMC Software, Inc.,* 183 F.Supp.2d 860 (S.D.Tex.2001). Courts

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 22862738 (N.D.Tex.)

**(Cite as: 2003 WL 22862738 (N.D.Tex.))**

can consider matters of which they take judicial notice. *Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1017-1018 (5th Cir.1996).

**\*3** Because R2 asserts fraud claims under the Securities Exchange Act of 1934 ("Exchange Act") Rule 10(b), it must also satisfy the heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b) and the PSLRA to avoid dismissal. Rule 9(b) requires certain minimum allegations to be pled in securities fraud cases including the specific place, time and content of the false representations as well as the identity of the individual making the false representations and what that person gained from making the representations. *Shushany v. Allwaste, Inc.,* 992 F.2d 517, 521 (5th Cir.1993). Additionally, the PSLRA requires complaints in security fraud cases to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1) (1995).

The PSLRA also requires plaintiffs to allege facts demonstrating scienter. *Lovelace,* 78 F.3d at 1018. Scienter is defined as a "mental state embracing an intent to deceive, manipulate or defraud ." *Id.* The PSLRA requires complaints to state with particularity facts giving rise to a strong inference of scienter. U.S.C. § 78u-4(b)(2) (1995); *Nathenson v. Zonagen Inc.,* 267 F.3d 400, 407 (5th Cir.2001). Negligence alone is insufficient to support liability; however, severe recklessness suffices. *Nathenson,* 267 F.3d at 408-409. The defendant's motive and opportunity to commit fraud, alone, does not support a strong inference of scienter. *Id.* at 410-411. If the complaint does not plead scienter as required by the PSLRA, then the case must be dismissed. 15 U.S.C. § 78u-4(b)(3)(A) (1995); *Coates v. Heartland Wireless Communications, Inc.,* 55 F.Supp.2d 628, 634 (N.D.Tex.1999).

*B. 10b-5 Claim*
1. Elements of 10b-5
Section 10b-5 of the Exchange Act ("10b-5")

makes it unlawful for any person "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5 (2002). To state a claim under 10b-5, a plaintiff must allege the following in connection with the sale or purchase of securities: (1) an omission or misstatement, (2) of a material fact, (3) made with scienter, (4) on which plaintiff relied, (5) that proximately caused the plaintiff's injury. *Nathenson v. Zonagen, Inc.,* 267 F.3d 400, 407 (5th Cir.2001). As discussed previously, plaintiffs must also state with particularity facts giving rise to a strong inference of scienter, specifically identify the alleged misleading omissions or misrepresentations, and discuss the reasons why the statement or omission is misleading. *Id.* at 412.

2. Alleged Misstatement
**\*4** In this case, R2 argues that E & Y made an actionable misstatement under 10b-5 when it consented to the inclusion of its audit opinion in SEC filings that state "that World Access would go through with the tender offer," when, at the time of the SEC filing, World Access knew it would not go through. *See* R2 Comp. ¶¶ 32, 63. E & Y's behavior does not constitute a misstatement under 10b-5. The statements in the SEC filings do not promise that World Access will actually perform the Senior Note tender offer, rather the filings say that "the Company [World Access] is currently *obligated* to tender to approximately $160 million of its 13.25% Senior Notes by January 2, 2001." *See* R2 Comp. ¶ 35 (emphasis added). Unfortunately, companies are not always able to meet their financial obligations, hence the fact that Chapter 7 and Chapter 11 bankruptcies occur often. Accordingly, stating that a company has a financial obligation is not equivalent to guaranteeing that the company will pay the debt. The Court is not required to accept R2's mischaracterization of the statements in World Access's SEC filings. *See Associated Builders, Inc. v. Alabama Power Co.,* 505 F.2d 97 (5th Cir.1974). The Court holds that the statements regarding the Senior Notes tender

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 22862738 (N.D.Tex.)

**(Cite as: 2003 WL 22862738 (N.D.Tex.))**

Page 4

obligation did not guarantee that World Access would complete the tender offer; therefore, they are not misstatements under Rule 10b-5.

Even if the statements in World Access's SEC filings regarding its financial condition after the E & Y audits constitute misstatements by World Access, those cannot be attributed to E & Y. E & Y did not complete an audit of World Access during the time frame at issue in this case, the year 2000. It performed audits on World Access in 1998 and 1999, which covered the financial information through December 31, 1999. All the events R2 says it relied upon in making its decision to purchase the Senior Bonds occurred after the time period covered in E & Y's audits of World Access. Also, the fact that E & Y's audit opinions are included in later SEC filings does not somehow make the opinions themselves cover a later time period. Because E & Y did not audit World Access during the relevant time period in this case, it cannot be liable for any alleged misstatements by World Access.

Finally, E & Y cannot be liable for misstatements under 10b-5 in this case because for an accountant's misrepresentations to be actionable under Rule 10b-5, the accountants themselves "must make a false or misleading statement (or omission) that they know or should know will reach potential investors." *Anixter v. Home-Stake Prod. Co.,* 77 F.3d 1215, 1226 (10th Cir.1996). In this case, R2 does not allege that any of E & Y's audit opinions contain any false or misleading information. Because R2 failed to plead any facts supporting the proposition that E & Y personally made any misstatements, R2's 10b-5 claim against E & Y for misstatements fails as a matter of law.

### 3. Alleged Omission
**\*5** Along with misstatements, R2 claims that E & Y violated 10b-5 when it omitted certain important information regarding World Access's ability to complete the tender offer. Rule 10b-5 imposed no duty on E & Y to disclose this information. [FN3] Rule 10b-5 requires disclosure only when silence would make other statements misleading or false. *Taylor v. First Union Corp. of S. Carolina,* 857

F.2d 240, 243 (4th Cir.1988). Additionally, auditors are required to disclose subsequent events only if they "cast doubt on the reliability of the certified figures with respect to the period covered by the audit." *Igenito v. Bermec Corp.,* 441 F.Supp. 525, 549 (S.D.N.Y.1977).

> FN3. Silence without a duty to disclose is not misleading under Rule 10b-5. *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 987 n. 17, 99 L.Ed.2d 194 (1988).

E & Y did not violate 10b-5 by omitting important information for several reasons. First, as mentioned previously, the information that R2 argues that E & Y was obligated to publicly disclose involved the year 2000, which is after the time frame during which E & Y audited World Access. Also, the description of the tender offer obligation did not constitute a promise that the tender offer would go through. The fact that World Access may not be able to complete the tender offer on time does make the statement that World Access has an obligation to repurchase the Senior Notes untrue or misleading. Therefore, E & Y's silence did not make other World Access or E & Y statements regarding the tender offer false or misleading. Accordingly, E & Y had no duty to report that World Access could not pay the whole debt on time. Thus R2's 10b-5 claim against E & Y for omissions also fails as a matter of law.

### 4. Necessary Scienter
In an abundance of caution, the Court will analyze whether the complaint alleges adequate facts regarding scienter. Assuming that R2 adequately pled a misstatement, it must also plead specific facts giving rise to a "strong inference" of scienter to avoid dismissal. *Abrams v. Baker Hughes, Inc.,* 292 F.3d 424, 430 (5th Cir.2002). Severe recklessness, which supplies the scienter required to prove a 10b-5 claim, is defined as "highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable evidence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 22862738 (N.D.Tex.)

**(Cite as: 2003 WL 22862738 (N.D.Tex.))**

Page 5

aware of it." *Id.* (citing *Nathenson v. Zonagen Inc.,* 267 F.3d 400, 408 (5th Cir.2001)). Circumstantial evidence can support a strong inference of scienter. *Id.* at 431. Finally, the allegations should not be considered in isolation, but should be read together as a whole to determine whether they rise to the required strong inference of scienter. *Id* .

In this case, R2 alleges that E & Y committed fraud because it knew or recklessly disregarded that World Access's financial statements did not comply with GAAP because "they failed to provide accurate information regarding World Access's ability to satisfy its obligations on the Senior Notes tender offer," and because E & Y knew that World Access could not go through with the tender offer when it issued it's audit letter. *See* R2 Comp. ¶ 66. Even assuming that R2's factual allegations are true, the mere misapplication of accounting principles does not establish 10b-5 scienter. *In re MicroStrategy, Inc. Sec. Litig.,* 115 F.Supp.2d 620, 651 (E.D.Va.2000). The PSLRA also requires the plaintiff to allege facts tending to show that "the accounting practices are so deficient that the audit amounted to no audit at all or that no reasonable accountant would have made the same decisions if confronted with the same facts." *Id.* (citing *Zucker v. Sasaki,* 963 F.Supp. 301, 307 (S.D.N.Y.1997)). R2 fails to meet this burden. As mentioned before, R2 does not complain about the quality or veracity of E & Y's 1998 or 1999 audits. R2 does not plead any facts supporting the proposition that E & Y's audit was so deficient that it amounted to no audit at all. Therefore, R2 fails to adequately plead scienter on this ground.

**\*6** Next, R2 claims it can prove scienter because E & Y had access to World Access's books during 2000 and that E & Y must have known that World Access could not honor its tender obligations, and it failed to make this information public. *See* R2 Comp. ¶ 63. This assertion is problematic. The mere fact that an accountant had access to a company's books does not mean that the accountant is automatically aware of GAAP violations, just as a person who reads one chapter in a textbook cannot be expected to know the contents of the entire book. *See Reiger v. Price Waterhouse Coopers LLP,* 117

F.Supp.2d 1003, 1012 (S.D.Cal.2000).

Also, when motive is not alleged and the plaintiff relies entirely on allegations of recklessness, the evidence of scienter must be strong. *Zucker v. Saski,* 963 F.Supp. 301, 309 (S.D.N.Y.1997). In this case, R2 fails to allege a motive for E & Y's failure to report the information that R2 alleges it must have learned by examining World Access's books. R2's allegations of recklessness involve GAAP violations which, as previously discussed, alone do not provide the necessary recklessness. Because R2 fails to adequately plead that E & Y acted reckless, R2 failed to allege the necessary scienter required for a 10b-5 violation. Accordingly, R2's 10b-5 claim against E & Y must also be dismissed on the alternate ground of failure to plead scienter.

### *C. Section 20(a) Claim*
Along with the 10b-5 claim, R2 alleges that E & Y violated section 20(a) of the Exchange Act. 15 U.S.C. § 78t(a) (2002). Section 20(a) discusses control person liability stating "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter ... shall also be liable jointly and severally with and to the extent as such controlled person...." *Id.* To establish liability under section 20(a), R2 must demonstrate in its pleadings that E & Y possessed the power to control the specific transaction or activity upon which the primary violation is predicated." *Abbot v. Equity Group, Inc.,* 2 F.3d 613, 620 (5th Cir.1993). Outside accountants are not controlling persons unless they have influence over the daily operations of the company. *Morin v. Trupin,* 809 F.Supp. 1081, 1087 (S.D.N.Y.1993). R2's complaint does not allege that E & Y controls the daily operations of World Access or that it controlled World Access during the time that each SEC filing at issue in this case was filed. Accordingly, R2 failed to adequately plead that E & Y was a "control person" liable under section 20(a) for any of World Access's potential 10b-5 violations. Therefore, R2's section 20(a) claim against E & Y is dismissed.

### *D. Fraud Claim*
In its complaint, R2 argues that E & Y committed fraud under Texas law when it allowed its audit

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 6

2003 WL 22862738 (N.D.Tex.)

**(Cite as: 2003 WL 22862738 (N.D.Tex.))**

opinion to be attached to World Access's SEC filings at issue in the case and when it failed to report possible GAAP violations regarding World Access's ability to make the $160 million tender offer. Most of the fraud analysis mirrors the 10b-5 analysis addressed in Section III, Part B of this Order. Texas fraud claims include liability for affirmative fraudulent representations, which are discussed in the 10b-5 analysis above, as well as liability for failure to disclose important information. A duty to disclose arises when a representation is made and new information makes the earlier representation misleading or untrue. *Hoggett v. Brown,* 971 S.W.2d 472, 487 (Tex.App.--Houston [1st Dist.] 1997, pet. denied). In the instant case, E & Y had no duty to disclose the fact that World Access may not be able to follow through with the $160 million tender offer because its earlier representation did not say that World Access would go through with the tender offer. As discussed previously, World Access's SEC filings at issue in the case merely stated World Access's tender offer *obligation;* it did not contain a guarantee that World Access would actually make and complete the tender offer. Accordingly, E & Y had no duty to disclose any information it may have received that World Access could not complete the tender offer. Because R2 failed to plead that E & Y made any fraudulent representations or failed to disclose any important information, R2's state fraud claim must be dismissed.

### E. Texas Securities Act Claim

*7 Along with the federal securities law and state fraud claims, R2 argues that E & Y violated the Texas Securities Act when it assented to the inclusion of its audit reports in World Access SEC filings and when it failed to make public that World Access did not have the funds to go through with the Senior Notes $160 million tender offer. Like the federal claims discussed previously, R2's Texas Securities Act claim fails because the pleadings do not allege that E & Y made any untrue statements or omitted any material facts. The Texas Securities Act prohibits false statements and material omissions in the sale of securities and imposes liability upon sellers, aiders and control persons who offer or sell securities "by means of an untrue statement of a

material fact or omission." Tex. Civ. Stat. Ann. art. 581-33 (2002). As discussed in the 10b-5 section, R2 failed to identify any false statements or material omissions by E & Y. Therefore, R2's Texas Securities Act claim fails.

Even assuming R2 adequately pled an untrue statement or material omission, E & Y is not liable under the Texas Securities Act because it is not a seller, control person or aider as defined by the Act. R2 did not allege that E & Y is a seller, and as discussed previously, R2 did not adequately plead that E & Y controlled the daily workings of World Access or the SEC filings at issue in the case. To establish aider and abettor liability R2 must demonstrate: (1) a primary violation of securities law, (2) the aider had a general awareness of its role in the violation, (3) the aider substantially assisted in the violation, (4) the aider intended to deceive the plaintiff or the aider acted with reckless disregard for the truth regarding the representations made by the primary party. *Crescendo Invs., Inc. v. Brice,* 61 S.W.3d 465, 472 (Tex.App.--San Antonio 2001, pet. denied). In this case, R2 did not plead evidence of any of the elements required for aider and abettor liability. First, R2 did not plead sufficient facts to establish a violation of securities law. Also, R2 plead no evidence indicating that E & Y knew about a violation or that E & Y substantially assisted in any such violation. Accordingly, R2's Texas Securities Act claim must be dismissed.

### F. Civil Conspiracy

R2 alleges that E & Y conspired with World Access to defraud R2 and other potential investors by failing to report that World Access did not have the funds to go through with the $160 million tender offer and by allowing its audit letter to be included in SEC filings that discuss the tender obligation. A civil conspiracy is defined as "a combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means." *Carroll v. Timmers Chevrolet, Inc.,* 592 S.W.2d 922, 925 (Tex.1979). A person without knowledge of the purpose or object of the conspiracy cannot be a co-conspirator because he cannot agree to the commission of a wrong that he

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22862738 (N.D.Tex.)

**(Cite as: 2003 WL 22862738 (N.D.Tex.))**

does not know about. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.,* 435 S.W.2d 854, 857 (Tex.1969). A meeting of the minds between co-conspirators is required for a conspiracy. *Id.* In this case, R2 did not plead any facts indicating a meeting of the minds between World Access and E & Y regarding the alleged fraud. Therefore, R2's civil conspiracy claim must be dismissed.

### G. Negligent Misrepresentation Claim

**\*8** R2 urges in its complaint that E & Y negligently misrepresented World Access's financial situation when it failed to make public World Access's GAAP violations and the fact that World Access did not have enough cash to go through with the tender offer. To prevail on a negligent misrepresentation claim, R2 must show: (1) that E & Y made a representation to R2 in the course of E & Y's business; (2) that E & Y supplied false information for the guidance of others; (3) that E & Y failed to exercise reasonable care or competence when obtaining or communicating the information; (4) that R2 justifiably relied on the representation; and (5) that E & Y's negligent representation proximately caused R2's injury. *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests,* 991 S.W.2d 787, 791 (Tex.1999).

In this case, R2's complaint does not allege that E & Y supplied any false information to the public or to R2 specifically. Rather, it asserts tangentially that E & Y's audit letter was attached to SEC filings that spelled out World Access's $160 million tender offer obligation on the Senior Notes. As established above, these statements did not guarantee that World Access would perform the tender offer, rather they merely stated World Access's obligation regarding the offer. Therefore, the SEC filings at issue did not contain false statements, and E & Y's involvement with the filings did not constitute a false statement. Without a false statement, R2's negligent misrepresentation claim against E & Y fails.

### IV. CONCLUSION

Ultimately, R2's case against E & Y must be dismissed because the complaint failed to allege that E & Y made a false statement,

misrepresentation or omission of a material fact. Without these things, R2's 10b-5, 20(a), fraud, Texas Securities Act, and negligent misrepresentation claims fail. In addition, R2's complaint did not allege a meeting of the minds between World Access and E & Y regarding an unlawful act or a lawful act achieved through unlawful means, which is required for a Texas civil conspiracy claim. Therefore, because R2 failed to adequately plead each of its causes of action against E & Y, E & Y's Motion to Dismiss Plaintiff's Second Amended Complaint is GRANTED IN ITS ENTIRETY, and the case against E & Y is DISMISSED WITH PREJUDICE. In addition, the Individual Defendants' Motion to Dismiss Plaintiff's First Amended Complaint is GRANTED IN PART, and R2 has 30 days from the date of this order to file an amended complaint in compliance with this order.

2003 WL 22862738 (N.D.Tex.)

**Motions, Pleadings and Filings (Back to top)**

• 3:02CV00323  (Docket)

(Feb. 15, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Crim. No.  H-04-25 (Lake, J.) |
| | ) | |
| RICHARD A. CAUSEY, | ) | |
| JEFFREY K. SKILLING, and | ) | |
| KENNETH LAY, | ) | |
| | ) | |
| Defendants. | ) | |

## **ORDER**

On July 1, 2005,  Defendant Richard A. Causey moved to dismiss Counts 21, 22, 24, 25,

26, 28 & 29 of the Second Superceding Indictment.  After reviewing the motion, other

responsive papers submitted by the parties, and the entire record of this case, the Court finds that

each of these counts is insufficient as a matter of law.  The motion is therefore, GRANTED.

IT IS HEREBY ORDERED AND DECREED:  Counts 21, 22, 24, 25, 26, 28 & 29 of the

Second Superceding Indictment are dismissed as to Mr. Causey.


_____
SIM LAKE
United States District Judge

Date:

## <u>CERTIFICATE OF SERVICE</u>

I hereby affirm that true and correct copies of Defendant Richard A. Causey's Motion to

dismiss Counts 21, 22, 24, 25, 26, 28 & 29 and the memorandum in support thereof have been

served by electronic copy on this 1st day of July, 2005 on counsel listed below:

**Counsel for United States of America:**

Sean Berkowitz
Linda Lacewell
John Hueston
Kathy Ruemmler
Special Attorneys
Enron Task Force
United States Department of Justice
1400 New York Avenue, NW, 10th Floor
Washington, DC 20530
(202) 305-2634
(202) 353-3165 (fax)
Sean.Berkowitz2@usdoj.gov

**Counsel for Defendant Jeffrey K. Skilling:**

Daniel Petrocelli
Matthew Kline
O'Melveny & Myers LLP
1999 Avenue of the Stars
7th Floor
Los Angeles, CA 90067
Office:  (310) 246-6840
mkline@omm.com

**Counsel for Defendant Kenneth L. Lay:**

Michael Ramsey
2120 Welch
Houston, TX 77019
mramsey@mramsey-lawyer.com

/s/ Matthew L. Stennes_____
Matthew L. Stennes
*Counsel for Defendant Richard A. Causey*