UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**REDACTED**

CLERK, U. S. DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
FILED
9/2/05
MICHAEL N. MILBY, CLERK
BY DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | Crim. No. H-04-25 (Lake, J.) |
| v. ) | |
| ) | **REQUEST FOR IMMEDIATE ORDER** |
| RICHARD A. CAUSEY, JEFFREY K. ) | **REGARDING EVIDENCE IN** |
| SKILLING, and KENNETH L. LAY, ) | **CONNECTION WITH MOTION** |
| Defendants. ) | |

**DEFENDANTS' JOINT MOTION TO DISMISS, OR FOR ALTERNATIVE RELIEF, BASED ON PROSECUTORIAL MISCONDUCT; MEMORANDUM IN SUPPORT THEREOF; DECLARATION OF MICHAEL E. TIGAR; DECLARATIONS OF ATTORNEYS A-F (SUBMITTED *IN CAMERA* AND UNDER SEAL); [PROPOSED] ORDERS (2); REDACTED VERSIONS OF DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION AND DECLARATION OF MICHAEL E. TIGAR**

Defendants Jeffrey Skilling, Kenneth Lay, and Richard Causey move pursuant to the Fifth and Sixth Amendments to the United States Constitution; *United States v. Scroggins*, 379 F.3d 233, 239 (5th Cir. 2004); *United States v. Goodwin*, 625 F.2d 693, 703 (5th Cir. 1980), *United States v. Hammond*, 598 F.2d 1008, 1012 (5th Cir. 1979); *United States v. Clemones*, 577 F.2d 1247, 1251-52 & n.3 (5th Cir. 1978); *United States v. Henricksen*, 564 F.2d 197, 198 (5th Cir. 1977); *United States v. Vavages*, 151 F.3d 1185, 1188 (9th Cir. 1998); *United States v. Foster*, 128 F.3d 949, 953 (6th Cir. 1997); *United States v. Smith*, 478 F.2d 976, 979 (D.C. Cir. 1973); *United States v. Leung*, 351 F. Supp. 2d 992, 998 (C.D. Cal. 2005); *United States v. Peter Kiewit Sons' Co.*, 655 F. Supp. 73, 77 (D. Colo. 1986), *aff'd United States v. Carrigan*, 804 F.2d 599 (10th Cir. 1986); the Federal Rules of Criminal Procedure; and the Court's inherent supervisory powers, for an Order dismissing with prejudice the Indictment in this case on the ground that the Enron Task Force has engaged in deliberate, systematic prosecutorial misconduct

that has irreparably harmed defendants' ability to prepare for trial and present a defense and that cannot be cured by lesser sanctions. A proposed order is submitted herewith.

Defendants also request an immediate order providing for disclosure of evidence relevant to this motion. A second proposed order is submitted in connection with this request.

Defendants finally request a hearing in connection with this motion at which they can present oral argument and evidence.

Pursuant to Local Rule 12.2, counsel for defendants have conferred with the Enron Task Force, and it opposes the relief sought in this motion.

Dated:  August 31, 2005

Respectfully submitted,

By:_____

Of Counsel:

Ronald G. Woods
Texas State Bar No. 21964000
Federal Bar No. 657
5300 Memorial, Suite 1000
Houston, TX 77007
Office: 713-862-9600
Facsimile: 713-864-8738

Daniel M. Petrocelli
M. Randall Oppenheimer
Mark Holscher
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
Office:  (310) 553-6700
Facsimile:  (310) 246-6779
*Attorneys in Charge for Jeffrey K. Skilling*

By:_____ *(by permission)*

Michael Ramsey
Chip Lewis
River Oaks/Welch Building
2120 Welch
Houston, TX 77019
Office: (713) 227-0275
Facsimile:  (713) 523-7887
*Attorneys in Charge for Kenneth L. Lay*

By: _____ (by permission)

Reid Weingarten
Mark Hulkower
Matt Stennes
STEPTOE & JOHNSON
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036-1795
Office: (202) 429-8074
Facsimile: (202) 261-0648
*Attorneys in Charge for Richard A. Causey*

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................................ 1

II.  DEFENDANTS HAVE BEEN UNABLE TO MEET WITH WITNESSES ................... 5

III. THE TASK FORCE HAS VIOLATED DEFENDANTS' CONSTITUTIONAL
     RIGHTS BY INTIMIDATING WITNESSES INTO NOT MEETING WITH
     THEM AND NOT TESTIFYING ON THEIR BEHALF ................................................. 8

     A.   Defendants' Burden of Proof ................................................................. 8

     B.   The Task Force Has Improperly Instructed Witnesses Not To Meet with
          Defendants ............................................................................................. 9

          1.   Examples of Improper Instructions and Threats ....................... 9

               a.   Instruct Your Lawyer to Stop Meeting With Skilling or
                    "Get Rid" of Him ........................................................... 9

               b.   Don't Talk to Defendants, "They Are Bad News." ...... 11

               c.   It's Not a "Good Idea" To Speak With Defendants ...... 12

               d.   Don't Talk to "Anybody" and "Take the Fifth," If
                    Necessary ...................................................................... 12

               e.   Witnesses Will "Pay" if They Cooperate with
                    Defendants .................................................................... 13

               f.   If You Cooperate With Defendants, We'll "Go After"
                    You ................................................................................ 13

          2.   The Task Force's Actions Violate Defendants' Constitutional
               Rights ......................................................................................... 14

          3.   *Newby* Is No Substitute for Private Interviews, Nor Does It Excuse
               the Task Force's Misconduct ..................................................... 18

     C.   The Task Force Has Harassed Defense Witnesses Expected to Provide
          Exculpatory Testimony at Enron Trials ................................................ 20

          1.   Examples of Improper Threats ................................................. 20

               a.   Testifying Is "Dangerous" and "Not in Your Best
                    Interest." ....................................................................... 20

               b.   You Are Now a Target and Will Be Prosecuted
                    for Perjury .................................................................... 20

               c.   "You're a Target," Don't Testify ................................. 22

          2.   The Task Force's Threats Violate Defendants' Constitutional
               Rights ......................................................................................... 23

     D.   The Task Force Is Using Plea Agreements As Means To Deny Defendants
          Access To Witnesses And To Enforce Its Version Of The "Truth." ......... 27

          1.   Defining the "Truth" and Quelling Any Dissent ..................... 27

i

TABLE OF AUTHORITIES
(continued)

Page

| | 2. | Creating a Right to Intrude on Defense Witness Interviews | 32 |

| | 3. | Forbidding Whole Subject Areas of Inquiry, Interview, and Discussion | 34 |

| E. | Other Actions of the Task Force Have Prejudiced Defendants | 41 |

IV. THIS CASE MUST BE DISMISSED ............ 43

| A. | Only Dismissal Is Appropriate; Lesser Remedies Have Failed to Deter the Task Force's Misconduct | 43 |

| B. | If the Court Is Inclined to Grant Any Sanction Other than Dismissal, Defendants Would Like the Opportunity to Brief and Discuss What Remedies Are Most Appropriate | 50 |

| C. | Defendants Seek a Hearing in Connection with this Motion | 51 |

| D. | Defendants Seek Evidence in Connection with this Motion | 51 |

V. CONCLUSION ............ 53

TABLE OF AUTHORITIES

Page

Cases

*Berger v. United States,*
   295 U.S. 78 (1935).................................................................... 49
*Brown v. Cain,*
   104 F.3d 744 (5th Cir. 1997) ..................................................... 23
*Coppolino v. Helpern,*
   266 F. Supp. 930 (S.D.N.Y. 1967) ............................................ 17
*Gregory v. United States,*
   369 F.2d 185 (D.C. Cir. 1966)........................................*passim*
*In re United States,*
   878 F.2d 153 (5th Cir. 1989) ................................................ 50, 51
*United States v. Bell,*
   506 F.2d 207 (D.C. Cir. 1974)..................................................... 27
*United States v. Bieganowski,*
   313 F.3d 264 (5th Cir. 2002) ........................................................ 8
*United States v. Black,*
   767 F.2d 1334 (9th Cir. 1985) .................................................. 39
*United States v. Blackwell,*
   694 F.2d 1325 (D.C. Cir. 1982) ................................................ 23
*United States v. Blanche,*
   149 F.3d 763 (8th Cir. 1998) ..................................................... 50
*United States v. Campa,*
   __ F.3d __, Case No. 01-17176, 2005 WL 1866323 (11th Cir. Aug. 9, 2005) ..................... 49
*United States v. Carrigan,*
   804 F.2d 599 (10th Cir. 1986) .......................................*passim*
*United States v. Clemones,*
   577 F.2d 1247 (5th Cir. 1978) ......................................... 1, 17, 36
*United States v. Davis,*
   974 F.2d 182 (D.C. Cir. 1992)..................................................... 23
*United States v. Doe,*
   125 F.3d 1249 (9th Cir. 1997) .................................................. 43
*United States v. Dupre,*
   117 F.3d 810 (5th Cir. 1997) ..................................................... 23
*United States v. Fischel,*
   686 F.2d 1082 (5th Cir. 1982) .................................................. 34
*United States v. Follin,*
   979 F.2d 369 (5th Cir. 1992) ..................................................... 50
*United States v. Foster,*
   128 F.3d 949 (6th Cir. 1997) ...........................................1, 9, 25
*United States v. Fricke,*
   684 F.2d 1126 (5th Cir. 1982) .................................................. 26
*United States v. Fulmer,*
   722 F.2d 1192 (5th Cir. 1983) .................................................. 43

TABLE OF AUTHORITIES
(continued)

Page

*United States v. Garrett,*
   238 F.3d 293 (5th Cir. 2000) ........................................................................ 51
*United States v. Golding,*
   168 F.3d 700 (4th Cir. 1999) ........................................................................ 25
*United States v. Goodwin,*
   625 F.2d 693 (5th Cir. 1980) .................................................................... *passim*
*United States v. Hammond,*
   598 F.2d 1008 (5th Cir. 1979) .................................................................. *passim*
*United States v. Hatch,*
   926 F.2d 387 (5th Cir. 1991) ........................................................ 15, 26, 27
*United States v. Henao,*
   652 F.2d 591 (5th Cir. 1981) .............................................................. 14, 26
*United States v. Henricksen,*
   564 F.2d 197 (5th Cir. 1977) .................................................................. *passim*
*United States v. Jackson,*
   935 F.2d 832 (7th Cir. 1991) ........................................................................ 26
*United States v. Kojayan,*
   8 F.3d 1315 (9th Cir. 1993) ........................................................................ 47
*United States v. Leung,*
   351 F. Supp. 2d 992 (C.D. Cal. 2005) .................................................... *passim*
*United States v. MacCloskey,*
   682 F.2d 468 (4th Cir. 1982) ........................................................................ 24
*United States v. Morrison,*
   535 F.2d 223 (3d Cir. 1976) .................................................................. 26, 50
*United States v. Opager,*
   589 F.2d 799 (5th Cir. 1979) ........................................................................ 14
*United States v. Peter Kiewit Sons' Co.,*
   655 F. Supp. 73 (D. Colo. 1986)............................................................ *passim*
*United States v. Rodgers,*
   624 F.2d 1303 (5th Cir. 1980) ...................................................................... 32
*United States v. Scroggins,*
   379 F.3d 233 (5th Cir. 2004) .................................................................. *passim*
*United States v. Smith,*
   478 F.2d 976 (D.C. Cir. 1973) ........................................................................ 1
*United States v. Soape,*
   169 F.3d 257 (5th Cir. 1999) .................................................................. 8, 32
*United States v. Thevis,*
   665 F.2d 616 (5th Cir. 1982) ........................................................................ 50
*United States v. Thomas,*
   488 F.2d 334 (6th Cir. 1973) .................................................................. 26, 49
*United States v. Vavages,*
   151 F.3d 1185 (9th Cir. 1998) ................................................................ *passim*
*United States v. Viera,*
   839 F.2d 1113 (5th Cir. 1988) ...................................................................... 23

# TABLE OF AUTHORITIES
## (continued)

Page

*United States v. Weddell,*
   800 F.2d 1404 (5th Cir. 1986) ................................................................ 14, 26
*United States v. Welbron,*
   849 F.2d 980 (5th Cir. 1988) ........................................................................ 43
*United States v. Whittington,*
   783 F.2d 1210 (5th Cir. 1986) ...................................................................... 23

## Rules

FED. R. CRIM. P. 16(d) ....................................................................................... 50

## Other Authorities

AMERICAN BAR ASSOCIATION'S STANDARDS FOR CRIMINAL
   JUSTICE § 3-3.1(d) (3d. ed. 1996) ........................................................ 18, 34
BENNETT L. GERSHMAN, PROSECUTORIAL MISCONDUCT §§ 14:9-10 (2d. ed. 2004).................... 51
Robert G. Morvillo & Robert J. Anello, *Government Attempts to Shield Its
   Witness from the Defense*, 231 NEW YORK LAW JOURNAL 3 (Feb. 1, 2005) ............................ 8
RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 116 (2000)........................................ 18

CCI:714957

## I.   Introduction

Defendants move to dismiss the Indictment in this case because actions of the Enron Task Force have deprived them of their constitutional rights both to secure and confront witnesses, thereby stripping defendants of their ability fully and fairly to prepare for and defend themselves at trial. Put simply, witnesses are afraid to talk to us. Defendants have sent hundreds of letters and made innumerable calls to witnesses and their counsel asking only for the opportunity to meet with witnesses about the issues in this case. Not only have the witnesses refused to talk to us, so have their lawyers. Those very few witnesses willing to give us any assistance have insisted, almost without exception, on doing so covertly. As we show in this motion, this unprecedented circumstance exists because the Enron Task Force has intentionally obstructed our access to witnesses.[1]

This is an uncommon and gravely serious charge. But the facts are what they are, they compel us to bring this motion, and they demand immediate, decisive, and final relief.

Forty years ago, Judge J. Skelly Wright observed, in the seminal witness access case, *Gregory v. United States*, 369 F.2d 185, 188-89 (D.C. Cir. 1966):

> A criminal trial, like its civil counterpart, is a quest for truth. That quest will more often be successful if both sides have an equal opportunity to interview the persons who have the information from which the truth may be determined. The current tendency in the criminal law is in the direction of discovery of facts before trial and the elimination of surprise at trial. A related development in the criminal law is the requirement that the prosecution not frustrate the defense in the preparation of its case. . . . Witnesses . . . are the property of neither the prosecution nor the defense. Both sides have an equal right and should have an equal opportunity to interview witnesses. . . .

The Enron Task Force has not honored this fundamental principle, endorsed by every court in the

---

[1] Consistent with the discussion on the record at the July 29, 2005 scheduling conference, *see* Ex. 42 (Hr'g Tr. at 17:18-20:15), and to preserve confidences and protect sources from reprisals, we submit the Declarations of Attorneys A-F *in camera* and under seal for the Court's review. Incidents identified in the declarations are recounted in this memorandum in detail, but without disclosing information identifying attorneys or witnesses. The factual information in this memorandum provides the Task Force with ample notice and ability to address the issues. Unless specifically identified, this motion refers to all attorneys and witnesses by male pronouns, regardless of actual gender.

country, the American Bar Association, the Restatement, and Congress in drafting the federal criminal "witness obstruction" statutes.

This is not a case involving a handful of witnesses with unsavory backgrounds. Far from it, this case implicates untold numbers of potential witnesses, who are law abiding citizens with good families and established track records. They were employed not only by Enron, but by some of the finest institutions and firms in the world. More so, many are people with whom defendants enjoyed close and longstanding relationships, both professional and personal. Given these facts, it is inconceivable that so many of them would all at once refuse to lend any assistance or information to their friends and colleagues now on trial for their lives. There is no innocent explanation for this. It has happened *only* because the Task Force has the power—and elected to abuse its power—to make it happen.[2]

Without Court intervention, there is only so much we can do to illuminate the Task Force's actions for the Court. To date, and in spite of the wall of silence confronting us, we have established that the Task Force has:

1. Delivered an email to ███████████████ a critical cooperating witness, instructing ██████████prohibi██attorney from communicating with Skilling's lawyers or else "get rid" of██.[2]

2. Warned an important material witness, with percipient knowledge of transactions targeted in the Indictment, not to "talk with" defendants Skilling or Lay or their lawyers because "they are bad news."[3]

3. Told Rex Shelby, when his status was as a "witness" with knowledge about EBS issues, that while the decision was his, it was not a "good idea" to speak with defense counsel.[4]

4. Ordered a witness, over threats of reprisal, not to talk to anybody concerning Enron matters or disclose what he had discussed with the Task Force, and if deposed in a civil matter or called to testify in other proceedings, to invoke his Fifth Amendment rights.[5]

5. Made clear to attorneys that it would "go after" or "make pay" any witnesses who

---

[3] Decl. of Atty. E ¶ 11.

[4] Ex. 5 (Typewritten notes of Rex Shelby dated Sept. 2, 2002).

[5] *See* Decl. of Atty. D ¶¶ 25-35.

cooperated with defendants, discussed Enron matters with them, or "lied" by disagreeing with the Task Force's positions.[6]

6. Cautioned counsel for a witness, four separate times in one month leading up to his possibly testifying for the defense in a related Enron case, that it was "dangerous" and "not in the witness' interest" to testify for defendants, a warning the attorney deemed a "veiled threat."[7]

7. Reminded counsel for Dr. Larry Ciscon, a defense witness in the EBS trial, three times in the two weeks leading up to his taking the stand that he was a "target" and could be indicted at any time.[8]

8. Changed at the eleventh hour the status of former Arthur Andersen accountant Kate Agnew from witness to target and threatened to bring what an experienced criminal attorney called a "patently meritless" perjury charge in a "blatant, horrible, awful," but successful attempt to dissuade Ms. Agnew from testifying and contradicting one of the Task Force's key theories of its case.[9]

9. Secured plea agreements with two banks, Merrill Lynch and CIBC, that prohibit the banks, as well as their employees and agents, from testifying *in this case* in any manner that would contradict the Task Force's allegations *in this case* about the Nigerian Barges and FAS 125/140 transactions to which these banks were parties.[10]

10. Procured from these same banks plea conditions entitling the Task Force to attend meetings between the bank's employees and defense counsel, despite clear case law, including Judge Wright's opinion in *Gregory*, holding that defendants have a right to meet with witnesses *alone* and ruling that even a "suggestion" that a prosecutor must be present is improper.[11]

11. Obtained plea agreements from cooperating witnesses that bar witnesses and their counsel from disclosing to defendants any information gleaned from meetings with the Task Force, as well as historical facts known to witnesses about events and transactions relevant to this case.[12]

12. Violated three separate court orders prohibiting interference with access to witnesses and misrepresented its conduct and position to the Courts, us, and others by assuring

---

[6] *See* Decl. of Attys. D ¶¶ 60-70, C ¶¶ 6-8.

[7] Decl. of Atty. B.

[8] Ex. 39 at 8429:3-13 (June 9, 2005 EBS Trial Tr.); Ex. 40 at 8935:22-8936:22 (June 10, 2005 EBS Trial Tr.).

[9] Decl. of Atty. D ¶¶ 71-81; Ex. 1 at 2 (Letter from R. Hardin to M. Chertoff of May 9, 2002).

[10] *See* Exs. 14 ¶ 8 (Enron Task Force-CIBC Settlement Agreement of Dec. 22, 2003); 8 ¶ 7 (Enron Task Force-Merrill Lynch Settlement Agreement of Sept. 17, 2003).

[11] *See* Exs. 8, 14, 16-18.

[12] *See* Decl. of Atty. D ¶¶ 31, 52; Exs. 45-58 (cooperators' plea agreements); 30 (Letter from J. Dowd to M. Ramsey, D. Petrocelli, R. Weingarten of May 10, 2005).

full adherence to the rule that witnesses were free to speak with whomever they wish.[13]

Courts, including those in this Circuit, have dismissed indictments, reversed convictions, and ordered other substantial relief, such as suppression of evidence and court-ordered depositions, in cases involving far less pervasive misconduct.[14]   In this case, we respectfully submit that dismissal is the only appropriate remedy.   The Task Force's actions have not been accidental or isolated in time.   They have been prolonged and widespread, and they continue to this day.   Just the evidence we have marshaled—let alone the vast evidence unavailable to us— spans several years and involves top Task Force lawyers.   ████████████ email, for example, was a deliberate, considered directive ████████████████████████

Any sanction less than dismissal will only be a half measure.   Three court orders (one from this Court and two in other Task Force cases) making clear the Task Force may not engage in exactly this type of conduct have not been respected.   When this Court and others have addressed the issue with the Task Force in open court, the Task Force has not been candid about

---

[13] *See* Exs. 7, 13, 35 (three court orders); 9, 12, 31, 33, 34 (Task Force representations); *infra* Section IV.A (discussing these orders and representations).

[14] *See, e.g., United States v. Goodwin*, 625 F.2d 693, 703 (5th Cir. 1980) ("Threats against witnesses are intolerable.   Substantial government interference with a defense witness' free and unhampered choice to testify violates due process rights of the defendant."); *United States v. Hammond*, 598 F.2d 1008, 1013 (5th Cir. 1979) ("[A]gent Peisner's comments constituted a 'substantial interference' with defense witness Parson's 'free and unhampered choice to testify. We therefore conclude that this governmental interference deprived the defendant of his due process right to present his witnesses."); *United States v. Henricksen*, 564 F.2d 197, 198 (5th Cir. 1977) ("Prior to trial, a codefendant, whose testimony would have tended to exonerate Henricksen, plea bargained with the Government.   As part of his plea, he had to agree not to testify in any manner regarding Henricksen. . . .   The Government . . . has now confessed error on this point and has requested that we reverse the conviction and remand for a new trial."); *United States v. Leung*, 351 F. Supp. 2d 992, 998 (C.D. Cal. 2005) (dismissing indictment because "government decided to make sure that [defendant] and her lawyers would not have access to [a key witness]"); *United States v. Peter Kiewit Sons' Co.*, 655 F. Supp. 73, 77 (D. Colo. 1986), *aff'd United States v. Carrigan*, 804 F.2d 599 (10th Cir. 1986) ("In fairness, the government should not be allowed to cut off defense access to witnesses who, but for prosecutors' advice, would be willing to speak with defense representatives.").

4

its actions. Indeed, misrepresentations about this issue were made to this Court just two weeks after ████████████████ email was sent, ████████████████████████████[15]

**II.    Defendants Have Been Unable To Meet With Witnesses.**

Defendants are men with long, successful careers, impeccable backgrounds, and strong ties to the community and the witnesses in this case. Ken Lay was Enron's Chairman of the Board and, except for six months in 2001, also served as Chief Executive Officer. Jeff Skilling was Enron's President and Chief Operating Officer and, between February and August 2001, was its CEO. Richard Causey was the company's Chief Accounting Officer, and before that a manager at Arthur Andersen. Defendants had been part of Enron and its culture for more than a decade and, with others—some of whom are now government cooperators—were the chief architects of Enron's transformation from sleepy pipeline company to massive, high-tech energy conglomerate with nearly 20,000 employees and, at its peak, a market capitalization of $60 billion.

As one might expect, over the course of more than a decade, defendants developed strong bonds, professional relationships, and personal friendships with many people in and out of the Enron organization. Indeed, the Task Force contends defendants and more than 100 other individuals were so closely knit they were able, for years, to pull off the most massive, far-reaching white collar conspiracy in the history of American business. Yet now, defendants have no meaningful access to these people. In contrast, the Task Force enjoys private interviews with hundreds of them, not to mention all of those subpoenaed to provide sworn testimony before the grand jury.

Faced with this extreme disparity in access to witnesses—especially important witnesses such as the alleged co-conspirators—defendants sent 144 letters directed to counsel for witnesses requesting the opportunity to meet with their clients who possess relevant and potentially exculpatory information.[16] Two accepted our request.[17] Nearly 90% of our requests were

---

[15] *See* Ex. 34 at 21:12-18 (Hr'g Transcript of Scheduling Conf. of May 18, 2005).

[16] *See* Decl. of Atty. D ¶¶ 9-10.

denied, including more than three-quarters of the recipients who failed to send any response whatsoever.[18]

A few attorneys with whom we spoke off-the-record "empathized" with our situation but were not surprised, acknowledging the Task Force made it clear to them and others, through explicit comments or implicit threats, that a witness who cooperated with defendants did so at his peril.

We brought these concerns to the Court's attention. On May 27, 2005, over the Task Force's objection, the Court signed an Order advising potential witnesses that the decision whether to meet with defendants or defense counsel is "entirely up to the witness," and that if the witness chose to meet with or assist defendants, "the government will not view [this] as any lack of cooperation . . . or use such [information] as a basis for decisions regarding prosecution."[19]

We sent a second round of 138 letters to attorneys representing witnesses who did not accept our initial request to meet, this time attaching a copy of the Court's order. We wrote: "As a follow-up to our earlier letter, we still wish to interview your client. We are updating our previous request because Judge Lake entered an Order which specifically prohibits the Task Force from retaliating against those who cooperate with us."[20]  Our second request fared no better. Two more witnesses agreed to meet with us (a total of four from nearly 300 letters).[21]

---

[17] See id. ¶ 10.

[18] See id. ¶¶ 10-11.  Twelve witnesses, through attorneys, refused to meet with us, but said they might meet in the future or might answer written questions submitted to them. See id.  Given the provisions in several plea and cooperation agreements requiring witnesses to share information with the Task Force, see infra Section III.D, we are concerned that our written questions, and our case theories, would be forwarded to the Task Force.

[19] Ex. 35 (Court order of May 27, 2005).

[20] Decl. of Atty. D ¶¶ 16-17.

[21] See Decl. of Atty. D ¶¶ 18-19.  Four witnesses, through their attorneys, refused to meet with us, but said they might meet in the future or answer written questions submitted to them. See id.

Roughly 95% of our follow-up requests were denied, with seven out of 10 recipients sending no response.[22]

To be sure, we recognize that in criminal or civil cases witnesses sometimes choose not to speak to one side or the other. However, for defendants, who are not charged with violent crimes, to be stripped of any contact with so many former friends and co-workers goes far beyond the realm of normal experience.[23] Our expert, venerated criminal law attorney Michael Tigar, concurs.

> In my experience, this level of silence is not normal. While witnesses have every right not to consent to an interview, and some do not consent, in my experience, many witnesses are willing to meet with the defense because they are friends, have personal relationships, used to be co-workers with defendants, have respect or admiration for defendants, believe the defendants have been wrongfully charged, feel that if they met with the government they should show the defense the same courtesy, or simply feel, in the criminal justice system, the most important thing is for the truth to be told. . . .

> [B]ased on nearly forty years of experience practicing, teaching, and studying criminal law, I have never seen defendants in a major public trial, especially a white collar trial, so completely ostracized by witnesses with pertinent information. . . .

> Even in the domestic terrorism cases I have defended, where national security and American lives are at stake, I have not seen such a wholesale refusal to meet with the defense.

> In this case, given the wholesale silence of witnesses, the scores of witnesses who would logically possess relevant percipient knowledge, and the examples of prosecutorial abuse reported in defendants' motion and in the press, I can only conclude that many witnesses who might otherwise have met with defendants are not doing so because they fear government reprisals. . . .

> To put it another way, and to answer a question this Court asked defense counsel at a May 18, 2005 hearing in this case, defendants' dire inability to interview witnesses or secure promises that they will testify on their behalf at trial is "unusual." Cf. Tr. of May 18, 2005 Hr'g at 20:17-21 (Mr. Petrocelli: . . . [We intend to file a motion] [d]ealing with the unavailability of witnesses, generally, and our inability to prepare this case for trial. Nobody will talk to us. The Court: Well, is that unusual in this type of case?").[24]

---

[22] See id. To date, none of the witnesses who has pled guilty to crimes or settled SEC enforcement actions and is expected to testify at defendants' trial—individuals such as Andrew Fastow, Michael Kopper, Ben Glisan, David Delainey, Wes Colwell, Paula Rieker, Tim Despain, and Christopher Calger—has met with defendants.

[23] See Decl. of Attys. A, C, E.

[24] Decl. of Michael Tigar ("Tigar Decl.") ¶¶ 16, 3, 17-18, 4.

Defendants are not dangerous men. They have no ability to intimidate witnesses, nor is there any claim to such effect. They are men who were highly respected, appeared on magazine covers lauding their brilliance and management skills, and were touted for powerful government posts. They pose no risk of witness tampering. *Cf.* Robert G. Morvillo & Robert J. Anello, *Government Attempts to Shield Its Witness from the Defense*, 231 NEW YORK LAW JOURNAL 3 (Feb. 1, 2005), *available on* Westlaw at 2/1/2005 NYLJ 3, (col. 1) ("While the government has, in some instances, legitimate fears of obstruction of justice and witness intimidation, these issues arise far less frequently in white-collar cases. Attempts to conceal government witness identities and the substance of their testimony, while tactically advantageous [to the government], can impair the fairness of criminal cases.").

**III.   The Task Force Has Violated Defendants' Constitutional Rights By Intimidating Witnesses Into Not Meeting With Them And Not Testifying On Their Behalf.**

**A.   Defendants' Burden of Proof.**

It is defendants' burden to show "by a preponderance of the evidence" that the Task Force's actions "interfered substantially" with witnesses' "free and unhampered" choice to meet with defendants or testify on their behalf. *United States v. Scroggins*, 379 F.3d 233, 239 (5th Cir. 2004); *United States v. Bieganowski*, 313 F.3d 264, 291 (5th Cir. 2002); *United States v. Hammond*, 598 F.2d 1008, 1012 (5th Cir. 1979); *accord United States v. Vavages*, 151 F.3d 1185, 1188 (9th Cir. 1998).

The substantial interference inquiry is fact-specific and requires a careful examination of the evidentiary record. *See Scroggins*, 379 F.3d at 239; *Bieganowski*, 313 F.3d at 291; *Vavages*, 151 F.3d at 1190. In judging the "coercive impact" of the government's alleged instructions or warnings to witnesses not to cooperate with defendants, courts consider (1) the timing and manner in which the government communicates with the witness; (2) the language of the instruction, warning, or statement; and (3) whether the prosecutor has a legitimate "basis in the record" for instructing the witness not to meet with or testify for defendants. *Vavages*, 151 F.3d at 1190; *see also United States v. Soape*, 169 F.3d 257, 270 (5th Cir. 1999) (permissible for

8

government to warn witnesses about meeting with defendant when defendant shows propensity for harassment); *Hammond*, 598 F.2d at 1012 (reversing conviction where law enforcement agent told witness if he testified for defense, he would have "nothing but trouble" in unrelated criminal investigation); *United States v. Foster*, 128 F.3d 949, 954 (6th Cir. 1997) ("[T]he government's 'warning' to [the witness'] attorney, a few days before Foster's trial, was at best ill-advised and at worst a possible attempt to intimidate [the witness].").

Despite limited access, defendants have been able to identify a number of instances of misconduct by the Task Force, as more fully explained in Sections III.B through III.D that follow.  These sections evidence acts of the Task Force (i) thwarting defendants' ability to interview witnesses *before* trial; (ii) obstructing defendants' right to secure witness testimony *at* trial; (iii) extracting coercive and unconstitutional terms in plea agreements; and (iv) fostering an atmosphere of fear against which all these actions must be judged.

To be clear, these incidents do not reflect the full extent of the Task Force's actions. Rather, they serve to demonstrate and corroborate that it is the Task Force's conduct—and not mere happenstance—that is depriving defendants of access to witnesses in this case.

**B.    The Task Force Has Improperly Instructed Witnesses Not to Meet with Defendants.**

Summarized below are instances of misconduct showing that the Task Force explicitly or implicitly suggested that witnesses not meet with defendants or their counsel.  The examples, which occurred between 2002 and 2005, are improper under the relevant case law, professional standards, and criminal statues.

**1.    Examples of Improper Instructions and Threats.**

*Instruct Your Lawyer To Stop Meeting With Skilling Or "Get Rid" Of Him.* █████████

former high-level executive at Enron.  After facing indictment on a number of counts, ████████

agreed to █████████████████████████████████████████████████████████

█████████████ "cooperate" with the government in exchange for the Task Force's

████████████████████████████████████████████████████████████████

9

████████████████████████ As with other cooperation agreements, the Task Force retains "sole and exclusive discretion" to determine ███████ "fully cooperated" and thus earned a favorable sentencing recommendation, or whether ██ should be reindicted.[25] ██████ like every other cooperator, is completely at the Task Force's mercy.

Imagine the pressure ███████████ felt when, on May 3, 2005, ███ received an email from █████████████████████ expressing ██ extreme displeasure at hearing "reports" that one of ████████████ was seen talking to Daniel Petrocelli, Mr. Skilling's lead trial counsel.  The email, which was produced in response to the Rule 17(c) subpoenas we served and is attached hereto as Exhibit 24, states in full:



Statements like this are rarely put in writing.  We have never seen anything like this email, nor has our expert Mr. Tigar.[26] █████████████ message was unmistakable: █████ putting ██████ in harm's way if ██ counsel talks to Skilling.  The harm, of course, was the reprisal ██████ expect from the Task Force ████████████████████████ ████████████████████████████. Insisting the Task Force would now "have to get to the bottom of this," ████████████████████ had two options:

████████████████████████████████

[26] *See* Tigar Decl. ¶ 21.

instruct ████████ to stop talking to Skilling's lawyer or "get rid of ███." *Not* an option was ███████ was "free to talk to whomever he wanted," as the Task Force had assured this Court and *three* others that witnesses were free to do.[27]  Given his client's predicament, it is no wonder that, after receiving ███████████████████ concluded he had no choice but to stop communicating with Skilling's counsel.[28]  To date, ██████████ not met with defendants.  How could ███ any witness ever meet with us if their counsel cannot speak with us, even to set up a witness interview, without being reprimanded, silenced, or fired?[29]

   *Don't Talk To Defendants, "They Are Bad News."*  During 2004, the Task Force debriefed "a person who is viewed by the Enron Task Force and the defense as an important material witness in the instant indictment."[30]  This witness is an alleged co-conspirator and has percipient knowledge regarding key transactions specifically mentioned in the Indictment.  The

---

[27] *See infra* Section IV.A (detailing promises made to this Court and Judges Gilmore, Werlein, and Hoyt).

[28]



[30] Decl. of Atty. E ¶¶ 9-11.

interview was "contentious." Near the end of the session, the Task Force asked whether the witness "had been talking to lawyers for Skilling or Lay." When the witness said the defense had tried to reach him but he had not met with them, a Task Force agent responded: "You don't want to talk to those guys. They are bad news." This statement was not interpreted by the witness or his counsel as a joke, but as a threat not to meet with defense counsel or in any way assist them absent reprisals.[31] To date, this "important material witness" has not met with defendants, though we know his testimony would be exculpatory based on our analysis of the record, and though he has intimate knowledge of key facts our clients do not possess.

*It's Not A "Good Idea" To Speak With Defendants.* In late 2002, the Task Force interviewed Rex Shelby who, at the time, was considered a "witness" to EBS-related charges. (Subsequently, the Task Force indicted and tried Shelby and others in the EBS case; he was acquitted on several charges with the jury hanging on the remainder.) Shelby took notes of his interview. Early in the meeting, Shelby informed the Task Force that counsel for EBS defendant Joe Hirko had left a message while Shelby was on vacation. Shelby asked the agents whether he should return counsel's call. The Task Force agents informed Shelby that it was his decision whether to talk to defense attorneys, "but that they did not think it was a good idea."[32] To date, Shelby has not met with defendants, and is awaiting the Task Force's decision whether to retry him.

*Don't Talk To "Anybody" And "Take The Fifth." If Necessary.* The Task Force told an attorney representing a witness with information material to this case that the witness may not talk to "anybody" except the Task Force about Enron matters. This same witness and his

---

[31] *See id.*

[32] Ex. 5 (Typewritten notes of Rex Shelby dated Sept. 2, 2002); *see also* Exs. 10 (Affidavit of David Angeli, defense counsel in EBS case for Joe Hirko, who had attempted to contact Shelby ¶ 5 ("In at least ten other instances, witnesses or counsel for these witnesses informed me that they did not want to communicate with me, as a representative of a defendant in this action. *In at least five of those instances, the witnesses or their counsel specifically cited their concern about how such a meeting might affect the witness's standing with the government.*") (emphasis added); 11 (Affidavit of Edwin Tomko (Shelby's lawyer) ¶ 4 (attesting to similar facts)).

counsel were instructed that if the witness is subpoenaed to give a deposition in an Enron-related civil case or in other proceedings, he is to invoke his Fifth Amendment right against self-incrimination.[33]  To date, and despite our request, this material witness has not met with defendants.  This witness' lawyer has refused to answer our questions about his client's views regarding our clients, historical facts in the case, and whether the Task Force intends to call the witness to testify in our case and on what subjects, citing the Task Force's instruction and a fear that the Task Force will seek retribution against his client if he or his client cooperates with defendants.[34]

*Witnesses Will "Pay" If They Cooperate With Defendants.*  Counsel for several witnesses with information related to specific transactions challenged in the Indictment and Statement of Compliance refused to let any of his clients meet with defendants here because, in his words, the Task Force "made it clear" it would "make them pay" if witnesses assisted defendants.[35]  Unable to gain access to the witnesses themselves, we asked the attorney if he would discuss the witnesses' understanding of certain transactions or their recollections of interactions with defendants and other witnesses.  Counsel refused, stating the witnesses had discussed those transactions and events with the Task Force.  We emphasized we were seeking not what the Task Force told these witnesses, but what the witnesses knew, understood, and believed at the time of the transactions or events in question.  The attorney still declined, stating that the witnesses discussed these topics with the Task Force and his clients and he had been instructed not to discuss them with anybody else.[36]

*If You Cooperate With Defendants, We'll "Go After" You.*  Another attorney representing an important witness with knowledge of a transaction in the Indictment advised his client not to meet with defendants because doing so could result in Task Force reprisals.  When we informed

---

[33] *See* Decl. of Atty. D ¶¶ 25-35.

[34] *See id.*

[35] *Id.* ¶ 36-54.

[36] *See id.*

13

the attorney of this Court's May 27, 2005 Order prohibiting the Task Force from retaliating because a witness met with defendants, the attorney responded that notwithstanding the Order, he did not "trust" the Task Force ███████████████████████████████ because he had seen them "go after" any witness who met or cooperated with defendants or challenged publicly the Task Force's alleged version of the facts. Another lawyer for a witness to the same transaction said that, while there were many people with equal knowledge about the transaction, only those individuals who chose to defend the transaction got indicted and prosecuted. Neither counsel would agree to allow their clients to be interviewed.[37]

> 2.   **The Task Force's Actions Violate Defendants' Constitutional Rights.**

Each example cited above—and there are no doubt many more—is highly improper and violates defendants' right to meet with material witnesses free from governmental interference. "To make [due process protection] fully meaningful it has been extended to proscribe the government's making a witness unavailable and thereby preventing a defendant from interviewing the witness. . . ." *United States v. Henao*, 652 F.2d 591, 592 (5th Cir. 1981); *see also Soape*, 169 F.3d at 270 ("Witnesses . . . to a crime are the property of neither the prosecution nor the defense. Both sides have an equal right, and should have equal opportunity, to interview them."); *United States v. Opager*, 589 F.2d 799, 804 (5th Cir. 1979) ("The importance to a litigant of interviewing potential witnesses is undeniable.").

Interference with defendants' access to witnesses violates their constitutional rights under the Fifth and Sixth Amendments, including their rights to due process, compulsory process of witnesses, and effective assistance of counsel. *See United States v. Weddell*, 800 F.2d 1404, 1410 (5th Cir. 1986) ("Federal courts must take special care to assure that prosecutorial conduct in no way impermissibly infringes on specific guarantees of the Bill of Rights, such as the right to counsel or the privilege against compulsory self-incrimination. The Sixth Amendment guarantees an accused the right to present his own witnesses to establish a defense. This court,

---

[37] *See id.* ¶¶ 60-70.

moreover, has held that [s]ubstantial government interference with a defense witness' free and unhampered choice to testify violates due process."); *United States v. Scroggins*, 379 F.3d 233, 239 (5th Cir. 2004) ("The Sixth Amendment guarantees a defendant the right to present witnesses to establish his defense without fear of retaliation against the witness by the government. Further, the Fifth Amendment protects the defendant from improper governmental interference with his defense."); *United States v. Hatch*, 926 F.2d 387, 395 (5th Cir. 1991) ("If the government did in fact prevent [a witness] from testifying at [defendant's] trial, he has a valid argument under both the Fifth and Sixth Amendments."); *Henao*, 652 F.2d at 592 & n.1 ("[T]he Sixth Amendment . . . guarantees a defendant the right to compulsory process for attendance of witnesses. To make this right fully meaningful it has been extended to proscribe the government's making a witness unavailable and thereby preventing a defendant from interviewing the witness and determining whether he will subpoena and call the witness in his defense. . . . Many of the witness unavailability cases are approached on due process grounds."); (all internal quotations and citations omitted).

The case most closely on point is *United States v. Peter Kiewit Sons' Co.*, 655 F. Supp. 73 (D. Colo. 1986), *aff'd United States v. Carrigan*, 804 F.2d 599 (10th Cir. 1986), but even it pales in comparison. In *Peter Kiewit*, three material witnesses, who had "given multiple interviews to the government," refused to meet with the defense. When asked why they would not meet with the defense, the witnesses reported that even though no one said "not to talk to the defense," the government did tell them they "probably shouldn't." *Id.* at 75. Likewise, the witnesses' attorney said the government never expressly instructed the witnesses not to speak with the defense, but they made it "obvious . . . they would prefer . . . the witnesses not be interviewed." *Id.* at 76. The witnesses were "bright people," and their attorney felt "they too had drawn this clear inference from the prosecutors' statements and conduct." *Id.*

The district court found the government's statements infringed defendants' due process rights. "[T]the witnesses got the clear mental impression or message that the prosecutors preferred that these witnesses not talk to defense representatives. . . . [T]his prosecutorial

attitude was communicated to the witnesses by words, implication, or non-verbal conduct." *Id.* at 77. These witnesses "were particularly vulnerable to suggestion and anxious not to offend the prosecutors," given that their former business associates and friends had been indicted on six white-collar felony charges "not through action of any local official or familiar United States Attorney in Colorado or New Mexico, but by the Justice Department itself reaching from Washington D.C. into their lives." *Id.*

That the witnesses' counsel advised his clients not to meet with the defense did not undo or cure the government's misconduct. "[I]n advising his clients not to speak with defense representatives, attorney Thompson was strongly influenced by the inference he had drawn from the prosecutors' words and conduct that the government did not want these witnesses, Thompson's clients, talking to the defense." *Id.*

> [The witnesses] apparently were concerned that if defendants could be indicted so could they be. . . . [W]hen [the defense] asked them for interviews, and when they testified on these motions, they were anxious to please the government because, in their minds at least, they were walking the tightrope of prosecutorial discretion from the threat of imprisonment to the hope of freedom. *Id.*

The parallels between *Peter Kiewit* and this case are obvious. In both cases, (a) the prosecutors were not local authorities but rather members of a special Task Force dispatched from out of town by the Department of Justice; (b) the prosecutors, in a highly public manner, indicted the witnesses' former co-workers and friends on serious federal charges and warned others might follow; (c) the witnesses in question were "bright" individuals represented by capable counsel who, based on conversations and interactions with the government, advised their clients not to meet with the defense, or else risk angering the government; and (d) the witnesses did not meet with the defense, even after the defense informed them it was their right to do so.

In *Peter Kiewit*, the government told witnesses it could not prohibit them from meeting with the defense, but thought the witnesses "probably shouldn't." That is, for example, the same message the Task Force gave Rex Shelby—it is your decision to talk to the defense, but we don't

think it is a "good idea."[38] This statement "strongly implied that the witnesses should decline the requested defense interviews" and, by itself, constituted substantial interference with defendants' constitutional rights. *Peter Kiewit*, 655 F. Supp. at 78.

The Enron Task Force did not stop there, however. It instructed other witnesses not to discuss with "anybody" the subjects, topics, or transactions they discussed with Task Force.[39] The Task Force "made it clear" to experienced attorneys that it would "go after" their clients and "make [them] pay" if witnesses assisted defendants in any way or publicly challenged the Task Force's allegations and stated version of the "truth."[40] A material witness was told he should not speak with defendants because "they are bad news."[41] And then there is the audacious ██████ email.███████████████████████ severely reprimanded ██████████████ a crucial witness in this case, merely for chatting with a single defense lawyer ████████ ; preposterously claiming it raised a "conflict of interest." And if that were not clear enough, the email directed ██████ either stop ██ lawyer from talking or "get rid" of ██.[42]

This case should be dismissed based on this single email. "A trial is a search for the truth. [It] is not a sporting game in which one side tries to outwit the other." *Coppolino v. Helpern*, 266 F. Supp. 930, 935-36 (S.D.N.Y. 1967). When seeking to "interview[] a prospective prosecution witness, our constitutional notions of fair play and due process dictate that defense counsel be free from obstruction, whether it come from the prosecutor or from a state official." *Id.* The Fifth Circuit stands firmly behind this principle. In *United States v. Clemones*, 577 F.2d 1247, 1251 (5th Cir. 1978), for example, the district court found it improper and ordered corrective measures because "[t]he [prosecutor] handling the case instructed some 30 to 35 witnesses appearing before the grand jury that the proceedings were secret and that they

---

[38] Ex. 5 (Typewritten notes of Rex Shelby dated Sept. 2, 2002).

[39] Decl. of Atty. D ¶ 29.

[40] *Id.* ¶¶ 36-54, 60-70; Decl. of Atty. C ¶¶ 6-8.

[41] Decl. of Atty. E ¶¶ 9-11.

████████████████████████████████████

should not discuss their testimony with anyone other than their attorneys or government agents."

As the American Bar Association has put it: "A prosecutor should not discourage or obstruct communication between prospective witnesses and defense counsel. *A prosecutor should not advise any person or cause any person to be advised to decline to give the defense information which such person has the right to give.*" AMERICAN BAR ASSOCIATION'S STANDARDS FOR CRIMINAL JUSTICE § 3-3.1(d) (3d. ed. 1996); *id.* at 50 ("Prospective witnesses should not be treated as partisans . . . . It is improper for a prosecutor . . . or anyone acting for [his] aide to *suggest* to a witness that the witness not submit to an interview by opposing counsel") (emphases added).[43]  The Restatement is in accord. *See* RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 116(2) (2000) ("A lawyer may not unlawfully obstruct another party's access to a witness."); *id.* § 116(3) ("A lawyer may not unlawfully induce or assist a prospective witness to evade or ignore process obliging the witness to appear to testify.").

        3.    *Newby* **Is No Substitute for Private Interviews, Nor Does It Excuse the Task Force's Misconduct.**

That some witnesses are being deposed in the *Newby* civil litigation in no way permits or excuses prosecutorial misconduct. We are entitled to same the opportunity to speak with witnesses, privately and free from interference, as is the Task Force. *See United States v. Soape*, 169 F.3d 257, 270 (5th Cir. 1999) ("[W]itnesses, particularly eye witnesses, to a crime are the property of neither the prosecution nor the defense. Both sides have an equal right, and should have an equal opportunity, to interview them.") (quoting *Gregory v. United States*, 369 F.2d 185, 188 (D.C. Cir. 1966)). We could not, for example, threaten witnesses with litigation if they agree to meet with the Task Force, and then argue the Task Force has no right to complain because it has access to witnesses through the grand jury process. *See Coppolino*, 266 F. Supp. at 935-36 ("[I]f a trial is to be a meaningful quest for the truth both sides must have a fair

---

[43] The Task Force is fully aware of these rules. It cited and attached them as an exhibit to a brief in the Nigerian Barges case. *See* Ex. 16 at 5 (Govt.'s Opp. to Bayly's Mot. to Dismiss or For an Order Directing the Govt. to Withdraw a Witness Request (filed May 7, 2004)).

opportunity in the preparation of its case. Presumably in the instant case the prosecutor can interview witnesses . . . unencumbered. The same right should be available to defense counsel.").

Furthermore, *Newby* has not provided open access to important witnesses:

- As of three months ago, some 56 witnesses, including several government cooperators, had asserted their Fifth Amendment right against self-incrimination and refused to give depositions.[44] Indeed, we have been told by at least one counsel that the Task Force instructed his witness to "take the Fifth" if subpoenaed in *Newby*.[45]

- Another 19 times, the Task Force has moved to postpone a *Newby* deposition when a witness it deems important or intends to call at our trial is scheduled for a deposition. Just two weeks ago, for example, the Task Force moved to stay the deposition of self-described Enron "whistleblower" Sherron Watkins because "[t]he government intends to call Ms. Watkins as a witness at trial to discuss her memorandum, related documents, and meetings with Kenneth Lay and others regarding her concerns."[46]

Finally, when witnesses give depositions in *Newby*, they are precluded by court order from testifying about "the areas of his or her anticipated testimony at a criminal trial, or the content of meetings . . . with any other agencies investigating the criminal conduct surrounding the collapse of Enron."[47] Lawyers defending *Newby* witnesses enforce this order to prevent such material information from being adduced at these depositions.[48]

---

[44] Ex. 36 at 28 & n.118 (Reply In Support of Def. Jeffrey Skilling's Mot. To Compel Production of Exculpatory And Rule 16 Materials (filed June 22, 2005)).

[45] Decl. of Atty. D ¶ 29.

[46] Ex. 43 (Govt.'s Mot. For a Limited Stay of the Deposition of Sherron Watkins (filed Aug. 19, 2005)). We have opposed this motion.

[47] Ex. 19 (June 1, 2004 Order at 4.)

[48] *See* Ex. 20 (Mot. of the Official Committee of Unsecured Creditors of Enron Corp. for Clarification of the Court's June 1, 2004 Discovery Order at 1-8 (filed under seal Dec. 3, 2004)).

**C.     The Task Force Has Harassed Defense Witnesses Expected to Provide Exculpatory Testimony at Enron Trials.**

The Task Force's impermissible interference has not stopped at preventing pre-trial interviews. It has also extended to witnesses who agreed to testify on a defendant's behalf, as the examples below demonstrate.

**1.     Examples of Improper Threats.**

*Testifying Is "Dangerous" And "Not In Your Best Interest."* The defense in one of the Enron-related trials subpoenaed a witness who was prepared to refute several of the Task Force's key allegations. *Four times* directly prior to the witness' expected testimony, the Task Force called or met with the witness' attorney. In what the witness' experienced defense attorney interpreted as "veiled threats," the Task Force persisted that it would be "dangerous" and not in the witness' "best interests" to testify for the defense.[49] This witness has direct and important evidence relevant to this case.

*You Are Now A Target And Will Be Prosecuted For Perjury.* Kate Agnew was a manager at Arthur Andersen and a percipient witness to a key Andersen meeting at which the Task Force claimed Andersen executives instructed subordinates to destroy documents. Importantly, Agnew is a percipient witness to numerous transactions and accounting decisions challenged in this case. To date Agnew has not met with defendants.

She did meet voluntarily with the Task Force in April 2002, and was told she was a "witness," not a target or subject. Agnew had taken handwritten notes of a critical Andersen meeting regarding its document retention policies, which later became the subject of the Andersen criminal trial. Her notes included references to "clean up documentation" and "SEC." The Task Force theorized Andersen ordered its employees to "clean up documentation," a euphemism to destroy documents, to obstruct an imminent "SEC" investigation. During her April 2002 interview, however, Agnew contradicted that theory. Agnew reported that her "SEC" and "clean up documentation" notes had nothing to do with each other; the "clean-up

---

[49] Decl. of Atty. B.

documentation" referred to certain "concurring partners" arriving from Chicago to review Andersen's Houston document protocol. The reference to the SEC meant it was important to get Andersen's files in order to assist any impending SEC investigation, *not* impede it.[50] The Task Force told Agnew it did not believe her explanation.

Roughly 10 days before the Andersen trial, knowing Agnew might testify for the defense and refute one of its core theories of the case, the Task Force's lead prosecutor, Andrew Weissmann, called Agnew's lawyer and, for the first time, informed him that Agnew's status had changed from "witness" to "target." The Task Force added that, if Agnew testified consistent with her previous statements, she would be prosecuted for perjury. After conferring with his client, Agnew's attorney informed the Task Force she would invoke her Fifth Amendment privilege against self-incrimination.[51] As a result, Ms. Agnew did not testify, to the great detriment of the defense.[52]

One attorney with first-hand knowledge of Ms. Agnew's situation described the prosecution's actions as "patently meritless," another as "blatant, horrible, and awful."[53] One of

---

[50] *See* Ex. 2 at 4991:10-21 (Andersen Trial Tr. May 29, 2002).

[51] Despite Agnew's offer to provide an affidavit to this effect, the Task Force subpoenaed Agnew and compelled her to endure what the Task Force itself acknowledged was the "stigmatizing" experience of asserting her rights in front of the national press. The Task Force did not require this of other witnesses. Andersen's lead lawyer, Rusty Hardin, asked the Department of Justice to investigate the Task Force's treatment of Ms. Agnew. *See* Ex. 1 at 2 (Letter from R. Hardin to M. Chertoff of May 9, 2002). The Department submitted Mr. Hardin's allegation to the Office of Professional Responsibility. *See* Ex. 4 at 1 (Letter from M. Chertoff to R. Hardin of June 26, 2002). We are not aware of the results of this investigation.

[52] *See* Decl. of Atty. D ¶¶ 71-81. Having convinced Agnew not to testify, the Task Force then used her notes to argue to the jury in closing that they established the very thing Agnew said they did not—an incriminating link between the "SEC" and the "clean up documentation" instruction from management. Ex. 3 at 6435:11-19 (Andersen Trial Tr. June 5, 2002). At the same time, the Task Force successfully prevented Andersen from introducing notes of the FBI's interview of Agnew, during which she explained the exculpatory meaning of her notes. *See* Decl. of Atty. D ¶¶ 71-81.

[53] Decl. of Atty. D ¶¶ 71-81. Another attorney said that based on what he has seen with Agnew and other witnesses, the Task Force takes the view that so long as any "conceivable, non-sanctionable" basis exists for giving a witnesses a target or perjury warning, it will repeatedly

these same lawyers attested that after the Agnew episode, several witnesses who had been prepared to testify for the defense in the Andersen case suddenly and without explanation backed out.[54]

*"You're A Target," Don't Testify.* Long before the recent EBS trial, the Task Force informed Dr. Larry Ciscon, a potential defense witness, that he was a "target" of its investigation. As with so many of its "targets," the Task Force had not proceeded to indictment against Ciscon—despite years investigating the case, an active grand jury, and other related indictments.[55] Based on its previous interviews with him, the Task Force knew that Ciscon's testimony would corroborate defendants' contention that critical EBS technologies were operational, refuting the Task Force's claims to the contrary.

Upon learning that Ciscon was slated to testify, the Task Force contacted his attorney, Charles Blau, to "remind" Blau that his client was a "target" and could be indicted any moment. The Task Force called Blau two more times in the week leading up to trial, ostensibly to "remind" Blau that Ciscon was a target.[56] Based on the timing, repetition, and tone of the calls, Blau stated on the record he felt he was being "reminded perhaps to pressure [Ciscon] not to testify. . . ."[57] Blau reported his conversations to Ciscon, who also interpreted the Task Force's calls as a "warning," a "threat that [he] could be prosecuted" if he were to testify for the defense.[58] Judge Gilmore acknowledged the potential abuse in this tactic:

---

"remind" witnesses of these warnings, even if the witness is represented by counsel, and even if the obvious and intended effect is to dissuade witnesses from testifying. *See id.*

[54] *See id.* Another lawyer for several witness in this case shared information concerning the Task Force's communications with potential defense witnesses in the EBS case. He indicated that, "when witnesses told the Task Force that crimes had not been committed by the charged defendants, or that events or transactions in dispute may have been lawful, counsel for those witnesses were told that prosecutors were concerned that the witnesses were committing perjury." This lawyer, not surprisingly, will not make any of his clients available to meet with us. Decl. of Atty. C ¶¶ 6-8.

[55] Ex. 39 at 8429:3-13 (June 9, 2005 EBS Trial Tr.).

[56] Ex. 40 at 8935:22-8936:22 (June 10, 2005 EBS Trial Tr.).

[57] Ex. 39 at 8429:3-13.

[58] Ex. 40 at 8935:22-8936:22.

So then what happened, sort of like for the rest of this man's life he's just kind of sort of like a target of the government's investigation and he never gets indicted and he never knows what his status is and he never gets to know, you know, whether or not he's going to get dragged into this case and so you just kind of issue target letters to whoever you want to and then *that puts you-all in the position of sort of eliminating people as potential witnesses* or how does that work?[59]

### 2.    The Task Force's Threats Violate Defendants' Constitutional Rights.

"Threats against witnesses are intolerable." *United States v. Goodwin*, 625 F.2d 693, 703 (5th Cir. 1980). While "[a] prosecutor is always entitled to attempt to avert perjury and to punish criminal conduct," *United States v. Viera*, 839 F.2d 1113, 1115 (5th Cir. 1988) (en banc), he "may not intimidate a witness into invoking the Fifth Amendment in order to interfere with a criminal defendant's right to compulsory process," *Brown v. Cain*, 104 F.3d 744, 749 (5th Cir. 1997) (citing *United States v. Whittington*, 783 F.2d 1210, 1219 (5th Cir. 1986)); *accord United States v. Blackwell*, 694 F.2d 1325, 1334 (D.C. Cir. 1982) ("It is not improper *per se* for . . . a prosecuting attorney to advise prospective witnesses of the penalties for testifying falsely. But warnings concerning the dangers of perjury cannot be emphasized to the point where they threaten and intimidate the witness into refusing to testify.").

As another Fifth Circuit panel said, no due process violation exists in investigating or communicating with a potential witness "so long as the investigation of witnesses is not prompted by the possibility of the witness testifying, and so long as the government does not harass or threaten them." *United States v. Dupre*, 117 F.3d 810, 823 (5th Cir. 1997) (quoting *United States v. Whittington*, 783 F.2d 1210, 1219 (5th Cir. 1986)); *United States v. Goodwin*, 625 F.2d 693, 703 (5th Cir. 1980) ("Substantial government interference with a defense witness' free and unhampered choice to testify violates due process rights of the defendant. . . . [I]f proven such violations of due process would require automatic reversal."); *accord United States v. Davis*, 974 F.2d 182, 187 (D.C. Cir. 1992) ("[A defendant's] rights are not trenched upon by mere information or advice about the possibility of a perjury prosecution, but by deliberate and

---

[59] Ex. 39 at 8427:10-18 (emphasis added).

badgering threats designed to quash significant testimony.").

Determining whether an admonition constitutes harassment or a threat is a matter of intent and degree, and courts look to the "totality of circumstances"—here, all the Task Force's actions—to decide whether the line was crossed. *See United States v. Vavages*, 151 F.3d 1185, 1188 (9th Cir. 1998) ("Where, under the totality of circumstances, the substance of what the prosecutor communicates to the witness is a threat over and above what the record indicates is necessary, and appropriate, the inference that the prosecutor sought to coerce a witness into silence is strong.").

The Task Force has clearly crossed the line. In *United States v. Hammond*, 598 F.2d 1008, 1012 (5th Cir. 1979), Parsons, a defense witness, had been indicted in Colorado. During a recess in defendant Hammond's trial, FBI Agent Peisner told Parsons he "knew about the 'situation in Colorado,'" and warned Parsons if he "continued on," he would have "nothing but trouble." *Id.* The government's warning violated defendant's constitutional rights:

> []]t was certainly reasonable for defense witness Parsons to interpret agent Peisner's comments as threats to retaliate if Parsons continued to testify. . . . [W]e find that agent Peisner's comments constituted a 'substantial governmental interference' with defense witness Parson's 'free and unhampered choice to testify. *Id.*

In *United States v. MacCloskey*, 682 F.2d 468, 475-79 (4th Cir. 1982), on the eve of an important defense witness' testimony, the prosecutor called the witness' lawyer to warn him if the witness testified, she could be indicted on charges that previously had been dropped. When the witness' attorney asked if the prosecutor comments were intended as "a threat," the prosecutor responded, "it was not, but [the witness would] best be advised of what the Fifth Amendment is" and "she'd best be advised that if she made any statements that she was subject to being reindicted." *Id.* at 476 n.16. The court (with the agreement of the government lawyers handling the appeal) found this comment "ill-advised" and "possibly improper." *Id.* at 479.

Here, the same warnings were given, only worse. After learning that a key witness was designated to testify for the defense in an Enron-related trial, the Task Force contacted his

counsel—*four times*—to warn him that his client's testifying would be "dangerous" and not in his "best interests."[60] Dr. Ciscon labored under similar warnings when preparing to testify in the EBS case.[61] Ms. Agnew[62] and several other witnesses[63] were accused of perjury—not because they had contradicted prior sworn testimony, but simply because they disagreed with the Task Force's version of events. *Cf. Vavages*, 151 F.3d at 1191 (where proposed trial testimony "would have been entirely consistent with [witness'] own prior statements and would not have conflicted with any past testimony, the prosecutor lacked [a] substantial basis for believing [defense witness] would perjure herself"; reversing conviction because of this perjury threat and other threats made to witness); *see also United States v. Foster*, 128 F.3d 949, 953-54 (6th Cir. 1997) (similarly improper perjury warnings). Compounding the misconduct, having deterred witnesses like Ms. Agnew from testifying, the Task Force then exploited her absence when arguing its case to the jury.[64] *Cf. United States v. Golding*, 168 F.3d 700, 702-05 (4th Cir. 1999) (prosecutor threatened defendant's key witness with prosecution if she gave testimony supporting defense theory: "The government did not stop with the threat. Instead, the prosecutor further abused her power by using the very situation she had created against the defendant in closing argument.").

Like the witnesses in *Hammond, MacCloskey, Vavages, Foster,* and *Golding*, it is "certainly reasonable" for witnesses and their counsel in this case to interpret the Task Force's persistent "target" reminders and perjury admonitions "as threats to retaliate" if the witnesses were to testify. *Hammond*, 598 F.2d at 1012. These types of warnings, given their source, timing, manner, and repetition have a plainly coercive effect.[65] Such a "'barrage of warnings'" made to a potential defense witness deprives defendant of his right to compulsory process, his

---

[60] Decl. of Atty. B.

[61] *See* Exs. 39, 40.

[62] *See* Decl. of Atty. D ¶¶ 71-81.

[63] *See* Decl. of Atty. C ¶¶ 6-8.

[64] *See* Ex. 3; Decl. of Atty. D ¶ 71-81; *supra* note 52.

[65] *See* Decls. of Attys. A-F; Tigar Decl.; Ex. 39, 40 (Ciscon testimony).

right to effective assistance of counsel, and his due process rights. *Vavages*, 151 F.3d at 1189 (quoting *United States v. Morrison*, 535 F.2d 223, 228 (3d Cir. 1976)); *see also United States v. Weddell*, 800 F.2d 1404, 1410 (5th Cir. 1986); *United States v. Scroggins*, 379 F.3d 233, 239 (5th Cir. 2004); *United States v. Henao*, 652 F.2d 591, 593 & n.1 (5th Cir. 1981); *United States v. Hatch*, 926 F.2d 387, 395 (5th Cir. 1991).

As the Fifth Circuit observed, "[t]he government does not usually follow about those it is investigating, reminding them of their fifth amendment rights," much less constantly and repeatedly doing so with an increasingly menacing tone. *United States v. Fricke*, 684 F.2d 1126, 1130 n.6 (5th Cir. 1982). A prosecutor acting in good faith might do what the prosecutor did in *United States v. Jackson*, 935 F.2d 832, 846-48 (7th Cir. 1991). Witness Bennett was scheduled to provide helpful testimony for the defendant. When Bennett, who was *not* represented by counsel, arrived at court, he was taken to the judge's chambers. In the presence of the court and three defense lawyers, the prosecutor informed Bennett *once* that he was a target of an ongoing investigation and that questions touching on that investigation could arise if he were to testify. *See id.* at 847. The prosecutor's actions did not constitute improper interference. Bennett was not accompanied by counsel and the prosecutor advised him of the dangers in the presence of the court and defense counsel, "a setting which limited the potential for threats and overreaching." *Id.*; *cf. United States v. Thomas*, 488 F.2d 334, 335-36 (6th Cir. 1973) ("[T]he actions of the Assistant U.S. Attorney, through the secret service agent, in seeking out the prospective witness and on an *ex parte* basis gratuitously admonishing him *cannot* be viewed as serving any valid purpose, even accepting the assertions of good faith.") (emphasis added). More importantly, the words used by the prosecutor were neither "excessive in number," "badgering in tone or phrasing," or "obviously threatening." *Jackson*, 935 F.2d at 847; *see also Vavages*, 151 F.3d at 1193 ("It is imperative that prosecutors and other officials maintain a posture of strict neutrality when advising witnesses of their duties and rights.").

**D.     The Task Force Is Using Plea Agreements As Means To Deny Defendants Access To Witnesses And To Enforce Its Version Of The "Truth."**

Another form of prosecutorial misconduct resulting in the denial of our access to witnesses is found in the Task Force's agreements with its cooperators. As written, and as applied, these agreements severely restrict witnesses' ability to testify on our behalf in this case or even to meet with us, and are unconstitutional. *See, e.g., United States v. Bell*, 506 F.2d 207, 223 (D.C. Cir. 1974) ("Inarguably, governmental impairment of the accused's ability to call witnesses in his behalf" by, for example, conditioning a plea agreement on a "commitment to refrain from testifying in [defendants'] behalf, . . . cannot be tolerated."); *see also United States v. Hatch*, 926 F.2d 387, 395 (5th Cir. 1991).

Such provisions, as well as threats to declare a witness in breach of his cooperation agreement if he assists the defense, are so inimical to due process that courts *and* the Department of Justice do not hesitate to reverse convictions and dismiss cases where such plea terms have been misused. *See, e.g., United States v. Henricksen*, 564 F.2d 197, 198 (5th Cir. 1977) (reversing conviction where plea agreement, on its face, prevented witness from providing exculpatory testimony for defendant); *United States v. Vavages*, 151 F.3d 1185, 1191 (9th Cir. 1998) (reversing conviction where prosecutor threatened to declare witness in breach of plea agreement if she provided alibi testimony for defendant); *United States v. Leung*, 351 F. Supp. 2d 992, 993-98 (C.D. Cal. 2005) (dismissing prosecution where plea agreement, as drafted and as applied, prevented witness from assisting defendant in preparing her defense).

**1.     Defining the "Truth" and Quelling Any Dissent**

In late 2003, the Task Force entered into cooperation agreements with two banks, Canadian Imperial Bank of Commerce ("CIBC") and Merrill Lynch ("Merrill"), each of which

had entered into a variety of business transactions with Enron over the relevant time period.[66]

Employees of both banks were accused in the agreements, the Indictment in this case, and the

Statement in Compliance of conspiring with defendants and others to misstate Enron's earnings.

CIBC employees were accused of conducting a series of fraudulent "FAS 125/140" transactions

with Enron. Merrill employees were accused of fraud in connection with the Nigerian Barges

deal. All these transactions were allegedly fraudulent because of "secret oral side-deals" Andrew

Fastow purportedly made, in which he is said to have guaranteed the banks that their "equity" in

these deals would not be at risk and that, in all instances, Enron would make the banks whole.[67]

By their clear terms, the Task Force's cooperation agreements with the banks prevent

CIBC, Merrill, and their employees from defending the legitimacy of these transactions and

disputing the Task Force's "oral side-deal" allegations. Paragraph 8 of the CIBC cooperation

agreement could not be more explicit:

> CIBC further agrees that it *will not*, through its attorneys, board of directors,
> agents, officers or employees, *make any public statement, in litigation or
> otherwise, contradicting any of the facts set forth in Appendix A.* Any such
> *contradictory statement* by CIBC, its attorneys, board of directors, agents, officers

---

[66] *See* Exs. 14 (CIBC agreement; executed Dec. 22, 2003 (page 1); expires Dec. 22, 2006 (¶ 14)),
8 (Merrill agreement; executed Sept. 17, 2003 (page 1); expired June 30, 2005 (¶ 13)).

[67] *See* Ex. 14 at 7 ¶ 6 (Appendix A to CIBC deal: "CIBC provided the 'equity' stake only
because Enron's senior management first orally promised CIBC that the 'equity' would be repaid
at or before maturity at par plus an agreed-upon yield. CIBC sought and obtained such promises
from Enron's senior management in connection with its three percent equity investment in
Projects Leftover, Nimitz, Alchemy, Discovery and Hawaii 125-0."); Indictment ¶ 46 ("As
CAUSEY knew, Enron executives provided [CIBC] with a secret oral promise that it would not
lose its three percent purported equity in a vehicle known as 'Hawaii 125-0,' which was used by
Enron repeatedly to move assets off-balance sheet and record earnings. As CAUSEY knew, this
oral commitment violated the accounting rules because CIBC's 'equity' was not sufficiently at
risk to qualify the vehicle as separate from Enron."); Statement in Compliance at 38-41 (listing
alleged fraudulent CIBC deals, including Leftover, Nimitz, Alchemy, Discovery and Hawaii
125-0); ████████████████████████████ Ex. 8 at 1-2 ¶¶ 1-2 & n.1 (Merrill deal;
challenging Merrill's "temporary 'purchase'" of the Nigerian Barges and subsequent sale);
Indictment ¶¶ 39-40 (asserting that "secret oral side-deal" made accounting treatment of Barges
deal fraudulent): ████████████████████████████

or employees *shall constitute a breach of this Agreement*, and CIBC thereafter would be *subject to prosecution . . . .*[68]

The CIBC agreement affords the Task Force "sole discretion" to determine whether "any provision of this Agreement" has been violated, as well as "sole discretion" to decide whether it may prosecute CIBC for a wide range of crimes.[69] The Merrill agreement contains identical terms.[70]

These provisions are abhorrent. They seek to contractually obligate Merrill, CIBC, and their agents and employees to support the Task Force's theories in this case—even though these witnesses have crucial testimony exculpatory to defendants. Cases like *Bell, Hatch, Henricksen, Vavages*, and *Leung* make abundantly clear the Task Force has no legitimate right to secure such commitments and that dismissal is the only way to remedy this abuse.

To take one stark example, a few months before the Task Force entered into its agreement with CIBC, the very CIBC employee to whom Mr. Fastow allegedly gave his oral guarantee, Ian Schottlander, sat for a deposition before the Enron Bankruptcy Examiner. During this deposition, Schottlander repeatedly and emphatically denied the making of an alleged oral guarantee or other "side deal."[71] Yet under the terms of the CIBC cooperation agreement, no CIBC employee can provide or corroborate this critical exculpatory testimony in our trial

---

[68] Ex. 14 at 3 ¶ 8 (CIBC agreement) (emphasis added); *see also id.* at 1-2 ¶ 2 (same).

[69] *Id.* at 4 ¶ 11; *see also id.* at 4-5 ¶¶ 12-13.

[70] Ex. 8 at 3 ¶ 7 ("Merrill Lynch further agrees that it will not, through its attorneys, board of directors, agents, officers or employees, make any public statement, in litigation or otherwise, contradicting Merrill Lynch's acceptance of responsibility set forth above. Any such contradictory statement by Merrill Lynch, its attorneys, board of directors, agents, officers or employees shall constitute a breach of this Agreement, and Merrill Lynch thereafter would be subject to prosecution . . . ."); *id.* 4 ¶¶ 10-12 (Task Force has "sole discretion" to declare Merrill in breach of agreement, to determine whether to initiate prosecution against Merrill, and to determine whether any statement made by any individual "will be imputed to Merrill Lynch for the purpose of determining whether Merrill Lynch has violated any provision of this Agreement").

[71] *See* Ex. 6 at 199-207 (Mar. 14, 2003 Schottlander deposition).

without subjecting CIBC to the risk of ruination by the same sort of criminal prosecution that

destroyed Arthur Andersen and over 20,000 jobs.  The only way for CIBC *potentially* to avoid

this result under its agreement with the Task Force would be to "publicly repudiat[e]" the

"contradictory statement" its employee or agent made—whatever "publicly repudiate" means

(*e.g.*, firing the employee, taking out an advertisement in the *Houston Chronicle* saying he was

lying, giving testimony in our trial that the employee was perjuring himself).[72]  Even then, since

it has sole discretion to determine whether CIBC is in breach, the Task Force could conclude

CIBC's denunciation was not "good enough."[73]  The Task Force's unfettered ability to void a

plea agreement in this way is an obvious and dangerous weapon for witness coercion.  *See*

*Vavages*, 151 F.3d at 1191 (reversing conviction even though it was unclear if the prosecutor

could declare a breach in his sole discretion; noting that, if he could, the case for reversal would

be even stronger).

Courts like *Vavages* have rightly reversed convictions where witnesses are prevented

from testifying for the defense because of onerous and abusive plea agreements.  In *Henricksen*,

564 F.2d at 198, it took the Fifth Circuit one page of a *per curiam* opinion to reverse defendant's

conviction where her co-defendant had signed a plea agreement with the government, pursuant to

---

[72] Ex. 14 at 3 ¶ 8 (CIBC agreement) (emphasis added).

[73] If Schottlander were to provide this testimony, CIBC might argue he is not an "agent or employee" of CIBC, because he left the company on October 31, 2002.  *See* Ex. 6 at 11 (Mar. 14, 2003 Schottlander deposition).  But, again, it would be solely in the Task Force's discretion to judge that argument.  Moreover, the Task Force appears to have accounted for such a claim, expanding "employee or agent" to include "any individual" whom it deems in its sole discretion is speaking for CIBC.  Paragraph 13 of the CIBC agreement provides: "The decision whether conduct and statements of *any individual* will be imputed to CIBC for the purpose of determining whether CIBC has violated any provision of this Agreement shall be in the *sole discretion* of the [Task Force]."  Ex. 14 at 5 ¶ 13 (emphasis added); *see also* Ex. 8 at 4 ¶ 12 (Merrill deal; same).  We have contacted Schottlander's counsel; he refused to make his client available for an interview or to testify in our trial.  Schottlander also refused to give testimony in *Newby* by asserting his Fifth Amendment right.

which he agreed not to give testimony exonerating defendant.  If he breached this agreement by testifying for the defendants, his plea agreement would be void and he would be prosecuted. Such plea terms so obviously "violate due process" that even the government lawyers on appeal, as well as the Justice Department and the trial judge, all confessed error and requested defendant's conviction be reversed.  *See id.*

Here, the Task Force has effectively silenced not just one witness with exculpatory testimony, but all CIBC and Merrill employees, as well as their agents and outside advisors who have exculpatory evidence.

2.      **Creating a Right to Intrude on Defense Witness Interviews.**

The Merrill and CIBC agreements contain another provision aimed at impeding witness access. As explained in *Gregory v. United States*, 369 F.2d 185, 188-89 (D.C. Cir. 1966), and its progeny in this circuit, *see, e.g., United States v. Soape*, 169 F.3d 257, 270 (5th Cir. 1999), since witnesses do not belong to the government (or the defense), the government may not "suggest" to witnesses, much less "advise" or require them under a plea agreement, "not to talk to anyone unless . . . the prosecutor [is] present," *Gregory*, 369 F.2d at 188; *United States v. Rodgers*, 624 F.2d 1303, 1311 (5th Cir. 1980) (prosecutors improperly "suggested" that witnesses "speak with defense lawyers only if [government] lawyers were also present"). Defendants have every right to interview witnesses *on their own* and determine "what the eye witnesses to the events [intend] to testify to [at trial] or how firm they [are] in their testimony" without government lawyers being present. *Gregory*, 369 F.2d at 189; *Rodgers*, 624 F.2d at 1311 ("Obstruction of access to witness is serious"; to remedy mere *suggestion* that witnesses only meet with defense counsel if government representatives were present, the court granted a two-month continuance, ordered the government to "inform [witnesses] that if they wished, they were free to talk with the defense"; conviction only affirmed because defendants were thereafter able to interview witnesses).

Despite these rules, the Merrill and CIBC agreements provide the Task Force with unlimited access, whenever it wishes, to Merrill's and CIBC's "facilities, documents and employees."[77] Failure to comply with this provision is a total breach. Once again, the Task Force has the sole discretion to determine whether a breach has occurred and whether it may

---

[77] Exs. 8 at 2 ¶¶ 4-5 (Merrill agreement) (emphasis added); 14 at 2-3 ¶¶ 4-5 (CIBC agreement).