IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CRIMINAL NUMBER H-04-025-SS |
| | § | |
| RICHARD A. CAUSEY, JEFFERY K. | § | |
| SKILLING, and KENNETH L. LAY, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court are Kenneth L. Lay's Motion to Dismiss the Securities Fraud and Wire Fraud Counts of the Second Superseding Indictment [Defense Motion No. 2] (Docket Entry No. 386),[1] and Jeffery K. Skilling's Motion to Dismiss Counts 23, 24, 26, and to Strike Various Allegations as Prejudicial Surplusage [Defense Motion No. 4] (Docket Entry No. 394).[2] The pending motions challenge charges brought against Lay for securities fraud and wire fraud and against Skilling for securities fraud as part of a 53-count Second Superseding Indictment ((SSI) Docket Entry No. 97). For the following reasons the motions will be denied.

_____

[1]By notice filed with the court, Lay's co-defendants join in this motion. See Jeffrey Skilling's Joinder in Support of Defendant Kenneth Lay's Defense Motions (Defense Motions Nos. 1 and 2)(Docket Entry No. 392); and Notice of Joinder (Docket Entry No. 420), executed by all three defendants.

[2]By notice filed with the court, Skilling's co-defendants join in this motion. See Defendant Richard A. Causey's Joinder in Various Defense Motions (Docket Entry No. 376)); Kenneth L. Lay's Notice of Joinder of Co-Defendants' Motions (Docket Entry No. 380); and Notice of Joinder (Docket Entry No. 420), executed by all three defendants.

## I. <u>Factual Background</u>

The SSI alleges that Lay served as Enron's Chief Executive Officer (CEO) and Chairman of the Board of Directors from 1986 until February of 2001, when he stepped down as CEO and continued as Chairman, and that Skilling served as Enron's President and Chief Operating Officer (COO) from January of 1997 until February of 2001, and President and CEO from February of 2001 until August of 2001 when he resigned.  (SSI ¶¶ 6-7)  The offenses charged in the SSI arise from an alleged scheme to deceive the investing public, including Enron's shareholders, the Securities Exchange Commission (SEC), and others

> about the true performance of Enron's businesses by:
> (a) manipulating Enron's publicly reported financial
> results; and (b) making public statements and representa-
> tions about Enron's financial performance and results
> that were false and misleading in that they did not
> fairly and accurately reflect Enron's actual financial
> condition and performance, and they omitted to disclose
> facts necessary to make those statements and representa-
> tions fair and accurate.

(SSI ¶ 5)  The SSI charges the defendants with having "enriched themselves as a result of the scheme through salary, bonuses, grants of stock and stock options, other profits, and prestige within their professions and communities."  (SSI ¶ 14)

## II. <u>Standard of Review</u>

Federal Rule of Criminal Procedure 12(b) authorizes motions to dismiss that raise "any defense, objection, or request that the court can determine without a trial of the general issue." Fed. R.

Crim. P. 12(b).  In assessing challenges to the sufficiency of an indictment the court must "take the allegations of the indictment as true and . . . determine whether an offense has been stated." United States v. Kay, 359 F.3d 738, 742 (5th Cir. 2004) (quoting United States v. Hoque, 132 F.3d 1087, 1089 (5th Cir. 1998)). Federal Rule of Criminal Procedure 7(c)(1) states that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."

> The test for sufficiency is "not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimum constitutional standards"; namely, that it "[(1)] contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against which he must defend, and [(2)], enable[] him to plead an acquittal or conviction in bar of future prosecutions for the same offense."

Kay, 359 F.3d at 742 (quoting United States v. Ramirez, 233 F.3d 318, 323 (5th Cir. 2000)).  "An indictment that tracks a statute's words is generally sufficient 'as long as those words fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished.'" United States v. Arlen, 947 F.2d 139, 145 (5th Cir. 1991), cert. denied, 112 S.Ct. 1480 (1992) (quoting United States v. London, 550 F.2d 206, 210 (5th Cir. 1977)). Evidence outside the indictment is irrelevant to a determination of whether the indictment itself is legally sufficient. United States v. Mann, 517 F.2d 259, 266-267 (5th Cir. 1975), cert. denied, 96 S.Ct. 878 (1976).

### III.  <u>Securities Fraud Charges</u>

Lay and Skilling seek dismissal of certain counts of the SSI that charge them with securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, on grounds that the misrepresentations alleged in these counts are general expressions of corporate optimism or vague predictions about Enron's future that are immaterial as a matter of law because reasonable investors would not have considered them in making an investment decision.  Lay also argues that the alleged misrepresentations are immaterial as a matter of law because they did not inflate Enron's share price.

### A.  **Applicable Law**

To charge that Lay and Skilling committed securities fraud in violation of § 10(b) of the Exchange Act, and SEC Rule 10b-5, the Government must allege that they

> (1) knowingly and willfully, (2) through use of the instrumentalities of commerce and the mails and (3) in connection with the purchase or sale of a security, (4) used manipulative and deceptive devices in violation of Rule 10b-5 by (a) employing any device, scheme, or artifice to defraud, (b) making any untrue statement of material fact or omitting to state a material fact necessary in order to make the statement, under the circumstances, not misleading, or engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit.

<u>United States v. Peterson</u>, 101 F.3d 375, 379 (5th Cir. 1996), <u>cert. denied</u>, 117 S.Ct. 1346 (1997).

-4-

1.   <u>Materiality Standard</u>

When allegations of securities fraud are based on an alleged misrepresentation or omission of material fact, the misrepresentation or omission must be factual, and it must also be material.[3]  <u>Basic, Inc. v. Levinson</u>, 108 S.Ct. 978, 987 (1988) ("It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant.").  <u>See also</u> <u>Kapps v. Torch Offshore, Inc.</u>, 379 F.3d 207, 216 (5th Cir. 2004); <u>Rosenzweig v. Azurix Corp.</u>, 332 F.3d 854, 865 (5th Cir. 2003).  The definition and scope of "materiality" are the same in both civil and criminal contexts.  <u>See</u> <u>Peterson</u>, 101 F.3d at 380 (citing civil precedent in discussion of materiality in a criminal case).  <u>See also</u> <u>United States v. Gleason</u>, 616 F.2d 2, 28 (2d Cir. 1979), <u>cert. denied</u>, 100 S.Ct. 1037, 1320 (1980) ("the same standards apply to civil and criminal liability under the securities laws").

A statement of fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important" in making an investment decision.  <u>Basic</u>, 108 S.Ct. at 983 (quoting <u>TSC Industries, Inc. v. Northway, Inc.</u>, 96 S.Ct. 2126, 2132 (1976)).  <u>See also</u> <u>Kapps</u>, 379 F.3d at 213-214.  An omission is

_____

[3]See Lay's Motion to Dismiss the Securities Fraud and Wire Fraud Counts of the Second Superseding Indictment (Lay Motion), Docket Entry No. 386, p. 2; Memorandum in Support of Jeffrey Skilling's Motion to Dismiss Counts 23, 24, 26, and to Strike Various Allegations as Prejudicial Surplusage (Skilling Memorandum), Docket Entry No. 395, p. 1.

material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id. See also Nathenson v. Zonagen Inc., 267 F.3d 400, 418 (5th Cir. 2001). "The 'total mix' of information normally includes information that is and has been in the readily available general public domain and facts known or reasonably available to the shareholders." Kapps, 379 F.3d at 216 (citing United Paperworkers Intern. Union v. International Paper Co., 985 F.2d 1190, 1198-1199 (2d Cir. 1993)). Materiality is a mixed question of law and fact usually reserved for the trier of fact. TSC Industries, 96 S.Ct. at 2132-2133. See also Kapps, 379 F.3d at 216. Nevertheless, "if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality [it is] appropriate for the district court to rule that the allegations are inactionable as a matter of law." Kapps, 379 F.3d at 216 (quoting In re Donald J. Trump Casino Sec. Litig.—Taj Mahal Litig., 7 F.3d 357, 368 n.13 (3d Cir. 1993), cert. denied sub nom Gollomp v. Trump, 114 S.Ct. 1219 (1994). See also Rosenzweig, 332 F.3d at 869 (some materiality determinations may be made as a matter of law); United States v. Gaudin, 115 S.Ct. 2310, 2317 (1995)(materiality is for the jury unless "the case for materiality [is] so weak that no reasonable juror could credit it").

-6-

2.   <u>Puffing</u>

Puffing is defined as "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." <u>In re Ford Motor Co. Sec. Litig., Class Action</u>, 381 F.3d 563, 571 (6th Cir. 2004) (quoting <u>Shaw v. Digital Equipment Corp.</u>, 82 F.3d 1194, 1217 (1st Cir. 1996) (recognizing courts "willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace")).   Puffing is not actionable because it is immaterial.   <u>See</u> <u>Rosenzweig</u>, 332 F.3d at 869-870 (characterizing "generalized, positive statements about the company's competitive strengths, experienced management, and future prospects" as inactionable puffery).   <u>See also</u> <u>Shaw</u>, 82 F.3d at 1217. "Statements that are 'mere puffing' or 'corporate optimism' may be forward-looking or 'generalized statements of optimism that are not capable of objective verification.'" <u>Id.</u> at 570 (quoting <u>Grossman v. Novell, Inc.</u>, 120 F.3d 1112, 1119 (10th Cir. 1997)).

(a)   Defendants' Arguments on Puffing:   <u>In re Azurix</u>

Citing <u>In re Azurix Corp. Sec. Litig.</u>, 198 F.Supp.2d 862 (S.D. Tex. 2002), Lay argues that generalized, positive statements that he made about Enron are immaterial as a matter of law because

-7-

"investors rely on <u>facts</u> when evaluating securities, not generalized expressions of corporate optimism."[4]  Citing <u>Grossman</u>, 120 F.3d at 1121-1122, Lay explains that "vague statements that are incapable of independent verification are immaterial as a matter of law."[5]  Also citing <u>Azurix</u>, Skilling argues that "no reasonable investor, let alone a sophisticated securities analyst, would ever rely on . . . [generalized statements of corporate cheerleading] in making an investment decision."[6]  Skilling also argues that

> [f]or precisely this reason, such statements of "puffery" and "corporate optimism" are uniformly considered immaterial and—even when willfully false—do not constitute a civil, much less, a criminal violation of the securities laws.[7]

In <u>Azurix</u> this court dismissed allegations based on generalized expressions of corporate optimism by company spokesmen in a prospectus, in  a newspaper article, and in a press release, after concluding that a "company's expressions of confidence in its management or business are not actionable, especially where, as here all historical information appears to be factually correct." 198 F.Supp.2d at 882.  In <u>Rosenzweig</u>, 332 F.3d at 869-870, the Fifth Circuit affirmed this court's dismissal of the generalized expressions of corporate optimism alleged in <u>Azurix</u>.  The Fifth

---

[4]Lay Motion, p. 4.

[5]Lay Motion, p. 5.

[6]Skilling Memorandum, p. 1.

[7]<u>Id.</u>

Circuit observed, however, that although "the prospectus identified around 60 privatization projects Azurix was targeting," the plaintiffs did not allege that "any of those projects were, at the time of the prospectus, not potentially viable acquisitions." <u>Id.</u> Concluding that statements made in the newspaper article and the press release were subject to dismissal because they too amounted to no more than "the same generalized puffery," the Fifth Circuit stated that "[i]mportantly, plaintiffs have not alleged that any of the historical representations in [these publications] were false." <u>Id.</u>

       (b)  Government's Arguments on Puffing: <u>Virginia Bankshares</u> and Its Progeny

Citing <u>Virginia Bankshares v. Sandberg</u>, 111 S.Ct. 2749 (1991), the Government responds that "even [conclusory] statements of opinion or belief assume significance that remove them from the category of mere puffery when made on the basis of an apparent <u>bona fide</u> belief by senior corporate officials."[8]

### (1) **Virginia Bankshares**

In <u>Virginia Bankshares</u> the Supreme Court considered whether a statement of opinion or belief could be materially misleading and thus actionable under § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and SEC Rule 14a-9. The statement at issue appeared in

---

[8]Government's Consolidated Response to Defendants' Pretrial Motions (Government's Response), Docket Entry No. 416, p. 27.

proxy materials that purported to explain management's reasons for
approving a merger proposal to shareholders.  The proxy materials
stated that the proposal offered shareholders the opportunity "to
achieve a high value for their shares" and that its terms were
"fair."  Id. at 2756-2757.  When a dissatisfied shareholder alleged
that these statements were fraudulent, the defendants argued that

> statements of opinion or belief incorporating indefinite
> and unverifiable expressions cannot be actionable as
> misstatements of material fact within the meaning of [the
> securities laws], and that such a declaration of opinion
> or belief should never be actionable when placed in a
> proxy solicitation incorporating statements of fact
> sufficient to enable readers to draw their own
> independent conclusions.

Id. at 2757.

### (i)  Expressions of Opinion and Belief

Rejecting the defendants' argument, the Court asserted "[t]hat
such statements may be materially significant raises no serious
question . . . We think there is no room to deny that a statement
of belief by corporate directors about a recommended course of
action, or an explanation of their reasons for recommending it,"
can be material.  Id. (explaining that "[s]hareholders know that
directors usually have knowledge and expertness far exceeding the
normal investor's resources, and the directors' perceived
superiority is magnified even further by the common knowledge that
state law customarily obliges them to exercise their judgment in
the shareholders' interest").

Addressing the question of "whether statements of reasons, opinions, or beliefs are statements 'with respect to . . . fact[s]' so as to fall within the strictures of [the securities laws]," id., the Court concluded that statements of reasons and belief expressed by directors are "factual in two senses:  [(1)] as statements that the directors do act for the reasons given or hold the belief stated and [(2)] as statements about the subject matter of the reason or belief expressed."   Id. at 2758 ("[r]easons for directors' recommendations or statements of belief are . . . characteristically matters of corporate record subject to documentation, to be supported or attacked by evidence of historical fact").   The Court explained that defendants ignored

> the fact that . . . conclusory terms in a commercial
> context are reasonably understood to rest on a factual
> basis that justifies them as accurate, the absence of
> which renders them misleading.   Provable facts either
> furnish good reasons to make a conclusory commercial
> judgment, or they count against it, and expressions of
> such judgments can be uttered with knowledge of truth or
> falsity just like more definite statements, and defended
> or attacked through the orthodox evidentiary process that
> either substantiates their underlying justifications or
> tends to disprove their existence.   In addressing an
> analogous issue in an action for misrepresentation, the
> court in Day v. Avery, 548 F.2d 1018[, 1025-1027] (D.C.
> Cir. 1976), for example, held that a statement by the
> executive committee of a law firm that no partner would
> be any "worse off" solely because of an impending merger
> could be found to be a material misrepresentation.

Id. at 2758-2759.

Finding that the plaintiffs had adduced factual evidence showing that the proxy materials' statement that the proposal

offered shareholders the opportunity "to achieve a high value for their shares" and that its terms were "fair," id. at 2756-2757, was both a false expression of the director's reasons for approving the merger, and misleading about its subject matter, the Court concluded that "however conclusory" a statement may be, if it is

> open to attack by garden-variety evidence . . . then[] a
> plaintiff is permitted to prove a specific statement of
> reason knowingly false or misleadingly incomplete. . . In
> reaching this conclusion we have considered statements of
> reasons of the sort exemplified here, which misstate the
> speaker's reasons and also mislead about the stated
> subject matter (e.g., the value of the shares).   A
> statement of belief may be open to objection only in the
> former respect, however, solely as a misstatement of the
> psychological fact of the speaker's belief in what he
> says.

Id. at 2759.   The Court then held that disbelief or undisclosed motivation, standing alone, is insufficient to sustain an action for fraud absent proof by objective evidence that the statement at issue expressly or impliedly asserted something false or misleading about its subject matter.   Id. at 2760.

(ii)   Expressions of Opinion and Belief
Accompanied by Cautionary Language

Defendants then argued that "even if conclusory statements of reason or belief can be actionable under § 14(a) . . . liability [should be confined] to instances where the proxy material fails to disclose the offending statement's factual basis."   Id.   "Since liability under [the securities laws] must rest not only on deceptiveness but materiality as well," id., the Court concluded

-12-

that defendants were "on perfectly firm ground insofar as they
argue[d] that publishing accurate facts in a proxy statement can
render a misleading proposition too unimportant to ground
liability." Id. The Court cautioned, however, that "not every
mixture with the true will neutralize the deceptive.  If it would
take a financial analyst to spot the tension between the one and
the other, whatever is misleading will remain materially so, and
liability should follow." Id. (citing Gerstle v. Gamble-Skogmo,
Inc., 478 F.2d 1281, 1297 (2d Cir. 1973) ("[I]t is not sufficient
that overtones might have been picked up by the sensitive antennae
of investment analysts.")).  The Court concluded that "[o]nly when
the inconsistency would exhaust the misleading conclusion's
capacity to influence the reasonable shareholder would a
[securities fraud] action fail on the element of materiality." Id.
at 2761.  The Court explained

> [w]e have no occasion to decide whether the directors
> were obligated to state the reasons for their support of
> the merger proposal here, but there can be no question
> that the statement they did make carried with it no
> option to deceive. Cf. Berg v. First American
> Bankshares, Inc., 796 F.2d 489, 496 (D.C. Cir. 1986)
> ("Once the proxy statement purported to disclose the
> factors considered . . . there was an obligation to
> portray them accurately.").

Id. & n.7.


### (2)  Virginia Bankshares' Progeny

Circuit courts of appeals have relied on the Supreme Court's
decision in Virginia Bankshares to find conclusory statements about

corporate finances made by top managers material for purposes of asserting securities fraud claims. See, e.g., Shapiro v. UJB Financial Corp., 964 F.2d 272, 282-83 (3d Cir.), cert. denied, 113 S.Ct. 365 (1992); In re Wells Fargo Sec. Litig., 12 F.3d 922, 927 (9th Cir. 1993), cert. denied, 115 S.Ct. 295 (1994); and Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 365 (1st Cir. 1994).

### (i)   Shapiro v. UJB Finance Corporation

In Shapiro, 964 F.2d at 281-283, the Third Circuit compared a bank's characterization of the adequacy of its loan loss reserves to management's conclusory reasons for approving the merger proposal expressed in the Virginia Bankshares proxy statement. The court observed that "where a defendant affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and the like, the subject is 'in play'" under the securities laws. Id. at 282. The court explained,

> if a defendant represents that its lending practices are "conservative" and that its collateralization is "adequate," the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations. Likewise, if a defendant characterizes loan loss reserves as "adequate" or "solid" even though it knows they are inadequate or unstable, it exposes itself to possible liability for securities fraud.

Id. The court explained that "[b]y addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to a reasonable shareholder, and

thus is bound to speak truthfully." <u>Id.</u> Citing <u>Virginia Banshares</u>, the court concluded "that such general labels as 'conservative' and 'cautious' can be the basis for liability under Rule 10b-5." <u>Id.</u> Finding the evaluations of management practices and financial well-being alleged there to be conclusory and provable like those alleged in <u>Virginia Bankshares</u>, the <u>Shapiro</u> court reasoned that

> [i]f a director's statement of belief is material because of the speaker's superior knowledge, then a manager's statement of belief must also be material. A manager's knowledge and expertise regarding the day-to-day operation of his company generally exceeds that of a director, and the reasonable investor is aware of this fact. Even if management sometimes acts in its own interest, a reasonable investor need not take a manager's statement of belief at anything less than face value.

<u>Id.</u> The court held that the following statements would be actionable if alleged to have been made knowingly or recklessly: "loan loss reserves were 'adequate,' 'adequately maintained,' 'strong,' and 'solid;'" "loan to value ratio was 'good;'" "asset quality was 'high,' while their level of bad loans was 'low;'" "loan management and underwriting practices were 'conservative,' 'basic,' 'careful,' 'good,' 'prudent,' and 'cautious.'" <u>Id.</u> at 283.

### (ii)   <u>In re Wells Fargo Security Litigation</u>

In <u>Wells Fargo</u>, 12 F.3d at 926-927, the Ninth Circuit analyzed a complaint in which plaintiff shareholders asserted claims against

bank officers and directors for stating that the bank's allowance for loan losses was "adequate."  Since the bank's reserves later proved to be grossly inadequate, the court concluded that the defendants' statement of adequacy would be actionable if the plaintiffs alleged facts showing that the contingencies that rendered the reserves inadequate "were foreseen or foreseeable." Id. at 927.  The court found that the plaintiffs satisfied this requirement by alleging that the bank knew of certain contingencies that rendered its reserves inadequate but failed to disclose that information to investors, i.e., that the bank's "non-performing assets and its reserves for possible loan losses were understated by at least $400 million and $350 million respectively, due to defaults on and the doubtful collectability of a number of its loans." Id. at 926.  Citing Shapiro, the court explained that

> [a]ccurate information regarding a bank's specific, substantial loans, with respect to which the alleged understating of value totals nearly $400 million in this case, cannot be deemed non-material as a matter of law. . . [A] reasonable investor would be influenced significantly by knowledge that a bank has knowingly or recklessly hidden its true financial status by deliberately misstating its level of non-performing loans, failing to provide adequate reserves, and indulging its problem loan customers.

Id.

Rejecting Wells Fargo's contention that the shareholders' allegations amounted to non-actionable mismanagement, the court stated that

> [a]n allegation of mismanagement on the part of a
> defendant will not alone support a claim under § 10(b) or
> Rule 10b-5; nor will an allegation that a defendant
> failed to disclose the existence of mismanagement . . .
> However, . . . a complaint does allege an actionable
> misrepresentation if it alleges that a defendant was
> aware that mismanagement had occurred and made a material
> public statement about the state of corporate affairs
> inconsistent with the existence of the mismanagement.

Id. at 927 (quoting Hayes v. Gross, 982 F.2d 104, 106 (3d Cir.

1992)).  The court explained that

> [w]here a defendant affirmatively characterizes manage-
> ment practices as "adequate" or loans as "substantially
> secured," "a defendant declares the subject of its
> representation to be material to the reasonable
> shareholder, and thus is bound to speak truthfully."
> . . . Statements of reasons, opinions, or beliefs are
> "factual" for purposes of the securities laws, and thus
> are actionable under § 10(b), if "one of three implied
> factual assertions is inaccurate: (1) that the statement
> is genuinely believed, (2) that there is a reasonable
> basis for that belief, and (3) that the speaker is not
> aware of any undisclosed facts tending to seriously
> undermine the accuracy of the statement."

Id. at 930 (quoting Hanon v. Dataproducts Corp., 976 F.2d 497, 501

(9th Cir. 1992)).  The court distinguished the cases relied upon by

Wells Fargo as "unlike the present situation [because] the

plaintiff in each of . . . [those] decisions failed to point to

alleged facts suggesting that the defendant's failure to disclose

its financial deterioration was attributable to fraud."  Id. at

927-928.  The court concluded that at least two of the statements

alleged by plaintiffs

> may be opinions of the sort classified as "factual" for
> purposes of § 10(b):  "[t]he [c]ompany believes at the
> present time that these [highly leveraged transaction]

loans are substantially secured by the assets of the borrowers" and "[t]he [c]ompany considers the allowance for loan losses of $885.4 million adequate."

Id. at 930.  Since the plaintiffs specifically identified Wells Fargo's misleading statements, and alleged that those statements "were not believed by Wells Fargo when published, lacked any reasonable basis, and were made despite known, undisclosed facts tending seriously to undermine their accuracy," the court concluded that questions of whether the statements were material were questions for the jury.  Id.


               (iii) Serabian v. Amoskeag Bank Shares, Inc.

In Serabian, 24 F.3d at 357, a class of shareholders alleged that bank officers and directors violated federal securities laws by describing the bank's loan review capabilities as "strong" and its allowance for loan losses as "sufficient" when those representations were inconsistent with internal information available to bank managers.  Id. at 364-365 (plaintiffs juxtaposed the company's public description of its loan review capabilities as "strong" and its approach to allowance for loan losses as "conservative," to contradictory factual allegations of internal awareness of loan review problems and inadequate loan loss reserves).  The court concluded that plaintiffs' allegations were actionable because they suggested that the bank's officers and directors "knew, or should have known, that [their] public statements were inconsistent with the actual conditions then being

-18-

reported to them." Id. at 365.   Citing Shapiro, 964 F.2d at 282,

Wells Fargo, 12 F.3d at 930, and Hayes, 982 F.2d at 106, the court

explained that "[b]y addressing the quality of a particular

management practice, a [managerial] defendant declares the subject

of its representation to be material to the reasonable shareholder,

and thus is bound to speak truthfully." Id. at 365.


    3.   Conclusions

    Standing alone, general statements of corporate optimism are

often held by courts to be immaterial as a matter of law.   However,

when juxtaposed to allegations of falsity capable of proof by

evidence of historical fact, generally optimistic statements are

not immune from charges of fraud merely because they are vague,

conclusory expressions of opinion and belief about a company's

then-current and/or future prospects.   See Virginia Bankshares, 111

S.Ct. at 2758 ("conclusory terms in a commercial context are

reasonably understood to rest on a factual basis that justifies

them as accurate, the absence of which renders them misleading").

Virginia Bankshares and its progeny establish that vague,

conclusory statements are actionable when juxtaposed to allegations

that they are false expressions of a corporate manager's opinion or

belief, they are misleading about their subject matter, and capable

of proof by objective evidence of historical fact.[9]   In such

_____

    [9]See Defendant Lay's Reply to the Government's Response to His
Motion to Dismiss the Securities Fraud and Wire Fraud Counts (Lay
Reply), Docket Entry No. 429, p. 10 (noting that these principals
                                              (continued...)

situations the question of materiality will be for the jury to
decide unless the alleged statement is so obviously unimportant to
a reasonable investor that reasonable minds cannot differ on the
question.  Kapps, 379 F.3d at 216.  See Shapiro, 964 F.2d at 282
("[b]y addressing the quality of a particular management practice,
a [managerial] defendant declares the subject of its representation
to be material to the reasonable shareholder"); Wells Fargo, 12
F.3d at 927-930; Serabian, 24 F.3d at 365.  See also United States
v. Morris, 80 F.3d 1151, 1163-1164 (7th Cir.), cert. denied, 117
S.Ct. 181 (1996) (applying these principals in a criminal wire
fraud case).  Cautionary statements and warnings may render
allegedly misleading statements immaterial, but only when they
exhaust the misleading statement's capacity to influence the
reasonable investor.  See Virginia Bankshares, 111 S.Ct. at 2761.
While corporate managers are not duty-bound to speak on every
subject, when they choose to speak on a particular subject, they
are duty-bound to speak accurately.  Id. & n.7.

---

[9](...continued)
derived from Virginia Bankshares have been recognized by circuit
courts of appeals and citing as an example, Nolte v. Captial One
Financial Corp., 390 F.3d 311, 315 (4th Cir. 2004) ("[T]he Supreme
Court held that in a securities fraud case, a statement of opinion
may be a false factual statement if the statement is false,
disbelieved by its maker, and related to matters of fact which can
be verified by objective evidence.")).

**B.   Analysis**

The securities fraud counts for which Lay and Skilling seek dismissal charge them with violation of § 10(b) of the Exchange Act, and SEC Rule 10b-5.  (SSI ¶¶ 102-103)  These counts reallege "paragraphs 1 through 85" (SSI ¶ 102) and additionally allege that

> [o]n or about the dates set forth below, each such date constituting a separate count of this Indictment . . . defendants KENNETH L. LAY, JEFFREY K. SKILLING, RICHARD A. CAUSEY, and others, in presentations to securities analysts and rating agencies, did willfully and unlawfully use and employ manipulative and deceptive devices and contrivances and directly and indirectly (i) employ devices, schemes and artifices to defraud; (ii) make untrue statements of material facts and omit to state facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engage in acts, practices, and courses of conduct which would and did operate as a fraud and deceit upon members of the investing public, in connection with purchases and sales of Enron stock and by the use of the instruments of communication in interstate commerce and the mails.

SSI ¶ 103.


1.   Counts for Which Lay Seeks Dismissal

Lay seeks dismissal of counts 27 through 30, which charge him with securities fraud on October 12, 16, 23, and November 12 of 2001.  Lay argues that each of these counts should be dismissed because

> CEO's routinely make -- and, in fact, are expected to make -- broadly optimistic statements such as those alleged in the Indictment.  No reasonable investor or employee views these comments as significant in making an investment decision.  Investors rely on statements of specific fact, not on the vague comments of a corporate

cheerleader.  The alleged statements are not material for
the additional reason that they did not inflate Enron's
stock price.  Moreover, to the extent the allegations in
these counts are based on alleged omissions, they must be
dismissed because, as a matter of law, Ken Lay had no
duty of disclosure.[10]

Lay also argues that these statements are immaterial as a matter of

law because

> [i]n the context of a civil case . . . this Court has
> held that such statements are not actionable under the
> same securities fraud statute that is at issue in this
> criminal case.  See In re Azurix Corp. Sec. Litig., 198
> F.Supp.2d 862, 886-87 (S.D. Tex. 2002).  The Government's
> argument -- that the same alleged misrepresentations
> judged against the same statute may be dismissed in a
> civil case but not in a criminal case -- defies logic.[11]

    (a)  Statements

The statements that Lay argues are immaterial as a matter of

law are alleged in the section of the SSI titled "Devices Employed

in Furtherance of Scheme [to Defraud]."  (SSI ¶¶ 27-85)


    **(1)  Count 27: Rating Agency Call, October 12, 2001**

Count 27 charges Lay with securities fraud arising from

statements made during a rating agency call on October 12, 2001.

The statements Lay argues are immaterial appear in ¶ 76:

> [o]n or about October 12, 2001, LAY had a telephone call
> with a representative of a prominent credit rating
> agency.  LAY stated that Enron and its auditors had
> "scrubbed" the company's books and that no additional

---

[10]Lay Motion, p. 1.

[11]Lay Reply, p. 2.

-22-

> <u>write-downs would be forthcoming</u>.  In fact, as LAY knew,
> Enron's international assets were being carried on
> Enron's books for billions of dollars in excess of their
> fair value.  LAY further knew that he made misrepresenta-
> tions to representatives of [Arthur] Andersen in order to
> conceal the Wessex $700 million goodwill impairment, and
> had falsely claimed that Enron would pursue a growth
> strategy in the water business.  In addition, as LAY
> knew, Enron's auditors had not been able to "scrub" the
> books due to misrepresentations by him and others to them
> regarding Wessex goodwill.

SSI ¶ 76 (emphasis added).[12]  Lay argues that his statements that

"Enron and its auditors had 'scrubbed' the company's books," is

immaterial as a matter of law because "[r]emarking that a company's

auditors 'scrubbed' the books is a vague statement that is

incapable of objective verification," and "[t]he degree of scrutiny

implied by the word 'scrubbed' defies precise definition."[13]  Lay

argues that his statement that "no additional write-downs would be

forthcoming" is immaterial as a matter of law because "it is a

generalized prediction about the future."[14]

Lay's statements include three implied factual assertions:

(1) that Lay genuinely believed that "Enron and its auditors had

'scrubbed' the company's books" and that "no additional write-downs

would be forthcoming;" (2) that Lay had a reasonable basis for that

belief; and (3) that Lay was not aware of any undisclosed facts

---

[12]Underlined words in this and subsequent quotations from the
SSI are those challenged by the defendants as immaterial.

[13]Lay Motion, p. 6.

[14]Lay Motion, p. 7.

that tended to seriously undermine the accuracy of his statements.
See Wells Fargo, 12 F.3d at 930; Virginia Bankshares, 111 S.Ct. at
2758-2759.   The truth of these implied factual assertions is
contradicted by the Government's allegations that Lay made these
statements knowing that Enron employees had briefed him that
billions of dollars of losses were embedded in Enron's assets and
business units (SSI ¶¶ 23-24), and that Enron's internal
accountants had determined that a new accounting rule introduced in
June of 2001 that eliminated the ability to amortize goodwill
impairments over a 40-year period would require Enron to report the
impaired goodwill value of its United Kingdom-based Wessex Water
Services (Wessex) -- estimated by Enron's internal accountants to
be $700 million -- in the first quarter of 2002 unless Enron was
able to state that it intended to again pursue a water growth
strategy that it had publicly abandoned in January of 2001 -- a
strategy that the Government alleges Enron's internal accountants
had estimated would require a capital investment of at least $1.5
billion that Lay knew Enron did not have.   (SSI ¶¶ 58-60)

Since the Government's allegations are matters of historical
fact capable of proof by objective evidence, and since proof of the
Government's allegations would show not only that Lay's statements
were false, but that there was no reasonable basis for them, and
that when Lay made them he was aware of undisclosed facts that
tended to undermine their accuracy, the court is not persuaded that

-24-

Lay's vague statements would have been so obviously unimportant to
a reasonable investor that reasonable minds could not differ on the
question of their materiality.  The court is persuaded that there
is a substantial likelihood that a reasonable investor would have
considered it important to learn that, contrary to Lay's assertion
that Enron's books had been "scrubbed" and "no additional write-
downs would be forthcoming," Lay knew that Enron's employees had
documented at least $7 billion of losses embedded in its assets and
business units, that Enron's internal accountants had documented a
$700 million impairment to the goodwill value of Wessex, and that
Lay had falsely told Enron's outside auditors that the company
intended to pursue a water growth strategy that it lacked either
the intent or the financial capability to pursue simply to avoid
disclosing the $700 million impairment.  Since publication of these
alleged facts would tend to undermine an investor's impression that
Enron had "scrubbed" its books and reported all known losses and
write-downs, there is a substantial likelihood that the disclosure
of these facts could have been viewed by a reasonable investor as
having significantly altered the "total mix" of information made
available about Enron and its financial condition.  See Kapps, 379
F.3d at 213-214.  See also Plotkin v. IP Axess, Inc., 407 F.3d 690,
698-699 (5th Cir. 2005).  Under these circumstances Lay's decision
to address the quality of Enron's internal review for write-downs
made the subject material to reasonable investors and imposed a

duty on Lay to speak accurately.  See Wells Fargo, 12 F.3d at 930;

Shapiro, 964 F.2d at 282.  Accordingly, the court is not persuaded

that count 27 should be dismissed because Lay's statements -- that

Enron and its auditors "scrubbed" Enron's books or that "no

additional write-downs will be forthcoming" -- are immaterial as a

matter of law.

### (2)  Count 28:  Analyst Call, October 16, 2001

Count 28 charges Lay with securities fraud arising from

statements made during an analyst call on October 16, 2001.  The

statements Lay argues are immaterial appear in ¶¶ 77-80:

> 77.  Third Quarter 2001 Analyst Call.  On
> October 16, 2001, Enron held its quarterly conference
> call with securities analysts to discuss its third
> quarter 2001 earnings results.  LAY and CAUSEY prepared
> for and participated in the call.  For the first time
> during the duration of the scheme to manipulate its
> reported financial results, Enron conceded that it had
> suffered large losses, totaling approximately $1 billion,
> in certain segments of its business.  These areas
> included many declining assets that had been concealed in
> the "Raptor" hedges, as well as EBS [Enron Broadband
> Services].  However, LAY and CAUSEY attempted to mislead
> the investing public and omit information about these
> losses in order to minimize the negative effect on
> Enron's stock price.  LAY described the losses as
> "nonrecurring," that is, a one-time or unusual earnings
> event.  However, as LAY and CAUSEY knew, the losses were
> not properly characterized as non-recurring.
>
> 78.  In addition, LAY stated:  "In connection with
> early termination [of the Raptor structures], share-
> holders' equity will be reduced approximately $1.2
> billion."  In fact, as LAY and CAUSEY knew, the reduction
> in equity resulted not from the termination of the
> "Raptor" structures, but principally from a huge
> accounting error by Enron.  In a further effort to
> deflect attention from the equity reduction, LAY, CAUSEY
> and others chose not to disclose the problem in Enron's
> third quarter press release.

79. LAY further stated that after review of its outside auditors, <u>"we currently estimate, based upon this recent review, that up to $200 million goodwill adjustment may be necessary, and will be recorded as required by the accounting principles in the first quarter of 2002."</u> In fact, as LAY and CAUSEY knew, the adjustment did not account for the impact on Enron of the impaired Wessex goodwill of approximately $700 million, due to misrepresentations by LAY and CAUSEY and others.

80. In response to questions regarding the value of <u>Elektro</u>, a Brazilian power plant, which Enron carried on its books as worth in excess of $2 billion, LAY stated that "[w]e may well have that asset and operate that asset for quite some time. <u>It's not a bad asset, it's a good asset, just like a lot of the other assets in this portfolio."</u> In fact, as LAY knew, Elektro was overvalued by as much as $1 billion and was classified by Enron's Risk Assessment and Control group as "troubled."

(i)  "Non-Recurring Losses"

Lay argues that his description of losses totaling $1 billion that Enron reported in the third quarter of 2001 as "non-recurring" (SSI ¶ 77) is immaterial as a matter of law because it is not a matter of verifiable fact, and because "analysts were given specific information about the losses . . . [that allowed them] to make their own judgments about whether the events underlying the losses were one-time occurrences."[15]  Asserting that "[c]ourts have held comparable statements to be immaterial if investors are adequately informed to make their own judgments about the accounting treatment of losses and earnings,"[16]  Lay submits a full transcript of the analyst call along with Enron's October 16, 2001,

---

[15]Lay Motion, p. 8.

[16]Lay Motion, p. 9.

earnings announcement, Enron's stock price schedule, and publicly available SEC filings.[17]  Lay asserts that these materials "are not proffered to contradict the [i]ndictment's factual allegations, but to provide the context of those allegations."[18]  Lay's argument that his description of losses as "non-recurring" is not material when viewed in the context of other information known or available to the investing public is a claim that cannot be considered on a motion to dismiss the indictment for failing to allege an offense because it relies on matters outside the indictment.  See Mann, 517 F.2d at 267 ("such evidence is irrelevant to a determination of whether the indictment itself is legally sufficient").  Furthermore, after reviewing the evidence submitted by Lay, the court is not persuaded that Lay's description of the losses as "non-recurring" was so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of materiality.

(ii)  Shareholders' Equity

Citing In re Bell Atlantic Corp. Sec. Litig., 1997 WL 205709, *32 (E.D. Pa. 1997), Lay argues that his attribution of the reported loss in shareholders' equity to early termination of the Raptor structures (SSI ¶ 78) instead of an accounting error is

---

[17]See Exhibits A, D-E, H-J included in the Appendix to Lay's Motion.

[18]Lay Motion, p. 9 n.2.

immaterial as a matter of law because "a rational investor would not view the distinction as significant. . . [since t]he material component of the alleged statement is the dollar amount of the reduction in shareholders' equity, not the basis underlying it."[19] In <u>Bell</u> the plaintiffs contended that defendants' statements about the write down of goodwill were misleading because they failed to disclose that the write down related only to one subsidiary (the Bell Atlantic Systems Leasing/financial services) and not to the entire financial services sector.  <u>Id.</u>  The <u>Bell</u> court explained that "[a]s long as the amount, purpose, and effect of the charge was disclosed, no reasonable investor would have considered the basis for the charge significant."  <u>Id.</u>

Lay's attribution of the shareholders' equity loss to early termination of the Raptors investment vehicles is a factual assertion the truth of which is contradicted by the Government's allegations that throughout September of 2001 Lay knew that the total amount of loss embedded in Enron's assets and business units was at least $7 billion, that Enron's auditors had changed their position about the accounting treatment of the four off-balance sheet vehicles known as the Raptors, and that the auditors' changed position required Enron to determine "in short order" whether an acceptable alternative methodology existed or whether, instead, Enron would have to restate its earnings and admit the accounting

---

[19]Lay Motion, p. 10.

error. (SSI ¶¶ 23-24) Since the Government's allegations that the loss of shareholder equity was attributable not to early termination of the Raptors, but to an accounting error, are matters of historical fact capable of proof by objective evidence (i.e., corporate record), and since proof of the Government's allegations would show that Lay falsely stated both the purpose for and amount of the loss in shareholder equity, the court is not persuaded that the allegations in this case are analogous to those in <u>Bell</u>. Nor is the court persuaded that the distinction between Lay's attribution of the loss to early termination of the Raptors and the Government's attribution of the loss to an accounting error is either "insignificant" or so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of materiality.

The court is persuaded that there is a substantial likelihood that a reasonable investor would have considered it important to learn that, contrary to Lay's attribution of the loss to early termination of the Raptors, Lay knew that Enron's auditors had changed their position on the accounting treatment accorded to the Raptors, and knew that unless Enron found an acceptable alternative methodology it would have to report losses that far exceeded the reported $1.2 billion loss in shareholders' equity. Since publication of these alleged facts would tend to undermine an investor's impression that Enron had simply terminated the Raptors

-30-

early, there is a substantial likelihood that the disclosure of these facts could have been viewed by a reasonable investor as having significantly altered the "total mix" of information made available about Enron and its financial condition.  See Kapps, 379 F.3d at 213-214; Plotkin, 407 F.3d at 698-699.  Lay's decision to address the purpose and amount of lost shareholder equity made these subjects material to reasonable investors and imposed a duty on Lay to speak about them accurately.  See Wells Fargo, 12 F.3d at 930; Shapiro, 964 F.2d at 282.  Accordingly, the court is not persuaded that Lay's attribution of the reported loss in shareholder's equity to early termination of the Raptor structures instead of an accounting error is immaterial as a matter of law.


(iii)  Goodwill

Lay argues that his statement -- that "we currently estimate, based on this recent review, that up to $200 million goodwill adjustment may be necessary, and will be recorded as required by the accounting principles in the first quarter of 2002" (SSI ¶ 79) -- is immaterial as a matter of law because it is a vague prediction that must be judged in the context of other information available to investors at the time, including warnings contained in the press release announcing the analyst call, which warned investors that "forward-looking statements are not historical facts, but reflect Enron's current expectations, estimates and

projections."[20]  Citing <u>Rosenzweig</u>, 332 F.3d at 869, Lay argues that
"cautionary language that warns investors not to draw a particular
conclusion renders immaterial statements giving rise to that
conclusion."[21]  Since Lay's argument that this statement is not
material rests on his assertion that it is not material when viewed
in the context of other information not alleged in the SSI but
known or available to the investing public, Lay's argument cannot
be considered in a motion to dismiss the indictment for failing to
allege an offense because it relies on matters outside the
indictment.  <u>See</u> <u>Mann</u>, 517 F.2d at 267.

Furthermore, even when considered in light of the warnings
contained in the press release announcing the analyst call, for the
same reasons that the court was not persuaded by Lay's arguments
that similar statements concerning the goodwill value of corporate
assets underlying count 27 are immaterial as a matter of law, the
court is not persuaded that this statement of Lay's estimate --
that "up to $200 million goodwill adjustment may be necessary . . .
in the first quarter of 2002" -- is immaterial as a matter of law.[22]
<u>See</u> <u>Grossman</u>, 120 F.3d at 1123 (bespeaks caution doctrine
inapplicable where defendants' misstatements concerned present
facts:  "Because several of the allegedly misleading statements

---

[20]Lay Motion, p. 12.

[21]<u>Id.</u>

[22]See § III.B.1.(a)(1), above.

referred to then-present factual conditions, or implied background
factual assumptions a reasonable investor would regard the speaker
as believing to be true, the 'bespeaks caution' doctrine would be
of no assistance to defendants as to those statements"); and Trump,
7 F.3d at 371 (applying bespeaks caution doctrine only to
allegations of forward looking statements, but not to allegations
concerning omissions of present fact).

### (iv)   Elektro

Lay argues that his statement that "[Elektro is] not a bad
asset, it's a good asset, just like a lot of the other assets in
this portfolio,"[23] is immaterial because it is a generalized
expression of confidence[24] and because "the context of the
conference call reflects that it was widely understood that, if
Elektro were sold on the date of the call, the sale would probably
generate a loss."[25]   Lay argues that

> [d]uring the call, David Fleischer, a securities analyst
> with Goldman Sachs, pointed out: "[I]f you were to sell
> them today, you know, things like (electro) [sic]
> probably would go for losses." (Ex. A, p. 16)   Indeed,
> Ken Lay acknowledged during the call that his evaluation
> of Elektro was premised on Elektro's future potential:
> "But right now, it looks like (electro) [sic] in fact
> might be an asset that we'd like to keep operating for

---

[23]Lay Motion, pp. 13-14.

[24]Lay Motion, p. 13.

[25]Lay Motion, p. 14.

> quite a while and see if we can build a meaningful
> wholesale and retail business around it in Brazil."[26]

Citing <u>Baron v. Smith</u>, 380 F.3d 49, 57 (1st Cir. 2004), Lay argues
that "[i]nformation such as this that is already known by analysts
or investors is immaterial as a matter of law."[27]

Lay's statements about Elektro include three implied factual
assertions: (1) that Lay genuinely believed that "[Elektro is] not
a bad asset, it's a good asset" (SSI ¶ 80); (2) that Lay had a
reasonable basis for that belief; and (3) that Lay was not aware of
any undisclosed facts that tended to seriously undermine the
accuracy of his statements.  <u>See</u> <u>Wells Fargo</u>, 12 F.3d at 930;
<u>Virginia Bankshares</u>, 111 S.Ct. at 2758-2759.  The truth of these
implied factual assertions is contradicted by the Government's
allegations that Lay made them knowing that Elektro was overvalued
by as much as $1 billion, and that Enron's risk assessment and
control group had classified Elektro as "troubled."  (SSI ¶ 80)

Since the Government's allegations are matters of historical
fact capable of proof by objective evidence, and since proof of the
Government's allegations would show not only that Lay's statements
about Elektro were false, but that there was no reasonable basis
for them, and that when Lay made them he was aware of undisclosed
facts that tended to undermine their accuracy, the court is not

---

[26]<u>Id.</u>

[27]<u>Id.</u>

persuaded that Lay's vague statements about Elektro would have been so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their materiality.  The court is persuaded that there is a substantial likelihood that a reasonable investor would have considered it important to learn that, contrary to Lay's assertion that "[Elektro is] not a bad asset, it's a good asset," Lay knew that Elektro was overvalued by as much as $1 billion, and that Enron's risk assessment and control group had classified Elektro as "troubled."  Even if, as Lay argues, his exchange with analyst David Fleischer shows that the investing public widely understood that if sold that day Elektro would sell for a loss, the court is not persuaded that a reasonable investor would not have viewed disclosure of the magnitude of the potential loss as having significantly altered the "total mix" of information made available about Enron's financial condition. Lay's decision to speak about the quality of Elektro as an asset in Enron's investment portfolio made the subject material to reasonable investors and imposed a duty on Lay to speak about Elektro accurately.  See Virginia Bankshares, 111 S.Ct. at 2761; Shapiro, 964 F.2d at 282; Wells Fargo, 12 F.3d at 930. Accordingly, the court is not persuaded that Lay's statement that "[Elektro is] not a bad asset, it's a good asset," is immaterial as a matter of law.

(v)   Conclusions as to Count 28

Since, for the reasons explained above, the court is not persuaded that any of the statements alleged in connection with count 28 are immaterial as a matter of law, Lay's motion to dismiss count 28 will be denied.

(3)   **Count 29:  Analyst Call, October 23, 2001**

Count 29 charges Lay with securities fraud arising from statements made during an October 23, 2001, analyst call.  The statements Lay argues are immaterial appear in ¶¶ 82-83 of the SSI:

> 82.  <u>October 23, 2001 Analyst Call</u>.  Enron held a special conference call with securities analysts on October 23, 2001, in an effort to dispel growing public concerns about Enron's stock, which had lost 25% of its value in the week following the October 16, 2001, third quarter earnings announcement.  LAY and CAUSEY prepared for and participated in the call.  LAY stated that <u>"[w]e're not trying to conceal anything.  We're not hiding anything."  "We're really trying to make sure that the analysts and the shareholders and the debt holders really know what's going on here.  So, we are not trying to hold anything back."  "I'm disclosing everything we've found."</u>  In fact, while professing candor, LAY failed to disclose numerous dire facts about the state of Enron's business that he knew and that are outlined in this Indictment.
>
> 83.  LAY further stated that, <u>"we, in fact both we and our outside auditors had already looked at all of our assets to determine if we had impairments under the new goodwill accounting rules that take effect first quarter next year.  And as you probably recall, out of that review, indeed there was somewhat less than $200 million of adjustments that will be required in the first quarter out of our whole portfolio.  And clearly, if there are impairments other than that, why then of course Arthur Andersen as well as our internal accounting staff would require that we write that down also."</u>  In fact, as LAY

and CAUSEY knew, the adjustment did not include the impact on Enron of the impaired Wessex goodwill of approximately $700 million, due to misrepresentations by LAY and CAUSEY and others.

Lay argues that count 29 of the SSI must be dismissed because he did not make the statements alleged in ¶ 82 during the analyst call held on October 23, 2001.[28]  Admitting that Lay did not make these statements during that call but, instead, made them during the analyst call held on November 12, 2001, the Government asserts that count 29 should, nevertheless, not be dismissed because the statements alleged in ¶ 82 are merely examples of false and misleading representations that Lay made in the charged analyst calls, and because ¶ 83 of the SSI alleges additional statements that support the charge.[29]  Since the Government admits that the statements alleged in ¶ 82 were not made during the analyst call charged in count 29, whether this count should be dismissed turns on the statements alleged in ¶ 83 concerning the goodwill value of corporate assets.

Lay argues that his statement -- that Enron and its outside auditors looked at all of the company's assets to determine if it had impairments under the new goodwill accounting rules set to take effect in January of 2002 and found that there was "somewhat less than $200 million of adjustments that will be required" -- is

---

[28]Lay Motion, p. 21.

[29]Government's Response, p. 23 n.9.

-37-

immaterial as a matter of law because it is only a vague
prediction.  For the reasons that the court was not persuaded by
the same argument made about similar statements alleged in relation
to counts 27 and 28, the court is not persuaded that Lay's
statements about the goodwill value of corporate assets alleged
here are immaterial as a matter of law.[30]

### (4)  Count 30:  Analyst Call, November 12, 2001

Count 30 charges Lay with securities fraud arising from
statements made during a November 12, 2001, analyst call.  The
statements Lay argues are immaterial appear in ¶ 85 of the SSI:

> Enron executives held a special conference call with
> securities analysts on November 12, 2001, in another
> effort to dampen public concerns about the decline of
> Enron's stock and the nature of Enron's finances.  LAY
> falsely stated that "[w]e don't have anything we're
> trying to hide . . . I'm disclosing everything that we've
> found."  LAY further stated that "one reason we went
> ahead and did this preliminary review with AA [Arthur
> Andersen] before we released these earnings, is to make
> sure we didn't have any other goodwill adjustments except
> the $200 million I mentioned we had to deal with, because
> we wanted to get as much of that on the table at this —
> with this report as we could."  In fact, as LAY knew, he
> and other senior Enron managers again failed to disclose
> a litany of negative facts about Enron and that the $200
> million figure did not account for the impact on Enron of
> the impaired Wessex goodwill of approximately $700
> million, due to misrepresentations by LAY and CAUSEY and
> others.

Asserting that no reasonable investor would construe Lay's
comment [that "[w]e don't have anything we're trying to hide . . .

---

[30]See §§ III.B.1.(a)(1), and III.B.1.(a)(2)(iii), above.

I'm disclosing everything that we've found"] to mean that he was disclosing each and every arguably dire fact about Enron, Lay argues that count 30 must be dismissed because he had no duty to disclose omitted information.[31]  Lay also argues that this statement is immaterial as a matter of law since the context in which it was made shows that it referred solely to Enron's accounting for related party transactions, and that it was accompanied by warnings that Lay was censoring his comments about related party transactions in light of the SEC inquiry and pending litigation.[32]

Lay's statements that "[w]e don't have anything we're trying to hide . . . I'm disclosing everything that we've found" (SSI ¶ 85) includes three implied factual assertions:  (1) that Lay genuinely believed that "[w]e don't have anything we're trying to hide . . . I'm disclosing everything that we've found;" (2) that Lay had a reasonable basis for that belief; and (3) that Lay was not aware of any undisclosed facts that tended to seriously undermine the accuracy of his statements. See Wells Fargo, 12 F.3d at 930; Virginia Bankshares, 111 S.Ct. at 2758-2759.  The truth of these implied factual assertions is contradicted by the Government's allegations that Lay made them knowing that Enron had not disclosed "a litany of negative facts about Enron" (¶ 85), including the Government's allegations that Lay knew Enron's

---

[31]Lay Motion, pp. 19 and 22.

[32]Lay Motion, pp. 22-23.

internal accountants had documented a $700 million impairment to the goodwill value of Wessex, and that Lay had falsely told Enron's outside auditors that the company intended to pursue a water growth strategy that it lacked either the intent or the financial capability to pursue so that Enron would not have to report Wessex' impaired goodwill.  (See SSI ¶¶ 58-60.)

Since the Government's allegations are matters of historical fact capable of proof by objective evidence, and since proof of the Government's allegations would show not only that Lay's statements were false but that there was no reasonable basis for them and that when Lay made them he was aware of undisclosed facts that tended to undermine their accuracy, the court is not persuaded that Lay's vague statements would have been so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their materiality.  Even assuming without deciding that the context in which these statements were spoken shows that they related solely to Enron's related-party transactions (e.g., the Raptors), the court is persuaded that there is a substantial likelihood that a reasonable investor would have considered it important to learn that, contrary to Lay's assertions of candor, Lay knew that Enron had not disclosed that its auditor had changed its position on the accounting treatment accorded to related-party transactions, including the Raptors, and that unless Enron found an acceptable alternative methodology it would have to restate its

income reports to recognize losses totaling up to $7 billion, i.e.,
losses that far exceeded those that Enron had disclosed.  (See SSI
¶¶ 23-24.)  Since publication of these alleged facts would tend to
undermine an investor's impression that Lay was "disclosing
everything" Enron had found, there is a substantial likelihood that
the disclosure of these facts could have been viewed by reasonable
investors as having significantly altered the "total mix" of
information made available about Enron and its financial condition.
See Kapps, 379 F.3d at 213-214; Plotkin, 407 F.3d at 698-699.
Although the court has no occasion to decide here whether Lay had
a duty to state that he was "disclosing everything," or that Enron
was not trying to hide anything, the statements that Lay did make
imposed a duty on him to portray the facts accurately.  See
Virginia Bankshares, 111 S.Ct. at 2761 & n.7.  Accordingly, the
court is not persuaded that count 30 should be dismissed because
Lay's statements -- that he was "disclosing everything" and that
Enron was not trying to hide anything -- were immaterial as a
matter of law.

(b)  Stock Price

Citing In re Burlington Coat Factory Sec. Litig., 114 F.3d
1410 (3d Cir. 1997), Lay asserts that "[w]hen stock such as Enron's
trades in an efficient market, 'the concept of materiality
translates into information that alters the price of the firm's

-41-

stock.'"[33]   Citing <u>In re Azurix</u>, 198 F.Supp.2d at 886-887, Lay asserts that "[i]f an allegedly inflationary statement fails to positively affect a company's stock price, the statement is immaterial as a matter of law."[34]   Asserting that Enron was a publicly traded company whose shares were listed on the New York Stock Exchange and, therefore, bought and sold around the world, Lay argues that Enron's stock traded on an efficient market, and that if the statements underlying counts 27 through 30 were material as alleged by the Government, they would have inflated Enron's share price.  Since, however, Enron's share prices declined significantly throughout October and November of 2001, the time period relevant to counts 27 through 30, Lay argues that the misrepresentations alleged in relation to counts 27 through 30 are immaterial as a matter of law because they did not inflate Enron's stock price.[35]

In <u>Burlington</u>, 114 F.3d 1410, and more recently in <u>Oran v. Stafford</u>, 226 F.3d 275 (3d Cir. 2000), the Third Circuit held that misrepresentations or omissions are immaterial as a matter of law unless the market reacts immediately.  Although Lay urges the court to apply the Third Circuit's bright-line rule to the statements alleged against him, application of this rule would contravene both

---

[33]Lay Motion, p. 23.

[34]<u>Id.</u>

[35]Lay Motion, pp. 23-25.

the Supreme Court's adoption of the "reasonable investor" standard
for determining materiality in the § 10(b) and Rule 10b-5 context,
and the Fifth Circuit's admonition that at least in civil cases it
is more appropriate to use market price to gauge reliance instead
of materiality.  <u>See</u> <u>Basic</u>, 108 S.Ct. at 978 (holding that a fact
is material if there is a "'substantial likelihood'" that a
reasonable investor would consider it important in his or her
decision making) (quoting <u>TSC Industries</u>, 96 S.Ct. 2126));
<u>Nathenson</u>, 267 F.3d at 415 (preferring to evaluate move in market
price -- at least in cases relying on theory of fraud-on-the-market
-- to the element of reliance instead of the element of
materiality).

The rule applied by the Third Circuit in <u>Burlington</u> and <u>Oran</u>,
which judges materiality by immediate market reaction, fails to
recognize that the market is subject to distortions that prevent
the ideal of "a free and open public market" from occurring.  108
S.Ct. 978 & n.28 (recognizing that market distortions are not
always corrected immediately).  Recognizing the difficulty of
proving investor reliance on a corporate misrepresentation or
omission, the <u>Basic</u> Court created a rebuttable presumption of
investor reliance based on the theory that investors presumably
rely on the market price, which typically reflects the
misrepresentation or omission.  <u>Id.</u> at 978.  In crafting this
presumption to favor investors, the Court stated "we do not intend

to conclusively adopt any particular theory of how quickly and completely publicly available information is reflected in the market price." Id. at 978 n.28.

The court is not persuaded that Lay's statements are immaterial as a matter of law merely because Enron's share price fell throughout September and October of 2001 despite Lay's statements of corporate optimism. When, in late November of 2001, the full extent of Enron's financial problems finally began to be disclosed to the market, Enron's share price dropped precipitously. Since the Government alleges that defendants, in an effort to prevent Enron's share price from falling even faster and sooner, continued to reassure analysts that reported losses and adjustments to the goodwill value of corporate assets required by new accounting rules would not noticeably impact the company, the court is not persuaded that the market's reaction defeats the Government's allegations of materiality. Since the truth of Lay's reassurances is contradicted by the Government's allegations that Lay made those reassurances knowing that Enron's assets were overvalued and that its losses were understated, the court is not persuaded that Enron's falling share price establishes that the "alleged misrepresentations or omissions [were] so obviously unimportant to an investor that reasonable minds cannot differ on the question of [their] materiality." See Kapps, 379 F.3d at 216. The court is persuaded that there is a substantial likelihood that

a reasonable investor would consider the potential effects of these undisclosed facts on the overall economic health of the company as "significantly alter[ing] the 'total mix' of information made available." TSC Industries, 96 S.Ct. 2126.  Accordingly, the court is not persuaded that counts 27 through 30 should be dismissed because they are grounded on statements that are immaterial as a matter of law because they did not cause a change in Enron's stock price.

2.   Counts for Which Skilling Seeks Dismissal

Skilling moves the court to dismiss counts 23, 24, and 26 and to strike "all allegations of immaterial statements in the [i]ndictment and [s]tatement of [c]ompliance, as identified in the [a]ppendix and [p]roposed [o]rder."[36]  Skilling argues that these counts of the SSI should be dismissed because

> statements of "puffery" and "corporate optimism" are uniformly considered immaterial and -- even when willfully false -- do not constitute a civil, much less, criminal violation of the securities laws.

> In this case, the Task Force has littered both the Indictment and the Statement of Compliance with dozens of such immaterial statements.  They include

> - statements of general praise for Enron, its businesses, and its financial results;

> - inherently uncertain predictions about the future (several of which were accompanied by express disclaimers that the future is unpredictable); and

---

[36]Skilling Memorandum, p. 20.  See also Appendix of Immaterial Statements attached to Skilling  Memorandum.

-45-

- a variety of other statements of opinion and belief upon which no investor could reasonably rely.

These types of allegations must be stricken.  They fail to satisfy the requirements of securities fraud, and allowing them to remain in the Indictment and Statement of Compliance will only serve to confuse the jury and prejudice defendants.  Moreover, because Counts 23, 24, and 26 are based wholly on immaterial statements by Skilling, they must be dismissed.[37]

The statements that Skilling argues are immaterial as a matter of law are alleged in the section of the SSI titled "Devices Employed in Furtherance of Scheme [to Defraud]."  (SSI ¶¶ 27-85)

Skilling challenges as immaterial statements that he made at an annual presentation for analysts on January 25, 2001 (count 23), that EBS [Enron Broadband Services] and EES [Enron Energy Services] were "strong franchises with sustainable high earnings power,"[38] statements that he made in an analyst call on March 23, 2001 (count 24), that "Enron's business is in great shape,"[39] that EBS "is coming along just fine," and that Enron was "very comfortable with the volumes and targets and the benchmarks that [it] set for EBS,"[40] and statements that he made in an analyst call on July 12, 2001 (count 26), that Enron had a "great quarter," that EES "had an

---

[37]Skilling Memorandum, p. 1.

[38]Skilling Memorandum, p. 3.

[39]Id.

[40]Skilling Memorandum, pp. 4 and 6.

-46-

outstanding second quarter,"[41] and that EES was "firmly on track to achieve our 2001 target of $225 million"[42] in earnings.

Skilling's statements about Enron and its EBS and EES subsidiaries include three implied factual assertions: (1) that Skilling genuinely believed them; (2) that Skilling had a reasonable basis for that belief; and (3) that Skilling was not aware of any undisclosed facts that tended to seriously undermine the accuracy of his statements. See Wells Fargo, 12 F.3d at 930; Virginia Bankshares, 111 S.Ct. at 2758-2759. The truth of these implied factual assertions is contradicted by the Government's allegations that Skilling made these statements knowing that EBS personnel had recommended shutting down or selling EBS's network because EBS had an unsupportable cost structure and few revenue prospects, and that EES was owed hundreds of millions of dollars in receivables by California utilities that it could not collect. Relevant historical facts that the Government alleges about EES include that

> [a]s LAY, SKILLING, and CAUSEY knew, in the first quarter of 2001, Enron executives manipulated EES's financial position through a reorganization designed to conceal the existence and magnitude of EES's business failure. Large portions of EES's business -- which otherwise would have to report hundreds of millions of dollars in losses -- were moved into another Enron business unit, Enron Wholesale. Enron Wholesale was capable of hiding these losses because it housed most of the company's wholesale

---

[41]Skilling Memorandum, p. 5.

[42]Skilling Memorandum, p. 10.

energy trading profits.  In spite of their knowledge of this maneuver, at various times, LAY, SKILLING, and CAUSEY claimed publicly that EES was continuing to perform successfully and as expected.

(SSI ¶ 48)  Relevant historical facts that the Government alleges about EBS include that

during 2000 as SKILLING and CAUSEY knew, conspirators authorized misleading, one-time, financial transactions, known as Project Braveheart and Backbone Trust, which manufactured earnings that Enron executives used to create the false impression that EBS would generate operating profits.  Even with these transactions, EBS still faced larger than expected losses during the first quarter 2001.

(SSI ¶ 53)  The Government alleges that "[t]he Project Grayhawk" maneuver allowed Enron to recognize, through JEDI, approximately $85 million in earnings as a result of the manufactured bounce in the stock [price] from the false and misleading presentation to analysts about EBS."  (SSI ¶ 52)  Since the Government's allegations about EES and EBS are matters of historical fact capable of proof by objective evidence, and since proof of the Government's allegations would show not only that Skilling's statements were false, but that there was no reasonable basis for them, and that when Skilling made them he was aware of undisclosed facts that tended to undermine their accuracy, the court is not persuaded that Skilling's statements about EES and EBS would have been so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their materiality.

The court is persuaded that there is a substantial likelihood that a reasonable investor would have considered it important to learn that, contrary to Skilling's assertions that EES and EBS were "strong franchises" with "high earnings power" that were adding to Enron's earnings power, valuation, and future growth, Skilling knew that EES was owed hundreds of millions of dollars by California utilities that it could not collect, and that large portions of EES's business were moved into Enron Wholesale to prevent EES from having to report hundreds of millions of dollars in losses; and that Skilling knew that Enron had used misleading financial transactions called Project Braveheart and Backbone Trust to manufacture earnings used to create the false impression that EBS would generate operating profits, and that EBS personnel had recommended shutting down or selling its network because EBS had an unsupportable cost structure and few revenue prospects.

Since publication of these alleged facts would tend to undermine an investor's impression that EES and EBS were "strong franchises" with "high earnings power" that were adding to Enron's earnings power, valuation, and future growth, there is a substantial likelihood that the disclosure of these facts could have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available about Enron's financial condition.  Skilling's decision to speak about the quality of EES and EBS made these subjects material to reasonable investors and imposed a duty on Skilling to speak accurately.  See

<u>Virginia Bankshares</u>, 111 S.Ct. at 2761; <u>Shapiro</u>, 964 F.2d at 282; <u>Wells Fargo</u>, 12 F.3d at 930.   The court is not persuaded that counts 23, 24, and 26 should be dismissed because Skilling's statements about EES and EBS are immaterial as a matter of law.

   3.   <u>Statements Skilling Seeks to Strike as Surplusage</u>

   In addition to the statements alleged in support of counts 23, 24, and 26, Skilling argues that "all of the other immaterial statements identified in the attached Appendix (that do not constitute entire counts charged against Skilling) should be stricken as prejudicial surplusage."[43]   Citing Federal Rule of Criminal Procedure 7(d), and <u>United States v. Bullock</u>, 451 F.2d 884, 888 (5th Cir. 1971), Skilling argues that "the inclusion of unnecessary language in an indictment that could serve only to inflame the jury, confuse the issues, and blur the elements necessary for conviction under the separate counts involved surely can be prejudicial."[44]   Relying on <u>United States v. Saporta</u>, 270 F.Supp. 183 (E.D.N.Y. 1967), Skilling asserts that "[s]triking the immaterial statements from the Indictment and Statement of Compliance would eliminate the risk of jury confusion and other prejudice against Skilling, without prejudicing the Task Force."[45]

―――――――――――――――――――

   [43]Skilling Memorandum, p. 17.

   [44]Skilling Memorandum, p. 18.

   [45]Skilling Memorandum, p. 19.

In <u>Saporta</u>, 270 F.Supp. at 184-185, multiple defendants were charged with 17 counts of securities fraud based on the offer and sale of a single stock called Precision.   Each count also contained, as part of its description of the overall "scheme to defraud," an allegation referencing another transaction, an illegal pledge of a second stock.   <u>Id.</u>   Finding that references to the second transaction "raise a serious question of surplusage and prejudice," because they do "not constitute any fraud or deceit upon the purchasers of the Precision stock," a necessary element of the charged offense, the court ordered allegations of the second transaction stricken from the indictment.   <u>Id.</u> at 186.

Although Skilling argues that the result reached in <u>Saporta</u> "should follow here,"[46] Skilling fails to demonstrate that the challenged statements are comparable to those stricken in <u>Saporta</u>, i.e., that if proven, any of the challenged statements would not constitute a fraud or deceit upon "the investing public, including Enron's shareholders, the SEC, and others (the "Victims")."  (SSI ¶ 5)   Nor has Skilling demonstrated that any of the challenged statements "could serve only to inflame the jury, confuse the issues, and blur the elements necessary for conviction under the separate counts."  <u>See</u> <u>Bullock</u>, 451 F.2d at 888.  Accordingly, for these reasons and for the reasons explained above with respect to the statements challenged by both Lay and Skilling, the court is

---

[46]<u>Id.</u>

not persuaded that any of the statements attributed to Skilling should be stricken as prejudicial surplusage.


## C.   Conclusions

The statements alleged in the SSI that Lay and Skilling argue are immaterial as a matter of law are juxtaposed to allegations that those statements are false expressions of the defendants' opinions or beliefs either because defendants had no reasonable basis for believing them or because defendants were aware of undisclosed facts that tended to undermine their accuracy, that the statements are misleading about their subject matter, and that the statements are capable of proof by evidence of historical fact. Because the court is not persuaded that the alleged statements are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their materiality, the court concludes that the question of materiality in each of these instances is for a jury to decide.  See Kapps, 379 F.3d at 216; Virginia Bankshares, 111 S.Ct. at 2758-2759; Shapiro, 964 F.2d at 282; Wells Fargo, 12 F.3d at 927-930; Serabian, 24 F.3d at 365; Morris, 80 F.3d at 1163-1164.

The juxtaposition of these allegations to the statements that Lay and Skilling argue are immaterial as a matter of law distinguish them from statements that the court concluded were immaterial as a matter of law in Azurix.  See In re Azurix, 198

-52-

F.Supp.2d at 882 (a "company's expressions of confidence in its management or business are not actionable, especially where, as here, all historical information appears to be factually correct."); Rosenzweig 332 F.3d at 869 ("generalized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial") (citing Abrams v. Baker Hughes, Inc., 292 F.3d 424, 433 (5th Cir. 2002) ("[A]s long as public statements are reasonably consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of the company's current performance."). The SSI alleges that information in the form of historical fact known to Lay and Skilling when they made the statements that they now challenge as immaterial prove that their statements were false when made and that Lay and Skilling knew that their statements were false when they made them. The court is, therefore, not persuaded that the charges arising from these alleged statements should be dismissed on grounds that the statements are immaterial as a matter of law. See Abrams, 292 F.3d at 433 (citing Serabian, 24 F.3d at 365 (bank's statement that loss reserves were adequate, conservative, and cautious directly contrary to identified internal reports was sufficient to state a securities fraud claim)).

## IV.  <u>Wire Fraud Charges</u>

Lay seeks dismissal of counts 12 and 13 of the SSI that charge him with wire fraud in violation of 18 U.S.C. § 1343 "[b]ecause the relevant statements are mere puffery and corporate cheerleading . . . [and] immaterial as a matter of law."[47]  Lay also argues that these counts are insufficient because they "fail[] to identify a critical component of materiality under the wire fraud statute -- a decision [capable of being] influenced by Lay's alleged statements,"[48] and because "no reasonable investor would have viewed them as important in making their investment decisions."[49]  Lay argues that "[a]t worst, [he] made some broadly optimistic remarks about Enron to Enron's employees in an effort to boost employee morale."[50]  The Government argues that the wire fraud counts are sufficient as a matter of law.[51]

---

[47]Lay Motion, p. 25.  Lay also filed a separate Motion to Dismiss Counts 12 and 13 of the Indictment (Defense Motion 1) (Docket Entry No. 383) based on other arguments.  The court denied that motion at the September 1, 2005, conference.  See Minutes of Hearing held on September 1, 2005 (Docket Entry No. 443).

[48]<u>Id.</u>  See also Lay Reply, p. 11, clarifying that he "relies on the language of the wire fraud statute and case law to explain that a statement is material only if, at a minimum, it <u>is capable of</u> influencing a reasonable recipient's decision or course of action," and asserting that "[t]he Government's failure to identify a potential decision is fatal to its case."

[49]Lay Reply, pp. 35-36.

[50]Lay Reply, p. 36.

[51]Government Response, pp. 36-45.

## A.    Applicable Law

The federal wire fraud statute states, in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.   When the government charges a defendant with wire fraud it must prove the materiality of the fraudulent state-ment(s) as an element of the offense.   See Neder v. United States, 119 S.Ct. 1827, 1839-1841 (1999).   In Neder the Supreme Court recognized that materiality under the wire fraud statutes can be shown in more than one way and expressly approved the tests for materiality set forth in the Restatement (Second) of Torts, § 538 (1977).   These tests provide that a statement is material if

> (a)  a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question; or

> (b)  the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it.

Id., S.Ct. at 1840 & n.5 (quoting Restatement (Second) of Torts, § 538 (1977)).   An assessment of materiality requires viewing the facts in the context of "all the circumstances," including the "'total mix' of information."   TSC Industries, 96 S.Ct. at 2132.

-55-

Failure to employ the word "material" in the indictment is not
fatal.  See United States v. Richards, 204 F.3d 177, 191 (5th Cir.
2000), cert. denied, 121 S.Ct. 73 (2000) ("In determining the
sufficiency of the indictment, '[t]he law does not compel a ritual
of words.'" (quoting United States v. Wilson, 884 F.2d 174, 179
(5th Cir. 1989))).  Allegations of fraud will be sufficient as long
as "the facts alleged in the indictment warrant an inference that
the false statement is material."  United States v. Bieganowski,
313 F.3d 264, 285 (5th Cir. 2002) (quoting United States v.
McGough, 510 F.2d 598, 602 (5th Cir. 1975)).  See also
United States v. Caldwell, 302 F.3d 399, 409 (5th Cir. 2002) (when
facts alleged in the indictment warrant an inference of
materiality, the indictment is not fatally flawed).

**B.    Analysis**

Counts 12 and 13 are based on statements that Lay made to
Enron employees during an on-line forum held on September 26, 2001,
and during and all-employee meeting telecast on October 23, 2001,
respectively.  These counts charge that

> On or about the dates set forth below, each such
> date constituting a separate count of this Indictment,
> within the Southern District of Texas and elsewhere,
> defendant KENNETH L. LAY, having devised a scheme and
> artifice to defraud Enron, its shareholders and other
> members of the investment public, the SEC, and others,
> including depriving Enron and its shareholders of the
> intangible right of honest services owed by LAY and other
> Enron executives to them, and to obtain money and
> property by means of materially false and fraudulent
> pretenses, representations, and promises, did for the
> purposes of executing such scheme and artifice transmit

and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds as follows:

| Count | Date | Wire Transmission |
|-------|------|-------------------|
| 12. | September 26, 2001 | Enron Online Forum electronic transmission from Houston, Texas, to other states and internationally |
| 13. | October 23, 2001 | All Employee Meeting video teleconference from Houston, Texas, to other states and internationally |

SSI ¶ 99.

1.   <u>Count 12:  September 26, 2001, Enron On-Line Forum</u>

Count 12 charges Lay with wire fraud arising from statements made to Enron employees during an on-line forum held on September 26, 2001.   The statements Lay argues are immaterial appear in ¶¶ 74-75:

> <u>September 26, 2001 Employee On-Line Forum</u>.   On September 26, 2001, LAY held an on-line forum with Enron employees.   LAY stated that "<u>[t]he third quarter is looking great.   We will hit our numbers.   We are continuing to have strong growth in our businesses</u>, <u>and at this time I think we're positioned for a very strong fourth quarter.</u>" He added that "<u>we have record operating and financial results</u>" and that "<u>the balance sheet is strong.</u>"   In fact, as LAY knew, Enron was preparing to announce a significant overall quarterly loss for the first time since 1997, and had committed a $1.2 billion accounting error, among other problems facing the company.   In addition, LAY knew that the balance sheet reflected approximately $7 billion in embedded losses in business units and overvalued investments and that Enron had been exploring such drastic solutions to Enron's financial problems as a merger with another company and the sale of Enron's pipelines.

LAY announced to the employees, "I have strongly encouraged our 16b [management] officers to buy additional Enron stock. Some, including myself, have done so over the last couple of months and others will probably do so in the future. . . My personal belief is that Enron stock is an incredible bargain at current prices." LAY deliberately created the impression with Enron employees that his confidence in Enron's stock was such that he had increased his personal ownership of Enron stock in the past two months. In fact, as LAY knew, during the prior "couple of months," LAY had purchased approximately $4 million in Enron stock but sold $24 million in Enron stock in sales to Enron that were concealed from Enron employees and the rest of the investing public.

SSI ¶¶ 74-75.

### (a)   Third-Quarter Operating Results

Citing <u>Rosenzweig</u>, 332 F.3d at 869, Lay argues that his statements -- that "[t]he third quarter is looking great[, w]e will hit our numbers[, w]e are continuing to have strong growth in our businesses, and at this time I think we're positioned for a very strong fourth quarter" -- are immaterial as a matter of law because they are "generalized statements of optimism that no reasonable investor would view as significant in making an investment decision,"[52] and because they are "qualified by the statements 'at this time' and 'I think,'" which emphasize their uncertain nature.[53] Citing <u>Nathenson</u>, 267 F.3d at 419, Lay argues that his statements -- that "we have record operating and financial results" and that "the balance sheet is strong" -- are immaterial as a matter of law

---

[52]Lay Motion, p. 36.

[53]Lay Motion, p. 37.

because "[r]ather than imparting any factual information to investors, these statements merely express the type of general corporate optimism expected from a CEO."[54]  Asserting that "these statements were made in response to a question about what Enron's employees could do to help increase Enron's stock price,"[55] Lay argues that since "Enron's employees were clearly aware that Enron was facing challenges . . . [that] none of them would have viewed [his] general statements of optimism as material."[56]

Lay's statements about Enron's third-quarter results and the strength of Enron's balance sheet include three implied factual assertions:  (1) that Lay genuinely believed them; (2) that Lay had a reasonable basis for that belief; and (3) that Lay was not aware of any undisclosed facts that tended to seriously undermine the accuracy of his statements.  See Wells Fargo, 12 F.3d at 930; Virginia Bankshares, 111 S.Ct. at 2758-2759.  The truth of these implied factual assertions is contradicted by the Government's allegations that Lay knew Enron was preparing to announce a significant overall quarterly loss for the first time since 1997, that Enron had committed a $1.2 billion accounting error, that Enron's balance sheet contained approximately $7 billion of losses embedded in its business units and overvalued investments, and that

---

[54]Id.

[55]Lay Motion, p. 38.

[56]Id.

Enron had been exploring such drastic solutions to its financial problems as a merger and sale of its pipelines.  (SSI ¶ 74)

Since the Government's allegations are matters of historical fact capable of proof by objective evidence and since proof of the Government's allegations would show not only that Lay's statements were false, but that there was no reasonable basis for them and that when Lay made them he was aware of undisclosed facts that tended to undermine their accuracy, the court is not persuaded that Lay's generally optimistic statements about Enron's third-quarter results and the strength of its balance sheet would have been so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their materiality.

The court is persuaded that the average investor would have found it important to learn that, contrary to Lay's assertions of optimism and strength, Lay knew that Enron was preparing to announce a significant overall quarterly loss for the first time since 1997, that Enron had committed a $1.2 billion accounting error, that Enron's balance sheet contained approximately $7 billion of losses embedded in its business units and overvalued investments, and that Enron had been exploring such drastic solutions to its financial problems as a merger and sale of its pipelines.  Since publication of these alleged facts would tend to undermine an investor's impression that Enron's third-quarter results and balance sheet were strong, a reasonable person could have attached importance to their existence or nonexistence in

determining his choice of action with respect to Enron stock purchases. Lay's decision to address the quality of Enron's third-quarter results and the strength of its balance sheet made these subjects material to reasonable investors and imposed a duty on Lay to speak accurately. See Wells Fargo, 12 F.3d at 930; Shapiro, 964 F.2d at 282. Accordingly, the court is not persuaded that Lay's statements about the strength of Enron's third-quarter results or its balance sheet are immaterial as a matter of law or that they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their materiality. Kapps, 379 F.3d at 216.

(b)   Stock Purchases and Stock Price

Asserting that the Government concedes the truth of his statements that "I have strongly encouraged our 16b [management] officers to buy additional Enron stock[, s]ome, including myself, have done so over the last couple of months and others will probably do so in the future," (SSI ¶ 75) Lay argues that the Government's allegations that his statements "'created the impression with Enron employees that his confidence in Enron stock was such that he had increased his personal ownership of Enron stock in the past two months,"[57] is an immaterial attempt to "bypass the truth of [his] statements and his compliance with SEC

----

[57]Lay Motion, p. 38.

regulations"[58] because he had no duty to disclose his recent stock sales,[59] because the sales were insignificant,[60] and because the purchases were described in vague, non-specific terms.[61]   Citing _Azurix_, 198 F.Supp.2d at 881, Lay argues that his statement, "[m]y personal belief is that Enron stock is an incredible bargain at current prices," is immaterial as a matter of law because "[u]pbeat statements about a stock's future potential are often bandied about by employees and management alike; no reasonable investor treats them as significant."[62]   In support of this argument, Lay asserts that "shortly after [his] statement [about Enron's stock price], an Enron employee expressed a similar opinion:  "I feel the stock is trading lower than it is worth.  Why the disconnect?"[63]

Lay's statements about his stock purchases and his belief that Enron's stock was a "bargain at current prices," include three implied factual assertions:  (1) that Lay genuinely believed them; (2) that Lay had a reasonable basis for that belief; and (3) that Lay was not aware of any undisclosed facts that tended to seriously undermine the accuracy of his statements.  See _Wells Fargo_, 12 F.3d at 930; _Virginia Bankshares_, 111 S.Ct. at 2758-2759.  The truth of

---

[58]_Id._

[59]Lay Motion, pp. 39-40.

[60]Lay Motion, pp. 40-41.

[61]Lay Motion, pp. 41-42.

[62]Lay Motion, p. 43.

[63]_Id._

these implied factual assertions is contradicted by the Government's allegations that Lay knew that during the previous "couple of months" he had purchased approximately $4 million of Enron stock, but had sold $24 million of Enron stock in sales that were concealed from Enron employees and the investing public.  (SSI ¶ 75)

Since the Government's allegations are matters of historical fact capable of proof by objective evidence, and since proof of the Government's allegations would show not only that Lay had not purchased "additional Enron stock," but that Lay was aware of undisclosed facts showing that his personal holdings of Enron stock had decreased instead of increased during the prior "couple of months," the court is not persuaded that Lay's statements about his stock purchases or his belief that Enron stock was a "bargain," were either not misleading or so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their materiality.

The court is persuaded that a reasonable investor would have found it important to learn that, contrary to Lay's assertions that he had purchased "additional Enron stock" "over the last couple of months," Lay knew that his holdings of Enron stock had actually decreased instead of increased during that period.  Since publication of this fact would tend to undermine an investor's impression that Lay believed Enron stock was "an incredible bargain at current prices," a reasonable person could have attached

-63-

importance to the existence or nonexistence of this fact in
determining his choice of action with respect to Enron stock
purchases.  Because determining a choice of action with respect to
Enron stock purchases constitutes a decision capable of being
influenced by Lay's statement, the court is not persuaded that
count 12 insufficiently fails to allege such a decision.  Lay's
decision to address the issue of stock purchase and share price
made these subjects material to reasonable investors and imposed a
duty on Lay to speak accurately.  <u>See</u> <u>Wells Fargo</u>, 12 F.3d at 930;
<u>Shapiro</u>, 964 F.2d at 282.  Accordingly, the court is not persuaded
that Lay's vague statements about his Enron stock purchases or
about his belief that Enron stock was a "bargain" are immaterial as
a matter of law or that they are so obviously unimportant to a
reasonable investor that reasonable minds could not differ on the
question of their materiality.  <u>Kapps</u>, 379 F.3d at 216.

       2.  <u>Count 13: October 23, 2001, Enron All Employees Meeting</u>

Count 13 charges Lay with wire fraud arising from statements
made to Enron employees during an all-employee meeting telecast on
October 23, 2001.  The statements that Lay argues are immaterial
appear in ¶ 84:

> <u>October 23, 2001 All Employees Meeting</u>.  Shortly
> after the October 23 analyst call, LAY attended another
> all employee meeting, with live webcast and video
> teleconference communication to Enron's 28,000 employees.
> LAY stated <u>"[o]ur liquidity is fine.  As a matter of</u>
> <u>fact, it's better than fine, its strong. . ."</u>  In fact,
> LAY knew that in order to maintain liquidity, Enron had
> been forced to take the unusual step of offering its
> pipelines as collateral to obtain a needed $1 billion

> bank loan.  LAY knew that Enron had failed to complete a
> $1 billion bond deal planned for execution since July,
> 2001.  LAY also knew that the only readily available
> source of liquidity was the $3 billion corporate line of
> credit, which, if drawn, would signal the dire straits of
> Enron's finances.  Indeed, three days later, LAY
> authorized the withdrawal of the entire $3 billion from
> the line of credit.

(SSI ¶ 84)  Lay argues that his statements that -- "[o]ur liquidity

is fine.  As a matter of fact, it's better than fine, its strong"

-- are immaterial as a matter of law because they are "immaterial

corporate cheerleading that could mean virtually anything."[64]  Lay

also argues that no reasonable investor could have interpreted

these statements as an indication of anything other than optimism

of a CEO because he qualified them with warnings that Enron's

future was uncertain:  "These are very turbulent and very tough

times, and I expect we still have quite a bit more to come."[65]

Lay's assertions that Enron's liquidity was "fine," and

"better than fine . . . strong," include three implied factual

assertions:  (1) that Lay genuinely believed these statements;

(2) that Lay had a reasonable basis for that belief; and (3) that

Lay was not aware of any undisclosed facts that tended to seriously

undermine the accuracy of his statements.  See Wells Fargo, 12 F.3d

at 930; Virginia Bankshares, 111 S.Ct. at 2758-2759.  The truth of

these implied factual assertions is contradicted by the

Government's allegations that Lay made these statements knowing

---

[64]Lay Motion, p. 43.

[65]Id.

that Enron had offered its pipelines as collateral to obtain a needed $1 billion bank loan, that Enron had failed to complete a $1 billion bond deal planned for execution in July of 2001, and that the only readily available source of liquidity was the $3 billion corporate line of credit, which, if drawn, would signal the dire straits of Enron's finances.  (SSI ¶ 84)

Since the Government's allegations are matters of historical fact capable of proof by objective evidence, and since proof of the Government's allegations would show not only that Lay's description of Enron's liquidity lacked a reasonable basis, but that Lay was aware of undisclosed facts that tended to undermine their accuracy, the court is not persuaded that Lay's vague, conclusory statements about Enron's liquidity were so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their materiality.

The court is persuaded that a reasonable investor would have considered it important to learn that, contrary to Lay's assertions that Enron's liquidity was "fine" and "better than fine," Enron was scrambling to secure access to liquid assets by collateralizing its pipelines, discussing merger with a rival, and drawing down its last line of corporate credit.  Since publication of these alleged facts would tend to undermine an investor's impression that Lay believed his assertions that Enron's liquidity was "fine," a reasonable person could have attached importance to the existence or nonexistence of these facts in determining his choice of action

with respect to Enron stock purchases. Because determining a choice of action with respect to Enron stock purchases constitutes a decision capable of being influenced by Lay's statement, the court is not persuaded that count 13 insufficiently fails to allege such a decision. Lay's decision to address the issue of Enron's liquidity made this subject material to reasonable investors and imposed a duty on Lay to speak accurately. See Virginia Bankshares, 111 S.Ct. at 2761; Shapiro, 964 F.2d at 282; Wells Fargo, 12 F.3d at 930. Accordingly, the court is not persuaded that "the case for materiality [is] so weak that no reasonable juror could credit it," Gaudin, 115 S.Ct. at 2317, or that count 13 should be dismissed because Lay's statements about Enron's liquidity are immaterial as a matter of law.

## V.  Conclusions and Order

For the reasons explained above, the court is not persuaded that the statements underlying violations of the wire fraud statute alleged against Kenneth L. Lay in counts 12 and 13 of the SSI, or violations of the laws governing securities fraud alleged against the defendants named in counts 23, 24, 26, and 27 through 30 are immaterial as a matter of law or that any of these counts should be dismissed for reason of immateriality. Nor is the court persuaded that the statements challenged by Jeffrey K. Skilling as prejudicial surplusage should be stricken. Accordingly, Defendant Kenneth L. Lay's Motion to Dismiss the Securities Fraud and Wire Fraud Counts of the Second Superseding Indictment [Defense Motion

No. 2] (Docket Entry No. 386) is **DENIED**, and Defendant Jeffery K. Skilling's Motion to Dismiss Counts 23, 24, 26, and to Strike Various Allegations as Prejudicial Surplusage [Defense Motion No. 4] (Docket Entry No. 394) is **DENIED.**[66]

 **SIGNED** at Houston, Texas, on this 17th day of October, 2005.

_Sim Lake_
SIM LAKE
UNITED STATES DISTRICT JUDGE

---

[66]The court has allowed the parties extraordinary leeway in submitting lengthy briefs and other written materials in connection with the pending motions. As the length of this Memorandum Opinion and Order indicates, the court has expended considerable time reading these papers and performing a significant amount of independent research to be as fully informed as possible when addressing the parties' arguments. While, because of the sheer volume of information presented, it is not impossible that some arguments were overlooked, the parties should assume that failure to expressly address a particular argument in this Memorandum Opinion and Order reflects the court's judgment that the argument lacked sufficient merit to warrant discussion. Accordingly, the court strongly discourages the parties from seeking reconsideration based on arguments they have previously raised or that they could have raised.