UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION



**ORIGINAL**

United States Courts
Southern District of Texas
FILED

JAN - 4 2006

Michael N. Milby, Clerk of Court

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) |
| JEFFREY K. SKILLING, and KENNETH L. LAY, | ) |
| Defendants. | ) |

Crim. No. H-04-25 (Lake, J.)

## DEFENDANTS' RENEWED MOTION FOR CHANGE OF VENUE AND RELATED RELIEF

Venue must be transferred. Prejudicial pre-trial publicity continues to flood this venue, as witnessed by the rage of adverse publicity surrounding Richard Causey's recent guilty plea. The coverage of this event in Houston was far more intense than in any of the alternative venues defendants have previously proposed. This unending mass of publicity has saturated Houston for four years and produced a profound, tangible, and undeniable effect, unlike any other venue in this country. There is no better evidence of this than the answers of prospective jurors in response to the Court's jury questionnaire. They show overwhelming bias against defendants and leave no room for doubt that defendants cannot receive a fair trial in Houston.

If the Court again denies a change of venue, defendants request, pursuant to the Court's Local Rules and Free Press and Fair Trial Guidelines and *Sheppard v. Maxwell*, 384 U.S. 333, 362-63 (1966), a continuance of the trial of not less than 30 days. This continuance is necessary for two reasons. First, it will allow for a meaningful "cooling off" period following the highly publicized guilty plea Causey entered last week. Second, it will enable the Court to submit a revised jury questionnaire to a new panel of prospective jurors. This is essential. Of the 280 questionnaires the parties received from the Court, an astounding 80% exhibited strong biases

against defendants. Furthermore, a new questionnaire would omit all references to Causey, who was prominently identified and associated with defendants in the existing questionnaire.[1]

Finally, defendants require and request the right to conduct sequestered voir dire of individual prospective jurors. Given the serious and systematic bias against defendants, a fair jury cannot be empanelled absent the right to question jurors individually.

The grounds for this motion are set forth in the accompanying memorandum. A proposed order is submitted herewith. Pursuant to Local Rule 12.2, counsel for defendants have met and conferred with the Enron Task Force, and it opposes the relief we seek.

Dated: January 4, 2006

Respectfully submitted,

By:_____

Of Counsel:

Ronald G. Woods
Texas State Bar No. 21964000
Federal Bar No. 657
5300 Memorial, Suite 1000
Houston, TX 77007
Office: 713-862-9600
Facsimile: 713-864-8738

Daniel M. Petrocelli
M. Randall Oppenheimer
Mark Holscher
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
Office: (310) 553-6700
Facsimile: (310) 246-6779
*Attorneys in Charge for Jeffrey K. Skilling*

---

[1] After completing and returning their questionnaires, prospective jurors undoubtedly realized they were being summoned to serve as a juror in this case and paid close attention to all Enron-related media, particularly the coverage of the Causey plea, if they were not already doing so. Nothing in the questionnaire admonished them not to follow or discuss this case. Indeed, as one prospective juror wrote: "I am a curious person, & will now be reading about the case & the defendants." Juror Questionnaire 294 (Question 73).

By: _____

Michael Ramsey
Chip Lewis
River Oaks/Welch Building
2120 Welch
Houston, TX 77019
Office: (713) 227-0275
Facsimile:  (713) 523-7887
*Attorneys in Charge for Kenneth L. Lay*

## TABLE OF CONTENTS

Page

I.      The Court's Rulings on Venue and Jury Selection Must Be Reconsidered. ...................... 1

II.     Venue Should Be Transferred ........................................................................................ 3

        A.      Recent Adverse Publicity ................................................................................... 4

        B.      The Causey Plea ................................................................................................ 5

        C.      Jury Questionnaire Responses ......................................................................... 10

                1.      Evidence of the Jurors' Attitudes, Opinions, Biases ............................... 10

                2.      Evidence of the Jurors' Connections to Enron and Its Bankruptcy ......... 16

                3.      Evidence of Jurors' Feelings of Betrayal, Shame, Embarrassment ......... 19

        D.      Latent Jury Dangers ........................................................................................ 20

        E.      The Logic of Transferring Venue ..................................................................... 22

III.    Voir Dire Should Be Individualized .............................................................................. 25

        A.      The Legal Standard ......................................................................................... 26

        B.      The Need for More Individualized Voir Dire ................................................... 27

        C.      Defendants' Proposed Procedure .................................................................... 31

IV.     At the Very Minimum, a Short Continuance Should Be Granted and New
        Questionnaires Should Be Sent to a New Round of Prospective Jurors ......................... 32

V.      Conclusion ................................................................................................................... 34

# TABLE OF AUTHORITIES

**Page**

## CASES

*Coleman v. Kemp,*
  778 F.2d 1487 (11th Cir. 1985) ................................................................. 10, 30

*Gentile v. State Bar of Nevada,*
  501 U.S. 1030 (1991) ................................................................................. 24

*Gladhill v. General Motors Corp.,*
  743 F.2d 1049 (4th Cir. 1984) ................................................................... 22

*In the Matter of Sullivan,*
  185 A.D.2d 440 (N.Y. App. Div. 1992) ...................................................... 23

*Irvin v. Dowd,*
  366 U.S. 717 (1961) ............................................................................. 27, 30

*Isaacs v. Kemp,*
  778 F.2d 1482 (11th Cir. 1985) ................................................................. 30

*Morgan v. Illinois,*
  504 U.S. 719 (1992) ................................................................................. 26

*Morvant v. Constr. Aggregates Corp.,*
  570 F.2d 626 (6th Cir. 1978) ..................................................................... 30

*Mu'Min v. Virginia,*
  500 U.S. 415 (1991) ................................................................................. 26

*People v. Boss,*
  261 A.D.2d 1 (N.Y. App. Div. 1999) .......................................................... 22

*Rideau v. Louisiana,*
  373 U.S. 723 (1963) ................................................................................... 4

*Salemme v. Ristaino,*
  587 F.2d 81 (1st Cir. 1978) ....................................................................... 26

*Sheppard v. Maxwell,*
  384 U.S. 333 (1966) ............................................................................. 23, 32

*Silverthorne v. United States,*
  400 F.2d 627 (9th Cir. 1968) ..................................................................... 30

*Smith v. Phillips,*
  455 U.S. 209 (1982) ................................................................................. 23

*United States v. Beckner,*
  69 F.3d 1290 (5th Cir. 1995) ................................................................. 26, 31

*United States v. Borchardt,*
  698 F.2d 697 (5th Cir. 1983) ...................................................................... 6

*United States v. Brown,*
  218 F.3d 415 (5th Cir. 2000) ................................................................. 21, 23

# TABLE OF AUTHORITIES
(continued)

Page

*United States v. Carmichael,*
    326 F.Supp.2d 1267 (M.D. Ala. 2004) .................................................. 23

*United States v. Chagra,*
    669 F.2d 241 (5th Cir. 1982) ............................................................ 26

*United States v. Colabella,*
    448 F.2d 1299 (2d Cir. 1971)........................................................ 27, 28

*United States v. Davis,*
    583 F.2d 190 (5th Cir. 1978) ..................................................... *passim*

*United States v. Engleman,*
    489 F. Supp. 48 (E.D. Mo. 1980)..................................................... 10

*United States v. Fleetwood,*
    528 F.2d 528 (5th Cir. 1976) ............................................................ 6

*United States v. Gullo,*
    502 F.2d 759 (3d Cir. 1974)............................................................. 6

*United States v. Harrell,*
    436 F.2d 606 (5th Cir. 1970) ............................................................ 6

*United States v. Hawkins,*
    658 F.2d 279 (5th Cir. 1981) ...................................................... 26, 31

*United States v. Holman,*
    680 F.2d 1340 (11th Cir. 1982) ....................................................... 26

*United States v. Leach,*
    918 F.2d 464 (5th Cir. 1990) ............................................................ 6

*United States v. Marcello,*
    280 F. Supp. 510 (E.D. La. 1968)..................................................... 23

*United States v. McVeigh,*
    918 F. Supp. 1467 (W.D. Okla. 1996) ............................................... 20

*United States v. Oscar Bear Runner,*
    502 F.2d 908 (8th Cir. 1974) ..................................................... 29, 30

*United States v. Peters,*
    754 F.2d 753 (7th Cir. 1985) ........................................................... 33

*United States v. Schrimsher,*
    493 F.2d 848 (5th Cir. 1974) ........................................................... 27

*United States v. Tokars,*
    839 F. Supp. 1578 (N.D. Ga. 1993) .................................................. 20

*United States v. Valuck,*
    286 F.3d 221 (5th Cir. 2002) ............................................................ 6

# TABLE OF AUTHORITIES
(continued)

Page

## OTHER AUTHORITIES

ABA STANDARDS RELATING TO FAIR TRIAL AND FREE PRESS, § 3.4(a) (Approved Draft, 1968)......................................................................................................... 25, 28

Edward R. Shohat & Pamela I. Perry, *International Drug Cartels*, 40 AM. U. L. REV. 849 (1991) ........................................................................................................ 29

Note, *Judges' Nonverbal Behavior in Jury Trials: A Threat to Judicial Impartiality*, 61 VA. L. REV. 1266 (1975)........................................................... 28, 31

R.M. Arkin et al., *Social Anxiety, Self-Presentation and the Self-Serving Bias and Causal Attribution*, 38 J. PERSONALITY & SOC. PSYCHOLOGY 23, 25 (1983)........................ 28

## RULES

ABA MODEL RULE 3.6(a) (2004)............................................................................ 23

ABA MODEL RULE 3.6(c) (2004)............................................................................ 24

FED. R. CRIM P. 24(a) ........................................................................................... 26

Local Rules for the United States District Court for the Southern District of Texas ("Local Rule") 23.1 (adopting the "Free Press-Fair Trial Guidelines," 87 F.R.D. 519, 533 (1980)).................................................................................. *passim*

Local Rule Appendix A Rule 1.A.............................................................................. 24

TEXAS DISCIPLINARY RULES OF CONDUCT 3.07 cmt. 3 (2005) ..................................... 24

CC1:729774.1

## I.      The Court's Rulings on Venue and Jury Selection Must Be Reconsidered.

Earlier this year, the Court denied defendants' motion for a venue change.  We believe

the motion should have been granted at that time; subsequent events have now underscored the

need for a change venue for this trial.  As recent events have reaffirmed, Houston stands alone in

the nature, extent, and intensity of its interest in this case.  Unlike any place else in this country,

the Houston community feels uniquely betrayed and ashamed by the demise of Enron.  The

passage of four years has done little to quiet community anger and disappointment.  These

feelings are deeply and personally shared by millions of people in this community.  Richard

Causey's recent guilty plea—entered on the eve of trial and widely described in the local media

as a major setback to Lay and Skilling—has only fueled the community's anger toward

defendants and its unflagging conviction that these two men are guilty.

All this animosity now centers on this case and its two remaining defendants—Jeffrey

Skilling and Kenneth Lay.  The Court need look no further than the juror questionnaires to

appreciate the depth of this problem.  The questionnaires returned by the 283 prospective jurors

who currently comprise the venire reveal a staggering 80% with strongly biased views and

attitudes against defendants, evincing prejudgment and predispositions of guilt that cannot be

altered easily—or at all.[2]  Close to one quarter of the prospective jurors with such opinions

openly admitted they cannot be impartial.  Another one quarter said they were unsure if they

could be fair notwithstanding the Court's lengthy instructions set out in the questionnaire.

Although the remaining half or so professes they can remain fair, most of them gave answers

decidedly negative to defendants.  While these individuals may genuinely believe they can set

---

[2] Approximately 100 out of 400 prospective jurors were excused by the Court on hardship grounds.  The questionnaires for these individuals have not been provided to the parties.  To more completely evaluate the data underlying this motion and establish a full record, defendants requested the opportunity to review these questionnaires.  *See* Defs.' Mot. For Access To Jury Questionnaires That Have Been Excluded On Hardship Grounds (filed Dec. 22, 2005).  Recently, the Court said we could examine the questionnaires *in camera*.  We reserve the right to supplement these papers after conducting that review.

aside these biases, defendants cannot and must not be saddled with that risk. Defendants constitutionally are entitled to a trial by jurors who fully presume they stand innocent until proven guilty.

Against this backdrop, the Court has ruled the trial will proceed here in Houston; the Court will conduct voir dire; attorneys can briefly question individual jurors at the bench; and jury selection will be completed in one day. With all respect to the Court, these rulings do not serve the interests of justice and threaten to deny defendants any possibility of a fair trial. We ask the Court to reconsider each of them:

1. As to venue, we demonstrated that a number of alternative venues exist, including Phoenix, Denver, and Atlanta, that do not remotely harbor the extent or intensity of prejudice against defendants exhibited here. We request this case be transferred to one of these venues.

2. As to voir dire, we request that counsel for the parties be allowed to question the panel. According to the Court's rules and procedures published on its website, counsel are normally afforded the opportunity to address the panel.[3] The Court afforded that opportunity to counsel in the recent *Olis* case. There is no reason to deny that same opportunity here.

3. As to questions of individual jurors, we urge the Court to give counsel a full and fair opportunity to examine prospective jurors on their exposure to pretrial publicity and other sources of prejudice. This cannot be done for just a select few individuals; *it must be done for all prospective jurors*, as close to 90% of them admit they have been exposed to publicity about Enron, 80% have expressed views adverse to defendants, close to two-thirds say they have an opinion about the company's collapse, close to half say they are angry about what happened at Enron, and close to half answered yes to one or more of the following questions: did you or your

---

[3] *See* http://www.txs.uscourts.gov/judges/sl/sl.pdf (Court's Procedures: "Voir Dire: The court will conduct a preliminary examination of the jury panel. Following the court's examination, the court will normally allow each side to briefly examine the panel.").

friends or family members work at Enron, do business with Enron, own Enron stock, or lose their job or money as a result of Enron's bankruptcy?

We submit that the process of questioning jurors should not be confined to one attorney for each defendant, standing at the bench with the prospective juror. We believe that a process whereby each person is questioned while comfortably sitting in the jury box on the witness stand in a sequestered courtroom, or at the table in the jury room offers, a more meaningful opportunity to obtain information. It also allows defendants to clearly observe and confer with their counsel; it enables their various counsel and jury consultants to provide input; and it gives individuals a more appropriate setting to answer questions less hurriedly and more completely.

4. As to the duration of jury selection, we do not believe it should be limited to one day. While we are mindful of the Court's desire to avoid inefficiency and delay, jury selection is perhaps the most important part of this trial. Given what is at stake, we do not think it unreasonable if it requires more than one day.

Finally, we request a 30-day continuance from the current January 30, 2005 trial date to help abate the adverse effects of recent publicity. The Local Rules and Supreme Court precedent counsel that such a continuance is wise. This brief continuance would also allow time for the submission of new jury questionnaires removing all references to Causey. It would also allow the parties, working with the Court, to streamline the trial in light of Causey's absence from the case.

## II.   Venue Should Be Transferred.

Defendants' venue motion presented extensive evidence showing that prejudice against defendants has pervaded this venue since Enron's bankruptcy in late 2001.[4] Over the past four years, defendants persistently have been demonized by the press, public, politicians, and

---

[4] Defendants' venue motion brief ("Mot.") and reply brief ("Reply") are attached as Exhibits 1 and 2. All of defendants' other venue-related pleadings are attached as Exhibit 3.

3

prosecutors. They have been called "crooks," "thieves," "snakes," and "economic terrorists," likened to Al Qaeda, Hitler, and Satan, and blamed for the devastating economic effects of Enron's collapse.[5] The scorn directed towards defendants has fueled a desire for vengeance, manifested in biased news coverage, inflammatory letters to the editor, and hostile responses to public opinion polls.[6] Defendants' claims of innocence have been dismissed as "b.s.," a "smoke screen," and "fantasy world," while the government's allegations are accepted as truth.[7] In short, Skilling and Lay were pronounced guilty in Houston years before this case began.[8]

### A.    Recent Adverse Publicity

Since defendants' venue motion was denied, the public attention and animus directed toward defendants have only intensified.[9] Appendix A to this brief collects just a small sampling of prejudicial news stories, editorials, and other media. As the Court can see, these reports have consistently attacked defendants in one-sided, intemperate ways and condemned them as guilty and deserving of harsh punishment for the sake of Enron's "victims." As most directly stated by a *Chronicle* columnist, the sentiments of this venue can best be expressed as follows: "*the Enron prosecution has had one true measure of success: Lay and Skilling in a cold steel cage.*"[10]

The Task Force has urged that venue may only be transferred where the precise facts of cases like *Rideau v. Louisiana*, 373 U.S. 723 (1963), are present (small town, violent murder, confession broadcasted repeatedly and to almost the entire venire). But 40 years of case law

---

[5] Mot. at 2-4, 14-38; *United States v. Causey et al.*, Order (Jan. 19, 2005) (order denying defendants' venue motion) ("Order") at 11.

[6] *See* Mot. at 2-4, 14-25.

[7] *See id.*

[8] Indeed, even the Court's order denying a venue transfer recognized the "evidence showing dramatic differences, both qualitatively and quantitatively, between news coverage of Enron's collapse and [Lay and Skilling] by news outlets in Houston and comparable news outlets in [other cities]." Order at 10, 14.

[9] *See generally* Def. Jeffrey Skilling's Joinder In Support Of Kenneth L. Lay's Reply Re: Scheduling Of Banking Counts (filed Apr. 18, 2005) (collecting and discussing sampling of recent negative publicity); Defs.' Joint Statement In Support Of Their Proposed Jury Questionnaire (filed Sept. 27, 2005) (same).

[10] Ex. 4 (*Task force needs to refocus after wishy-washy verdict*, HOUSTON CHRON., July 21, 2005).

4

since *Rideau*, discussed and examined at length in our prior motion, show that when a community is so focused on punishing certain defendants—no matter how big or small the community or whatever the nature of the alleged crimes—venue must be transferred.

**B.     The Causey Plea**

Of course the most damning piece of recent adverse publicity resulted from Rick Causey's guilty plea last week and the ensuing media maelstrom.  Starting the day before Christmas, continuing through the taking of his plea on December 28, Causey's guilty plea has been front-page news and leading television, radio, and internet news throughout Houston.[11] Coming only a few weeks after prospective jurors sat down in their homes and filled out detailed questionnaires about their knowledge, views, and opinions of Causey, Skilling, Lay, and only a few weeks before the jury was to be empanelled in this case, the effects of the Causey plea are severe.  Causey was identified with Skilling and Lay as one of three defendants to stand trial. Prospective jurors were asked to answer several questions referencing Causey by name—each of which grouped him with defendants Skilling and Lay, and each of which associates Causey to Skilling and Lay in the minds of prospective jurors.

We can expect that many prospective jurors who knew and had opinions about Causey when they filled out their questionnaire, or who learned that he worked with defendants when filling it out, have read or heard about Causey's plea.  The coverage of the plea has been persistent during the holiday period when more people are at home reading the newspaper, talking to friends and family, and watching television.  Prospective jurors who spent several hours last month filling out the jury questionnaire, realizing that they have been summoned as potential jurors in this case, understandably would have paid keener attention to the news of Causey's plea.  Given that the Court has not yet to had the opportunity to instruct jurors not to

---

[11] *See, e.g.*, Ex. 5.

follow this case in the news, the likelihood that potential jurors were exposed to Causey's plea is especially high.[12]

All such jurors can be expected to draw the inference—forbidden by law, but common for laypersons—that because Causey pled guilty, his former co-defendants, Skilling and Lay, must also be guilty. *See, e.g., United States v. Leach*, 918 F.2d 464, 467 (5th Cir. 1990); *United States v. Fleetwood*, 528 F.2d 528, 532 (5th Cir. 1976). Given the time between jurors hearing the news of the Causey plea and the start of voir dire and trial, a pretrial jury instruction cannot cure the prejudice. *See, e.g., United States v. Valuck*, 286 F.3d 221, 228 (5th Cir. 2002); *United States v. Borchardt*, 698 F.2d 697, 701 (5th Cir. 1983) (jury must be given a "clear and strong cautionary instruction" when exposed to a co-defendants' plea); *United States v. Harrell*, 436 F.2d 606, 614 (5th Cir. 1970) (reversing conviction where "[n]othing was said to dispel the predictably certain reasoning a juror could be expected to indulge in: if Norris, *as admitted*, was guilty of conspiring with Harrell, how then could Harrell be other than guilty of conspiring with Norris?"). Such an instruction may only serve to remind jurors of Causey's plea and its importance. *See, e.g., United States v. Gullo*, 502 F.2d 759, 762 (3d Cir. 1974) (instruction inadequate to cure prejudice because given 24 hours after the plea injected into proceeding; if anything, delayed instruction reminded the jurors of plea and called attention to its significance).

Finally, if there were any doubt in prospective jurors' minds about how to interpret Causey's plea, the *Chronicle* and other local media sources have erased it. Uniformly, in front page and leading stories, the media have reported that Causey will be the Task Force's "star" witness; opined his plea will damage Lay and Skilling; quoted "legal experts," describing the

---

[12] *See* Ex. 6 (*Plea Deal is Seen for Enron Figure*, N.Y. TIMES (Dec. 28, 2005) ("Hundreds of Houston residents have been notified by mail that they are in the pool of potential jurors for the Enron case, with questions that make it clear that Mr. Causey is a defendant. *His change of plea would not only provide jurors with information they might otherwise not have had, but would also expose them to a renewed onslaught of publicity at a time when they have not been admonished by the court to avoid media reports about the case.*") (emphasis added).

plea as "a legal blow to co-defendants Ken Lay and Jeffrey Skilling"; and, in the case of the

*Chronicle*, running multiple stories on the same day about the Causey plea, in large, bold

headlines reading, "Plea: Causey may give 'roadmap to conviction,'" and with full-page charts

and graphics purporting to lay out the Enron conspiracy, how Lay and Skilling were at the top of

it, and how Causey and 21 of Lay's and Skilling's other subordinates at Enron have pled guilty

to, been convicted of, or are still charged with crimes.[13]   Indeed the day after the plea, the

*Chronicle* ran the following editorial:

> Former Enron chief accounting officer Richard Causey's guilty plea and
> agreement to aid prosecutors throws a wrench into Lay's defense theme. According
> to Lay, the collapse of Enron was due to the criminal activities of a cabal headed by
> chief financial officer Andy Fastow, followed by a subsequent crusade by an
> overzealous Justice Department task force.  Causey's admission of security fraud in
> exchange for a sentence of five to seven years in prison makes him the 16th Enron
> executive to admit guilt.  It also makes less plausible Lay's claim that most of the

---

[13] Ex. 7 (*Sources: Enron's Causey reaches deal with feds*, KHOU 11 NEWS (Dec. 27, 2005)); Ex. 47 (*Causey's plea wreaks havoc for Lay, Skilling*, HOUSTON CHRON. (Dec. 29, 2005) (front page story: "After Enron's former top accountant entered a guilty plea Wednesday, Ken Lay and Jeff Skilling were granted an extra two weeks to prepare for trial, but legal analysts suggested more time may not be enough to offset the potential damage.  'It's a serious blow to the defense,' said Kendall Coffey, a former U.S. attorney in Miami.")); *see also, e.g.*, Ex. 8 (*Causey will plead guilty, leaving just Skilling: Lay Enron's former chief accountant is now likely to be the government's new star witness*, HOUSTON CHRON. (Dec. 28, 2005) ("Losing an ally of Causey's stature so close to trial could throw off Lay and Skilling's defense and leave them scrambling to prepare for his likely testimony.")); Ex. 9 (*Top Story—Plea's Impact: Richard Causey's departure from ex-leaders throws them a curveball*, KHOU 11 NEWS (Dec. 28, 2005)); Ex. 10 (*Today's Top News—Richard Causey will testify against Lay, Skilling*, KTRK ABC 13 (Dec. 28, 2005); Ex. 11 (*Top Stories—Report: Ex-Enron Accountant To Plead Guilty*, AM740 KTRH NEWS RADIO (Dec. 28, 2005) ("A prime defendant in the Enron Corp. criminal trial has reportedly struck a plea deal with prosecutors, potentially bolstering the case against Kenneth Lay and Jeffrey Skilling.")); Ex. 12 (*Causey's guilty plea could shake up Enron case*, HOUSTON CHRON. (Dec. 27, 2005) ("Prosecutors are expected to gain valuable ammunition in their case against Enron's former top two officials when ex-chief accounting officer Richard Causey enters a guilty plea Wednesday afternoon. . . . . [The] plea deal will likely make him the government's new star witness.")); Ex. 13 (*Causey expected to plead guilty*, HOUSTON CHRON. (Dec. 27, 2005) ("An agreement from Causey to work with the government would undermine the remaining defendants' cases")); Ex. 14 (*Ex-Enron exec again talking deal: A Causey plea could damage his co-defendants, Lay and Skilling*, HOUSTON CHRON. (Dec. 24, 2005) ("Causey's cooperation with the government, if a plea bargain is reached, could be damaging to co-defendants Ken Lay and Jeff Skilling")); Ex. 15 (*Richard Causey won't stand trial with Ken Lay and Jeff Skilling*, KTRK ABC 13 (Dec. 28, 2005) ("Causey could be more damaging to Lay and Skilling than [Fastow]")); Ex. 16 (*Former Enron Accountant Strikes Plea Deal*, AM740 KTRH NEWS RADIO (Dec. 27, 2005) (reporting on story on air and directing visitors to its website to an AP story about Causey's plea)).  All of these newspaper, radio, and television stories—and many, many more like them—have been repeated scores of times in Houston and are accessible on these news outlets' websites.

guilty pleas were the result of prosecutorial pressure rather than actual wrongdoing.

His defection leaves Lay and former Enron CEO Jeff Skilling alone in the dock and provides the government with a new star witness. Causey lacks the heavy criminal baggage carried by Fastow, who admitted to reaping multimillion-dollar profits from illegitimate partnerships. With his daily interactions with Lay and Skilling as Enron spiraled from giddy success to financial crisis to bankruptcy, Causey is also in a better position to document the defendants' role in the company's failure.

In their book "Power Failure," Enron whistleblower Sherron Watkins and writer Mimi Swartz described Causey as a corporate "Pillsbury dough boy," a yes man who liked to go along and get along. Unlike Enron's globe-trotting high rollers, Causey was a guy "whose idea of excitement was a trip to Austin for a University of Texas football game." Such a figure could make for a more sympathetic witness than other executives who emerged from the corporate rubble with their fortunes intact.

Lawyer David Berg was one of the first Houstonians to publicly question Enron's financial stability when its subsidiary, Azurix, bid for a municipal waterworks contract. Berg expects Causey's plea bargain to present a range of problems for Lay and Skilling. "It undermines the defense of the case by putting a believable linchpin between Fastow and the defendants," Berg said. . . .

If Lay's pre-trial strategy was to try to stir the pot of public opinion with speeches and interviews urging former employees to tell all, Causey's defection should cause him to think twice about that tactic. The latest twist in the case suggests that when it finally emerges in court, the truth about Enron might not be Lay's friend.[14]

Reports in other locales have been far less sensational, more balanced and nuanced, and generally minimal.[15] The home page of the *Denver Post* website, for example, had no stories

---

[14] *See* Ex. 19 (*Enron end game*, HOUSTON CHRON. (Dec. 29, 2005)).

[15] *See, e.g.*, Ex. 17 (*Enron Executive Agrees to Plea Deal: Prosecutors Gain Witness Against Lay and Skilling*, WASHINGTON POST (Dec. 28, 2005) ("For friends of Causey, including his next-door neighbor Steve Huey, word of the advanced plea negotiations is bittersweet. They say Causey is devoted to his three children, the youngest of whom is in eighth grade, and is a devout Catholic who helped raise funds for a new church in the Woodlands, an upscale suburb of Houston. 'I don't think Rick has ever believed he did anything wrong,' said Huey, who shared a Christmas Eve dinner with Causey and his wife, Elizabeth. 'I think that Rick's concern is over the family and what the eventual outcome will be for the family. As you get closer to trial, you start to weigh the options and weigh the odds and the resources the federal government has.'")); Ex. 52 (*Enron on Trial: Causey and Effect*, BUSINESS WEEK ONLINE (Dec. 29, 2005) ("Causey's defection would certainly seem a win for the government -- except, perhaps, for the pain that was in his face when he left the courtroom. If jurors interpret that anguish as the result of prosecutorial coercion, then his testimony might turn out to be a boon for the defense."); Ex. 53 (*In Enron Case, a Guilty Plea but No Certainties*, N.Y. TIMES (Dec. 29, 2005) ("At a top-level Enron management meeting in September 2001, a red-faced Richard A. Causey, the chief accounting officer, pounded the table after hearing his colleagues label the company's accounting practices as 'aggressive.' According to executives in the room, Mr. Causey fumed that he considered such criticism a personal affront, adding that he would stake his career on the propriety of Enron's accounting. . . . Creating part of the uncertainty [about Causey's value as a Task Force witness] is the limited nature of the admissions made

about the Causey plea on the day after it was entered; one has to go to the "more business headlines" page to see a one-line headline ("Ex-Enron exec strikes plea deal") buried below the five main business headlines and among a long list of over 30 business-related wire stories to find a link to the Causey plea story.[16] The *Atlanta Journal-Constitutional* homepage includes the Causey story, but it is buried at the bottom of the page as the third story in the business section.[17] The *Arizona Republic* on-line print edition (the main newspaper in Phoenix) includes the Causey plea story as the fourth leading story.[18] The *Houston Chronicle* homepage, in stark contrast, leads with the Causey plea story; has pictures of Causey and his wife leaving court; includes links to several stories about Causey, the Causey plea, Causey's *Chronicle* biography; has links to the Chronicle's special Enron website ("The Fall of Enron"), audio and video clips, and an on-line forum for readers to post their views on, "What will this mean for Lay and Skilling?"; and a Readers' Poll entitled: "What impact will Causey's guilty plea have on the Enron case?"—with the possible answers: "Can you say Club Fed?," "Should help get convictions against Skilling, Lay," "Might help defendants challenge his credibility," "Will have no impact. They're innocent!," and "Why ask me? I'm no lawyer!" The current vote: 70% of 3,835 readers voted for "Can you say Club Fed?" or "Should help get convictions against Skilling, Lay."[19]

The type of publicity that has engulfed Houston—and the almost sport-like manner in which this case is covered—are well-recognized grounds for transferring venue, especially in a case such as this one, where hostile publicity has infected the venire for several years. *See, e.g.*,

---

by Mr. Causey in an affidavit filed as a result of his plea agreement. . . . They do not involve some of the broader accounting allegations related to off-books entities, with esoteric names like the Raptors and LJM2. . . . They make no reference to secret handshake deals . . . . Rather, the crimes admitted to by Mr. Causey involve one-time deals that, while significant in their effect on Enron's finances, do not lock him into the prosecution's portrait of the company's senior management as being engaged in a nearly continuous conspiracy to defraud investors . . . .")).

[16] *See* Ex. 48.

[17] *See* Ex. 49.

[18] *See* Ex. 50.

[19] *See* Ex. 51.

*Coleman v. Kemp*, 778 F.2d 1487, 1532-33, 1538 (11th Cir. 1985) (Coleman's conviction reversed; multiple defendants tried in successive proceedings, Coleman's trial occurring last; testimony adduced in prior trial and guilty conviction of Coleman's alleged co-conspirator heavily reported by media; coverage, in part, responsible for biasing jury pool); *United States v. Engleman*, 489 F. Supp. 48, 51-52 (E.D. Mo. 1980) (venue transferred from St. Louis where co-defendant admitted guilt prior to defendants' trial, and media reported on guilty plea and how it could impact defendant's case; "[t]he danger [of undue prejudice] is especially acute when reporting extends to such matters as . . . speculation as to testimony or other matters to be introduced at the trial").

### C.   Jury Questionnaire Responses

The most powerful evidence of the need for a change of venue comes from prospective jurors themselves, as reflected in their responses to the Court's jury questionnaire. These responses, prepared and returned *before* Causey pled and before the recent plea and ensuing news bonanza, confirm that this venue, as personified by the current jury pool—in overwhelming numbers and with unmatched intensity—is irreparably prejudiced against Skilling and Lay. Many of these jurors will likely be stricken for cause, but the stunningly negative opinions of jurors both obviously unfit to serve, and who harbor more latent biases, show that a fair trial cannot be had in this venue.

### 1.   Evidence of the Jurors' Attitudes, Opinions, Biases

The raw percentages proving prejudice and negative pre-trial publicity alone are staggering. Of the 280 jurors who returned questionnaires and currently comprise the venire:

- *Over 86%* have heard of or read about Enron-related cases, and *one out of every eight* jurors has chosen to read an Enron-related book or see an Enron-related movie. *See* Ex. 18 (Questions 41-42); App. L; App. M.

- *Exactly 80%* of the jurors, or 224 out of 280, expressed preexisting negative views toward defendants, indicated they had opinions about the perceived role defendants

played in Enron's collapse, or expressed anger about what happened to Enron's "victims." *See* App. B.

- *60%* have an opinion about the cause of Enron's bankruptcy, and nearly all of these believe Enron was brought down by "greed," "accounting fraud," "lie[s]," "scheming to increase profits," and other "criminal" and "illegal activities" by upper management. *See* Ex. 18 (Question 39); App. J.

- *Over 40%* openly admit to being "angry" about Enron. *See* Ex. 18 (Question 67); App. N. This is an incredibly high number of jurors to harbor such intense negative feelings, and is no doubt the result of the unique identifications between Enron and Houston.

- *Over 40%* either admitted outright that they could not be fair or expressed reservations about whether their preconceived opinions would prevent them from impartially considering the evidence at trial. *See* Ex. 18 (Question 73); App. S.[20]

- *Over 40%* have an opinion about Lay, and *over one-third* have an opinion about Skilling—virtually all of which are emotionally-charged and hostile. *See* Ex. 18 (Question 70); App. Q.[21]

- Approximately *40%* also said they have an opinion about Lay and Skilling's guilt or innocence, and the open-ended responses overwhelmingly indicate that these jurors believe Lay and Skilling are guilty. *See* Ex. 18 (Question 71); App. R.

Even the Task Force has been forced to acknowledge the pervasive bias these questionnaires evince, stipulating to excuse prospective jurors who have prejudged defendants and said they could not be fair.[22] However, the Task Force has refused to dismiss a large number of jurors with the same negative who said they are "unsure" if they could be fair to defendants. Given the Task Force's earlier insistence that a fair jury can readily be found among Houston's "4.7 million citizens,"[23] its desire to keep clearly biased jurors in the remaining pool speaks volumes.

---

[20] Specifically, 18.6% of the jurors stated they could not be fair regarding Lay, and 18.2% said they could not be fair regarding Skilling. An additional 23.9% were "unsure" about their ability to fair regarding Lay, and 22.5% were "unsure" regarding Skilling.

[21] These figures only represent the jurors who checked "yes" in response to the "do you have an opinion" question. The actual number of negative responses is even higher, since some jurors failed to check the "yes" box but nevertheless wrote several negative comments.

[22] *See* Stip. re Prospective Jurors (filed Dec. 28, 2005).

[23] Gov't's Mem. of Law in Response to Defs.' Joint Mot. to Transfer Venue at 4, 20 (filed Dec. 14, 2004).

There can be no good faith argument for empanelling jurors with such biases. When asked to express themselves in their own words, prospective jurors did so in disturbing terms. For example, they called Skilling "the devil," a "thief," a "cheater," "brash, arrogant, and conceited," "dishonest," and "a high class crook" "without a moral compass." App. Q. Others said he "projects a high sleaze factor," and described him as "smug," "totally unethical and criminal," the "mastermind" who "took everything he could" and "would lie to his mother if it would further his cause." *Id.* Lay was the subject of similar scorn, described as a "low down scumbag," "crooked," "a snake in the grass" who "made too much money by screwing other people over." *Id.* He also was described as "hypocritical," "phony," "fake," "holier-than-thou," "a selfish, greedy man," and "the biggest lying crook of all." *Id.*

Responses like these confirm that Houston citizens have pronounced Lay and Skilling guilty, their opinions are unshakeable, and they justify their opinions citing perceived personal knowledge about these men, their actions, and their character—expressed in the most impassioned and even violent terms:

- "I believe that the rape of Enron and its [employees] and stock holders could not have happened without their knowledge." App. R.

- "They're guilty—criminally and morally." *Id.*

- "Guilty without any doubt." *Id.*

- "They are all guilty as sin—come on now." *Id.*

- "Guilty as hell." App. Q.

- "I believe that . . . Jeffrey Skilling and Kenneth Lay are guilty of defrauding Enron employees and investors." App. R.

- "Lay and Skilling are guilty and personally involved in this whole mess. They are fully aware of what was happening and [were] a part of it." *Id.*

- "Based on news reports they all appear to be guilty of basically a 'Ponzi scheme' and misleading investors and investigators." *Id.*

- "I think they knew exactly what they were doing and blat[a]ntly did it anyway no matter who[] it hurt." *Id.*

- "I believe Skilling and Lay are guilty and should be held responsible for Enron's failures." *Id.*

- "I think these three men are guilty of letting mismanagement of funds get so far out of control, and basically robbed innocent people of their finances and future." *Id.*

- "Jeffrey Skilling was at the center of the financial schemes." *Id.*

- "I believe all of them were instrumental, and were co-conspirators, in the massive fraud perpetrated at Enron." *Id.*

- "[Lay is] guilty as sin.  Career Enron leader who conveniently looked the other way as his lieutenants bent and broke laws in pursuit of profits and ever greater stock prices." App. Q.

- "[Skilling] initiated, designed and authorized certain illegal actions." *Id.*

- "[Skilling] [s]eems to be very much involved in criminal goings on." *Id.*

- "I believe [Lay] knew, and certainly should have known as the CEO, that illegal and improper [activities] were rampant in Enron." *Id.*

- "I also believe, along with Kenneth Lay, that Skilling knew about the accounting problems that Enron faced, but failed to disclose the information." *Id.*

- "Mr. Skilling is the biggest liar on the face of the earth.  He was a complete control freak and nothing went on or happened without his full knowledge and authorization." *Id.*

- "*Please list (3) people that you admire the least*:  (1) Ken Lay; (2) Jeffrey Skilling; (3) Richard Causey." App. T.

These feelings have their roots in one-sided media coverage, rank hearsay, speculation, supposition, and emotion—not facts or evidence.  *See* App. Q (opinions based on "news media," "what I heard about the whole Enron thing," "personal beliefs," "gut feeling," "gossip," "public opinion," "second hand knowledge," "common sense").  One juror summed up the prevailing attitude best:  "[Skilling and Lay] must have done *something* wrong, though I don't know what." *Id.* (emphasis added).

13

The prospective jurors uniformly blame Lay and Skilling for Enron's bankruptcy, the layoffs of Enron employees, and the losses suffered by Enron shareholders, 401(k) participants, and retirees. They are demonized as "greedy executives," and are contrasted against the "honest, hard-working" "poor little people who lost everything." App. J; App. N; App. O. For instance:

- "[Lay and Skilling were] [k]ey player[s] in the loss of retirement and life savings of employees. Also responsible for the downfall of the corporation." App. Q.

- "[Lay] did a lot of injustice to a lot of good people." *Id.*

- "I believe the origination of the Enron collapse lies with Skilling." *Id.*

- "[Skilling is] [r]esponsible for colla[pse]. . . . caused a lot of anguish, time, and pain to families directly, indirectly. . . ." App. Q.

- "I pity the employees who worked all their life and lost money while the executives are counting their money and having a good life." App. N.

- "Tens of thousands of honest, hard-working people lost billions in retirement funds and other investments. Thousands lost their jobs and some their homes, all because of corporate greed, larceny, and un-excusable dereliction of duty by executive corporate [management]." *Id.*

- "All the little regular people got ruined and rich guys got richer." *Id.*

- "It is a shame that a lot of innocent people worked so long to end up with nothing while the top executives and their families are continuing to [enjoy] the lifestyle of the rich." *Id.*

- "I think so many innocent people were ruined financially and suffered so much mental anguish and lost so much because of the greed of a few." *Id.*

- "[A]ll of the 'little' people got swindled and [] all of the executives, so far, [have] only been tapped on the wrist—can't compare a 10 yr. sentence with losing all of your life savings." App. O.

- "Greed, corruption, unethical standards by senior management; looking for personal gain with no concern or regrets about loss to their employees or [their] employees' life savings—no loyalty to employees." App. J.

- "Crooked executives, cooked books, and the employees paid the price." App. O.

- "[I feel] [a]ngry and disgusted that greed and egos destroyed lives of thousands of innocent people." App. N.

- "These men have profited at the expense of others.  Many retirement dreams were dashed due to these people."  App. S.

- "Corrupt executives and bad management—squashed and hurt all the 'little guys.'"  App. J.[24]

The message is clear:  the victims of the Enron tragedy deserve sympathy; Skilling and Lay deserve punishment.  Many jurors equate justice with retribution.  Their questionnaire responses manifest a strong desire for vengeance against Enron's top executives:

- "I find it morally awful that these people are still running loose.  I believe this should be a nice short trial, all of them go to jail, and not a country club."  App. T.

- "[The government] should hang Ken Lay and his underlings."  App. K.

- "[Lay and Skilling] need[] to be prosecuted to the maximum."  App. Q.

- "If what I have heard or read is true he should serve many years in prison."  App. R.

- "[Skilling] and his family also should be stripped of all their assets and [be] made to start over just like the thousands he made start over."  App. Q.

- "Ken Lay and the others are guilty. . .and ought to go to jail."  App. J.

- "They are all guilty and should be reduced to having to beg on the corner and live under a bridge."  App. R.

- "[Lay] should fess up and take his punishment like a man."  App. Q.

- "If convicted, [Lay] should pay back every cent he made working for Enron."  *Id.*

- "Everyone involved in this is equally guilty and should be personally held liable for the money that people lost as a result of these people's selfishness."  *Id.*

- "Mr. Lay and Mr. Skilling shouldn't get away with bringing down Enron.  Someone needs to be held responsible for the fall of this company."  App. O.

---

[24] Another stark contrast can be seen between defendants and former Enron employee Sherron Watkins, the so-called Enron "whistleblower."  While defendants are excoriated as "crooked," jurors describe Watkins as a "courageous," "brave," "honest" woman, with "great strength of character," who "had the guts to speak up," "did the right thing," and "exposed Enron for what it was, an empty shell of a company."  App. Q.  They "respect" and "admire" her, are "proud" of her, "applaud her willingness to stand up and speak out," and believe "[s]he deserves to be employee of the year."  *Id.*  One juror even falsely reported that Lay tried to have her fired: "Ken Lay was not as out of the loop as he claims to be. . . . When notified of the fraudulent activities by Sherron Watkins he didn't look into it, but looked for ways to have Sherron fired."  *Id.*

- "I hope that if they prove all that is being charged, that these men are [given] a long term in prison." App. K.

- "I believe all these executives are guilty and should spend the rest of their lives in jail for the damage they did to their employees' lives." App. S.

- "The people responsible for the collapse of Enron should go to jail and pay back every cent." App. K.

- "I just know right now in my mind they are guilty and should be pros[e]cuted to the full[est] extent of the law!" App. S.

- "My mind is made up—guilty. They should be punished [to make] an example for any other executives. . .who are tempted by greed." *Id.*

- "I hope that justice does in fact get done. These people should be held accountable for such blatant thievery." App. K.

- "[T]hese guys are guilty, they don't even deserve a trial. Let all the people they ruined have at them." App. S.

- "*Are you angry about what happened with Enron?* Yes. I think a number of individuals conspired to illegally deceive & conceal from shareholders & the SEC certain material facts about Enron's business that led to the company's failure & which had a great economic impact on employees & shareholders." App. N.

These are not the hasty responses of random people who participated in a test survey.

These are *actual* responses from *actual* prospective jurors in this case, who took time to carefully and thoughtfully write out their answers.

> ### 2.   *Evidence of the Jurors' Connections to Enron and Its Bankruptcy*

The questionnaire responses also prove Houstonians have been uniquely affected by

Enron's bankruptcy. Incredibly, *almost half* of all jurors responded that they, their family, or

their friends had some connection to Enron or its bankruptcy. More specifically, 132 out of the

280 jurors (47%) responded affirmatively to at least one of Questions 32-38, which ask about

such connections.[25]

- *One out of four* responded that they, their family, or their friends worked for or applied to work for Enron, and another 15% either worked for or knew someone who worked for Arthur Andersen. *See* Ex. 18 (Questions 32-33); App. C; App. D.

---

[25] *See* Ex. 18.

- *One out of eight* responded that they, their family, or friends had done business with Enron. *See* Ex. 18 (Question 34); App. E.

- *One out of five* responded that they, their family, or friends had owned stock in Enron. *See* Ex. 18 (Question 35); App. F.

- *Nearly one-third* said they know someone who lost their job or lost money in an investment, IRA, 401(k), or other retirement plan due to Enron's bankruptcy. *See* Ex. 18 (Question 36); App. G.

- *One out of six* responded that they, their family or friends have been employed by a company affected by Enron's bankruptcy or the layoffs of Enron employees. *See* Ex. 18 (Question 37); App. H.

- An additional *one out of eleven* responded that they knew someone who has been negatively affected or hurt by Enron's bankruptcy in some other way. *See* Ex. 18 (Question 38); App. I.

Jurors' open-ended descriptions of these connections are even more revealing. In a city of 4.7 million people, a mere 280 questionnaires turned up an extraordinary amount of links to Enron, its bankruptcy, and people and entities involved in this case. For instance, one potential juror is Rick Causey's sister; another attends the same church as Causey and has daughters who went to school with Causey's children. *See* App. P. Other jurors personally know key witness Ken Rice, Rice's executive assistant (who had frequent contact with Lay and Skilling's offices); EBS defendant Kevin Howard; EBS defense attorneys Tony Canales and Jack Zimmerman, Judge Gilmore; potential witnesses David Duncan and Kristina Mordaunt, and another has an indirect connection to Nigerian Barges defendant Dan Boyle. *See* App. D; App. I; App. P; App. S; App. T.[26]

Such personal connections, which can only be found in the Houston venue, are just the beginning. Intimate ties to Enron the company can be found throughout the questionnaires. Jurors worked for Enron (or applied to work for Enron or had family, friends, neighbors, co-

---

[26] These personal connections engender bias and a belief that jurors know the true facts: "Mr. Skilling is the biggest liar on the face of the earth. . . . *On what do you base your opinion?* Based mainly on the information and opinions provided by friends Dorothy and Tim Dalton [who worked at Enron]." App. Q. A former Enron employee named Katherine Dalton is also listed on the Task Force's witness list; defendants are unsure whether she is related to Tim and Dorothy Dalton.

workers, or acquaintances who did), and these ties ran to different business units and areas of the company, such as Enron's commodities trading business and Azurix, Enron's water business. *See* App. D; App. G; App. T. Other connections include an Enron secretary and a talent recruiter. *See* App. G; App. I. Several other jurors either worked for Arthur Andersen or knew someone who did. *See* App. C. Another juror was even the Assistant Treasurer at Mariner Energy, a company Enron owned that is expressly at issue in the Indictment. *See* App. T.

Still other jurors or their employers did business with Enron, either as a counterparty, contractor, or vendor. For instance, jurors' companies had contracts with Enron; worked on projects with Enron; did construction for Enron; provided document management services to Enron; and provided real estate brokerage services to Enron. *See* App. E. Other examples include a florist who lost Enron as a big account and a YMCA worker who had his hours cut because Enron employees cancelled their memberships after the bankruptcy. *See* App. H.

The negative effects of Enron's bankruptcy permeated jurors' personal relationships. In response to questions asking if they knew someone who lost jobs or money as a result of the bankruptcy, jurors identified themselves, their spouses, family members, co-workers, clients, friends, friends of friends, neighbors, and many others as affected. *See* App. H; App. I. One juror was a teacher whose students had family members who were affected. *See* App. G. Others knew people at church who were negatively impacted. *See id*. Still others pointed out: "In addition to the far-reaching impact on the business community, Enron's demise had an extremely negative effect on the charitable and arts organizations" in Houston, and also hurt the "city of Houston real estate market." App. I. In the words of one juror, "Was there anyone in Houston not affected in some way?" App. H. Clearly, the answer is no, and clearly these answers are unique to this venue.[27]

---

[27] Given the extent of jurors' connections to Enron and this case, it is not surprising that the jurors in the present venire, like all their peers in Houston, follow the Enron story much more closely than jurors in

3.     *Evidence of Jurors' Feelings of Betrayal, Shame, Embarrassment*

Finally, the questionnaire responses demonstrate another emotion that is unique to

Houston—feelings of betrayal.  As fully detailed in defendants' initial venue motion, Enron

occupied a singular place in the business, social, and cultural milieu of Houston.  In good times,

Enron was revered.  It was the city's foremost corporate citizen and a source of great pride, and

Lay and Skilling were praised as visionaries.  After the bankruptcy, however, Houstonians felt

betrayed and deceived.  Enron became a source of shame and embarrassment for the city, a dark

mark on the community's reputation.  Almost overnight, Lay and Skilling went from being

hailed as local heroes to being denounced as architects of the city's greatest fraud.  As the expert

declarations submitted with our venue motion made clear, the local media and populace perceive

that, by convicting Skilling and Lay, Houston's reputation can be restored.  No other venue has

so much at stake in this case.

The questionnaire responses prove this.  According to prospective jurors, "Enron gave

Houston a black eye," it "tarnished the image of Houston," it was "an embarrassment."  App. N;

App. O; *see also id.* ("*Are you angry about happened with Enron?*  Yes.  Bad reflection on

business, city, and state.").  Other jurors report: "we were delusional-–thought it was the #1

place to work-–the ideal company," and now all that is left is "the stigma of having been an

Enron employee."  App. N; App. O.  Other jurors put it even more bluntly:  "I feel we were

betrayed by Enron," App. N, and another explained she would like to serve on this jury to "[h]elp

---

other venues.  This is confirmed not only by the amount of resources Houston media outlets devote to the story, *see* App. A, but by jurors' questionnaire responses.  Many of the 280 potential jurors expressed specific, detailed knowledge about facts and allegations surrounding Enron's collapse and aspects of this case.  For example, certain jurors discussed the circumstances surrounding Skilling's resignation, the suicide of Enron executive Cliff Baxter, Skilling's Congressional testimony, the Sherron Watkins memo, allegations of market manipulation in California, the guilty plea of Andrew Fastow, the imprisonment of Lea Fastow, Lay's wife opening a thrift shop, Enron's "asset-light" strategy, the Nigerian Barges transaction, and alleged document destruction by Andersen.  *See* App. J; App. O; App. R.  This level of specific knowledge is the product of intense interest in Enron and this case and is not replicated in any other venue.

bring closure to all concerned." App. T. These are the words of people whose community has

suffered a great trauma, both economically and emotionally. These feelings exist nowhere else.

### D. Latent Jury Dangers

Based on our review of the questionnaire responses, we believe that well over *three*

*fourths* of the prospective jurors should be stricken based on their questionnaires alone. Such a

high exclusion rate should come as no surprise. In the EBS case, which used a less fulsome

questionnaire and involved far less prominent defendants, the Task Force and defense counsel

agreed to exclude 91 of the 400 potential jurors based on their questionnaire answers.[28] Here, the

Task Force has agreed to dismiss 109 of 280 prospective jurors based solely on the

questionnaires. Of the remaining 175 jurors, over 100 expressed clear bias against defendants in

their questionnaires, plainly requiring their excusal.

The remaining 70 or so jurors whose responses do *not* disclose obvious bias still pose

serious due process concerns. There are four reasons for this, and only a change of venue can

begin to cure the problem. *First*, there are no doubt disproportionately many more jurors in this

venue who harbor deep-seated, unconscious biases that even the most careful questionnaires and

voir dire cannot detect.[29] This is because Houston, as best evidenced by the questionnaire

responses, was uniquely affected by Enron's bankruptcy, more than any other place in the world.

---

[28] *See* Ex. 20 (Agreed Motion to Remove Certain Potential Jurors from the Venire, filed in *U.S. v. Hirko, et al.* on March 28, 2005); Ex. 21 (*Questionnaire gets 91 out of 400 potential jurors dismissed*, HOUSTON CHRON., Mar. 30, 2005). Even though it was a smaller case, at the end of even the EBS trial, Judge Gilmore ordered jurors not discuss the case with anyone. Otherwise, "We would likely have to move to another state to try this case again." Ex. 22 (July 20, 2005 EBS Trial Tr. at 13743:13-13745:7).

[29] *See United States v. Tokars*, 839 F. Supp. 1578, 1584 (N.D. Ga. 1993) ("The strongest argument against a finding of presumed prejudice sufficient to warrant transfer of this case to another venue is the fact that the Northern District of Georgia contains Atlanta, Georgia—a very large metropolitan, populous city. Even the Defendants' own poll reveals that at least 30% of the citizenry have no opinion whatsoever about this case. Therefore, it does not take a sophisticated mathematician to figure out that sufficient unbiased jurors exist in the Northern District of Georgia from which to select a jury panel. *Of course, the difficult task would be ascertaining which prospective jurors in fact are unbiased. Where the negative publicity has been so intense, the court's task would be made more difficult by prospective jurors' subconscious recollection of news coverage*."); *United States v. McVeigh*, 918 F. Supp. 1467, 1473 (W.D. Okla. 1996) ("Extensive publicity before trial does not, in itself, preclude fairness. . . . Properly

*Second*, as the Court has noted, even sitting jurors may become exposed to media coverage during the trial.[30] The risk this will occur is exponentially greater in Houston than elsewhere. The *Chronicle* is the leading paper in Houston and is widely read,[31] the *Chronicle* will cover the trial gavel to gavel, and it has filed legal pleadings touting the unprecedented importance of this case to local citizens. *See* App. A. Lastly, given the coverage to date, seated jurors in Houston will be exposed to much more *prejudicial* publicity in this venue than elsewhere.[32]

*Third*, jurors in our case will be uniquely affected—and reminded—by their friends, families, neighbors, co-workers, and fellow worshipers just how important this case is to the people of Houston. Even the most unbiased of jurors going into the case can be expected to encounter hostile opinions and emotions of the type reflected by the questionnaires. These pervasive attitudes and feelings will exert extraordinary pressures on a *Houston* jury—unlike a

---

motivated and carefully instructed jurors can and have exercised the discipline to disregard that kind of prior awareness. *Trust in their ability to do so diminishes when the prior exposure is such that it evokes strong emotional responses or such an identification with those directly affected by the conduct at issue that the jurors feel a personal stake in the outcome.* That is also true when there is such identification with a community point of view that jurors *feel a sense of obligation to reach a result which will find general acceptance in the relevant audience.*") (all emphases added; both cases transferring venue).

[30] Ex. 23 (Nov. 18, 2005 Hr'g Tr. at 35:24-36:2).

[31] The *Chronicle*—the nation's eighth largest daily newspaper, which serves nearly a third of the occupied households in Houston—published between 2 and 7.3 Enron-related stories per day between 2001 and 2004. *See* Mot. at 49. The pace has not slowed in 2005, will intensify in 2006 during this trial, and as the *Chronicle* reports it "reaches more Houston adults than five prime-time television or 10 drive-time radio spots." Mot. at 14.

[32] *See* App. A. Moreover, the Court has no meaningful ability to enjoin prejudicial comments by the media. *See United States v. Brown*, 218 F.3d 415, 425 (5th Cir. 2000) ("The Supreme Court and other Courts of Appeals have recognized a 'distinction between participants in the litigation and strangers to it,' pursuant to which gag orders on trial participants are evaluated under a less stringent standard than gag orders on the press."); Local Rules for the United States District Court for the Southern District of Texas ("Local Rule") 23.1 (adopting the "Free Press-Fair Trial Guidelines," 87 F.R.D. 519, 533 (1980) ("No rule of court or judicial order should be promulgated by a United States District Court which would prohibit representatives of the news media from broadcasting or publishing any information in their possession relating to a criminal case.").

jury in any other venue—to return home from trial with a guilty verdict in this case.[33]  If the professionals in the local U.S. Attorney's Office could not withstand these pressures and had to recuse themselves from the case, it is unfair and unrealistic to impose that burden on local lay jurors.[34]

*Finally*, there is a real risk that jurors will campaign to get on the jury and convict defendants.  This "stealth juror" risk is especially acute in this venue.[35]  Indeed, misreading a *Chronicle* article entitled "Want to be an Enron juror?," a number of Houstonians called the court clerk's office this spring and *volunteered* to serve on the EBS jury.  "'People wanted to know how they could be on the Enron jury,' Chief Deputy Clerk Bradley said.  'I've never had that happen before.'"[36]  Stealth jurors will be almost impossible to detect in jury selection, because they know that opinionated questionnaire or voir dire answers may get them stricken.

### E.     The Logic of Transferring Venue

By far, the best way to cure these problems is to transfer venue.  The Court's recent consideration of a gag order is instructive.  The Court's proposed gag order stated:  "The court has concluded that without such limitations there is a *reasonable likelihood* that extra-judicial

---

[33] *See People v. Boss*, 261 A.D.2d 1, 6 (N.Y. App. Div. 1999) ("The subject of potential pressure upon jurors would be particularly difficult to deal with in voir dire.  This is not a simple matter of asking the jurors if they could put aside any opinions they may have formed.  Instead, *it would also be necessary to ascertain whether they could resist a public cry for conviction, and, specifically, whether they could face their friends and neighbors in the event of an acquittal.  The very asking of such questions* carries the danger of implanting or reinforcing in the jurors' minds the fear of the consequences of reaching an unpopular verdict.") (emphasis added).

[34] *Cf. Gladhill v. General Motors Corp.*, 743 F.2d 1049, 1051 (4th Cir. 1984) ("[A] judge who is a stockholder in a party to a case [is required] to disqualify himself from participation in the case even when he is not the fact-finder.  *We would find it difficult to say . . . that a less rigorous rule should apply to laymen who are chosen as jurors when they lack a lifetime of training in objectivity in the disposition of lawsuits*.") (emphasis added).

[35] According to social scientists, "stealth jurors" seek to serve on particular juries to gain publicity, for financial motivations, or to exact retribution from the defendants.  *See* Mot. at 58-59; Reply at 24-29.  Courts recognize this phenomenon.  *Smith v. Phillips*, 455 U.S. 209, 221-22 (1982) (O'Connor, J., concurring) ("Determining whether a juror is biased or has prejudged a case is difficult, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it").

[36] Ex. 24 (*The few, the brave want to be in Enron jury pool*, HOUSTON CHRON., Feb. 28, 2005).

22

communications during trial will prejudice the parties' rights to a fair trial." Proposed Order at 2 (emphasis added). The Task Force itself urged the Court to make this finding and issue the proposed order exactly as written, based solely on comments Lay made at a recent public speech.[37]

If, as the Task Force argues, Lay's recent press conference created such a likelihood of prejudice, then surely the four years of poisonous publicity generated by the Task Force, local elected officials, and the Houston media—capped off by the Causey plea—have done far more.[38] As this court and other courts have observed, defense comments are "a mere drop in the ocean of publicity surrounding the trial." *In the Matter of Sullivan*, 185 A.D.2d 440, 445 (N.Y. App. Div. 1992). As explained in the Court's Free Press and Fair Trial Guidelines, which are incorporated into its local rules, transferring venue, granting a continuance, or conducting more extensive voir

---

[37] *See* Gov't's Request that the Court Issue an Order Relating to Out-of-Court Statements by the Parties at 1 (filed Dec. 15, 2005) ("In light of [Lay's] public statements, the United States believes that issuance of the proposed prospective Order is now appropriate . . . .").

[38] *Compare Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966) (due process violated where there was "*a reasonable likelihood*" that publicity and other outside influences prevented a fair trial in the venue in which crime occurred); *United States v. Marcello*, 280 F. Supp. 510, 513-514 (E.D. La. 1968) ("As the Supreme Court recently stated in *Sheppard v. Maxwell*, 384 U.S. at 363, venue should be changed 'where there is a *reasonable likelihood* that prejudicial news prior to trial will prevent a fair trial.'"), *with* Local Rules for the United States District Court for the Southern District of Texas ("Local Rule") 23.1 (adopting the "Free Press-Fair Trial Guidelines," 87 F.R.D. 519, 525 (1980) (counsel shall not release statements or opinions "if there is a *reasonable likelihood* that such dissemination will interfere with a fair trial"); *id.* at 519-24 (noting that reasonable likelihood test in the Free Press-Fair Trial Guidelines came from *Sheppard*).

If anything, the gag order test is more stringent and requires the showing of a "substantial likelihood" of prejudice. *See United States v. Brown*, 218 F.3d 415, 427 (5th Cir. 2000) (applying "substantial likelihood" test and declining to decide whether the "reasonable likelihood" test passed constitutional muster); *see also* ABA MODEL RULE 3.6(a) (2004) (employing "substantial likelihood" test). To be clear, and for the sake of the record, defendants believe that consistent with the First Amendment, the test for imposing a gag order must be the "clear and present danger" or "serious and imminent threat" test adopted by three other circuit courts. *See United States v. Carmichael*, 326 F.Supp.2d 1267, 1293 (M.D. Ala. 2004) ("A three-way circuit split exists with respect to the third, and most important, factor to be considered: the threshold standard for imposing a prior restraint. The United States Courts of Appeals for the Sixth, Seventh, and Ninth Circuits have held that, before the court may issue an order restricting the speech of trial participants, it must find that the speech at issue presents a 'clear and present danger' or a 'serious and imminent threat' to a fair trial. The Courts of Appeals for the Third and Fifth Circuits have adopted the 'substantial likelihood of material prejudice' standard. The Fourth and Tenth Circuits have held that the appropriate standard is 'reasonable likelihood' of prejudice. The Eleventh Circuit has not addressed this issue.") (citations omitted).

dire is a preferable and less severe remedy than the gag order the Task Force urged:

> It is recommended that, in criminal cases likely to attract substantial public interest, the United States District Courts make more extensive use of existing techniques designed to ensure an impartial jury.  This recommendation is included primarily to make clear the belief that, in many cases where the problem of prejudicial publicity is present, the utilization of one or more traditional methods for controlling the effects of prejudicial publicity upon a jury will be effective to preserve for the accused a fair trial.  These techniques include continuance, change of venue, . . . individual voir dire of prospective jurors, including in camera voir dire. . . .

Local Rule 23.1 (Free Press-Fair Trial Guidelines, 87 F.R.D. at 532-33 (committee comment)).

Finally, any argument by the Task Force that defendants' public comments proclaiming their innocence somehow moots this motion is specious.  Defendants and their counsel have a constitutional right to respond to the adverse publicity leveled against them.  *See* TEXAS DISCIPLINARY RULES OF CONDUCT 3.07 cmt. 3 (2005); Local Rule Appendix A Rule 1.A; ABA MODEL RULE 3.6(c) (2004); *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1043 (1991) (Kennedy, J., plurality opinion).  Unlike the Task Force, defendants do not enjoy the support of the local media.  The recent coverage of Lay's speech is just the latest example.  A *Chronicle* columnist mocked Lay's speech,[39] and its editorial page added a long, damning criticism all but proclaiming his guilt entitled: "Former Enron chairman's speech long on self-pity and short on

---

[39] Ex. 25 (*Rewriting Acts I, II of Enron just a little bit*, HOUSTON CHRON., Dec. 14, 2005):
OK, quiet everyone!  Places!

Let's get this right, people.  We only have a month before the big show, and we have to make this dress rehearsal count. . . .

[Excerpt from Lay's speech.]  That's good, baby.  Everybody's doing it.  I love it.  Now, in this next part, you need to whine, but not too much.  Play for pity.  The government is blocking all potential defense witnesses.  They're stifling the truth, that sort of thing.  Former employees, fearing indictment, are too scared to help. . . .

Cue the patriotic music.  "Either we stand up now and prove that Enron was a real company, a substantial company, an honest company. . .or we will leave this horrific legacy shaped by others for someone else to sort out."

Oh, Kenny, that's pure gold, baby.  I'm tearing up.  I mean it, I'm feeling it.  We're all in this together.  It's not just you on trial, but everyone who worked at Enron, vicariously prosecuted through you.  You're a genius.

Cue the lackluster applause.  Cue the disgruntled audience members leaving early. . .  Beautiful, Kenny Boy!  You're a natural.  The jury's gonna love ya, baby . . . .

accountability."[40]

No matter what defendants do—stand silent or speak—this venue and its media have condemned them.  Venue must be transferred.  Defendants reiterate their request for oral argument and a full hearing on this motion.  Again, if the Task Force thought a hearing was warranted on its gag order,[41] it should not be heard to object to a hearing on this motion.

## III.    Voir Dire Should Be Individualized.

Wherever this trial occurs, but especially if it is Houston, defendants are entitled to a more thorough jury selection process than currently envisioned by the Court.  To begin with, as the Local Rules and Free Press and Fair Trial Guidelines observe, there is good reason for defendants' request:

> The suggested use of individual voir dire of jurors in sensitive and widely publicized cases is similar to the view expressed in Standard 8-3.5(a) of the ABA "Standards Relating to the Administration of Justice: Free Press and Fair Trial," which urges that such questioning in these circumstances should be conducted *outside of the presence of other jurors* but that a record of the voir dire be kept by a court reporter or by electronic means. *These objectives may be satisfied by conducting the questioning of each juror in turn at the bench or sidebar, in a separate courtroom, or in the judge's chambers.*

Local Rule 23.1 (Free Press-Fair Trial Guidelines, 87 F.R.D. at 532-33 (emphasis added)); *see also United States v. Davis*, 583 F.2d 190, 197 n.7 (5th Cir. 1978) (endorsing ABA STANDARDS RELATING TO FAIR TRIAL AND FREE PRESS, § 3.4(a) (Approved Draft, 1968).

The Court has said it will conduct voir dire in a single day and to the entire panel with individualized questions of selected jurors at the bench by the Court and counsel.  This procedure, we submit, is inadequate in the circumstances of this case.

---

[40] Ex. 26 (HOUSTON CHRON., Dec. 15, 2005).  The editorial pilloried Lay's defense, saying it conflicted with "the version of the Enron scandal that has been reported in detail by business journalists and company insiders since the bankruptcy," and contended it was "distasteful" for Lay to portray "himself as a martyr persecuted by the federal government, a man guilty of nothing more than ignorance of what was going on inside his own company." *Id.*

[41] *See* Gov't's Request that the Court Issue an Order Relating to Out-of-Court Statements by the Parties at 1 (filed Dec. 15, 2005).

## A.     The Legal Standard

Rule 24(a) of the Federal Rules of Criminal Procedure provides the Court discretion to determine how to conduct voir dire,[42] but that discretion must yield to defendants' Sixth Amendment right to a fair trial, *see Morgan v. Illinois*, 504 U.S. 719, 729-30 (1992); *Mu'Min v. Virginia*, 500 U.S. 415, 417 (1991).  When a case has been surrounded by extensive pretrial media coverage, a more thorough examination should be conducted to ensure that prospective jurors' objectivity has not been compromised.  *See Davis*, 583 F.2d at 196.  Because jurors are poorly suited to assess whether they are capable of maintaining objectivity, it is the responsibility of the trial court to make this determination.  *See id.* at 196-97.  Merely asking jurors if they can be fair is not enough.  *See id.*; *United States v. Beckner*, 69 F.3d 1290, 1292 (5th Cir. 1995); *United States v. Hawkins*, 658 F.2d 279, 282-85 (5th Cir. 1981).

A defendant's conviction may be reversed where pretrial publicity surrounding a case raises a significant possibility of prejudice and voir dire does not provide a reasonable assurance of detecting that prejudice.  *See Beckner*, 69 F.3d at 1292; *United States v. Chagra*, 669 F.2d 241, 249-50 (5th Cir. 1982).  Whether pretrial publicity creates a significant possibility of prejudice depends on the facts of the particular case, *see Beckner*, 69 F.3d at 1293, including such factors as the: (1) amount of publicity, *see Hawkins*, 658 F.2d at 282; (2) time period between publicity and trial, *see Salemme v. Ristaino*, 587 F.2d 81, 88 (1st Cir. 1978); (3) inclusion of inadmissible evidence, *see United States v. Holman*, 680 F.2d 1340, 1348 (11th Cir. 1982); (4) reports of the guilty pleas and sentences of related defendants, *see Hawkins*, 658 F.2d at 282; and (5) the inflammatory nature of the publicity, *see Davis*, 583 F.2d at 196.  All five factors (and many more) are present in this case.

---

[42] *See* FED. R. CRIM P. 24(a) ("(1) In General.  The court may examine prospective jurors or may permit the attorneys for the parties to do so.  (2) Court Examination.  If the court examines the jurors, it must permit the attorneys for the parties to: (A) ask further questions that the court considers proper; or (B) submit further questions that the court may ask if it considers them proper.").

### B.    The Need for More Individualized Voir Dire

We submit the Court's proposed voir dire process is inadequate for at least five reasons.

First, answers given to general questions the Court poses in front of the entire prospective panel can be as prejudicial as any story a juror could read in the newspaper.  If a juror openly remarks about his antipathy for defendants, his hate for Enron, how his cousin's life was ruined by the company's bankruptcy, how Causey's guilty plea helped him make up his mind, or his views on certain myths surrounding the Enron case, the entire panel will be tainted.  The Task Force, as well as several courts, recognize this danger.  *See, e.g.*, Ex. 27 at 2 (Task Force brief regarding voir dire in EBS case (filed Apr. 1, 2005)) ("answers given by one prospective juror, in the rambling format often created by attorney voir dire, may 'poison the well' with respect to fellow prospective jurors"); *Irvin v. Dowd*, 366 U.S. 717, 728 (1961) ("'You can't forget what you hear and see.'").

We are mindful the Court may seek to deliver broad admonitions and confine questions to more generalized topics, an approach that we endorse.  Open questioning of the panel at large poses too great a risk of prejudicial contamination.  That makes it more incumbent, in our view, to screen jurors one by one.  *Cf. United States v. Schrimsher*, 493 F.2d 848, 854 (5th Cir. 1974) ("The safer practice in situations involving possible prejudice from newspaper articles or other sources is to interrogate each juror separately and out of the presence of the other jurors."); *United States v. Colabella*, 448 F.2d 1299, 1303-04 (2d Cir. 1971) ("[W]hen there is any foundation for concern about juror partiality . . . which, if expressed, might affect other prospective jurors, the demands of the 'most priceless' safeguard of individual liberty—the right to trial by an impartial jury—justify the small expense of time required by the guidelines suggested above.").

Second, social science studies and sound judicial wisdom show that jurors do not reveal their true biases when asked to reveal them in front of others or asked by an authority figure, such as a judge. *See id.* at 1304 ("It is too much to expect of human nature that a juror would volunteer, in open court, before his fellow jurors, that he would be influenced in his verdict by a newspaper story of the trial."). In such circumstances, jurors shade their answers so not to appear biased or irresponsible to the court or in front of a courtroom packed with the press. *See* R.M. Arkin et al., *Social Anxiety, Self-Presentation and the Self-Serving Bias and Causal Attribution*, 38 J. PERSONALITY & SOC. PSYCHOLOGY 23, 25 (1983) (recognizing natural human tendency *not* to publicly admit bias); *Davis*, 583 F.2d at 197 n.7 (endorsing ABA STANDARDS RELATING TO FAIR TRIAL AND FREE PRESS, § 3.4(a) (Approved Draft, 1968) ("The questioning shall be conducted for the purpose of determining what the prospective juror has read and heard about the case and how his exposure has affected his attitude towards the trial, not to convince him that he would be derelict in his duty if he could not cast aside any preconceptions he might have."); Note, *Judges' Nonverbal Behavior in Jury Trials: A Threat to Judicial Impartiality*, 61 VA. L. REV. 1266, 1267-69 (1975) (examining how judges influence jurors through subtle and unintentional signals, and exploring corrective measures); Edward R. Shohat & Pamela I. Perry, *International Drug Cartels*, 40 AM. U. L. REV. 849, 857 (1991) (citing an experiment comparing responses to questions posed by a judge and by an attorney, and concluding that jurors are far more likely to be honest in their responses to the latter).

Third, questioning jurors in a group setting runs the risk of placing to much faith in jurors' subjective opinions of themselves that they can be fair. As several courts and social scientists have explained, merely bringing prejudices to the light of day, let alone curing for them, is exceedingly difficult and requires probing and careful questions. *See Davis*, 583 F.2d at 196-97 (a "juror is poorly placed to make a determination as to his own impartiality"); Mot. at

58-62 (collecting and discussing social science studies).  Only through *in camera* questioning by the Court and counsel, out of the presence of others jurors, as well as the media, can true biases be revealed.  *See Davis*, 583 F.2d at 196-97 ("The district court erred in not undertaking a more thorough examination of those panel members exposed to publicity.  Under the circumstances of this case, where the nature of the publicity as a whole raised a significant possibility of prejudice, the cursory questioning by the court was not enough.  The court should have determined what in particular each juror had heard or read and how it affected his attitude toward the trial, and should have determined for itself whether any juror's impartiality had been destroyed.").

Fourth, given the circumstances of this case, conducting individualized voir dire in the confined area at the bench with others looking on, the press taking notes, lawyers leaning in to hear the jurors' words, and defendants sitting yards away with earphones is neither practical nor effective.  Jurors will feel awkward, uncomfortable, rushed, more nervous, and more eager to give an answer pleasing to the Court.  Lead trial counsel cannot easily consult with their client, colleagues, or jury consultants.  Conducting voir dire *in camera*, in the jury room, or in a separate closed courtroom—all of which the Local Rules contemplate—will be more comforting to jurors and conducive to an open, honest exchange of information .  *See* Local Rule 23.1 (Free Press-Fair Trial Guidelines, 87 F.R.D. at 532-33 (committee comment) ("The suggested use of individual voir dire of jurors in sensitive and widely publicized cases . . . *should be conducted outside of the presence of other jurors* [with] . . . a record of the voir dire . . . kept by a court reporter or by electronic means. *These objectives may be satisfied by conducting the questioning of each juror in turn at the bench or sidebar, in a separate courtroom, or in the judge's chambers*.") (emphasis added); *United States v. Oscar Bear Runner*, 502 F.2d 908, 912 (8th Cir. 1974) ("the better practice in a sensitive case is to direct probing questions touching areas of possible prejudice to each individual juror, with the questions to be asked by the trial judge or

counsel"); *Silverthorne v. United States*, 400 F.2d 627, 639 (9th Cir. 1968) ("The court should make a careful, individual examination of each of the jurors . . . out of the presence of the remaining jurors, as to the possible effect of the articles.").

Fifth, asking jurors en masse to raise their hands if they cannot be fair, or allowing the Task Force to ask leading questions to get the jurors to give answers that would seemingly help them pass a litmus test (*e.g.*, "You can be fair and impartial, can't you?"), is counterproductive. Such "yes or no" questions, for which the Task Force continues to argue,[43] tend to illicit affirmative responses from prospective jurors that may not reflect their actual views. *See Coleman v. Kemp*, 778 F.2d 1487, 1542-43 (11th Cir. 1985) (explaining that leading and conclusory procedure by which prospective jurors were questioned about possible prejudice improperly prompted them to provide what they deemed to be correct, rather than honest, answers); *Morvant v. Constr. Aggregates Corp.*, 570 F.2d 626, 635 n.12 (6th Cir. 1978) (describing inherent suggestiveness of leading questions); *Irvin v. Dowd*, 366 U.S. 717, 728 (1961) (recognizing that psychological impact of questioning jurors about their ability to be fair and impartial often ensured affirmative response).

This is particularly true in light of jurors' unconscious tendency to respond as they believe the Court desires, which is to say that they can be fair. *See* Note, *Judges' Nonverbal Behavior in Jury Trials*, 61 VA. L. REV. at 1267. In order to minimize this tendency, the Court should avoid leading questions, whether to the panel or individual jurors, and use open-ended questions designed to elicit information, not a particular answer (*e.g.*, "Please tell us what you meant by that answer."). *See Bear Runner*, 502 F.2d at 910 (allowing defense counsel to ask open-ended questions in order to accurately determine jurors' impartiality); *Isaacs v. Kemp*, 778

---

[43] *See* Gov't's Proposed Examination of Prospective Jurors at 6 ¶ 17 (filed Dec. 23, 2005) (including such a leading litmus test question); Defs.' Joint Statement In Support Of Their Proposed Jury Questionnaire (filed Sept. 27, 2005) (arguing against "yes or no" questions Task Force proposed for questionnaire).

F.2d 1482, 1484-85 n.6 (11th Cir. 1985).[44]  We urge the Court to make an independent

determination of each prospective jurors' impartiality by questioning them, and allowing counsel

to question them, individually, rather than as an entire panel.[45]

### C.    Defendants' Proposed Procedure

Defendants submit the best way to conduct voir dire in this case would be for the Court to

deliver general admonitions and instructions to the entire panel followed by general questioning

---

[44] The questions posed by the Court in the *Olis* case, we submit, should be avoided for this reason. *See* Ex. 28 (*United States v. Olis*, CR. NO. H-03-217 Trial Tr. at 8-9 (inquiring of entire panel: "Are there any of you who, if selected, could not conscientiously and faithfully follow all of those instructions?")).

[45] Fifth Circuit precedent supports this request. In *United States v. Hawkins*, 658 F.2d 279, 282-85 (5th Cir. 1981), defendants submitted over 40 instances of pre-trial media reports about their case, and it was shown that 86% of jury panel had been exposed to pretrial publicity. Defendants' conviction was reversed on appeal because the district court denied the defendants' motion for individual voir dire, and instead, inquired of the entire panel: "If any of you have heard about this case, or have read about it in the newspaper, or heard it on TV or the radio, or have talked with anyone, which has caused you to form an opinion as to the guilt or innocence of the Defendants, and if that is such an opinion as would affect you if selected as a Juror, if so, may I see your hand?" *Id.* at 285.  When no panel members responded, the judge concluded: "I presume then, that none of you know enough about the case or heard enough about it that you feel that it would keep you from being a fair and impartial Juror or would affect or influence your verdict." *Id.*

In *United States v. Beckner*, 69 F.3d 1290, 1292 (5th Cir. 1995), the court held that the media coverage surrounding the trial of a former U.S. Attorney for wire fraud, obstruction of justice, and perjury created a substantial risk of prejudice, and the trial court's voir dire procedure failed to provide a reasonable assurance that prejudice would have been discovered if present.  In his motion for extended voir dire, defendant submitted 48 newspaper articles and excerpts from eight local television broadcasts, the majority of which were published or broadcasted within five months of his trial.  When a mistrial was declared in the defendant's first trial, the U.S. Attorney was quoted as stating that eleven out of twelve jurors were prepared to find him guilty on several counts.  The media linked the possibility of a retrial with the defendant's political connections.  The Court concluded that the nature and extent of publicity was sufficient to raise a significant possibility of prejudice.

The trial judge did not ask jurors what information they had read, heard, or otherwise received about the case before trial, or how any such information had affected their attitudes toward the defendant. The district court simply asked the panel collectively whether anyone had been so affected by pretrial publicity that he could not be completely fair and impartial:

> Does anybody feel that, up to this point in time, they have in any way been affected by any news coverage, so that they could not be absolutely satisfied within themselves that they would be able to give this matter a completely fair and impartial hearing at your hands, in your good hands when you are the members of the jury in this case?  Does anybody feel that anything they either have read, seen on the tube, or heard from people talking about it, an article in the paper or a news coverage on the television or whatever, would in any way affect their ability to be completely fair and impartial in hearing and deciding this case?

*Id.*  None of the prospective jurors responded, and the defendant was ultimately convicted.  The court of appeals held that by allowing jurors to decide their own impartiality, the district court failed to fulfill its obligation to make an independent determination of each juror's ability to render an impartial verdict.

by counsel. If the Court prefers, defendants agree to dispense with their general questioning of the panel. Each juror should then be questioned one-by-one, in a closed courtroom, and out of the presence of other jurors and the public, starting with the lowest numbered juror and continuing until a full jury and a set of alternates is selected. This practice has been employed to great effect by other judges in this Court and in other major trials and will not delay jury selection so much as it will ensure the process is fair, dignified, and allows defendants and their counsel to fully participate. In this more relaxed setting, jurors need to be questioned individually by both the Court *and* counsel about publicity issues, contacts with Enron, opinions regarding defendants, the financial impact Enron had on them or their friends and families, and such issues as personal experiences with large corporations or lay-offs. Asking any of these questions to a panel generally will skew the data in two ways. First, the Court's asking such personal questions of a large group will stifle truthful or complete responses. Second, overly emotional or angry responses delivered in front of the entire panel will prejudice the pool. The sorts of answers collected from the questionnaires in Section II.C, if any were recounted in front of the whole group, would taint the trial.

## IV.     At the Very Minimum, a Short Continuance Should Be Granted and New Questionnaires Should Be Sent to a New Round of Prospective Jurors.

The Supreme Court, the drafters of the Free Press and Fair Trial Guidelines, and this Court, like many others in incorporating those guidelines into its Local Rules, all recognize the propriety of granting a continuance when adverse pre-trial publicity threatens a fair trial. *See Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966) ("[W]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity."); Local Rule 23.1 (Free Press-Fair Trial Guidelines, 87 F.R.D. at 532-33 (a "continuance" is a "traditional

method[] for controlling the effects of prejudicial publicity upon a jury" and "preserve[ing] for the accused a fair trial"); *id.* at n.19 (collecting cases).

The Causey guilty plea demands at least a 30-day continuance.  First, such a continuance would allow news stories regarding Causey's plea and the attendant prejudice to defendants a chance to somewhat abate.  Second, such a continuance would enable the Court to send a revised jury questionnaire making no reference to Causey, thus helping to minimize the prejudicial impact his publicized guilty plea no doubt had on the current venire who filled out questionnaires that closely associated Causey with Skilling and Lay.  *Cf. United States v. Peters*, 754 F.2d 753, 761-62 (7th Cir. 1985) (indicating court should consider "traditional techniques" discussed in Free Press-Fair Trial Guidelines for insuring an impartial jury; "if necessary the judge could have dismissed the entire venire and called another until twelve impartial jurors, unaffected by the media's stories on the trial, were found").

Third, a continuance would also help streamline the trial and allow defendants to adjust their preparations in light of the Causey plea:

- It would enable defendants and the Task Force to clearly agree upon which counts (*e.g.*, Money Laundering, Counts 7-11) and transactions (*e.g.*, Mariner, Coyote Springs, Global Galactic, and all the FAS 125/140 deals, *see* Indict ¶¶41-46) are out of the case because Causey is no longer a defendant and only he was charged with these alleged offenses and transactions.  Each of these transactions implicates numerous witnesses (several of whom have testimony to give only about these subjects), hundreds, if not thousands, of Task Force and defense trial exhibits, and significant areas of expert testimony.
- It would allow defendants to review and amend the portion of the defense exhibit list that Causey and his lawyers had been responsible for preparing, as well as afford defendants the much-needed opportunity to prepare large areas of the case for which Causey and his counsel had been responsible under the division of labor to which defendants had long agreed.

- It would allow defendants time to reallocate responsibility for the large number of witnesses for which Causey's legal team intended to take primary responsibility.
- And it allows defendants to prepare to respond to whatever testimony Causey may be prepared to give and account for that proposed testimony in preparing opening statements and cross-examining government witnesses.

## V.    Conclusion

Defendants' motion should be granted.  Venue should be transferred and more extensive, individualized, and attorney-conducted voir dire should be allowed.  In the event the Court denies defendants' venue motion, no shorter than a 30-day continuance from the current January 30, 2005, trial date should be ordered and a new jury questionnaire should be sent to potential jurors.  None of these requests is convenient or without its costs.  The ultimate consideration that must drive this analysis, however, must be ensuring defendants a fair trial.

Dated: January 4, 2006

Respectfully submitted,

By:_____

Of Counsel:

Ronald G. Woods
Texas State Bar No. 21964000
Federal Bar No. 657
5300 Memorial, Suite 1000
Houston, TX 77007
Office: 713-862-9600
Facsimile: 713-864-8738

Daniel M. Petrocelli
M. Randall Oppenheimer
Mark Holscher
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
Office:  (310) 553-6700
Facsimile:  (310) 246-6779

*Attorneys in Charge for Jeffrey K. Skilling*

By:_____

Michael Ramsey
Chip Lewis
River Oaks/Welch Building
2120 Welch
Houston, TX 77019
Office: (713) 227-0275
Facsimile:  (713) 523-7887
*Attorneys in Charge for Kenneth L. Lay*

34

## APPENDIX A:
## A SMALL SAMPLING OF RECENT ADVERSE PUBLICITY

1. In April 2005, a "documentary" film about Enron was released. The film demonized

defendants and declared them guilty of fraud. The film constructed a one-sided case against

defendants based on demonstrable falsehoods, disproved myths about Enron, biased testimonials

from plaintiffs' lawyers and short sellers of Enron's stock, and a cruel, thoughtless reenactment

of the suicide of former Enron executive Cliff Baxter. The film premiered in Houston amidst

great fanfare. As the *Houston Chronicle* quoted the film's director, "I think it's important to

have the premiere in Houston for the most obvious reason: Houston . . . was the city most

affected by the company's rise and fall."[1] The *New York Times* described the movie's effect on

viewers: "Anyone who might be in the jury pool for the coming trials of [Lay and Skilling] . . .

should probably stay away, since the movie makes the case against them with prosecutorial

vigor."[2] Despite the film's obvious bias, the *Chronicle*, quoted a local business person touting

the film as "'offer[ing] an objective view of what happened . . . and in under two hours.'"[3]

To maximize the prejudice against defendants, and the profits for the filmmakers, the

film's DVD release date was set for what was the first day of trial—January 17, 2006.[4] On the

DVD's cover are large pictures of Lay and Skilling, with the tag line: "Come see where your

money went." Below that appears a blurb from a review of the film: "It leaves you with the

exhilarated view of understanding the defining financial scandal of the era."[5] Also available

from the promoters of the film is a fake Enron stock certificate that, "[l]ike Enron stock . . . holds

---

[1] Ex. 29 (*Enron movie to have River Oaks premiere*, HOUSTON CHRON., Mar. 22, 2005).

[2] Ex. 30 (*Those You Love to Hate: A Look at the Mighty Laid Low*, THE NEW YORK TIMES, Apr. 22, 2005); *see also id.* ("If you are looking for a good dose of outrage at a theater near you, you won't find a better bargain than 'Enron: The Smartest Guys in the Room'. . . .").

[3] Ex. 29 (*Enron movie to have River Oaks premiere*, HOUSTON CHRON., Mar. 22, 2005).

[4] Ex. 31 (http://www.amazon.com/gp/product/B000C3L2IO/ref=pd_bbs_null_2/104-8320882-2242310?s=classical&v=glance&n=5174).

[5] *Id.*

no actual value. . . . Enron -- the gift that keeps on taking."[6]

2. Other articles have revived and reinforced the community's antipathy for defendants and sympathy for Enron's "victims." A *Chronicle* columnist profiled an Enron retiree who lost his savings, as "a reminder that while [Enron] news may grow old, it doesn't dull the pain that comes with seeing a lifetime of work swept away."[7]  Another story wrongly reported that Lay and Skilling "tried to stop" a settlement in an Enron civil case (they had merely lodged a legal objection), asserting that doing so would delay the payment funds to former Enron employees.[8]

3. The Task Force has added fuel to the fire.  In an interview with the *Chronicle,* then-Director of the Enron Task Force, Andrew Weissmann called Enron "*the* white collar crime," and compared the "evil" of Enron executives to Nazis.[9]  In addition, the Task Force has threatened to bring new indictments—after some 18 months of inaction—on the eve of the trial in this case, and as the jury is being selected.

4. After the Task Force's conviction of Arthur Andersen was unanimously reversed by the U.S. Supreme Court, and after it failed to obtain any convictions in the EBS trial, readers were reassured by a *Chronicle* columnist that *this* case is the only one that really matters.  This is "The Big One," "the real trial," and "the *true measure of justice* in the Enron saga."  As the columnist argued:  "Let the small fry swim free if need be," for "[w]e've got bigger fish in need

---

[6] *Id.; see also* Ex. 32 (*Enron movie makes first cut toward Oscars*, HOUSTON CHRON., Nov. 16, 2005 ("'The movie is a handbook for people going to the trial,' said filmmaker Alex Gibney"; noting "the official release date is the trial opening day").  Only making matters worse, American Airlines is showing the movie on flights this month, weeks after potential jurors returned their questionnaires, and a fictional movie, lampooning Enron, called "Fun With Dick and Jane," opened recently in Houston and ends with a credit "thanking" Skilling and Lay.

[7] Ex. 33 (*Forgotten people still remember*, HOUSTON CHRON., Mar. 5, 2005).

[8] Ex. 34 (*Enron workers' money put on hold for bosses' appeal*, HOUSTON CHRON. June 24, 2005); *see also* Mot. at 46-48; Reply at 10-12.  Another *Chronicle* article reported on efforts to remunerate "victims," and sought out one of the Task Force's lead witnesses for comment:  "Sherron Watkins, the former Enron vice president famous for warning about the company's troubles in a memo, said that the average ex-Enron employee would not have the cash to take advantage of the proposal.  'That's a rich man's solution; that's not an every-man's solution,' she said."  Ex. 35 (*Bill OKs employee catch-up in IRAs*, HOUSTON CHRON., Nov. 18, 2005).

[9] Ex. 55 (*Enron prosecutor says task force didn't overreach*, HOUSTON CHRON., July 23, 2005).

of frying.  What matters is what comes next.  *From the beginning, the Enron prosecution has had one true measure of success: Lay and Skilling in a cold steel cage.*"[10]

5.  Recently, the *Chronicle* announced this same columnist will write a daily blog covering this trial, which he calls "the Super Bowl of Enron prosecution" and jokes will be one great, big "Media Love-In."[11]  The *Chronicle* blog also includes links to the *Chronicle*'s "Prosecution Scorecard," which pits Enron defendants as opponents of the home team.[12]  The blog says Enron is "crooked," ridicules what it calls Ken Lay's "doofus defense," and says Lay "left thousands of people out of work, cost shareholders millions of dollars, led to new corporate governance laws that have affected almost every public company in America, triggered the demise of the country's biggest accounting firm and generally undermined America's faith in corporate America."[13]

6.  The television airwaves in Houston remain filled with bias against defendants.  One typical recent broadcast was clearly intended to engender anger against Skilling and Lay as they approach trial, and suggest that defendants' wealth should be contrasted with the plight of Enron's victims in assessing defendants' guilt—an inference the law prohibits, *see Mayer v. City of Chicago*, 404 U.S. 189, 196 (1971) ("The size of the defendant's pocketbook bears

---

[10] Ex. 4 (*Task force needs to refocus after wishy-washy verdict*, HOUSTON CHRON., July 21, 2005) (emphasis added). The same solace was offered after the 9-0 reversal in Andersen, and the *Houston Press* continues to add scorn to the heap.  *See* Ex. 36 (*It might be useful to remember reasons behind original verdict*, HOUSTON CHRON., June 1, 2005 ("As I said in January when the Supremes agreed to hear the case, the outcome doesn't change the events that preceded conviction. . . . For the legions of honest Andersen employees, the decision means nothing. . . . *Nor does it mean much for the victims of Enron, nor for the public at large whose trust in the markets was shattered by the accounting transgressions that Andersen ignored at Enron*.") (emphasis added)); Ex. 37 (*Turkeys of the Year*, HOUSTON PRESS ("Good news: At least *one* of the big-name Enron players served some time—Lea Fastow, who is now a semi-free woman.  Bad news: Every other player is still walking around River Oaks or Vail four years after their con game collapsed.").

[11] Ex. 38 (*He won't have Ken Lay to kick around anymore*, HOUSTON CHRON., July 18, 2005, *available at* http://blogs.chron.com/fulldisclosure/archives/2005/07/he_wont_have_ke.html); Ex. 39 (*Enron Trial Can Become Media Love-In*, HOUSTON CHRON., Aug. 21, 2005).

[12] *See* Ex. 40 (http://www.chron.com/content/chronicle/special/01/enron/index.html).

[13] Ex. 41 (*Lunch with Lay*, Oct. 19, 2005, HOUSTON CHRON., *available at* http://blogs.chron.com/fulldisclosure/archives/2005/10/lunch_with_lay.html).

3

no . . . relationship to his guilt or innocence . . . .").

Transcript of Broadcast:
"We believed fiercely in what we were doing," Jeff Skilling told Congress.
But the feds chose not to believe them.  And two months from now, they'll be putting Enron's top brass on trial at the federal courthouse in downtown Houston.
You'll see nationally known lawyers like LA's Daniel Petrocelli defending Jeff Skilling.  One of Houston's best, Michael Ramsey, will defend Ken Lay.
Their defense in a nutshell: this guy, Andrew Fastow, orchestrated the fraud to enrich himself, all the while keeping his scheme secret from his bosses.
Will the jury believe it?
"God only knows," said Angelina Lorio, who definitely doesn't believe it. "And there's no way in hell you can tell me he didn't know what was going on inside Enron."
"He" being Ken Lay who she said she admired for much of the 28 years she worked for Enron.  She had invested most all her retirement savings in the company's stock, believing it was a good investment because her bosses said so.
And besides, "The stock kept going up and up and up, it was unbelievable," she said.
At one point, she had $500,000 in Enron stock, only to lose it all when the company collapsed four years ago next month.
She had to sell her home and now lives in a small apartment.
And finding a new job at age 60 hasn't been easy for her.  "People want young blood," she said.
She feels the little people are paying the price for Enron's collapse while the big guys are "still millionaires," Lorio added.
Reporter: "Have you by chance seen this house before [showing Lorio a picture of Skilling's house]?"  Lorio: "No, this is the first time.  He lives exquisitely, that's for sure."
According to the tax office, Jeff Skilling's River Oaks house is worth over $5 million.
"It's upsetting and angering," Lorio said.[14]

7.  Despite their best intentions and the Court's instructions, it will be exceedingly difficult for jurors to tune out daily Houston media coverage.[15]  Jurors in Houston are especially vulnerable to this temptation, because as *Chronicle* lawyers recently argued in seeking to unseal

---

[14] Ex. 42 (*How the meaning of 'Enron' has changed*, KHOU 11 News (Nov. 18, 2005), *available at* http://www.khou.com/news/local/stories/khou051118_gj_enron.733f5c5b.html); *see also* Mot. at 14-25 (collecting various examples of biased televised media coverage, especially concerning defendants and the demeanor of government witnesses in the Barges trial); Reply at 12-21 (same).

[15] Ex. 23 (Nov. 18, 2005 Hr'g Tr. at 35:24-36:2) (COURT: "It is impossible to prevent jurors from reading about the case and listening and watching media reports, although, of course, I will instruct the jury panel not to do so.").

court filings, "'[t]his case is of extraordinary interest to Houstonians.'"[16]  Any juror who peeks at

the local media coverage, such as the *Chronicle*'s special Enron-devoted website, will be

confronted with a substantial array of information, the vast majority of which is heavily slanted

against defendants.  The website contains vast databases of alleged "facts" in the case; timelines

and graphics purporting to explain events and transactions; links to all the stories cited in this

motion and more; links to documents in the case, trial and Congressional testimony transcripts,

and audio and video files; and biased profiles of defendants and trial witnesses.[17]  The website is

---

[16] Ex. 43 (*Judge is asked to unseal items: Chronicle wants three documents on sentencing to be made public*, HOUSTON CHRON., Mar. 9, 2005).

[17] Included in a profile on Skilling on the *Chronicle* website are the following quotes and descriptions of the source of the quotes, which, given the stature and seemingly official nature of some of the speakers and so-called "smoking gun" evidence cited, all but tells jurors to convict defendants:

- "'I don't believe you when you say you didn't know what was going on.'  U.S. Sen. Barbara Boxer, D-Calif., addressing Skilling during his testimony before the Senate Commerce Committee in February 2002."

- "'You are practicing plausible deniability.'  U.S. Rep. Cifford Stearns, R-Fla."

- "'Evidence shows that, as a result of their day-to-day involvement at the company, Lay and Skilling knew or should have known their subordinate officers misused the SPE transaction in a manner that resulted in the dissemination of materially misleading financial information.'  Court-appointed bankruptcy examiner Neal Batson writing in November 2003 report on Enron.  Batson's $100 million, 18-month investigation focused on special purpose entities, the financing tools Enron used to borrow money without recording it as debt, and, instead, to record these loan proceeds as a cash flow from business activities."

- "'We were not able to ascertain with . . . precision what Lay or Skilling knew.'  'No one in Management accepted primary responsibility of oversight; the controls were not executed properly, and there were structural defects in those controls that became apparent over time . . . .  Skilling appears to have been almost entirely uninvolved in the process, notwithstanding representation made to the Board that he had undertaken a significant role.'  The Powers report commissioned by Enron's board of directors and related [sic] in February 2002.  The report written by William Powers, dean of the University of Texas School of Law, said off-balance-sheet joint ventures helped Enron keep significant losses off their books for most of 2001."

- "'Skilling is resigning now for "personal reasons" but I think he wasn't have [sic] fun, looked down the road and knew this stuff was unfixable and would rather abandon ship now than resign in shame in 2 years.'  Enron Vice President Sherron Watkins in August 2001 'smoking gun' memo to Lay outlining concerns about Enron's accounting practices and conflicts of interest."

- "'I believe that Mr. Andy Fastow would not have put his hands in the Enron candy jar without an explicit or implicit approval to do so from Mr. Skilling . . . .'  Watkins in congressional testimony in February 2002."

- "'I hope he winds up in jail . . .  My guess is he will be led off in handcuffs, and when that happens the people who worked at Enron will feel that it didn't come soon enough.'  Charles

especially problematic because jurors in Houston, like jurors in no other venue, are likely to be aware of it.

8.   Indeed, in one measure of how biased the coverage has been, even the courts have succumbed to it.  Although it has never had the opportunity to review the facts of this case, the Court of Appeals for this Circuit recently assumed in dicta, in a published opinion, that Enron was befallen by a massive fraud.  This is, of course, one of the ultimate issues to be decided at this trial.[18]

9.   Finally, the *Chronicle* wrote a lengthy New Year's day article anticipating the filing of this venue and voir dire motion, including quotes from legal experts it sought out explaining why they expect the Court to deny the motion even though facts like the Causey plea may cause prejudice and individual voir dire by attorneys is not uncommon in large trials such as this one.[19] Reminding jurors that defendants have moved to transfer venue or are seeking a particular form of voir dire, and suggesting the motion is misguided and expected to be denied, only further prejudices defendants.  Articles like this do not appear in the other venues defendants have proposed.

---

Weiss, a former manager at Enron Broadband Services who was among those who lost careers and investment dollars when Enron imploded."
Ex. 44 (screen shots of pop-ups on *Chronicle* webpage).

[18] *See* Ex. 45 (*Enron trio object to the appellate court's statement that books were 'cooked,'* HOUSTON CHRON., Nov. 19, 2005); Ex. 46 (defendants' letter to court asking that prejudicial dicta about Enron be deleted from opinion).

[19] *See* Ex. 54 (*Will plea add bias to Enron jury pool? Another push to move the trial of Skilling and Lay is expected,* HOUSTON CHRON., Jan. 1, 2006).

## <u>CERTIFICATE OF SERVICE</u>

This is to verify that true and correct copies of the following documents (Defendants' Renewed Motion For Change Of Venue And Related Relief) have been served on this 4th day of January, 2006 on counsel listed below.

_____
Matthew T. Kline

Sean Berkowitz
John Hueston
Kathy Ruemmler
Enron Task Force
DOJ Criminal Division
1400 New York Avenue, NW, 10th Floor
Washington, D.C.  20530
Facsimile:  (202) 353-3165
*Enron Task Force*

Michael Ramsey
Chip Lewis
River Oaks/Welch Building
2120 Welch
Houston, Texas 77019
Facsimile:  (713) 523-7887
*Counsel for Kenneth L. Lay*

CC1:727577