UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED
JAN 18 2006
Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Cr. No. H-04-25 (Lake, J.) |
| JEFFREY K. SKILLING, and | § | |
| KENNETH L. LAY, | § | |
| | § | |
| Defendants. | § | |

## GOVERNMENT'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR CHANGE OF VENUE AND RELATED RELIEF

The government, by and through undersigned counsel, hereby opposes the defendants' renewed motion for change of venue and related relief ("Def. Mot." hereinafter). The Court denied the defendants' original motion to transfer venue on January 19, 2005. Memorandum and Opinion (Jan. 19, 2005) ("Mem. Op." hereinafter). Now, on the eve of trial, the defendants reassert by and large the very same arguments that the Court previously rejected. Nothing warranting reconsideration has occurred in the interim. The defendants make no showing that media coverage of Richard Causey's decision to plead guilty has poisoned the jury pool; nor do they show that the potential jurors' responses to the jury questionnaire somehow demonstrate that it would be impossible to select an impartial petit jury. The defendants argue as a last-ditch measure that the voir dire process the Court will employ to empanel the jury is inadequate. That is wrong: the Court's voir dire process is fair and balanced and accords with Fifth Circuit precedent, the Federal Rule of Criminal Procedure, and the Court's own experience in

picking petit juries.

## ARGUMENT

The defendants' primary argument is that moving the trial to Atlanta, Denver, or Phoenix is necessary due to local media coverage of their coconspirator's, Richard Causey, decision to plead guilty. Def. Mot. 5 (describing defendant Causey's guilty plea as "the most damning piece of recent adverse publicity"). They claim that because Causey pleaded guilty after the Court circulated jury questionnaires to the jury pool, Houston jurors will be unable to be fair in their deliberations months from now after hearing the trial evidence. This argument should be rejected out of hand.

In the first place, the local media coverage of Causey's guilty plea does not seriously prejudice them, much less demonstrate that "'prejudicial, inflammatory publicity so saturated the community jury pool as to render it virtually impossible to obtain an impartial jury.'" Mem. Op. 22 (citing *United States v. Smith-Bowman*, 76 F.3d 634, 637 (5th Cir. 1996), and *United States v. Parker*, 877 F.2d 327 (5th Cir. 1989)). The defendants merely cherry-pick isolated media reports without regard to what has been on the whole fair and factual accounts of the collapse of Enron and this trial. "[I]solated incidents of intemperate commentary about the alleged crimes and their perpetrators do not rise to the level of 'inflammatory' where, as here, for the most part, the reporting appears to have been objective and unemotional." Mem. Op. 12; *see also id.* at 13 ("[T]he news accounts in this case simply do not constitute the type of inflammatory reporting of inherently

prejudicial facts . . . needed to support a claim of presumptive prejudice.").

The defendants' own expert, Edward J. Bronson, acknowledges (although grudgingly) that he reviewed "the relevant publicity over the past year" and that it has "somewhat abated" since his previous two declarations were filed in support of the defendants' unsuccessful motion to change venue. Skilling Supp. at 3 n.1. Consistent with that, the defendants offer little that is new to bolster their claim that hostile media coverage has poisoned the attitudes of the approximately 4.5 million people living in the Houston area. They cobble together a handful of citations to Internet "blogs," Houston Chronicle editorials or articles, and a documentary film, none of which suggests that the jury pool is tainted. *See* Def. Mot. Att. A; *see also* Skilling Supp. Br. Exh. A. Only one of the newspaper articles they cite even mentions Causey's guilty plea, and does that only in the context of correctly anticipating the defendants' decision to renew their venue motion. *See* Def. Mot. Att. A at 6, ¶ 9. Two of the media sources the defendants quote are merely Internet websites, *see id.* at 3, ¶ 5; *id.* at 3-4, ¶ 7; Skilling Supp. Br. Exh. A, for which the defendants supply no readership information. The defendants quote at length from an editorial that appeared in the Houston Chronicle concerning Causey's plea, Def. Mot. 7-8, but editorials by their nature express the opinions of their authors, not the opinion of the entire community. In addition, as the Court previously found, the Chronicle "reaches less than 'one-third of occupied households in Houston.'" Mem. Op. 16 (citations omitted);

*see also* Govt. Opp. at 30 (citations omitted).[1]

More importantly, the defendants fail to cite a single precedent under which a coconspirator's decision to plead guilty required a change of venue. That should come as no surprise, as jurors are routinely trusted to correctly and fairly assess information concerning coconspirators' guilty pleas. It is black-letter law in this and every other circuit in the country that even before a petit jury – which involves a much more critical point in litigation than pretrial proceedings – "'[a] witness-accomplice guilty plea may be admitted into evidence if it serves a legitimate purpose and a proper limiting instruction is given.'" *United States v. Valuck*, 286 F.3d 221, 228 (5th Cir. 2002) (quoting *United States v. Marroquin*, 885 F.2d 1240, 1247 (5th Cir. 1989)); *United States v. Borchardt*, 698 F.2d 697, 701 (5th Cir. 1983) ("The general rule in this Circuit is that a witness-accomplice's guilty plea may be brought out at trial . . . .") (citing cases from various circuits). Jurors are presumed to make their decisions based upon the evidence presented at trial and the

---

[1] In any event, the extent of media coverage concerning Causey's guilty plea was presumably comparable to the coverage of defendant Lay's own speech to Houston business persons on December 12, 2005. In that speech, Lay called for witnesses to step forward on his behalf, thus clearly indicating that he intended his message to reach the wider Houston audience through the media. Far from seeking a change of venue at that time, defendants affirmatively opposed the government's motion for a protective order on all parties. *See* Status Hearing Tr. 20 (Dec. 16, 2005). The Court denied the government's motion, reasoning that "this is just a drop in the bucket." *Id.* at 21. If the defendant's decision to speak to the jury pool through the media does not seriously risk juror taint, then there is no reason to imagine that largely balanced, factual reporting concerning Causey's guilty plea risks any taint. *See* Def. Mot. 22 (describing as "instructive" the "Court's recent consideration of a gag order").

trial court's instructions. *See, e.g.*, *United States v. Tarango*, 396 F.3d 666, 677 (5th Cir. 2005) ("There is a well-established presumption that juries are able to follow the court's instructions and compartmentalize the evidence against each defendant."). Thus, especially in a case where the jurors will still be screened through an in-court voir dire process, there is no basis for asserting that *no* potential juror could competently fulfill his or her obligation once seated. To the contrary, jurors faithfully fulfill those obligations all the time, including where they have knowledge that a defendant's coconspirator entered a guilty plea.

The defendants claim that the responses to the jury questionnaires received by the Court bolster their renewed motion to transfer venue. In this connection, they rely on the aforementioned late-filed declaration of Edward J. Bronson. Skilling Supp. Exh. 1. The Bronson declaration acknowledges that "over half (57.5%)" of the potential jurors responded that they could serve as impartial jurors. He nonetheless opines that "*that no doubt significantly overstates what they would in fact be able to do.*" *Id.* at 5-6, ¶ 14 (emphasis in original). Bronson bases this claim on dubious and equivocal premises, such as his assertion that "guilt percentages obtained in court through jury questionnaires or voir dire are substantially lower than what is found in anonymous community surveys." *Id.* at 5, ¶ 11. But, as this Court observed in denying the defendants' earlier transfer motion, "courts have commonly rejected such polls as unpersuasive . . . ." Mem. Op. 19 (citations omitted). The defendants suggest no reason to alter that practice here. Bronson

further argues that undisclosed taint is revealed by one potential juror who responded, "I hate to say it, but I cannot image how my personal involvement in Mariner Energy could not influence my involvement." Skilling Supp. Exh. 1 at 5, ¶ 13 (emphasis in original). However, Bronson provides no reason to think that one potential juror's use of a stock phrase means that the other potential jurors could not be trusted to fulfill their duties as petit jury members.

In any event, even under the defendants' implausible reading of the juror-questionnaire responses, they acknowledge that there are "70 or so jurors whose responses do *not* disclose obvious bias . . . ." Def. Mot. 20 (emphasis in original).[2] Thus, the defendants' own figures strongly suggest that there will be more than enough potential jurors to seat a petit jury and alternates. *See also id.* at 10 ("Exactly 80% of the jurors, or 224 out of 280, expressed preexisting negative views . . . .") (emphasis omitted). There is,

---

[2] The defendants claim that even the roughly 70 jurors whose responses they candidly acknowledge "do *not* disclose obvious bias" nonetheless pose "serious due process concerns" because the jurors (1) may "harbor deep-seated, unconscious biases," (2) be exposed to media coverage during trial, (3) be affected by their "friends, families, neighbors, co-workers, and fellow worshipers," and (4) may turn out to be "stealth jurors." Def. Mot. 20-22. Defendants' rank speculation about possible present and future bias fails to distinguish these potential jurors from those in any high-profile civil or criminal trial. *Cf. Calley v. Callaway*, 519 F.2d 184, 210 (5th Cir. 1975) ("In prominent cases of national concern, we cannot allow widespread publicity concerning these matters to paralyze our system of justice."). Moreover, an instruction from the Court would ameliorate any such supposed difficulties. *Cf. United States v. Williams*, 573 F.2d 284, 287-88 (5th Cir. 1978) (affirming conviction for tax fraud where trial court properly instructed jurors on legal matters and obligations).

thus, no compelling reason to change venue or award any other requested relief.[3]

Earlier Enron-related cases bear that out. *See* Gov't Opp. To Def. Transfer Motion (Gov't Opp.) at 20-29. In both the *Arthur Andersen* and *Bayly* trials – which were held close to the intense media scrutiny that followed the collapse of Enron – juries were empaneled in a single day. *See* Gov't Opp at 24-5 (discussing cases). Tellingly, neither of those cases involved the extensive and searching jury questionnaires filled out by the potential jurors in this case. Here, virtually all the questions the defendants sought to have asked were incorporated into the jury questionnaire.[4] Thus, if anything, the jury-selection process in this case should be more efficient, not less, than in *Andersen* or *Bayly*.

In the final analysis, the defendants' argument is premised on a misconstrual of the

---

[3] The Bronson declaration goes so far as to say that a mere 18 potential jurors are free from "serious[ ] . . . doubt on their ability to be fair." *Id.* at 8, ¶ 19. Bronson reaches that extreme conclusion only by making the unwarranted wholesale assumptions that, for example, there is "significant question" about the fairness of any respondent who indicated that he or she was angry about what happened at Enron (not angry Lay or Skilling) or had an opinion (either positive or negative) about Lay or Skilling. *See id.* at 7 (chart); *id.* at 8, ¶¶ 18-9. That is baseless. The fact that, say, a juror is angry about the collapse of Enron does not mean that he is unable to judge the defendants fairly or even that he thinks that Lay or Skilling is guilty. The responses show a more nuanced picture. Thus, one potential juror responded: "Yes. Perhaps angry is not the right word to describe my feeling but concern for those affected." Simply put, Bronson's conclusions are vitiated because he conflates concern for one's community with prejudice.

[4] The defendants submit declarations from three (presumably paid) individual attorneys who state that, after reviewing "jury questionnaire summaries," they believe that venue must be transferred. *See* Skilling Supp. Exh. 2-4. None of these attorneys suggests that he is familiar with the kind of extraordinarily detailed and searching jury questionnaire sent to potential jurors in this case. One of them nonetheless states that it would not "be impossible to find twelve fair people . . . ." *Id.* Exh. 2 at 2.

applicable standard of law. The defendants are entitled to a fair jury, not one that has been unexposed to media coverage or that comes to the case with no preconceived impression of the merits. As the Supreme Court explained in its seminal decision on jury selection, *Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639 (1961), "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 723, 81 S. Ct. at 1644. The Court explained:

> In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. *To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.*

*Id.* at 722-23, 81 S. Ct. 1643-44 (emphasis added). In short, contrary to the defendants' underlying claim, "[n]otoriety alone does not indicate that a change of venue is warranted." Mem. Op. 14 (citations omitted).[5]

---

[5] Defendants' urge the Court to grant a 30-day continuance to permit awareness of Causey's guilty plea to "abate," Def. Mot. 33, but the Court has already continued trial for two weeks and the defendants provide no reason to think that two additional weeks would be helpful. The defendants argue that additional time would allow for the circulation of a new jury questionnaire that does not reference Causey, *id.* at 33, but there is no need to excise Causey's name. Causey is not the only non-defendant about whom the questionnaire inquires. At the defendants' own insistence, the questionnaire asks jurors' opinions of Sherron Watkins, who will appear as a government witness. *See* Jury Questionnaire No. 70(d).

## II. The Court's Voir Dire Process Will Effectively Elicit Juror Bias And Accords Fully With Fifth Circuit Law.

The defendants ask the Court to reconsider its ruling on how it will conduct voir dire. The Court has determined that it will "question the jury and explain the rules of law that apply and ask them a number of questions. If I think that individual questioning at the bench is warranted, I will bring the juror up here. One lawyer per side may come up, and we will explore the matter further." Status Hearing Tr. 37 (Dec. 16, 2006) ("Hearing Tr." hereinafter). The defendants argue that this procedure is inadequate; they contend instead that the Court should reduce or forego "general questioning of the panel" and that "[e]ach juror should be questioned one-by-one in a closed courtroom, and out of the presence of other jurors and the public . . . ." Def. Mot. 32.

There is no reason for the Court to reconsider its voir dire process. Contrary to the defendants' repeated and erroneous suggestions, *see* Lay Supp. 1-3, the Fifth Circuit has made it abundantly clear that "[d]istrict courts may use collective questioning to identify jurors for which further individual questioning is necessary . . . ." *United States v. Beckner*, 69 F.3d 1290, 1292 n.2 (5th Cir. 1995); *see also id.* at 1291 ("the district court's discretion includes the decision whether jurors should be questioned collectively or individually.") (citing *United States v. Delval*, 600 F.2d 1098, 1102 (5th Cir. 1979)); *United States v. Chagra*, 669 F.2d 241, 250 n.15 (5th Cir. 1982) ("The use of such collective questions to identify the individuals possibly having knowledge about the case followed by a separate examination of each such individual is entirely acceptable."),

*overruled on other grounds*, *Garrett v. United States*, 471 U.S. 773, 105 S. Ct. 2407 (1985); *United States v. Davis*, 583 F.2d 190, 196-97 (5th Cir. 1978) ("Though separate examination of jurors is sometimes preferable, it is not necessarily required. We recognize the district court's need for flexibility in interrogating jurors as to possible prejudice.") (footnotes omitted).

The Court's voir dire process is hardly unusual, even in high-profile cases related to Enron. For example, in denying defendant Lea Fastow's motions for change of venue and individual voir dire, Judge Hittner of this Court ruled that he would conduct voir dire by first asking jury panel members questions as a group and then, "as need based the answers of the various veniremembers, the Court will question certain jurors individually . . . ." *United States v. Fastow*, 292 F. Supp. 2d 914, 921 (S.D. Tex. 2003). Judge Hittner reasoned that such a procedure would "elicit fewer volatile responses, which might jeopardize the sanctity of the entire panel." *Id.* at 921. *See also* Gov't Opp. 26 (noting court-conducted voir dire in *Bayly* trial).[6]

The defendants argue that the Court's voir dire process is infirm because "[m]erely asking jurors if they can be fair is not enough." Def. Mot. 26. That point gets no traction in this case. Here, the Court specifically requested the parties to submit questions that they believe should be asked of the veniremembers. *See, e.g.*, Hearing Tr. 36-37. Moreover, as

---

[6] The defendants cite Local Rule 23.1, Def. Mot. 25, but even cursory inspection of the Rule reveals that the voir dire process announced by the Court violates neither its letter nor spirit. *See* Cr LR 23.1 (citing 78 F.R.D. 519, 532-33 (1980)).

noted above, the potential jurors submitted responses to an extremely detailed jury questionnaire. The questionnaire included, for example, requests for information about media exposure to the case. *See, e.g.*, Jury Questionnaire No. 41 ("please tell us the name of all sources from you have heard or read about the Enron cases . . . ."); *id.* No. 42 ("please describe the book(s) or movie(s) [discussing Enron] and tell us what you thought of that book or movie"); *see also* Nos. 51-56 (inquiring about media sources). Thus, the safeguards for determining the impartiality of jurors in the Court's procedure already exceed those sought by the defendants.[7]

The defendants suggest that counsel, rather than the Court, should the conduct questioning of the jury panel. *See* Def. Mot. 32. However, the Court has already indicated that it will permit limited questioning by counsel at the bench. Hearing Tr. 36.[8] Allowing

---

[7] More generally, the Fifth Circuit has approved voir dire procedures for cases involving pretrial publicity where the trial court has "ask[ed] jurors what information they have received, ask[ed] responding jurors about the prejudicial effect of such information, and then independently determine[d] whether such information has tainted jurors' impartiality." *Beckner*, 69 F.3d at 1291-92. As noted above, this is exactly what the Court's voir dire process will ensure.

[8] Federal Rule of Criminal Procedure 24(a) provides:

> (1) In General. The court may examine prospective jurors or may permit the attorneys for the parties to do so.
> (2) Court Examination. If the court examines the jurors, it must permit the attorneys for the parties to:
>> (A) ask further questions that the court considers proper; or
>> (B) submit further questions that the court may ask if it considers them proper.

(continued...)

counsel to take the lead in questioning potential jurors would be inappropriate in a case with public sensitivities such as this, where it is fairest to both sides to vet their questions, which may then be posed to the jury pool by the Court acting as a neutral party.

Moreover, the defendants erroneously disregard the Court's own substantial experience in conducting voir dire. *See Mu'Min v. Virginia*, 500 U.S. 415, 427, 111 S.Ct. 1899 (1991) ("Particularly with respect to pretrial publicity, we think this primary reliance on the judgment of the trial court [in conducting voir dire] makes good sense."). As the Court has explained:

> I've found over many years I get more forthcoming responses from jurors than the lawyers on either side. I don't know whether people are suspicious of lawyers – but I think if I ask a person a question I will get at candid response much easier than if a lawyer asks the question.
>
> I'll ask the questions in a neutral, non-argumentative manner. Not that any of you would ever couch a question in a manner intended to be disguised as a jury argument, but some lawyers in some cases have done that.

Hearing Tr. 36. Thus, not only will examination by a neutral party be the fairest method for conducting voir dire in a publically sensitive case such as this, in the Court's experience, it will also be the most effective method.

---

[8](...continued)
Fed. R. Crim. P. 24(a). Because the Court permitted the parties to submit questions for it (the Court) to ask of the prospective jurors, the Court is under no obligation to allow defendants' counsel to question the jurors. *See id.* 24(a)(2)(B).

## CONCLUSION

Defendants' Renewed Motion For Change of Venue And Related Relief should be denied.

Dated: January 18, 2006
Houston, Texas

Respectfully submitted,

SEAN M. BERKOWITZ
Director, Enron Task Force

/s/

John A. Drennan
John C. Hueston

Special Attorneys
Enron Task Force

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of January 2006, I caused a true and correct copy of the foregoing Government's Opposition to Defendants' Renewed Motion For Change Of Venue And Related Relief to be served by electronic mail upon the following counsel of record:

Daniel M. Petrocelli
Matthew T. Kline
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
(310) 246-6850
Dpetrocelli@OMM.com

Ronald G. Woods
5300 Memorial, Suite 1000
Houston, TX 77007
(713) 862-9600
RonWoodsLaw@aol.com

Michael Ramsey
Chip B. Lewis
River Oaks/Welch Building
2120 Welch
Houston, TX 77019
(712) 523-7878
mramsey@mramsey-lawyer.com

Mary Ellen Vedas
Paralegal Specialist