ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

MAR 3 1 2006

MICHAEL N. MILBY, CLERK OF COURT

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | Crim. No. H-04-25 (Lake, J.) |
| v. ) | |
| JEFFREY K. SKILLING and ) KENNETH L. LAY, ) | |
| Defendants. ) | |

## SUPPLEMENTAL EXPERT DISCLOSURE FOR MICHAEL MULLIGAN

Pursuant to Federal Rule of Criminal Procedure 16(b)(1)(C) and the Court's January 12, 2006 ruling with respect to defendants' expert witnesses, defendant Jeffrey Skilling hereby provides a summary of expert testimony that may be offered at trial by Michael Mulligan.

### I.   QUALIFICATIONS

As previously disclosed, Mr. Mulligan is Executive Director of Financial Corporate Legal Advisors International, Inc., a former Associate Professor of Accounting at Georgetown University, a former Senior Counsel and Staff CPA for the Securities and Exchange Commission, and has been a licensed CPA for approximately 20 years. He holds both a B.B.A. in Accounting from the College of William and Mary and J.D. from George Mason University Law School. A copy of Mr. Mulligan's curriculum vitae listing his academic credentials and scholarly publications previously was provided with our October 21, 2005 disclosure letter.

### II.   OPINIONS AND BASES THEREFOR

Mr. Mulligan or staff members working at his direction have reviewed Enron's relevant financial statements; Arthur Andersen's ("Andersen") workpapers for the Corporate, Enron

North America (formerly known as Enron Capital and Trade), Enron Energy Services, Enron Broadband Services, and Enron International business units for 1999-2001; the depositions of Andersen accountants in *Newby v. Enron Corp.* civil litigation; the minutes and related materials for Enron's full Board and Board Committee meetings; other internal Enron accounting documentation, including the deal documentation for the Cuiaba, Nigerian Barges, ENA/CLO Trust, Backbone, Bob West Treasure, and Raptors transactions; the records in the prior trials in *U.S. v. Arthur Andersen, U.S. v. Bayly, et al.,* and *U.S. v. Hirko, et al.*; the trial testimony in this case; and the applicable accounting literature as well as applicable rules, regulations and form requirements promulgated by the SEC and interpretations and releases thereon. Mr. Mulligan is expected to testify to the matters identified below.

### A.     Structured Finance and Use of Special Purpose Entities

Mr. Glisan and Mr. Fastow have testified that various Enron structured finance transactions "hid" debt or loses and/or "manufactured" or "inflated" earnings.[1]

Based on his knowledge and experience, Mr. Mulligan will explain briefly why structured finance transactions and monetizations using special purpose entities ("SPEs") necessarily result in the removal of debt and assets from a company's balance sheet. He will also testify that structured finance transactions appropriately result in recognition of cash flow and earnings, and that such results are normal and appropriate under Generally Accepted Accounting Principles ("GAAP").

### B.     LJM1 and LJM2

Several witnesses have provided opinion testimony and other evidence at trial asserting that LJM1 and LJM2 were not properly treated as third parties or, in other words, that the LJM1

---

[1] *See, e.g.,* 3/7/06 Transcript at 6430:19-6431:11, 6463:9-6464:15, 6487:11-18, 6514:10-13, 6553:18-25 (Fastow); 3/21/06 Transcript at 9053:14-9054:20 (Glisan).

and LJM2 entities were the "same thing" as Enron. Specifically, Sherron Watkins testified that "LJM" transactions were "not third party structures," and Ben Glisan and Andrew Fastow testified that "LJM" did not act independently in particular transactions. Whether the LJM entities were properly treated as separate parties for accounting purposes– or "deconsolidated" from Enron – is an accounting issue.

Based on his knowledge and experience, the applicable accounting rules, the relevant deal documentation, the relevant Board of Directors and committee minutes and meeting materials, as well as Enron's financial statements, the relevant portions of Andersen's workpapers, the trial record to date, and the SEC's relevant disclosure provision in Regulations S-X, S-K and SEC interpretations and releases thereon, Mr. Mulligan is expected to offer the following expert opinions relating to LJM1 and LJM2:

1. LJM1 was properly deconsolidated pursuant to SPE rules under GAAP (EITF Topic D-14, SOP 78-9, EITF Issue 90-15, EITF Issue 96-21, EITF Issue 96-16, EITF Issue 98-6 and the Speech of Armando Pimentel of December 9, 1997) because it met the applicable 3% independent equity, control, and risks and rewards tests. Mr. Fastow's ability to make decisions as the general partner of LJM1 was well known to Andersen, does not equate to "control" by Enron for accounting purposes and, therefore, does not result in consolidation of LJM1 (*i.e.*, LJM1 being treated as the "same company" as Enron).

2. LJM2 was not a SPE sponsored by Enron and therefore was properly deconsolidated under GAAP regardless of whether it met the SPE rules (EITF Topic D-14, SOP 78-9, EITF Issue 90-15, and EITF Issue 98-6, EITF Issue 96-21, EITF Issue 96-16, the Speech of Armando Pimentel of December 9, 1997), but, even if the SPE rules are applied, LJM2 was properly deconsolidated under GAAP because it met the applicable independent equity, control,

3

and risks and rewards tests. With respect to testimony provided in this matter by Mr. Fastow and Chris Loehr regarding Mr. Fastow's ability to negotiate on behalf of and make decisions for LJM2, the nature of Mr. Fastow's role at LJM2 was set forth in the contractual documentation and known to Enron's Board of Directors and Andersen. Further, the fact that Mr. Fastow made day-to-day decisions for LJM2 does not equate to "control" by Enron for accounting purposes and, therefore, does not result in consolidation of LJM2 (*i.e.*, LJM2 being treated as the "same company" as Enron).

3.  Enron's disclosures concerning the existence of LJM1 and LJM2 and transactions with those entities complied with applicable GAAP and SEC rules (FAS 57 and SEC Regulations S-K and S-X, and the SEC interpretations and releases thereon).

**C.   "Side Agreements"**

Certain witnesses have testified about the supposed accounting significance of alleged "side agreements" and, in particular, those allegedly referenced in the so-called "Global Galactic" document. Mr. Fastow, for example, opined that "side deals" identified on the "Global Galactic" document "violated[] accounting rules" and "tainted" the accounting for transactions.[2] Both Mr. Fastow and Mr. Glisan similarly opined that alleged verbal assurances that someone "wouldn't lose money" or "couldn't suffer a loss" were tantamount to "guarantees" that "would violate the accounting rules" and preclude "sales treatment" for the transactions.[3] Andersen accountant Tom Bauer also testified that he was "shocked" when he saw the "Global Galactic" document, and opined that it contained "three pages of lies about transactions, some of which I had been involved with, that any one of them would alter the accounting or the financial

---

[2] *See, e.g.*, 3/8/06 Transcript at 6471:16-6472:7 (Cuiaba); *id.* at 6953:9-13 (Global Galactic).
[3] *See, e.g.*, 3/7/06 Transcript at 6466:5-13, 6468:8-19, 6469:5-21, 6472:3-7 (Fastow re: Cuiaba); 3/22/06 Transcript at 9415:24-9416:23, 9422:19-9423:24 (Glisan re: Nigerian Barges); *id.* at 9427:3-15 (Glisan re: Cuiaba).

4

statements."[4] Mr. Bauer further opined in connection with a discussion of Enron's management representation letters that "agreements to repurchase assets previously sold" could "have an impact on whether the accounting treatment was right in the first instance," that "oral guarantee[s] can also have an impact on the transaction and the disclosure of the transaction," and that even legally unenforceable oral agreements entered into in derogation of integration clauses "can still have an impact on the financial statements."[5]

With respect to such testimony, Mr. Mulligan is expected to offer the following expert opinions based on his knowledge and experience, the applicable accounting rules, the relevant deal documentation for the items referenced in the "Global Galactic" document, relevant portions of Enron's financial statements, Andersen's workpapers, and the trial record to date in this matter:

1.  Parties to transactions oftentimes may have understandings or assurances that are not embodied in contractual documentation. In some situations, such communications, though undocumented, may give rise to additional rights and obligations. Other times they may not. Even when such communications result in additional rights and obligations, those additional terms may not have any material effect on the accounting for the transaction.

2.  No conclusion about the accounting effect of understandings or assurances not contained in contractual documentation can be made without first determining whether an "agreement" was reached, *i.e.*, a meeting of the minds on essential terms (or, as SEC Staff Accounting Bulletin ("SAB") 101 describes an analogous concept, a "final understanding between the parties as to the specific nature and terms of the agreed-upon transaction"). If it is determined that there has been a meeting of the minds on essential terms such that an agreement

---

[4] *See, e.g.*, 3/20/06 Transcript at 8621:3-11.
[5] *See, e.g.*, 3/20/06 Transcript at 8628:5-8629:14.

exists for accounting purposes, it is then necessary to determine whether the resulting "agreement" constitutes a "right of return" or "guarantee" within the meaning of GAAP authorities such as Statement of Financial Accounting Standards ("FAS") 48, FAS 49, and SAB 101. Oral "side agreements" constituting a right of return or guarantee may, depending upon the circumstances, call into question the original sales or gains treatment (*e.g.,* what some trial witnesses have referred to as a "true sale"), may create a contingent obligation under FAS 5, or potentially invalidate the independence of a 3% equity investment in a SPE. Mere inducements, assurances, or even agreements that do not amount to a right of return or guarantee, however, do not have such an effect.

3. From an accounting perspective, the "Global Galactic" document itself has no accounting significance. First, the evidence presented at trial by Mr. Fastow and Mr. Glisan establishes that the document, even if genuine, memorializes a collection of individual understandings and is not itself an agreement.[6] Second, to the extent that the items set forth in the "Global Galactic" document reflect "side agreements" reached after inception of the original transactions (which, from the evidence adduced to date, appears to be the case), from an accounting perspective, the alleged "side agreements" would have no adverse effect on the accounting for the original deals, because the new arrangements would be the result of subsequent negotiations (for example, if it was done in connection with the unconsummated deal to sell a number of international assets known as Project Summer).[7]

4. **Cuiaba.** With respect to the Cuiaba transaction specifically, Mr. Mulligan is expected to provide the following opinions:

---

[6] *See, e.g.,* 3/7/06 Transcript at 6499:12-6500:3, 6501:8-11 (Fastow); 3/22/06 Transcript at 9419:7-9420:22 (Glisan).
[7] *See, e.g.,* 3/9/06 Transcript at 7159:19-25; 3/23/06 Transcript at 9699:11-9701:6.; 3/14/06 Transcript at 7815:19-7818:3.

6

      a.      The sale of the interest in Cuiaba to LJM1 in 1999 was properly accounted for under GAAP as a sale and deconsolidation was appropriate, as the transaction met the applicable accounting tests for financing and equity risk (FAS 66, EITF 96-16, EITF 98-8, and SAB 99). Andersen reviewed and concurred in Enron's accounting for the transaction.

      b.      With respect to testimony provided in this matter by Mr. Loehr, Mr. Fastow, and Mr. Glisan and others concerning alleged oral statements that Mr. Fastow or LJM1 "would not lose money on the deal" or that Mr. Fastow had a "bear hug" from Mr. Skilling,[8] Mr. Mulligan will opine that these are mere assurances that do not create a right of return or guarantee for accounting purposes (FAS 48, FAS 49, SAB 101, FASB Staff FAS 125 Implementation Guide ¶ 50, and SEC Financial Reporting Release No. 23). Mr. Mulligan also will opine that such assurances do not undermine the original accounting treatment that resulted in a sale and deconsolidation.

      c.      Mr. Mulligan will opine that the Cuiaba references in the "Global Galactic" document do not create or reflect a right of return or guarantee for accounting purposes (FAS 48, FAS 49, SAB 101, FASB Staff FAS 125 Implementation Guide ¶ 50, and SEC Financial Reporting Release No. 23), or result in LJM1's capital not being at risk or deconsolidation being inappropriate under applicable GAAP (EITF Topic D-14 and EITF Issue 90-15). As described in the original two-page Global Galactic document and in the evidence presented at trial, the alleged statements fail to meet the definition of an "arrangement" under SAB 101 or the requisite certainty necessary for accounting significance discussed in ¶ 50 of the FASB Staff Implementation Guide for FAS 125.

---

[8] 3/7/06 Transcript at 6466:5-13, 6468:8-19, 6469:5-21, 6506:9-18 (Fastow); 3/14/06 Transcript at 7741:11-16 (Loehr); 3/21/06 Transcript at 9427:3-15 (Glisan).

7

5.  **Nigerian Barges.** With respect to the Nigerian Barges transactions, Mr. Mulligan is expected to provide the following opinions:

   a.  The sale of the financial interest in 3 Nigerian Barges to Merrill Lynch that occurred in 1999 was properly accounted for under GAAP as a sale, deconsolidation was appropriate under GAAP, and recognition of approximately $12 million in income was appropriate under GAAP (FAS 66, FAS 125, FIN 43, EITF 88-18, EITF 98-8, and SAB 101). Andersen reviewed and concurred in Enron's accounting for the transaction.

   b.  With respect to testimony provided in this matter by Mr. Fastow, Mr. Glisan, and Mr. Loehr regarding an assurance or other representations to "take out" Merrill Lynch in or about December 1999,[9] Mr. Mulligan will opine that such statements did not create a right of return or guarantee for accounting purposes under FAS 48 or FAS 49, did not constitute an "arrangement" as that term is used in SAB 101 or have the requisite certainty under ¶ 50 of the FASB Staff Implementation Guide for FAS 125, and did not result in the creation of a contingent obligation pursuant to FAS 5. Mr. Mulligan also will opine that, to the extent an agreement was formed, it would be best described for accounting purposes as a remarketing agreement, which does not undermine a transfer of risk or sales treatment.

   c.  With respect to testimony provided in this matter by Mr. Fastow concerning alleged oral assurances or a "bear hug" from Mr. Skilling,[10] Mr. Mulligan will opine that these statements do not affect the accounting for the December 1999 sale from Enron to Merrill Lynch or the June 2000 sale from Merrill Lynch to LJM2, since such assurances do not constitute an arrangement, a right of return, or a guarantee under

---

[9] *See, e.g.,* 3/7/06 Transcript at 6495:14-24 (Fastow); 3/14/06 Transcript at 7739:10-25 (Loehr); 3/22/06 Transcript at 9410:7-14, 9413:9-16, 9416:6-9418:5 (Glisan).

8

applicable GAAP (FAS 5, FAS 48, FAS 49, SAB 101, FASB Staff FAS 125 Implementation Guide ¶ 50, and SEC Financial Reporting Release No. 23). Mr. Mulligan also will opine that, because Enron was not a party to the June 2000 transaction and made no accounting entries as a result, any alleged assurances from December 1999 would not create an adverse accounting effect for Enron. Any conclusion to the contrary fails to take into account that LJM2 is a deconsolidated, third-party entity.

    d. Mr. Mulligan will opine that the Nigerian Barges references in the "Global Galactic" document do not create or reflect a right of return or guarantee for accounting purposes (FAS 48, FAS 49, SAB 101, FASB Staff FAS 125 Implementation Guide ¶ 50, and SEC Financial Reporting Release No. 23).

6. To assist the jury in understanding why the remaining items listed on the "Global Galactic" document do not reflect rights of return or guarantees that could negatively impact the accounting for the underlying deals, Mr. Mulligan will also briefly offer opinions on the ENA/CLO Trust, Backbone, Bob West Treasure transactions.

7. **ENA/CLO Trust.** With respect to the ENA/CLO Trust transaction, Mr. Mulligan is expected to provide the following opinions:

    a. With respect to testimony provided in this matter by Mr. Fastow that Enron incorrectly recorded earnings (or avoided losses) on the ENA/CLO transaction,[11] Mr. Mulligan will testify that there were no gains or losses on the transaction and there was no impropriety with respect to the original accounting for this transaction or the accounting for the repurchase of LJM2's equity or debt investments under GAAP (FAS 5, FAS 48, FAS 49, SAB 101, FASB Staff FAS 125 Implementation Guide ¶ 50, and

---

[10] *See, e.g.,* 3/7/06 Transcript at 6488:13-6489:6, 6507:21-25, 7191:11-7192:3.
[11] *See, e.g.,* 3/7/06 Transcript at 6446:8-6448:7.

9

SEC Financial Reporting Release No. 23). Andersen also reviewed and concurred in Enron's accounting for the transaction.

b. With respect to testimony provided in this matter by Mr. Loehr that Mr. Fastow said "LJM would not lose money on its investment,"[12] Mr. Mulligan will testify that the alleged statements do not create a right of return or guarantee for accounting purposes, and that the subsequent repurchases of LJM2's equity and debt investments were done for acceptable business reasons disclosed to and approved by Andersen.

c. Mr. Mulligan will opine that references in the "Global Galactic" document to the ENA/CLO Trust do not create or reflect a right of return or guarantee under applicable GAAP (FAS 48, FAS 49, SAB 101, FASB Staff FAS 125 Implementation Guide ¶ 50, and SEC Financial Reporting Release No. 23). Mr. Mulligan also will testify that the document references an agreement to repurchase LJM2's ENA/CLO Trust equity investment reached in September 2000, well after the original transaction closed in December 1999 and, as such, would not have had any retroactive effect on the accounting for the original transaction.

8. **Backbone**. With respect to the Backbone transaction, Mr. Mulligan will testify that to the extent there was any "side agreement" for a tax liquidity facility as testified to by Mr. Fastow,[13] such agreement would have no effect upon the accounting for the underlying transaction under applicable GAAP (SFAS 5, SFAS 48, SAB 101, FASB Staff FAS 125 Implementation Guide ¶ 50, and SEC Financial Reporting Release No. 23). Mr. Mulligan will opine that the liquidity provision referenced in the "Global Galactic" document would constitute

---

[12] 3/14/06 Transcript at 7765:6-12.
[13] *See, e.g.,* 3/7/06 Transcript at 6541:22-6542:15.

10

an immaterial modification of tax-related distribution provisions in the previously executed June 30, 2000 Agency and Marketing Agreement.

 9. **Bob West Treasure.** With respect to the Bob West Treasure transaction, Mr. Mulligan is expected to provide the following opinions:

 a. With respect to testimony provided in this matter by Mr. Fastow indicating that Enron engaged in a "side agreement" relating to a tax indemnification agreement at the outset of the transaction,[14] Mr. Mulligan will opine that any such "side agreement" did not affect the gain recognition reported by Enron on gas contracts related to the Bob West Treasure transaction (FAS 5, FAS 48, EITF Topic D-14, EITF Issue 90-15, EITF Issue 98-6, SAB 101, FASB Staff FAS 125 Implementation Guide ¶ 50, and SEC Financial Reporting Release No. 23). Mr. Mulligan also will testify that there was no accounting significance to a written tax indemnification agreement was reached in or about May 2000, subsequent to the original deal and after a tax issue arose.

 b. With respect to testimony provided in this matter by Mr. Loehr stating that documents were "backdated" in connection with the Bob West Treasure transaction,[15] Mr. Mulligan will testify that such backdating, if it did occur pursuant to the Tax Agreement dated May 2000, did not constitute a right of return or guarantee and, consequently, would not affect the accounting for the transaction as originally recorded in 1999 (FAS 48, FAS 49, SAB 101, FASB Staff FAS 125 Implementation Guide ¶ 50, and SEC Financial Reporting Release No. 23).

 c. Mr. Mulligan will opine that references to Bob West Treasure in the "Global Galactic" document do not create a right of return or guarantee under applicable

---

[14] *See, e.g.*, 3/7/06 Transcript at 6542:23-6543:11.
[15] *See, e.g.*, 3/14/06 Transcript at 7736:25-7738:6.

11

GAAP (FAS 48, FAS 49, SAB 101, FASB Staff FAS 125 Implementation Guide ¶ 50, and SEC Financial Reporting Release No. 23).

### D. Raptors

Based on his knowledge and experience, the applicable accounting rules, the relevant deal documentation, the relevant portions of Enron's financial statements, Andersen's workpapers, and the trial record to date, Mr. Mulligan is expected to offer the following expert opinions relating to the Raptors:

1. With respect to testimony provided in this matter by Mr. Fastow, Mr. Glisan, Mr. Loehr, and Ms. Watkins to the effect that (i) there was no economic risk to LJM2 and that the Raptors were structured solely for accounting purposes – thereby implying that the LJM2 subsidiary named Talon (for Raptor I) was not a proper SPE and therefore should have been consolidated by Enron; (ii) LJM2 did not incur "real risk" on the $41 million Put or with regard to its back-end interest; and (iii) LJM2 did not have control for accounting purposes over its subsidiary,[16] Mr. Mulligan will testify that these opinions are not supported by GAAP, and that Andersen and its Professional Standards Group consulted extensively on the accounting issues related to the transaction and concurred in the accounting results. Mr. Mulligan will testify that trial testimony and other materials support Enron's original accounting, including evidence that Enron bought other puts on its own stock, that LJM2 was at risk of loss on the $41 million Put, that LJM2 continued to have a substantive investment for accounting purposes even after receiving an initial $41 million distribution, and that the structure of the Raptors established LJM2's control for accounting purposes. Finally, Mr. Mulligan will briefly explain the structure of the Raptors and opine that they were accounted for properly under the relevant provisions of

---

[16] *See, e.g.*, 3/7/06 Transcript at 6564:7-6567:14 (Fastow); 3/14/06 Transcript at 776:15-7768:13 (Loehr); 3/15/06 Transcript at 8143:4-21, 8164:4-11 (Watkins); 3/22/06 Transcript at 9331:4-9332:21 (Glisan).

12

GAAP (FAS 5, EITF Topic D-14, EITF Issue 90-15, EITF Issue 98-6, EITF 96-16, EITF 96-21, Speech of Armando Pimentel of December 9, 1997).

    2.    With respect to testimony provided in this matter by Ms. Watkins indicating that the Raptors were improper because they used Enron's stock "to affect the income statement for losses or revenues" and were like "doing business with yourself,"[17] testimony from Mr. Glisan and Mr. Delainey that the Raptors hedges were not "true hedges,"[18] and testimony from Mr. Glisan that use of Enron's stock may be prohibited because of "accounting rules,"[19] Mr. Mulligan will testify that Enron was entitled to and did properly recognize income statement effects from hedges with an entity partially capitalized with Enron stock based on relevant GAAP authorities (FAS 133, EITF Issue 96-13, EITF Issue 00-07 and EITF Issue 00-19).

    3.    With respect to Ms. Watkins' testimony that the transactions with Raptors were "Enron-controlled structures," not done at "arms-length," and therefore not "third party structures,"[20] thereby indicating that the Raptors should have been consolidated, Mr. Mulligan will opine that, based on the accounting literature, such determinations should be made pursuant to the applicable SPE literature and that Talon and the other Raptors hedging entities were properly deconsolidated in accordance with EITF Issue 90-15, EITF Issue 96-16, EITF Issue 96-21, EITF Issue 98-6, and EITF Topic D-14.

    4.    With respect to Ms. Watkins' testimony regarding her opinion that there is a "basic overriding principal of accounting" that "rules never trump principles,"[21] Mr. Mulligan will opine that Ms. Watkins is incorrect, and that SFAC 1 provides that accounting rules shall not be superseded by the broader and more fundamental accounting concepts. In the context of SPEs

---

[17] 3/15/06 Transcript at 8140:9-8141:4.
[18] 2/29/06 Transcript at 5152:10-5154 (Delainey):7; 3/22/06 Transcript at 9342:8-24 (Glisan).
[19] 3/22/06 Transcript at 9343:8-9344:17.
[20] *See, e.g.,* 3/15/06 Transcript at 8174:1-8175:8.

in particular, accounting rules control over the economic substance of the transaction (FAS 125, FASB Staff FAS 125 Implementation Guide ¶ 50, and EITF Issue 90-15).

5.  With respect to testimony provided in this matter by Mr. Glisan indicating that "the accounting rules require that each step of the transaction have an independent business purpose" and that the alleged failure of the $41 million Put to have such a purpose "causes the structure itself to fail accounting rules,"[22] Mr. Mulligan will opine that no such requirement exists under GAAP that would be applicable to the Raptors.

6.  With respect to testimony provided in this matter by Mr. Delainey and others about alleged "backdating" of the swap agreement for Enron's investment in Avici,[23] Mr. Mulligan will testify that use of "as of" dates in contracts is a common and accepted practice for indicating the date upon which an agreement was reached even if it is not documented until later, and that agreements dated "as of" an earlier date are not treated as having been improperly "backdated" for accounting purposes.

7.  Mr. Mulligan will also testify that Enron's securities filings and proxy statement disclosures of the formation and operation of the Raptors, including their income statement effects, complied with the requirements of GAAP (FAS 57).

### E.  Disclosure Events

Based on his knowledge and experience, the applicable disclosure standards, the relevant documentation, the relevant portions of Enron's financial statements, Andersen's workpapers, and the trial record to date, Mr. Mulligan is expected to testify about the following issues:

1.  **$.01 in Q4 1999.** With regard to testimony offered by Ms. Rieker and Mr. Koenig that a one-cent post-closing adjustment for unspecified reasons in the fourth quarter of

---

[21] 3/15/06 Transcript at 8165:18-8166:2.
[22] See 3/22/06 Transcript at 9332:10-21.

14

1999 was "improper" and, more specifically, Mr. Koenig's testimony that it was "wrong to sharpen your pencil after the fact,"[24] Mr. Mulligan will testify that ordinary accounting practices often result in post-closing adjustments and that there is no accounting basis for presuming impropriety in such adjustments. Additionally, even if the $.01 adjustment had occurred and resulted in a misstatement (a conclusion that cannot be reached based on the evidence introduced to date), such adjustment was immaterial to Enron's financial statements for that quarter under applicable GAAP (SAB 99).

2. **Securitizations and Monetizations.** With respect to testimony offered in this matter by Mr. Koenig, Ms. Rieker, Mr. Rice, and others that earnings releases and analysts calls failed to appropriately disclose the Braveheart transactions and securitizations involving New Power Company/ResCo,[25] Mr. Mulligan will testify that Enron's securities filings adequately disclosed the effect of these transactions, and that there is no requirement for more detailed disclosure of such items set forth in SEC Regulations S-X or S-K or the releases or interpretations thereon.

3. **Backbone.** With respect to testimony offered in this matter by Mr. Koenig with regard to an analyst call and earnings release for the second quarter of 2000 in which Mr. Skilling allegedly described the Backbone transaction as "core business" and that Enron "incorrectly" minimized the amount of contribution from dark fiber sales,[26] Mr. Mulligan will

---

[23] *See, e.g.,* 2/29/06 Transcript at 5166:11-5167:12.
[24] *See, e.g.,* 2/1/06 Transcript at 743:11-751:23, 2497:4-13, 2606:11-2608:9 (Koenig); 2/23/06 Transcript at 4541:8-4543:2 (Rieker).
[25] *See, e.g.,* 2/1/06 Transcript at 840:5-841:19, 987:22-991:15, 993:16-999:18 (Koenig); 2/14/06 Transcript at 2876:20-2877:10 (Rice); 2/21/06 Transcript at 3799:9-3803:23 (Rieker).
[26] *See, e.g.,* 2/1/06 Transcript at 840:9-850:13, 863:9-864:10, 883:1-25.

testify that there is no need for such items to be separately disclosed under SEC Regulations S-X or S-K. Furthermore, even if disclosure was required, the item is immaterial under SAB 99.

Dated: March 30, 2006

Respectfully submitted,

By: _____

Of Counsel:

Ronald G. Woods
Texas State Bar No. 21964000
Federal Bar No. 657
5300 Memorial, Suite 1000
Houston, TX 77007
Office: 713-862-9600
Facsimile: 713-864-8738

Daniel M. Petrocelli
M. Randall Oppenheimer
Mark Holscher
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
Office: (310) 553-6700
Facsimile: (310) 246-6779

*Attorneys in Charge for Jeffrey K. Skilling*

## CERTIFICATE OF SERVICE

This is to verify that true and correct copies of the following document (Supplemental Expert Disclosure for Michael Mulligan) has been served on this 30th day of March, 2006, on counsel listed below.

Jeffrey A. Barker

Sean Berkowitz
John Hueston
Kathy Ruemmler
Cliff Stricklin
Enron Task Force
DOJ Criminal Division
1400 New York Avenue, NW
10th Floor
Washington, D.C. 20530
Facsimile: (202) 353-3165
*Enron Task Force*

Michael Ramsey
Chip Lewis
River Oaks/Welch Building
2120 Welch
Houston, Texas 77019
Facsimile: (713) 523-7887
*Counsel for Kenneth L. Lay*

CC1:738428.4