IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CRIMINAL NUMBER H-04-025 |
| | § | |
| JEFFERY K. SKILLING and | § | |
| KENNETH L. LAY, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court is Defendants' Motion to Introduce Prior Testimony of Unavailable Witnesses Pursuant to Federal Rules of Evidence 804(b)(1) or 807 (Docket Entry No. 840).  For the reasons explained below the motion will be granted in part and denied in part.

## I.  Introduction

Defendants seek to admit testimony given in prior trials by Joseph Hirko, former CEO of Enron Broadband Services (EBS), and by David Duncan, former Arthur Andersen engagement partner for Enron, and testimony given in prior Securities and Exchange Commission (SEC) proceedings by Georganne Hodges and John Lavorato, former executives of Enron's Wholesale unit, and by Kristina Mordaunt, former general counsel of EBS, because each of these individuals is unavailable to testify in the trial of this case.  Citing Federal

Rule of Evidence 804(b)(1) defendants argue that prior testimony of unavailable witnesses is admissible because "the Enron Task Force had an opportunity and similar motive to develop the testimony defendants seek to introduce at this trial."[1]   Alternatively, defendants argue that the testimony of these unavailable witnesses is independently admissible under the "residual" or "catch-all" exception to the hearsay rule provided by Federal Rule of Evidence 807.[2]   The government argues that the prior testimony defendants seek to admit is inadmissible under either Rule 804 or Rule 807.[3]

## II.  **Rule 804**

### A.  **Applicable Law**

Federal Rule of Evidence 804(b) provides in pertinent part:

> The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> (1) Former testimony.  Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

---

[1] Defendants' Motion to Introduce Prior Testimony of Unavailable Witnesses Pursuant to Federal Rules of Evidence 804(b)(1) or 807, Docket Entry No. 840 (Defendants' Motion), p. 2.

[2] <u>Id.</u>

[3] United States' Response to Defendants' Motion to Introduce Prior Testimony of Unavailable Witnesses Pursuant to Federal Rules of Evidence 804(b)(1) or 807, Docket Entry No. 849 (United States' Response).

The government does not dispute that

> the declarants' invocation of their Fifth Amendment
> privilege against compelled self-incrimination renders
> them 'unavailable' within the meaning of Rule 804(b)(1)
> or that the government was a party to the prior criminal
> trials or SEC proceedings at which the declarants gave
> the former testimony.[4]

The government disputes, however, that it had an opportunity and similar motive to develop the testimony of these witnesses at the prior proceedings and that the testimony is relevant.

In <u>United States v. Salerno</u>, 112 S.Ct. 2503, 2507-2509 (1992), the Court held that a party has no right to introduce former testimony under Rule 804 without showing similar motive. Since "similar motive does not mean identical motive, the similar-motive inquiry is inherently a factual inquiry, depending in part on the similarity of the underlying issues and on the context of the questioning." <u>Battle v. Memorial Hospital at Gulfport</u>, 228 F.3d 544, 552 (5th Cir. 2000) (citing <u>Salerno</u>, 112 S.Ct. at 2509 (Blackmun, J., concurring). "Moreover, like other inquiries involving the admission of evidence, the similar-motive inquiry appropriately reflects narrow concerns of ensuring the reliability of evidence admitted at trial." <u>Id.</u> (quoting <u>Salerno</u>, 112 S.Ct. at 2509 (Blackmun, J., concurring). The party seeking to offer prior testimony under Rule 804(b)(1) bears the burden of showing that each of the Rule's elements was satisfied. <u>Id.</u> ("a party has no

---

[4] <u>Id.</u> at 2 and n.1.

right to introduce former testimony under Rule 804 without showing similar motive"). See also United States v. Omar, 104 F.3d 519, 522 (1st Cir. 1997) ("the evidence in question being hearsay, it was the defendants' burden to prove each element of the exception they invoked").

To determine whether the government had a "similar motive" in prior proceedings, the Fifth Circuit found "valuable" the fact-specific test applied by the Second Circuit in United States v. DiNapoli, 8 F.3d 909 (2d Cir. 1993), where the court "held that the test must turn not only on whether the questioner is on the same side of the same issue at both proceedings, but also on whether the questioner had a substantially similar interest in asserting and prevailing on the issue." Id. (citing DiNapoli, 8 F.3d at 912). In DiNapoli the Second Circuit explained that

> [i]f a fact is critical to a cause of action at a second proceeding but the same fact was only peripherally related to a different cause of action at a first proceeding, no one would claim that the questioner had a similar motive at both proceedings to show that the fact had been established (or disproved).  This is the same principle that holds collateral estoppel inapplicable when a small amount is at stake in a first proceeding and a large amount is at stake in a second proceeding, even though a party took the same side of the same issue at both proceedings.  See, e.g., Hicks v. Quaker Oats Co., 662 F.2d 1158, 1171 (5th Cir. Unit A Dec. 1981); Restatement (Second) of Judgments § 28, cmt. j (1982). This suggests that the questioner must not only be on the same side of the same issue at both proceedings but must also have a substantially similar degree of interest in prevailing on that issue.

> Whether the degree of interest in prevailing on an issue is substantially similar at two proceedings will sometimes be affected by the nature of the proceedings. Where both proceedings are trials and the same matter is seriously disputed at both trials, it will normally be the case that the side opposing the version of a witness at the first trial had a motive to develop that witness's testimony similar to the motive at the second trial. The opponent, whether shouldering a burden of proof or only resisting the adversary's effort to sustain its burden of proof, usually cannot tell how much weight the witness's version will have with the fact-finder in the total mix of all the evidence. Lacking such knowledge, the opponent at the first trial normally has a motive to dispute the version so long as it can be said that disbelief of the witness's version is of some significance to the opponent's side of the case; the motive at the second trial is normally similar.

DiNapoli, 8 F.3d at 912-913.

Rule 804(b)(1) does not exempt defendants from having to show that the prior testimony they seek to introduce is relevant under Rule 401 and does not violate other rules of evidence, e.g., Rule 403. See United States v. Avants, 367 F.3d 433, 443-444 (5th Cir. 2004). "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

**B.   Analysis**

Defendants argue that the trial testimony of Hirko and Duncan, and the SEC testimony of Hodges, Lavorato, and Mordaunt is admissible under Rule 804(b)(1) because the government possessed a similar motive to develop their testimony in those prior proceedings; the government responds that it did not have a similar motive to develop the relevant testimony in prior proceedings.

1.   <u>Trial Testimony</u>

Defendants seek to introduce testimony that Hirko gave on June 24-29, 2005, at the criminal trial of former EBS executives and testimony that Duncan gave on May 13-14, 2002, at the criminal trial of Arthur Andersen.   The government argues that neither Hirko's nor Duncan's testimony is admissible under Rule 804(b)(1) because

> Duncan's testimony at the Andersen trial, and Hirko's testimony at the Broadband trial both involved issues sharply different from those presented in this case.   For that reason the government did not have a "similar motive" to develop those witnesses' testimony at those trials.[5]

(a)   Hirko

Defendants seek to introduce a long excerpt of Hirko's testimony about a January 16, 2001, meeting that he had with Ken

---

[5] <u>Id.</u> at p. 19.

Rice and Kevin Hannon, two government witnesses in this case.[6]
Defendants argue that

> Mr. Hirko was a defendant in the Broadband trial, charged
> with lying about the state of the Broadband business.
> Mr. Hirko testified that Mr. Rice and Mr. Hannon informed
> him in January 2001 that Broadband was doing well.  *See*
> Ex. 2 at 10925:10-10938:12.  The Task Force there, like
> the Task Force here, had a motive to discredit any
> testimony that Broadband was prospering in 2001.
> Although not a requirement under the similar motive
> inquiry, the Task Force did vigorously cross examine
> Hirko about his meeting with Rice and Hannon.  *See* Ex. 2
> at 11389:3-11390:9.[7]

> Asserting that "[t]he issues in the current trial have minimal

overlap with the charges in the Broadband case,"[8] the government

argues that

> Hirko's testimony about the [January 16, 2001] meeting is
> of little or no relevance to this case and should not be
> admitted.  First the government did not elicit testimony
> from Rice and Hannon concerning the January 16 meeting.
> Nor did defendants seek to question those witnesses about
> the meeting.  Accordingly, Hirko's testimony would not
> impeach either Rice or Hannon.  Second, statements that
> Rice and Hannon made to outside consultants in January
> 2001 are minimally probative of the state of EBS's
> business at that time, because Rice and Hannon have
> already testified that they lied to the market during
> this period.  Evidence suggesting they also lied to
> outside consultants in January 2001 would be merely
> cumulative.  Third, because Hirko's testimony was
> intended to show that he did not learn insider
> information at the January 2001 meeting, the government
> did not have a motive to cross-examine him in the same
> way that it would if he testified in this case. . . In
> addition, the government would be entitled to show that
> Hirko was under indictment when he gave the testimony and

---

[6]Defendants' Motion, p. 3, and Exhibit 2 attached thereto.

[7]Id. at p. 9.

[8]United States' Response, p. 24.

thus had a strong motive to lie.  For these reasons, Hirko's testimony should be excluded under Rule 403.[9]

Defendants respond that

[t]he prior testimony that the defendants designated concerns a January 16, 2001 meeting that Mr. Hirko, Mr. Rice and Mr. Hannon had with a group of outside consultants to discuss EBS.  Mr. Rice was asked specifically about this meeting at this trial.  *See, e.g.,* 2/15/06 Trial Tr. at 3202:18-3205:11.  Mr. Hirko's testimony directly and specifically contradicts the testimony of Mr. Rice and Mr. Hannon about what EBS's business prospects were like in January 2001.  Far from being "cumulative" evidence that Messrs. Rice and Hannon "lied to analysts" at the time, *see* Opp. at 25, Mr. Hirko's prior testimony establishes prior inconsistent statements by these two Task Force witnesses.  This is critical information, as Mr. Skilling is charged with having allegedly lied about the health of EBS in this same time period when he repeated information he had been provided about EBS.[10]

The court agrees.

There is no dispute that Hirko's prior testimony was given at the same type of proceeding, i.e., the EBS criminal trial, and that the government was on the same side of the issues in both that trial and this present trial.  Although the government argues that the two trials involve different issues, a central issue at the EBS trial is also an issue that is central to charges made in this case, i.e., EBS's financial performance and future prospects in January of 2001.  Skilling in particular faces charges based on allegations that in January of 2001 he misrepresented EBS as

---

[9]*Id.* at pp. 25-26.

[10]Reply in Support of Defendants' Motion to Introduce Prior Testimony of Unavailable Witnesses, Docket Entry No. 865 (Defendants' Reply), p. 11.

performing well financially when, in truth, EBS was performing poorly and lacked prospects for improving its performance.

The government in this case has introduced testimony from EBS executives Rice and Hannon that in January of 2001 they and Skilling knew that EBS was performing poorly and lacked prospects of improving its financial performance. To rebut this testimony defendants seek to introduce Hirko's testimony from the EBS trial that on January 16, 2001, he attended a meeting at which Rice and Hannon informed him that EBS was performing well and having good prospects for future performance. Since this testimony does not support the government's theory that by January of 2001 Rice, Hannon, and Skilling knew that EBS was not performing well financially and lacked prospects for improving its performance, the government's interest in this case would be to discredit Hirko's testimony from the EBS trial.

At the EBS trial Hirko was under indictment for insider trading based on the theory that he possessed insider information that EBS's financial performance and prospects for improvement were both poor.[11] Since Hirko's testimony that on January 16, 2001, he attended a meeting where Rice and Hannon informed him that EBS was performing well and had good future business prospects did not support the government's theory that he had acquired contrary information at that meeting, the government's interest at the EBS

---

[11]United States' Response, p. 9.

trial would have been the same as in this trial, i.e., to discredit Hirko's testimony. Accordingly, the court concludes that the government's interest at the EBS trial in asserting and prevailing on its theory that in January of 2001 Rice and Hannon knew and disclosed to Hirko that Enron's broadband unit was performing poorly and lacked prospects for future improvement would be substantially similar to the government's interest in making the same showing at this trial. See DiNapoli, 8 F.3d at 912-913 ("Where both proceedings are trials and the same matter is seriously disputed at both trials . . . so long as it can be said that disbelief of the witness's version is of some significance to the opponent's side of the case; the motive at the second trial is normally similar."). The court therefore concludes that defendants' motion to introduce Hirko's prior testimony regarding the January 16, 2001, meeting with Rice and Hannon should be granted.

(b) Duncan

Defendants seek to introduce 17 excerpts from Duncan's testimony at the Arthur Andersen criminal trial.[12] Defendants argue that

---

[12]The Duncan excerpts that defendants seek to introduce are:

1. 1664:12-1665:14  —  Arthur Andersen's Enron engagement;
2. 1686:20-1687:17  —  Size of Enron engagement;
3. 1689:8-1690:3  —  Size and scope of Enron engagement;
4. 1739:11-1739:24  —  Enron's accounting practices;
5. 1839:4-1840:8  —  $1.2 billion accounting error could be corrected by unwinding the Raptors;
6. 1841:12-1846:12  —  Oct. 16, 2001, Analyst Call;
7. 1846:24-1847:22  —  Materiality of $1.2 billion accounting error and need for restatement;
                       (continued...)

> [t]his testimony refutes the Task Force's core allegation that defendants signed false financial statements and helps refute the assertion that Enron concealed material facts from more than 100 Andersen professionals working in Enron's offices.  It also addresses the Task Force's contention that the accounting treatment for the Raptors transactions was improper.[13]

The government argues that Duncan's testimony is inadmissible

under Rule 804(b)(1) because

> the Andersen trial did not directly involve allegations of wrongdoing at Enron, the issues at that trial differed significantly from the issues in this case, and the facts that are critical to this trial were not central to the Andersen trial.  Moreover, although the government elicited testimony from Duncan concerning some of the transactions at issue in this case, its motive in questioning Duncan was to show that his employer, Andersen, obstructed justice, not that officials at Enron misrepresented or concealed material information from Enron's shareholders and employees.  Presumably for that reason, the government did not call any Enron employees to testify.[14]

---

[12](...continued)

| | | |
|---|---|---|
| 8. | 1848:9-1850:8 | — Duncan's view on necessity of restatement changed after Oct. 16, 2001; |
| 9. | 1870:15-1871:11 | — Adequacy of Enron's disclosures; |
| 10. | 1923:13-1924:20 | — Agenda for Oct. 16, 2001, Analyst Call; |
| 11. | 1926:5-1928:17 | — Agenda for Oct. 16, 2001, Analyst Call; |
| 12. | 2019:22-2021:14 | — Propriety of Enron accounting dependent upon full disclosure by Enron; |
| 13. | 2038:14-2039:16 | — Materiality of $1.2 billion accounting error; |
| 14. | 2050:1-2050:16 | — Accounting issues Arthur Andersen handled inappropriately; |
| 15. | 2177:25-2178:23 | — Challenges posed by Enron accounting; |
| 16. | 2272:1-2272:9 | — Propriety of Enron's accounting; |
| 17. | 2313:8-2317:21 | — Arthur Andersen addressed problems. |

[13]Defendants' Motion, p. 4.

[14]United States' Response, p. 20.

-11-

Defendants respond that "[i]n the Andersen trial, in an effort to show why a blue chip accounting firm might have a motive to destroy documents and obstruct justice, the Task Force sought to establish the existence of potentially fraudulent accounting and disclosures at Enron,"[15] and that "[w]hen Mr. Duncan's testimony on the stand contradicted that motive, the Task Force cross-examined him in an attempt to show that Enron's accounting and disclosures were at least 'aggressive,' if not misleading."[16]  Asserting that the government has similarly made the propriety of Enron's accounting practices an issue in this case, defendants argue that the government's interest in raising and prevailing on that issue in this case is substantially similar to its interest in raising and prevailing on that issue in the Andersen trial.[17]

There is no dispute that Duncan's prior testimony was given at the same type of proceeding, i.e., the Arthur Andersen criminal trial, and that the government was on the same side of the issues in both that trial and this trial.  Grouping the Duncan excerpts into different categories, the government argues that they are all inadmissible under Rule 804(b)(1) because "the government lacked either the need or the ability to show Duncan key documents during

---

[15]Defendants' Reply, p. 7.

[16]Id.

[17]Id. at pp. 9-10.

the Andersen trial,"[18] or "because they will consume undue time."[19]
The Duncan excerpts can be grouped into three different categories:
(1) the propriety of Enron's accounting;[20] (2) the propriety of
Enron's and Arthur Andersen's treatment of a $1.2 billion
accounting error;[21] and (3) general information about the Arthur
Andersen's Enron engagement.[22]

### (1)  General Propriety of Enron's Accounting

The government argues that excerpts concerning the general
propriety of Enron's accounting should be excluded "because they
consist of Duncan's unvarnished opinions concerning the propriety
of Enron's accounting."[23]  The government argues that

> Duncan gave these opinions in 2002, a short six months
> after the Enron bankruptcy.  In this trial, however,
> [Tom] Bauer and [J.R.] Sult both said that they had not

---

[18]United States' Response, p. 21.

[19]Id. at pp. 22-23.

[20]The Duncan excerpts that address the propriety of Enron's
accounting practices are: (4) 1739:11-1739:24; (9) 1870:15-1871:11;
(12) 2019:22-2021:14; (14) 2050:1-2050:16; (15) 2177:25-2178:23;
(16) 2272:1-2272:9; and (17) 2313:8-2317:21.

[21]The Duncan excerpts that address treatment of the $1.2
billion accounting error are:  (5) 1839:4-1840:8; (6) 1841:12-
1846:12; (7) 1846:24-1847:22; (8) 1848:9-1850:8; (10) 1923:13-
1924:20; (11) 1926:5-1928:17; and (13) 2038:14-2039:16.

[22]The Duncan excerpts that include general information about
Arthur Andersen's Enron engagement are: (1) 1664:12-1665:14;
(2) 1686:20-1687:17; and (3) 1689:8-1690:3.

[23]Id. at p. 21.

seen relevant internal Enron documents when performing
their auditing function and that if they had seen those
documents their opinion of certain transactions may have
been different.   Thus, the relevance and validity of
opinions that Duncan gave in 2002 is seriously in doubt,
and their probative value in this trial is minimal,
especially in light of the absence of substantial
government testimony concerning the accounting treatment
of the transactions charged in the indictment.[24]

Defendants respond that in the Arthur Andersen trial the government argued that Andersen employees shredded documents, in part, to cover up improper accounting engaged in by Enron with Andersen's approval.   Duncan, Arthur Andersen's relationship manager, testified that to his knowledge Enron's accounting and financial statements fully complied with generally accepted accounting principles (GAAP).   Defendants argue that because Duncan's testimony was inconsistent with the government's theory of the case, the government had incentive to discredit him, and the government did attempt to develop and discredit his testimony.[25] The court agrees.

With respect to the propriety of Enron's accounting, Duncan testified that Enron's disclosures were in the "minimal range" of compliance with GAAP,[26] that Enron adequately disclosed of its related-party transactions,[27] that based on the information that was

---

[24]<u>Id.</u> at pp. 21-22.

[25]Defendants' Motion, pp. 9-10.

[26]Exhibit 3 attached to Defendants' Motion, p. 1739.

[27]<u>Id.</u> at p. 1870.

disclosed to him he continued to think that Enron's accounting complied with GAAP,[28] that nevertheless mistakes were made,[29] that accountants try "to push the envelope,"[30] and that Arthur Andersen was required to address problems that arose,[31] and did address problems as they arose.[32]

These excerpts from Duncan's testimony show that the propriety of Enron's accounting procedures, including Enron's disclosure of related party transactions, was an issue that was raised and disputed in the Andersen trial.  They also demonstrate that while Duncan, the Arthur Andersen engagement partner for Enron, was motivated to testify that Enron's accounting practices, including its disclosures for related party transactions, were proper and in compliance with GAAP, the government was motivated to show that Enron's accounting practices were improper and not in compliance with GAAP.  Since the defendants in this case have been charged with offenses arising from allegations that Enron's accounting for and disclosure of related party transactions were improper, like the government prosecutors in the Andersen case, the government

---

[28]Id. at pp. 2019-2021.

[29]Id. at p. 2050.

[30]Id. at p. 2178.

[31]Id. at p. 2272.

[32]Id. at pp. 2313-2317.

-15-

prosecutors in this case are motivated to show that Enron's accounting, including its accounting and disclosure of related party transactions, were improper.

Citing the testimony of Arthur Andersen accountants Bauer and Sult in this trial regarding internal Enron documents that had been withheld from Arthur Andersen, the government argues that Duncan's testimony at the Arthur Andersen trial should be excluded because the government lacked either the need or the ability to show Duncan key documents during that trial. The court is not persuaded by this argument because when asked about the propriety of Enron's accounting practices at the Andersen trial, Duncan expressly qualified his opinion that Enron's accounting was appropriate by explaining that his opinion was based only on information that Enron disclosed to Arthur Andersen, and that it did not extend to financial results that had to be restated. In light of these qualifications the court is not persuaded that the government's inability to show Duncan key documents that were not available during the Andersen trial alters the government's interest and motivation for raising and prevailing on the issue that Enron's accounting and disclosure of related party transactions were improper. Accordingly, the court concludes that the defendants' motion to introduce the excerpts of Duncan's testimony that address the propriety of Enron's accounting, including its disclosure of related party transactions, should be granted.

### (2)  Accounting Error

The government argues that excerpts concerning a $1.2 billion accounting error should be excluded because like the excerpts concerning the general propriety of Enron's accounting they too "consist of Duncan's unvarnished opinions concerning the propriety of Enron's accounting,"[33] because they "consist . . . of Duncan's reading and explication of the transcript of the analyst call on October 16, 2001, . . . [that] is in evidence,"[34] or because they "consist of Duncan's identification and explanation of an internal Arthur Andersen document that is not in evidence in this case."[35]

With respect to the $1.2 billion accounting error, Duncan testified that Arthur Andersen advised Enron that it could correct the error by unwinding the Raptor transaction and repurchasing the equity,[36] that prior to October 16, 2001, he accepted Enron's position that the error did not need to be disclosed because it was immaterial,[37] that he helped plan and then listened to an analyst

_____

[33]United States' Response, p. 21 (citing Exhibit 3 attached to Defendants' Motion, p. 2038).

[34]Id. at p. 22 (citing Exhibit 3 attached to Defendants' Motion, pp. 1841-1846).

[35]Id. (citing Exhibit 3 attached to Defendants' Motion, pp. 1923 and 1926-1928).

[36]Exhibit 3 attached to Defendants' Motion, pp. 1839-1840.

[37]Id. at pp. 1846-1847, 2038-2039.

conference call held on October 16, 2001,[38] but that after October 16, 2001, he changed his opinion on that issue.[39]

These excerpts from Duncan's testimony demonstrate that the propriety of Enron's treatment of a $1.2 billion accounting error is an issue that was raised and disputed in the Andersen trial. They also demonstrate that Duncan — and by extension Arthur Andersen — were aware of both the $1.2 billion accounting error and Enron's treatment of it before the October 16, 2001, analyst call occurred. Since the defendants in this case have been charged with offenses arising from allegations that the Enron actions that caused the $1.2 billion accounting error and Enron's treatment of that error once it was discovered were improper, the court concludes that like the government prosecutors in the Andersen case, the government prosecutors in this case are motivated to show that Enron's accounting, including its treatment and disclosure of the $1.2 billion accounting error, were improper. Accordingly, for the reasons stated above in § II.B.1(b)(1), the court concludes that defendants' motion to introduce excerpts of Duncan's testimony from the Andersen trial concerning the $1.2 billion accounting error should be granted.

---

[38]Id. at pp. 1926–1928 (agenda) and pp. 1841–1846 (transcript of October 16, 2001, analyst conference call).

[39]Id. at pp. 1848–1850.

### (3)  Arthur Andersen Engagement

The government argues that certain excerpts of Duncan's testimony from the Arthur Andersen trial should be excluded because the defendants seek to use those excerpts to "establish facts that could be shown by witnesses or evidence currently available to defendants."[40]  These excerpts address Duncan's role as Enron engagement partner, the fees that Arthur Andersen earned from the Enron engagement, and the scope of that engagement.[41]  Although the issues addressed in these excerpts are not in dispute, the court concludes that these excerpts are necessary correlates to the excerpts of Duncan's testimony that the court has already concluded are admissible under Rule 804(b)(1) because they identify Duncan and his employer, Arthur Andersen, and explain why he is knowledgeable and competent to testify about the issues addressed in those excerpts that the court has already concluded are admissible.[42]  Accordingly, the court concludes that defendants' motion to introduce excerpts of Duncan's testimony from the

---

[40]United States' Response, p. 22.

[41]Exhibit 3 attached to Defendants' Motion, pp. 1664:12-1665:14, 1686:20-1687:17, and 1689:8-1690:3.

[42]Alternatively, the court concludes that these excerpts are admissible under Federal Rule of Evidence 807 because they were given under oath, they concern material facts on which Duncan had first-hand personal knowledge, they are more probative on the points for which defendants seek their admission than other evidence that defendants could procure through reasonable efforts, and the interests of justice will best be served by their admission into evidence.  See below, § III.A.

Andersen trial concerning his role as Enron engagement partner, the fees that Arthur Andersen earned from the Enron engagement, and the scope of that engagement should be granted.

2.   <u>SEC Testimony</u>

The government argues that testimony Hodges, Lavorato, and Mordaunt gave at SEC proceedings is not admissible under Rule 804(b)(1) because the government lacked a similar motive to develop that testimony as it would have were that testimony introduced in this trial.  The government argues

> [t]hat testimony was taken years before the indictment in this case by a government agency pursuing a separate statutory mandate.  Moreover, the SEC proceeding was a civil fact-finding inquiry, not a criminal trial, and the depositions that defendants seek to admit were taken before the government had the benefit of a more complete investigation and the cooperation of key insiders at Enron.  For these reasons, it is inadmissible under Rule 804(b)(1).[43]

The government also argues that the low probative value of the SEC testimony demonstrates that the government would not have had a similar motive, and that the testimony of Hodges, Lavorato, and Mordaunt should be excluded under Rule 403 because it is not relevant to the issues presented in this trial.

(a)   General Analysis

Since the SEC proceedings at issue were civil as opposed to criminal, the government argues that its motive to develop

---

[43]United States' Response, p. 5.

testimony at those proceedings was not similar to the motive it has to develop testimony in this trial.  The government argues that it lacked a similar motive to develop testimony at the SEC proceedings because those proceedings occurred long before the defendants were indicted, before the government knew the issues that would be critical to this case, and before the government acquired information needed to question the witnesses meaningfully about those issues, e.g., the LJM transactions.[44]

   While it is undisputed that the nature of the SEC proceedings and this trial differ and that the government has more information today than it had when the SEC proceedings occurred, since the SEC proceedings were conducted for the purpose of developing facts that could be used to initiate either civil or criminal proceedings against Enron or its principals,[45] the court is not persuaded that the government lacked either the opportunity or the motive to challenge the witnesses and to discredit their testimony just as it would were they to testify in this or any other trial.  <u>Salerno</u>, 112 S.Ct. at 2503, <u>Battle</u>, 228 F.3d at 544, and <u>DiNapoli</u>, 8 F.3d at

---

   [44]See, e.g., Excerpts from testimony of Georganne Hodges, Exhibit 5 attached to Defendants' Motion, p. 3, where the SEC hearing officer stated:  "We are here today in the matter of Enron, which is our caption No. 9350, to determine if there have been violations of certain provisions of the federal securities laws. The facts developed today in our investigation may constitute violations of other federal or civil or criminal laws."  Similar warnings were also provided to Lavorato (Exhibit 6 attached to Defendants' Motion, p. 3), and Mordaunt (Exhibit 4 attached to Defendants' Motion, pp. 3-4).

   [45]Defendants' Reply, p. 14.

909, and their progeny all make clear that the admission of prior testimony under Rule 804(b)(1) requires particularized, fact-based analysis of the testimony at issue.  Accordingly, the court is not persuaded that the SEC testimony the defendants seek to introduce is inadmissible merely because it was given at civil proceedings held before the defendants were indicted and before the government acquired all of the information that it has now gained from its cooperating witnesses.  See <u>United States v. Omar</u>, 104 F.3d 519, 523 (1st Cir. 1997) (concluding that Rule 804(b)(1)'s "opportunity and motive" test is to be applied to the specific portion of the testimony at issue).

        (b)  Particularized Analysis

            **(1)  Hodges**

    Hodges was a high-ranking accountant in Enron's Wholesale unit who reported to Wes Colwell, a government witness at this trial. Defendants seek to introduce two excerpts from testimony that Hodges gave before the SEC on July 25, 2002.[46]  Defendants argue that they seek to introduce Hodges' testimony because it

> refutes the Task Force's allegation that Enron improperly
> used its reserves as a "cookie jar" and would "back-into"
> reserves numbers based solely on the desire to achieve
> targets set by upper management.   It also directly
> contradicts the testimony of Mr. Colwell and Arthur
> Andersen accountant Tom Bauer that Enron improperly

---

[46]Defendants' Motion, p. 5 and Exhibit 5 attached thereto, pp. 56:16-60:7 and 91:4-112:25.

backed-into the $369 million 4Q00 gas and power reserve and withheld information from Andersen about the reserve.[47]

(i)   Schedule C Reserves

The first excerpt from Hodges' testimony that defendants seek to introduce addresses the manner in which Hodges tracked on a daily basis the amounts that traders booked to Schedule C.  The government argues that this excerpt should be excluded because

> [d]efendants fail to explain the relevance of this testimony, which relates not to the calculation or use of the reserve at the end of the quarter, but to the tracking of the reserve during the quarter.  Moreover, this testimony is taken from the context of a much longer discussion of the Schedule C reserve and would make little sense to the jury unless prohibitively long portions of the remainder of the testimony were read to the jury.  Finally, several of Hodges's answers came in response to questions from her own attorney . . . and thus could not be said to be "developed" by the government at all.[48]

Defendants respond that this excerpt contains

> Hodges' testimony about how 'Schedule C' was used by traders intra-quarter and then reviewed by accountants before being established as 'reserves' at the end of the quarter goes directly to Task Force allegations that Schedule C reserves were 'over-reserved' and used to manipulate earnings.[49]

Hodges testified that in response to an order from Lavorato traders notified her and/or other accountants on a daily basis of

---

[47]Defendants' Motion, p. 5.

[48]United States' Response, p. 15 (citing Exhibit 5 attached to Defendants' Motion, pp. 56-60).

[49]Defendants' Reply, p. 14.

the amounts that they booked to Schedule C for their individual
books of business.  She testified that these amounts were tracked
for the purpose of maintaining "on a daily basis — what would best
be described as a by-trader schedule that showed what these
reserves were."[50]  She also testified that it was not the
accountants' responsibility to do anything else with these amounts,
i.e., analyze them or adjust the general ledger, until the end of
the quarter.[51]  Since Hodges' testimony in this excerpt is that she
simply tracked amounts that traders notified her they had booked to
Schedule C for their individual books of business and that these
daily figures were neither checked nor analyzed for reasonableness,
but merely maintained for the purpose of providing Lavorato a daily
"by-trader schedule,"[52] the court is not persuaded that this excerpt
is either relevant or probative of the reasons for which defendants
seek to introduce it, i.e., to refute "the Task Force's allegation
that Enron improperly used its reserves as a 'cookie jar' and would
'back-into' reserves numbers based solely on the desire to achieve
targets set by upper management."[53]  Accordingly, the court
concludes that defendants' motion to introduce Hodges' testimony

---

[50]Exhibit 5 attached to Defendants' Motion, p. 59.

[51]Id.

[52]Id.

[53]Defendants' Motion, p. 5.

-24-

about the manner in which she tracked on a daily basis the amounts that traders booked to Schedule C should be denied.

> (ii) Liquidity, Second-Quarter 2001 Reserves, and Schedule C Memorandum

The second excerpt from Hodges' testimony that defendants seek to introduce addresses a number of issues including liquidity, reserves for the second-quarter of 2001, and a memorandum that Hodges prepared at Colwell's behest.

> (A)  Memorandum of Reasonableness

Asserting that most of the second excerpt of Hodges' testimony concerns a memorandum that was admitted when Colwell testified, the government argues that "reading Hodges's testimony into the record will be misleading because the jury will not have information necessary to assess her credibility and will not know that the government did not have relevant information when it questioned Hodges."[54]  Defendants argue that Hodges' testimony is relevant and necessary because it establishes that "she set up the reserve amount properly and tested it for reasonableness."[55]

The memorandum was written by Hodges and has already been admitted as Government Exhibit 4643.  Colwell testified that the memorandum was not an accurate reflection of how the Schedule C

---

[54]United States' Response, p. 16.

[55]Defendants' Reply, p. 15.

reserve was determined in the fourth-quarter of 2000 because it had
been "backward engineered" at his direction, i.e., Colwell
testified that he directed Hodges to draft a memo that justified
the size of the reserve.[56]  At the SEC proceeding Hodges testified
that she received the amount of the reserve, $369 million, from
Colwell who asked her to prepare the memorandum, i.e., Government
Exhibit 4643, and that in the memorandum she "was really trying to
do a reasonableness test . . . of the [$369 million] number."[57]
Since Hodges testified that she received the $369 million number
from Colwell and merely tested it for reasonableness, the court is
not persuaded that her testimony contradicts Colwell's or that it
is relevant or probative of the other purposes for which defendants
seek to introduce it, i.e., to refute the government's allegations
that Enron improperly "'backed-into' reserves numbers based solely
on the desire to achieve targets set by upper management."[58]
Accordingly, the court concludes that defendants' motion to
introduce Hodges' testimony regarding her memorandum of reason-
ableness dated February 17, 2001, should be denied.

(B)  Liquidity and Second-Quarter 2001

Asserting that the remaining "two pages" of this excerpt
"relate to the bases upon which the gas and power volatility

---

[56]Id.  See also United States' Response, pp. 15-16.

[57]Exhibit 5 attached to Defendants' Motion, p. 106.

[58]Id.

reserve was established and later released,"[59] defendants argue that these pages "are relevant to establish the propriety of the reserve."[60]   Asserting that "Ms. Hodges proffered testimony establishes that the gas and power volatility reserve was established in response to liquidity concerns, and then released in the second quarter of 2001 pursuant to previously established criteria,"[61] defendants compare this testimony to Bauer's testimony that "the event that triggered the reserve should be identified at the time of creation of the reserve, and the event that would trigger the release should be identified at that time as well."[62]

At this junction of the SEC proceedings Hodges was asked if she had an understanding as to what a $204 million adjustment in the second-quarter of 2001 might relate.  Since Hodges answered that she did not have an understanding about what it related to because it was an intra-quarter adjustment and she only looked at the adjustments on a quarterly basis, for the reasons explained above in § II.B.2(b)(1)(i) with respect to the manner in which she tracked on a daily basis the amounts that traders booked to Schedule C, the court is not persuaded that this testimony is

---

[59]Defendants' Reply, p. 15 & no. 4.  Although defendants do not cite the specific portion of this excerpt at issue here, the only pages that do not concern Hodges' reasonableness memorandum are pp. 91-93 of Exhibit 5 attached to Defendants' Motion.

[60]Id.

[61]Id.

[62]Id.

either relevant or probative of the reasons for which defendants seek to introduce it, i.e., to refute "the Task Force's allegation that Enron improperly used its reserves as a 'cookie jar' and would 'back-into' reserves numbers based solely on the desire to achieve targets set by upper management."[63]   Accordingly, the court concludes that defendants' motion to introduce excerpts of Hodges' SEC testimony concerning the definition of "liquidity" and second-quarter 2001 reserves should be denied.

### (2)  Lavorato

Lavorato is a former CEO of Enron's Wholesale unit. Defendants seek to introduce eight excerpts from testimony that Lavorato gave before the SEC on August 28, 2002.[64]   Defendants argue that they seek to introduce Lavorato's testimony because it

> refutes the Task Force's allegation that Enron, at defendants' insistence, improperly booked reserves to hide volatility in its trading operations. Mr. Lavorato's account of the late 2000 meeting also contradicts the Task Force's allegation that Mr. Skilling spearheaded a conspiracy to improperly use reserves as Enron's "cookie jar."[65]

---

[63]Defendants' Motion, p. 5.

[64]Defendants' Motion, p. 4, and Exhibit 6 attached thereto. Although defendants' motion seeks to introduce nine Lavorato excerpts, defendants have withdrawn the excerpt relating to Lavorato's discussions with Ben Glisan.  See Defendants' Reply, p. 17.  The Lavorato excerpts that they seek to introduce are the marked lines on the following pages:  (1) p. 105, (2) pp. 113-114, (3) p. 117, (4) pp. 124-126, (5) pp. 135-137, (6) pp. 138-139, and (7) pp. 139-141.

[65]Id.

(i)  Reserve Process

Seven of the excerpts from Lavorato's testimony that defendants seek to introduce concern the process used to set reserves over the last two quarters of 2000.  The government argues that the testimony in these excerpts should be excluded because

> Lavorato never stated in his testimony that he believed either that all of Wholesale's reserves were properly taken or that the reserves at issue in this trial were properly taken. Absent that testimony, it is far from clear why Lavorato's description of the reserve process is relevant to this proceeding or, if it is relevant, why defendants cannot call a live witness to establish the same facts.[66]

Defendants respond that "Lavorato repeatedly *did* affirm to the SEC that Enron made appropriate determinations as to whether there was a need for reserves and then appropriately set such reserves."[67]

In these seven excerpts Lavorato testified that Enron needed various types of reserves to better reflect profitability,[68] that he would get involved only if the size of the reserve was large enough to be considered "material,"[69] that if a reserve was needed it would be booked by Colwell's accounting group and justified by Arthur Andersen,[70] that reserves would be tracked as each quarter progressed and at the end of each quarter Enron accountants like

---

[66]United States' Response, p. 17.

[67]Defendants' Reply, p. 16.

[68]Exhibit 6 attached to Defendants' Motion, p. 105.

[69]Id. at p. 114.

[70]Id. at p. 117.

Colwell and Hodges would "refine the reserves, to get them to where Arthur Andersen was comfortable with them,"[71] and that liquidity reserves were taken from the management book as opposed to the books of individual traders because he "just needed to reserve properly and didn't want to have to worry about going trader by trader and location by location [to do so]."[72]   Lavorato also acknowledged that the reserves increased significantly during the third- and fourth-quarters of 2000 and the first-quarter of 2001 due to retail risk management issues, but fell in the third-quarter of 2001 when the gas crisis in the west faded thereby lessening the need for liquidity reserves.[73]   Although Lavorato's testimony describes how reserves were processed, it says nothing about how the amounts reserved or the amounts released from reserves were determined.   Consequently, the court is not persuaded that any of these seven excerpts are relevant to the purpose for which they are being offered, i.e., to refute the government's allegation that Enron, at the defendants' insistence, improperly booked reserves to hide volatility in its trading operation.   Accordingly, the court concludes that defendants' motion to introduce the first seven excerpts of Lavorato's SEC testimony concerning the general manner in which reserves were processed should be denied.

-----

[71]Id. at p. 125.

[72]Id. at p. 137.

[73]Id. at pp. 138-139, 139-141.

(ii)  Skilling Meeting

The final Lavorato excerpt that defendants seek to introduce addresses a meeting in November or December of 2000 that Skilling had with Lavorato, Delainey, Colwell, and Causey.[74]  The government argues that this testimony should be excluded

> because the SEC attorneys had no motive to conduct a thorough inquiry into this meeting.  In particular, the SEC attorneys made no effort to clarify or explore Lavorato's testimony to the extent it bore on Skilling's knowledge of Wholesale's reserves.  Lavorato testified that prior to the meeting he "had understood" that Skilling "was a little surprised at the size of Enron's reserves."  He could not recall, however, whether Skilling was in fact surprised by the amount of the reserves when he heard about them at the meeting.  The failure to explore the source of Lavorato's "understanding" or Skilling's reaction to the news of the size of the reserves demonstrates that the SEC attorneys did not have the same motive that the government now has for questioning Lavorato about this meeting and substantially diminishes its relevance for this proceeding.[75]

Defendants respond that

> no credence can be given to the Task Force's assertion that the 'SEC attorneys had no motive to conduct a thorough inquiry' about Mr. Lavorato's understanding that Mr. Skilling had been 'surprised' by the size of Enron's reserves. . . The SEC lawyers spent dozens of pages questioning Mr. Lavorato about reserves, and they had no less of a motive to explore the mindset of Mr. Skilling, another Enron corporate officer who had already been deposed.[76]

Lavorato testified that he had been summoned along with others to a meeting in Skilling's office because Skilling wanted to know

---

[74]Id. at pp. 164-166.

[75]United States' Response, pp. 18-19.

[76]Defendants' Reply, p. 17.

about reserves.  Lavorato explained, "I understood that he [i.e., Skilling] was a little surprised at the size of our reserves, which surprised me because it means that somebody hadn't been telling him about the size of our reserves."[77]  When asked "[d]id Mr. Skilling in any way seem surprised at the amount of reserves you were telling him about?,"[78]  Lavorato answered, "I don't recall."[79] Lavorato's testimony that he "understood" that Skilling was surprised at the size of Wholesale's reserves demonstrates that he lacked personal knowledge about what Skilling thought about the reserves.  Moreover, since Lavorato did not identify the basis for his "understanding" that Skilling was surprised at the size of Wholesale's reserve, and testified that he did not recall whether Skilling expressed surprise at the face-to-face meeting he had with Skilling and others about Wholesale's reserves, the court is not persuaded that Lavorato's testimony on the subject of this meeting is relevant to the reason for which defendants seek to introduce it, i.e., to refute the government's allegation that Enron, at defendants' insistence, improperly booked reserves to hide volatility in its trading operations, or to contradict "the Task Force's allegation that Mr. Skilling spearheaded a conspiracy to

---

[77]Exhibit 6 attached to Defendants' Reply, p. 165.

[78]Id. at p. 166.

[79]Id.

-32-

improperly use reserves as Enron's "cookie jar."[80] Accordingly, the court concludes that defendants' motion to introduce Lavorato's SEC testimony concerning his meeting with Skilling and others to discuss Wholesale's reserves should be denied.

### (3) Mordaunt

Mordaunt is former General Counsel of EBS. Defendants seek to introduce five excerpts from testimony that Mordaunt gave before the SEC on December 12, 2001.[81] Defendants argue that they seek to introduce Mordaunt's testimony because it

> refutes testimony from those like Andrew Fastow and Ben Glisan who stated that defendants approved certain transactions simply for their accounting benefits, and substantiates defendants' position that LJM was an appropriate third-party vehicle that was fully researched, vetted, approved, and disclosed.[82]

### (i) Off-Balance Sheet Financing Structures

The first excerpt from Mordaunt's testimony that defendants seek to introduce is a series of questions in which she testified that she had never heard anyone say that Enron used certain transactions for accounting considerations to keep debt off of

---

[80]Id.

[81]Defendants' Motion, p. 5, and Exhibit 4 attached thereto. The Mordaunt excerpts that defendants seek to introduce are the marked lines on the following pages: (1) p. 60:9-18, (2) pp. 116:18-1117:1, (3) pp. 125:8-126:14, (4) pp. 141:5-146:6, and (5) p. 186:2-11.

[82]Id. at p. 6.

Enron's balance sheet.[83]   Asserting that the testimony in this excerpt concerns the Cactus and JEDI transactions that are not at issue in this case, the government argues that this testimony should be excluded because its probative value is substantially outweighed by the danger of confusing the jury and wasting time.[84] Defendants reply that the Task Force mischaracterizes Mordaunt's testimony as addressing only the Cactus and JEDI transactions when in fact

> [a]lthough these two examples may have been used, Ms. Mordaunt was asked a broader question — unlimited in time — for which defendants seek admission of her prior testimony:  "Have you ever heard anybody say to you in words or substance 'That the reason we want to do it this way is that we want to keep certain things off our balance sheet'?"[85]

Mordaunt's answer to this question was that no one had ever told her that Enron engaged in transactions to keep certain things, including debt, off its balance sheet.[86]   Mordaunt explained, however, that no one needed to say that because it was common knowledge within the commercial finance team that any debt associated with these transactions would not appear on Enron's balance sheet.[87]   Since Mordaunt testified that it was common

---

[83]Exhibit 4 attached to Defendants' Motion, p. 60.

[84]United States' Response, pp. 11-12.

[85]Defendants' Reply, p. 12.

[86]Exhibit 4 attached to Defendants' Motion, p. 60.

[87]Id. at pp. 60-61.

knowledge that debt associated with these transactions would not appear on Enron's balance sheet, the court is not persuaded that this excerpt of her testimony is relevant to the purposes for which it is being offered, i.e., to refute testimony from witnesses who stated that defendants approved certain transactions for their accounting benefits. Accordingly, the court concludes that defendants' motion to introduce Mordaunt's testimony that she never heard anyone say that Enron used certain transactions for accounting considerations to keep debt off its balance sheet should be denied.

(ii)  Enron Broadband

The second Mordaunt excerpt that defendants seek to introduce is her testimony that following termination of the Blockbuster contract the EBS "business folks" were saying that the video-on-demand business "had a lot of activity."[88]  Asserting that this testimony is vague and only marginally relevant, the government argues that this excerpt should be excluded because it is cumulative of testimony that defendants sought to elicit on cross-examination of Ken Rice and Kevin Hannon, and because when she was questioned the SEC was not focused on EBS and had no motive to probe Mordaunt's testimony about the state of the video-on-demand

---

[88]Exhibit 4 attached to Defendants' Motion, pp. 116-117.

business in the spring of 2001.[89]   Defendants reply that this testimony

> directly refutes testimony provided in this case by
> Messrs. Rice and Hannon.  It is no answer to the Task
> Force to cagily assert that such testimony is
> 'cumulative' of other testimony that the defendants
> 'sought to elicit' on cross-examination of Task Force
> witnesses.  Messrs. Rice and Hannon, for example, denied
> on the stand their prior, optimistic statements about the
> future of the content business.[90]

> Mordaunt's testimony was that

> [w]e had terminated the Blockbuster longterm arrangement,
> but our business folks were telling us they were in good
> negotiations with the studios, so the impression was we
> were going to be able to continue or to develop the
> video-on-demand business directly through the
> relationship with one of the studios, Universal, Disney,
> Dreamworks.  They were apparently talking to all of them.
> So while nothing been consummated yet, there was a lot of
> — there was a lot of activity.[91]

Mordaunt's testimony that she was told by EBS's "business folks" that there were negotiations with studios and that this information created "the impression" that the video-on-demand business would continue because "there was a lot of activity" demonstrates that she lacked personal knowledge about any of these subjects, i.e., negotiations with the studios, EBS's continued ability to develop the video-on-demand business, or the level of activity surrounding the video-on-demand business.  Moreover, since Mordaunt did not identify the "business folks" who told her this

---

[89]United States' Response, p. 12.

[90]Defendants' Reply, p. 12.

[91]Exhibit 4 attached to Defendants' Motion, pp. 116-117.

information as Rice or Hannon, and did not explain why "a lot of activity" justified an impression that the video-on-demand business would continue to be developed, the court is not persuaded that her testimony on these subjects bears any indicia of reliability or is relevant for either of the two reasons that defendants seek to introduce it:  (1) to refute testimony given by Rice and Hannon that EBS's future business prospects were poor,[92] or (2) to refute testimony from witnesses who stated that defendants approved certain transactions simply for their accounting benefits.[93] Accordingly, the court concludes that defendants' motion to introduce Mordaunt's testimony that the EBS "business folks" were saying that the video-on-demand business "had a lot of activity" should be denied.

(iii)  LJM

In the third excerpt that defendants seek to introduce Mordaunt testified that she had heard that Skilling and Lay "were supportive" of Fastow's being a general partner in LJM and JEDI because of the speed with which the partnerships could do transactions with Enron and not because Enron would be able to do the transaction within a particular period.[94]  Asserting that

---

[92]Defendants' Reply, p. 12.

[93]Defendants' Motion, pp. 5-6.

[94]Exhibit 4 attached to Defendants' Motion, pp. 125-126.

Mordaunt learned this information from a PowerPoint presentation that Fastow gave to Lay and Skilling, and that this PowerPoint presentation is already in evidence, the government argues that this testimony should be excluded because in addition to being inadmissible under Rule 804(b)(1) it would be cumulative and an undue waste of time.[95] Defendants reply that the Task Force mischaracterizes Mordaunt's testimony as being derivative of a document when, in fact, "she testified from personal knowledge as to how Mr. Fastow pitched the structure to the defendants, and her version of events establishes that it was pitched as a lawful and appropriate structure."[96]

Mordant testified that she "heard that management, Skilling, Lay" supported Fastow's being a general partner in partnerships that engaged in third-party transactions with Enron because of the speed with which the transactions could be done since Fastow knew either the transaction or the asset. When asked if she had heard this from Fastow, Mordaunt testified that she "was part of a presentation that . . . [Fastow had] given for the initial LJM 1 transaction to Ken Lay and Jeff Skilling."[97] She also testified that Fastow's presentation was a PowerPoint presentation that was

---

[95]United States' Response, p. 13.

[96]Defendants' Reply, pp. 12-13.

[97]Exhibit 4 attached to Defendants' Motion, p. 125.

also going to be presented to the board.[98]  Mordaunt did not testify
that the transaction had been pitched as a lawful and appropriate
structure.   Since the only source that Mordaunt cited for her
testimony regarding the defendants' support for Fastow serving as
general partner of the LJM entities was a PowerPoint presentation
that is already in evidence, and since Mordaunt did not testify
that she had any personal knowledge of the reasons why Skilling and
Lay supported Fastow's serving as general partner in the LJM
entities, the court is not persuaded that her testimony on these
subjects bears any indicia of reliability or relevance to any of
the reasons that defendants argue it should be introduced:  (1) to
refute testimony from witnesses like Fastow and Glisan who stated
that defendants approved certain transactions simply for their
accounting benefits; (2) to substantiate defendants' position that
LJM was an appropriate third-party vehicle that was fully
researched, vetted, approved, and disclosed; or (3) to establish
that LJM 1 was pitched as a lawful and appropriate structure.[99]
Accordingly, the court concludes that defendants' motion to
introduce Mordaunt's testimony regarding Skilling's and Lay's
support for Fastow's serving as general partner of the LJM entities
should be denied.

---

[98]Id.

[99]Defendants' Motion, p. 6; Defendants' Reply, pp. 12-13.

(iv)  Disclosures for LJM and RhythmsNet

In the fourth excerpt that defendants seek to introduce Mordaunt testified that she understood the defendants to have accepted the need for disclosures with respect to LJM and the RhythmsNet transaction.[100]  The government argues that this testimony should be excluded because the SEC attorneys did not probe the basis for Mordaunt's testimony that Skilling and Lay knew that the transaction would have to be structured in a certain manner.[101]  Defendants reply that "the SEC had a substantial motive to pursue such questioning about Ms. Mordaunt's understanding.  The fact that the government lawyer involved chose not to ask follow-up questions does not affect the admissibility of the testimony."[102] The court agrees.

Mordaunt testified that she worked on disclosures for a related party transaction that the parties agree was the RhythmsNet transaction.  Although the SEC asked her who had been involved in deciding how to structure these transactions and whether anybody had expressed a desire to structure the transactions in a way that did not involve disclosures, her response to all of these questions was that when she began working on the disclosures the decisions

---

[100]Exhibit 4 attached to Defendants' Motion, pp. 141-146.

[101]United States' Response, pp. 13-14 (citing Exhibit 4 attached to Defendants' Motion, pp. 145-146).

[102]Defendants' Reply, p. 13.

regarding how the transaction would be structured had already been made.  Although the government argues that Mordaunt's lack of knowledge on structuring weighs against admitting this testimony, the government does not challenge its relevancy and does not argue that the SEC lacked either the motive or the opportunity to question Mordaunt about the bases of her testimony that Skilling and Lay knew that if they were going to put Fastow, a senior officer of Enron, into a partnership like this that they were going to have to disclose that he was participating.  Accordingly, the court concludes that defendants' motion to introduce Mordaunt's testimony concerning disclosures for the LJM and the RhythmsNet transactions should be granted.

### (v)  Office Gossip

In the fifth excerpt Mordaunt testified that "until they asked me to leave the building, I had a longterm view of that company. So I sold no stock, and I bought at 60."[103]  The government argues that this testimony should be excluded "both as unreliable and under Rule 403."[104]  Defendants reply that the

> material part of Ms. Mordaunt's prior testimony is her statement that she 'had a longterm view of the company,' sold no stock herself, and, in fact, purchased additional stock at $60 per share. . .  These facts are based on her personal knowledge, and, more importantly, they

---

[103]Exhibit 4 attached to Defendants' Motion, p. 186.

[104]United States' Response, p. 14.

demonstrate that, as an EBS executive, she continued to believe in the future prospects of Enron's businesses through late 2001.[105]

While Mordaunt's testimony is evidence that she had faith in the company's future prospects, the court is not persuaded that her faith in the company's long-term future prospects is relevant to the reasons for which defendants argue they seek to introduce her testimony, i.e., to refute testimony from witnesses like Fastow and Glisan who stated that defendants approved certain transactions simply for their accounting benefits, and to substantiate defendants' position that LJM was an appropriate third-party vehicle that was fully researched, vetted, approved, and disclosed.[106]   Accordingly, the court concludes that defendants' motion to introduce Mordaunt's testimony that she had a long-term view of the company until the day she was asked to leave the building should be denied.

### III.   **Rule 807**

Citing United States v. Earles, 113 F.3d 796, 801 (8th Cir. 1997), cert. denied, 118 S.Ct. 851 (1998), defendants argue that the former testimony they seek to introduce is admissible under Federal Rule of Evidence 807 because the declarants "all related facts on which they had first-hand personal knowledge.   None is

---

[105]Defendants' Reply, p. 14.

[106]Defendants' Motion, p. 6.

available for trial.  All the prior statements were under oath, and to defendants' knowledge, have never been recanted."[107]  Asserting that Rule 807 'is to be used only rarely, in truly exceptional cases,' United States v. Walker, 410 F.3d 754, 756 (5th Cir. 2005) (quoting United States v. Phillips, 219 F.3d 404, 409 (5th Cir. 2000)," the government argues that this prior testimony should not be admitted because it does not satisfy Rule 807's substantive requirements.[108]

## A.    Applicable Law

Rule 807's residual hearsay exception permits the admission of out-of-court statements not covered by Rules 803 or 804 if

> (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Fed. R. Evid. 807.  Because the residual exception applies only to statements "not specifically covered by Rule 803 or 804," the majority of courts interpret the rule to mean that, if a statement is admissible under one of the hearsay exceptions, that exception should be relied on instead of the residual exception.  See Earles, 113 F.3d at 800 & n.3 (statement found inadmissible under other

---

[107]Id. at pp. 12-13.

[108]United States' Response, p. 27.

hearsay exceptions can then be considered under residual exception)
(citing <u>United States v. Deeb</u>, 13 F.3d 1532, 1536-37 (11th Cir.
1994), <u>cert. denied</u>, 115 S.Ct. 1093 (1995)).  Thus, when faced with
evidence potentially admissible under either the unavailable
witness exception or the residual exception, a district court
should first determine whether the evidence is specifically covered
by the former before reaching the latter.   See <u>United States v.
Ismoila</u>, 100 F.3d 380, 392-93 (5th Cir. 1996), <u>cert. denied</u>, 117
S.Ct. 1712 (1997) (finding credit cardholder statements admissible
under residual exception after determining that statements were
inadmissible as business records); <u>United States v. Hitsman</u>, 604
F.2d 443, 447 (5th Cir. 1979) (college transcript not admissible as
business record under Rule 803(6) was found admissible under
general hearsay exception).

**B.   Analysis**

     For the reasons explained above the court has concluded that
defendants' motion to introduce prior testimony of five unavailable
witnesses under Rule 804(b)(1) should be granted as to the excerpts
of prior trial testimony given by Hirko and Duncan, and with one
exception, denied as to the SEC testimony given by Hodges,
Lavorato, and Mordaunt.  The court concluded that certain of these
excerpts of prior SEC testimony are not admissible under
Rule 804(b)(1) because they are not relevant and do not serve the

interests for which defendants seek to introduce them into evidence. Since the court has already concluded that the statements contained in these excerpts are not relevant, it also concludes that they fail to satisfy the substantive requirements of Rule 807. Accordingly, the court concludes that defendants' motion to introduce these excerpts under Rule 807 should be denied.

## IV.  Conclusions and Order

For the reasons explained above, the court concludes that defendants' motion to introduce excerpts from the prior trial testimony given by Hirko and Duncan and Mordaunt's SEC testimony concerning disclosures for the LJM and the RhythmsNet transactions should be granted, but defendants' motion to introduce excerpts from the prior SEC testimony given by Hodges and Lavorato and Mordaunt's SEC testimony on subjects other than disclosures for the LJM and the RhythmsNet transactions should be denied. Accordingly, Defendants' Motion to Introduce Prior Testimony of Unavailable Witnesses Pursuant to Federal Rules of Evidence 804(b)(1) or 807 (Docket Entry No. 840) is **GRANTED in PART** and **DENIED in PART**.

**SIGNED** at Houston, Texas, on this 27th day of April, 2006.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE

-45-