UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

MAY 5 - 2006

MICHAEL N. MILBY, CLERK OF COURT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| v. § | Cr. No. H-04-25 (S-2) (Lake, J.) |
| § | |
| JEFFREY K. SKILLING and § | |
| KENNETH L. LAY, § | |
| § | |
| Defendants § | |

### UNITED STATES' SUMMARY OF EVIDENCE TO SUPPORT A DELIBERATE IGNORANCE INSTRUCTION

Defendant Skilling has submitted a supplemental memorandum in opposition to the government's request that the Court give the jury a deliberate indifference instruction. Although Skilling asserts that the Court must find three preconditions before it can give an instruction, the Fifth Circuit has made clear that a deliberate ignorance instruction may be given as long as it has "the required factual basis." *United States v. Moreno*, 185 F.3d 465, 476 (5th Cir. 1999). The required factual basis is present "when a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate indifference." *United States v. Posada-Rios*, 158 F.3d 832, 875 (5th Cir. 1998). Although Skilling contends that he has not asserted "an ostrich defense," both defendants have flatly testified that they knew of no wrongdoing (other than Andrew Fastow's crimes) that occurred at Enron. Indeed, in light of the government's proof concerning the allegations of the indictment, defendants' assertion that there was "no evil" at Enron

(Skilling Motion at 3) is an assertion that they lacked guilty knowledge. Moreover, there is overwhelming evidence to support an inference of deliberate indifference. The remainder of this submission summarizes some of the evidence that supports a deliberate indifference instruction. It is not an exhaustive compilation of the evidence supporting a deliberate ignorance instruction; instead, the brief highlights a portion of the evidence supporting that instruction.

I. **Defendants claim a lack of guilty knowledge**

Defendants' entire defense hinges on their claim of a lack of guilty knowledge.

1. **Skilling**

Direct Examination:

Q. Were you aware of any conspiracy at Enron?

A. I was not.

Q. Were you aware of anyone breaking the law at Enron?

A. No. I was not. . . . I was aware of no illegal – illegal activity occurring at Enron?

4/12/06 Tr. 12442-43.

Q. Were you ever told about any secret side deals between Enron and LJM?

A. No.

4/12/06 Tr. 12396.

Q. Okay. Now, did you have any knowledge of any secret side deal or any quid pro quo in connection with the Raptor transactions?

2

    A.    No.

4/12/06 Tr. 12415.

    Q.    Did you have any knowledge or information that anything was backdated [in reference to the Avici/Raptor hedge]?

    A.    No.

Cross Examination:

    Q.    Sir, you were aware [in September 2001] that there was an internal investigation going on into accounting improprieties. You were aware that there were write-downs coming. You were aware of a lot of bad news. And you wanted to use, when the SEC was asking you tough questions, the September 11 tragedy to cover up the reason you sold those stocks, isn't it?

    A.    Mr. Berkowitz, I had no knowledge of an internal investigation. I had no knowledge of any accounting improprieties. I had no knowledge of any potential write-offs within the company. So no, that was not a motivation. The motivation was that after September 11th, I was very concerned about the economy. And I still had a very significant investment at Enron that I was concerned about.

4/17/2006 Tr. 13116.

    Q.    I'm asking if you have any personal knowledge of situations where Mr. Fastow was, in fact, negotiating on behalf of LJM after the controls were in place?

    A.    I don't think I ever heard of a specific instance when he was doing that, no.

**2.    Lay**

Direct Examination

"I don't' think there ever was a conspiracy of any kind." 4/24/2006 Tr. 14509.

    Q.    . . . But as you sit here on the witness stand under oath, was there anything that you said in these various analyst calls or conference calls, all-employee

>   meetings, et cetera, that was intentionally misleading or intentionally false?
>
> A.   Absolutely not. Absolutely not. As I – certainly, at the time, I thought all of those things were accurate. As I've now had to go back painstakingly and go through all of those time after time after time, I still believe, based on the information we had at the time, those were all accurate.

4/24/2006 Tr. 14522-23.

> Q.   I guess here's the bottom line, Mr. Lay: You were on watch on December 2d, 2001, when the company filed bankruptcy. Do you accept responsibility for that?
>
> A.   I said before I accept full responsibility for everything that happened at Enron. Having said that, I can't take responsibility for illegal activity that there is no way I could have had any knowledge of. But I take full responsibility for what happened at Enron. I can't take full responsibility for the individual conduct of all 30,000 employees at Enron particularly, those that, in fact, appear to have been engaged in criminal activity.

4/24/2006 Tr. 14523-24.

Cross-Examination

*The Ceconi email*: Government witness David Delainey testified that he discussed the Ceconi email with Lay during the fall of 2001. Lay told Mr. Delainey that "he had seen the letter." 2/28/06 Tr. 5267. On cross-examination, Lay denied having seen the letter until after Enron's bankruptcy. 5/1/06 Tr. 15877-78

## II.   Evidence of deliberate ignorance

Testimony throughout trial has demonstrated that defendants repeatedly failed to take steps to learn information that would have revealed, or led to further information concerning, criminal conduct occurring at Enron.

1. **Skilling**

*The Mintz Memo and the LJM DASHs*: In the spring of 2001, Jordan Mintz, an Enron attorney, attempted to get Skilling to sign the deal approval sheets (or DASHs) for all the LJM deals. Mintz sent Skilling a memo seeking to arrange to have Skilling sign the forms, and he even offered to come to Skilling's office with the forms. Gov't Ex. 1670. Skilling said he did not recall receiving the memo, but admitted that if he had acted on Mr. Mintz's request, he would have been more aware "of all of the things that LJM was doing and all of the transactions that they were entering into." 4/17/06 Tr. 13319-20.

*Failure to inquire into Fastow's compensation*: Skilling testified that he had a meeting with Fastow in September 2000 to discuss Fastow's compensation. The LJM entities had already been operating for more than a year by that time. Cross-examination concerning the meeting included the following:

> Q. He comes in a year into his transactions with LJM and he tells you 20 to 25 percent, correct?
>
> A. Yes.
>
> Q. And he had already been doing various transactions, although it's your understanding he hadn't been able to come up with a rate of return. My question is, did you ask him that?
>
> A. No, I didn't.
>
> \* \* \*
>
> Q. Didn't that send up any red flags for you, Mr. Skilling, this guy who is

>       supposed to be negotiating – supposed not to have any conflict of interest, negotiating against Enron, says he's making all this money or will be making all this money? That a lot of – it's a pretty high rate of return.
>
> A.    As he explained it to me, he was trying to be conservative, that would lead to a higher number for his LJM compensation. So, he told me that he – by doing that, that he agreed he would not earn that high rate of return but that this was just conservative so that I could feel comforted that the ratio he had come up with really overstated his LJM income.
>
> Q.    Mr. Skilling, you knew that Mr. Fastow and LJM were making a ton of money, didn't you?
>
> A.    No, I did not.

4/17/06 Tr. 13323-27. Skilling also testified that he spoke at the LJM investors conference in Florida in October 2000, but that he did not obtain the handout that contained the "eye-popping" returns received by LJM from the Raptor transactions. 4/17/06 Tr. 13328-29.

*Failure to inquire Fastow's conflict of interest*: Government witness Ken Rice testified that Cliff Baxter complained to Skilling about Fastow's conflict of interest in setting up LJM. 2/14/06 Tr. 2752. Rice also complained that allowing Fastow to run LJM was a "bad idea." Vince Kaminski told Rick Buy, the head of RAC, that LJM's hedge of Rhythms should not go forward. Skilling nevertheless allowed Fastow to form the partnership, and then transferred, Kaminski, the person most likely to recognize that the "excessive, reckless risks" inherent in Enron's deals with LJM out of RAC. Skilling told Kaminski that he had received complaints that he and his group were acting too much like cops. 3/14/06 Tr. 7958-59. Skilling's desire not to have "cops" in RAC is strong

evidence of deliberate ignorance.

2.   **Lay**

Taken as a whole, Lay's defense and his testimony strongly support a deliberate ignorance instruction. Lay's defense is that from August 14, 2001, until Enron's bankruptcy, all of his statements to the public were accurate. That defense depends on the jury's believing that he did not know all of the information concerning the state of the company that, the government's evidence, has showed, was conveyed to him by Andrew Fastow, Dave Delainey, Ben Glisan, and others. Some of the evidence supporting a deliberate ignorance instruction is set forth below.

*Fourth Quarter 1999 Extra Penny*: The government's evidence showed that defendants and their coconspirators increased Enron's earnings for the fourth quarter 1999 solely to meet the consensus estimate. Mark Koenig testified that Lay told him on the morning that the earnings were released that "he went to bed and we were .30 cents and when he awoke he . . . saw that it was .31 cents." 2/1/06 Tr. 756. Lay knew that the earnings were increased to meet the consensus estimate, yet, as far as the government's evidence shows, Lay never asked how the company came up with another penny of earnings. *Id.* at 756-57.

*The Wall Street Journal's questions*: In late September 2001, the Wall Street Journal submitted a list of 25 questions concerning LJM to Enron. Lay met with Fastow and Mark Palmer over the questions. Fastow believed that they were "fair

questions" and showed that "there were a lot of problems with the things [he] had done with LJM at Enron," and he offered to answer the questions at the meeting. Lay did not ask Fastow to answer any questions or explain any issues that they raised. 3/8/06 Tr. 6768-73.

*Fastow's Compensation*: On cross-examination, Lay insisted that there was a "Chinese wall" that prevented him from finding out what Fastow was making from LJM. 4/27/06 Tr. 15480.

*Response to Lay it on the Line Survey*: After Lay resumed the CEO position at Enron, he asked employees to respond to a survey called Lay it on the Line. One of the top five employee concerns was "aggressive accounting," 5/1/06 Tr. 15856; other concerns were the "integrity of management," *id*. at 15875, and "business ethics." *Id*. at 15875-76. Yet, the announcement of the results did not list "aggressive accounting" as one of the top five areas. 5/1/06 Tr. 15860. Although Lay testified that "[w]e had a lot of people looking at these different things," he also said that many of the issues raised "had already been put to rest," 5/1/06 Tr. 15884, and he said that he only would have acted on a concern raised by an employee if it had "great validity." 5/1/06 Tr. 15885.

*Response to Luntz Group survey*: On October 19, 2001, the Luntz Group sent Lay a memo that outlined "issues and problems at Enron." 5/1/06 Tr. 15888. Lay admitted that he read the memo, which included comments from Enron vice-presidents such as "[t]here is chaos in the company that starts at the top and filters down," "[i]t is

utterly unrealistic to maintain morale when the people above us don't play the game properly," and "I tell my guys how great things are. I say all the right things to them. But in the back of my mind, I know the truth." 5/1/06 Tr. 15887-89. When the prosecutor asked Lay, "And you took no specific steps to try to figure out --" Lay cut him off and said, "an awful lot is going on by the 19th of October, as you know." 5/1/06 Tr. 15890.

*Response to Schweiger email*: On October 19, 2001, Jim Schweiger, a vice-president in Enron's trading operation, sent Lay a strongly worded email accusing Enron management of "lying, stealing, and cheating," manipulating earnings, and "criminal" behavior. 5/1/06 Tr. 15892-95. Lay admitted that the email showed that "we had an environment where an employee . . .did not feel intimidated to send me an email directly," but he failed to identify a single step he took in response to the email. Significantly, Lay did not directly answer the prosecutor's question about whether he had gone to Mr. Schweiger to discuss his concerns. 5/1/06 Tr. 15896. At the conclusion of this line of questioning, the prosecutor asked,

> Q. Sir, how many emails and notifications would it take for you to ask a single question of Mr. Fastow? Answer me that.

Lay did not answer and instead gave a lengthy non-responsive answer that ended with "And we're doing our best to assimilate all the input, all the information that's coming at us to decide how best to respond to all of this." 5/1/06 Tr. 15898-99.

*Response to the Sherron Watkins allegations*: Taken as a whole, the

government's evidence concerning the Sherron Watkins allegations shows that Lay deliberately ignored information that would have led to criminal conduct at Enron. Watkins predicted a "wave of accounting scandals," she alleged "handshake deals" involving Skilling, and recommended that Lay speak to certain individuals about her allegations. Watkins also recommended that Lay not use Vinson & Elkins or Arthur Andersen to investigate the allegations. Lay nevertheless commissioned Vinson & Elkins to conduct the investigation, and Enron then limited the investigation in a manner that resulted in a whitewash.

Dated:    May 5, 2006
          Houston, Texas

>                    Respectfully submitted,
>
>                    SEAN M. BERKOWITZ
>                    Director, Enron Task Force
>
>                    /s/ Douglas W. Wilson
>                    J. Douglas Wilson
>                    Enron Task Force

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of May, 2006, I caused a true and correct copy of the foregoing United States' Summary of Evidence to Support a Deliberate Ignorance Instruction to be served by electronic mail upon the following counsel of record:

Daniel M. Petrocelli
Matthew T. Kline
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
(310) 246-6850
Dpetrocelli@OMM.com

Ronald G. Woods
5300 Memorial, Suite 1000
Houston, TX 77007
(713) 862-9600
RonWoodsLaw@aol.com

Michael Ramsey
Chip B. Lewis
River Oaks/Welch Building
2120 Welch
Houston, TX 77019
(712) 523-7878
derissa@mramsey-lawyer.com

By: ___Mary Ellen Bedal___