```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3   UNITED STATES OF AMERICA    .
                                 . H-04-025SS
 4          vs.                  . HOUSTON, TEXAS
                                 . JUNE 21, 2013
 5                               . 1:32 P.M.
     JEFFREY K. SKILLING         .
 6   . . . . . . . . . . . . . . .

 7

 8

 9                    TRANSCRIPT OF RE-SENTENCING
                   BEFORE THE HONORABLE SIM LAKE
10                    UNITED STATES DISTRICT JUDGE

11

12

13   A P P E A R A N C E S:

14   FOR THE GOVERNMENT:

15        Patrick Stokes
          Robert Heberle
16        Pamela J. Hicks
          US Department of Justice
17        1400 New York Avenue, NW
          Washington, DC  20530
18
     FOR THE DEFENDANT JEFFREY K. SKILLING:
19
          Daniel M. Petrocelli
20        M. Randall Oppenheimer
          Matthew Kline
21        David J. Marroso
          O'Melveny and Myers, LLP
22        1999 Avenue of the Stars
          Suite 700
23        Los Angeles, California  90067-6035

24   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
25                            - - - - -
```

1   A P P E A R A N C E S:   (Continued)

2   FOR THE DEFENDANT JEFFREY K. SKILLING: (Continued)

3          Ronald Gene Woods
           Attorney at Law
4          5300 Memorial Drive
           Suite 1000
5          Houston, Texas   77007

6   OFFICIAL COURT REPORTER:

7          Cheryll K. Barron, CSR, CMR, FCRR
           U.S. Courthouse
8          515 Rusk, Rm. 8016
           Houston, Texas   77002

9

10  ALSO PRESENT:

11         Chad Nunez

12                            - - - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

3

P R O C E E D I N G S

1

2      THE COURT:  Good afternoon.  Please be seated.

3         Good afternoon, ladies and gentlemen.  We're here

4      this afternoon for resentencing of Mr. Jeffrey K. Skilling.

01:32  5      This is Criminal Action H-04-25.

6         Before we proceed with Mr. Skilling's

7      resentencing, I want to be sure that Mr. Skilling understands

8      and agrees to all of the provisions of the sentencing agreement

9      entered into by him, his attorneys, and the Department of

01:32  10      Justice.  The agreement is filed as part of Docket Entry

11      Number 1316.

12         Mr. Skilling, would you please come forward with

13      your attorney and would the Government's attorney please come

14      forward and would all of you please identify yourselves?

01:33  15      THE DEFENDANT:  I'm Jeff Skilling, your Honor.

16      MR. PETROCELLI:  Good afternoon, your Honor.  Daniel

17      Petrocelli for Mr. Skilling, along with Matt Kline, David

18      Marroso, Randy Oppenheimer, and Ron Woods.

19      MR. STOKES:  Good afternoon, your Honor.  Patrick

01:33  20      Stokes for the United States.  Along with me from the

21      Department of Justice is Robert Heberle and Pamela Hicks and

22      Special Agent Chad Nunez from the FBI.

23      THE COURT:  Thank you.  This agreement is somewhat out

24      of the ordinary, so I'm going to assume for the purposes of the

01:33  25      Rules of Criminal Procedure that it is subject to the same

Cheryll K. Barron, CSR, CM, FCRR                        713.250.5585

01:33  1    requirements of a plea agreement, which means I must ask you a
       2    number of questions.
       3                    First of all, Mr. Skilling, have you read the
       4    agreement?
01:33  5                THE DEFENDANT:  Yes, I have, your Honor.
       6                THE COURT:  All right.  When did you first read it?
       7                THE DEFENDANT:  Boy, I can't say that my memory is as
       8    good as it used to be.  Probably a month ago.  I forget, your
       9    Honor.
01:34  10               THE COURT:  Have you discussed the sentencing
       11   agreement with your attorney Mr. Petrocelli?
       12               THE DEFENDANT:  Yes, I have.
       13               THE COURT:  How much time have you spent discussing
       14   the agreement with your attorney?
01:34  15               THE DEFENDANT:  Several hours.
       16               THE COURT:  Okay.
       17               THE DEFENDANT:  At least.
       18               THE COURT:  All right.  Are you fully satisfied with
       19   the advice and counsel that Mr. Petrocelli has provided you?
01:34  20               THE DEFENDANT:  Absolutely, your Honor, yes.
       21               THE COURT:  All right.  In order to be sure that you
       22   understand and agree to all of the provisions of the sentencing
       23   agreement, I want to review some of the terms with you now
       24   again.  So do you have a copy of the agreement before you?
01:34  25               MR. PETROCELLI:  We do, your Honor.

01:34  1          THE COURT:  If you will turn first to Paragraph 8 of

2     the agreement, Paragraph 8 says, "For the reasons set forth

3     below as 'Relevant Considerations,' the Government and the

4     defendant agree to recommend jointly that the District Court

01:35  5     apply a one-level downward variance and resentence the

6     defendant using an adjusted offense level of 35, pursuant to

7     United States Sentencing Guidelines.  Given that the defendant

8     is located in Criminal History Category I for resentencing

9     purposes, the jointly recommended adjusted offense level will

01:35 10     result in a jointly recommended guideline range of 168 to 210

11     months of imprisonment."

12          What I want you to understand in particular about

13     that provision is that, as a result of the ruling of the United

14     States Court of Appeals for the Fifth Circuit in January of

01:36 15     2009, your advisory guideline range, without giving effect to

16     this agreement, would be 188 months to 235 months in prison.

17     Do you understand that?

18          THE DEFENDANT:  Yes, I do, your Honor.

19          THE COURT:  Therefore, the effect of Paragraph 8 of

01:36 20     the sentencing agreement is to recommend that your advisory

21     guideline range be lowered by 20 months.  Do you understand

22     that?

23          THE DEFENDANT:  Yes, I do.

24          THE COURT:  All right.  We'll continue with

01:36 25     Paragraph 9 of the sentencing agreement.

Cheryll K. Barron, CSR, CM, FCRR                    713.250.5585

01:36    1          "Neither the Government nor the defendant will

2    seek any variance or departure from the jointly recommended

3    guideline range.  The Government may allocate at sentencing,

4    but the Government will not take a position regarding the

01:37    5    particular sentence the District Court should impose within the

6    jointly recommended guideline range.

7          "The defendant agrees to waive all potential

8    challenges to his convictions and sentence, including a motion

9    for new trial pursuant to Federal Rule of Criminal Procedure

01:37   10    33, appeals, and collateral attacks, except as set forth in

11    Paragraph 11.  For purposes of this provision, the defendant's

12    sentence shall include any applicable orders of restitution or

13    forfeiture."

14          MR. PETROCELLI:  It says "and forfeiture."

01:37   15          THE COURT:  "And forfeiture."  Thank you.

16          "Neither the Government nor the defendant will

17    appeal a sentence imposed within the jointly recommended

18    guidelines range.  However, the Government and the defendant

19    each reserve the right to appeal a sentence imposed outside

01:38   20    this range."

21          Paragraph 12, "Neither the Government nor the

22    defendant will object to the incorporation in the defendant's

23    criminal judgment at resentencing of the criminal monetary

24    penalties established by the District Court in its Order of

01:38   25    Forfeiture of October 23rd, 2006, and criminal judgment on

01:38   1   October 25, 2006.   Neither the Government nor the defendant

       2   will otherwise object to the continuing validity of the

       3   Stipulated Forfeiture and Restitution Settlement Agreement

       4   approved on October 23rd, 2006."

01:38   5           Paragraph 13, "The Government agrees that it will

       6   not oppose the defendant's request at resentencing or otherwise

       7   that he receive credit for approximately six weeks of home

       8   confinement he served prior to reporting to the custody of the

       9   United States Bureau of Prisons."

01:39  10           And, finally, Paragraph 14, "The Government

      11   acknowledges that, pursuant to the applicable laws and

      12   regulations, it must defer to the United States Bureau of

      13   Prisons with regard to any future requests by the defendant to

      14   the Bureau of Prisons that:

01:39  15           (a) the defendant be entitled to participate in

      16   the Residential Drug Abuse Program; and

      17           (b) the defendant not be classified as a 'broad

      18   publicity' inmate pursuant to 28 Code of Federal Regulations,

      19   Section 524.72."

01:39  20           Now, the matters discussed in Paragraphs 13 and

      21   14 of the sentencing agreement will be decided by the Bureau of

      22   Prisons.

      23           Did you need to consult with Mr. Petrocelli?

      24           THE DEFENDANT:   For just one second, your Honor.

01:40  25   Would that be okay?

Cheryll K. Barron, CSR, CM, FCRR                    713.250.5585

01:40  1          THE COURT:  Sure.

       2     (Mr. Petrocelli confers with the defendant)

       3          MR. PETROCELLI:  Okay, your Honor.

       4          THE COURT:  You ready to proceed?

01:40  5          THE DEFENDANT:  Yes.  Thank you.

       6          THE COURT:  The matters that are covered in Paragraphs

       7     13 and 14 will be decided by the Bureau of Prisons.  But what I

       8     want you to understand in particular is that the sentencing

       9     agreement, and Section 10 in particular, provides that if the

01:40  10    Court sentences you to a term of imprisonment of 210 months or

       11    less you will forever waive and give up any right to challenge

       12    your conviction or sentence by any means, for any reason.  Do

       13    you understand that?

       14         THE DEFENDANT:  Yes, your Honor, I do.

01:40  15         THE COURT:  Now, other than what is stated in the

       16    sentencing agreement, has the United States Government made any

       17    promises to you in connection with your resentencing?

       18         THE DEFENDANT:  No, your Honor, they have not.

       19         THE COURT:  Has anyone threatened you or forced you to

01:41  20    enter into the sentencing agreement?

       21         THE DEFENDANT:  No, your Honor.

       22         THE COURT:  Well, you paused there.  Is there some

       23    need to talk to Mr. Petrocelli?

       24         THE DEFENDANT:  No.  No, your Honor.

01:41  25         THE COURT:  All right.

01:41   1                THE DEFENDANT:  Just a little slower than I used to

        2    be.

        3                THE COURT:  I realize this is an anxious event for

        4    everyone.  We have plenty of time.  So if you need to stop and

01:41   5    talk to Mr. Petrocelli, please feel free to do so.

        6                THE DEFENDANT:  Thank you, your Honor.

        7                THE COURT:  Finally, other than what is stated in the

        8    sentencing agreement, has anyone promised you what sentence you

        9    will receive today?

01:41  10                THE DEFENDANT:  No, they have not.

       11                THE COURT:  All right.  I have carefully considered

       12    the sentencing agreement and the reasons that underlie it, and

       13    I accept the sentencing agreement.

       14                     Now, the next matter is the third addendum to the

01:41  15    presentence report.  Mr. Skilling, have you read the third

       16    addendum to the presentence report?

       17                THE DEFENDANT:  No, I have not, your Honor.

       18                MR. PETROCELLI:  Can we have a copy of that?

       19       *(Mr. Petrocelli and the defendant confer)*

01:42  20                THE DEFENDANT:  Yes, your Honor, I've reviewed that in

       21    the past, as well.

       22                THE COURT:  All right.  Have you discussed it with

       23    your attorney?

       24                THE DEFENDANT:  Yes, I have.

01:42  25                THE COURT:  Your attorney has not filed any objections

10

01:42  1    to the third addendum.  Mr. Petrocelli, do you have any

2    objections to it?

3                MR. PETROCELLI:  We do not.

4                THE COURT:  Mr. Skilling, do you have any objections

01:43  5    to the third addendum?

6                THE DEFENDANT:  No, I do not.

7                THE COURT:  All right.  The Court adopts the third

8    addendum to the presentence report.

9                     In accordance with the third addendum, I find

01:43 10   that your total offense level is 36, your criminal history

11   category is one, and your advisory guideline range is 188 to

12   235 months in prison.

13                     However, pursuant to the one-level downward

14   variance recommended in the sentencing agreement, the agreed

01:43 15   upon guideline range is 168 to 210 months in prison.

16                     The Court has read the victim statements that

17   were submitted to the Government and to the Court and the more

18   than 200 letters submitted on behalf of Mr. Skilling.  The

19   Court has also read defendant's motion for judicial

01:44 20   recommendations regarding prison designation and participation

21   in the residential drug and alcohol program, which is Docket

22   Entry 1331; and Jeffrey Skilling's resentencing memorandum,

23   which is Docket Entry 1329; and the United States' memorandum

24   in aid of sentencing, which is Docket Entry 1334.

01:44 25                     I would like to compliment both the Government

*Cheryll K. Barron, CSR, CM, FCRR*                    713.250.5585

01:44  1   and the defense.  The memorandum were thorough, fair, and

2   persuasive.

3          MR. PETROCELLI:  Thank you, your Honor.

4          THE COURT:  Mr. Skilling, you may now make a statement

01:44  5   and present any information in mitigation.  Then I will allow

6   any victims to speak and the Government's attorney may speak

7   and your lawyer may speak.

8              I remind the attorneys again I've read carefully

9   the written presentations.

01:44  10             You may now proceed, sir.

11         THE DEFENDANT:  Your Honor, I drafted a statement to

12   the Court, which I am sure you have read.  And I think it

13   probably reflects best statements or comments that I could make

14   to the Court.  And so I really don't have anything else to say,

01:45  15   your Honor.

16         THE COURT:  I did read it.  And I read your wife's

17   statement and all the other statements.  I particularly found

18   the statement of former inmate Richard Wilson as very

19   informative.

01:45  20         THE DEFENDANT:  Thank you, your Honor.

21         THE COURT:  You've made a positive impact on his life

22   and the lives of many other people while you've been confined,

23   and I applaud you for that effort.

24         MR. PETROCELLI:  Shall we be seated, your Honor?

01:45  25         THE COURT:  No -- you may, yes, of course.

12

01:45  1          The Court's order of May 8th, 2013, required that

2     all victims must notify the Court by June 7, 2013, if they wish

3     to be heard today.  Only one victim, Ms. Diana Peters, has

4     notified the Court that she wishes to be heard today.

01:46  5          Ms. Peters are you present?

6               MS. PETERS:  Yes.

7               THE COURT:  Would you like to come forward to the

8     microphone, please, so we can hear you better?

9               MS. PETERS:  (Complies).

01:46 10              THE COURT:  Please identify yourself, and then you may

11    proceed.

12              MS. PETERS:  Thank you.  My name is Diana Peters, and

13    I worked at Enron.  I wanted to say thank you for letting me

14    speak today.

01:46 15          Your Honor, I'm here speaking for the employees

16    of Enron that cannot be here to speak for themselves.  These

17    employees came to work every day and gave 110 percent of their

18    lives to Enron.  They took pride in going out into the

19    community, representing Enron and giving to Habitat for

01:46 20    Humanity, the Star of Hope, and supporting the new stadium with

21    the Enron name on it.  These employees gave their hard work,

22    vibrant spirit, loyalty and trust to Jeff Skilling and the

23    other VP's within the company to build up the company they were

24    so proud to be a part of.

01:47 25          Jeff Skilling betrayed that trust to those

13

01:47  1    employees and played a part in the financial collapse of an

2    amazing company.

3            Bill Peterson worked for the company's Lotus

4    Notes group.  He was admitted to MD Anderson for cancer

01:47  5    treatment.  When Enron filed bankruptcy, the company contacted

6    him, while he was in the hospital, to let him know he was laid

7    off.  His wife sold their cars, their homes and moved in with a

8    sister in order to pay the COBRA insurance that Bill needed for

9    his care.  Bill died in a borrowed bed.

01:47 10            Charles Prestwood worked at a plant, that Enron

11    obtained, for 40 years.  He retired and went home to work on

12    his farm.  Because his retirement was in Enron, he had to sell

13    a portion of his farm and his house was all he had left.  His

14    legacy did not go on.

01:48 15            Sue Glenn worked as a clerk at Enron, raised her

16    kids.  In just a few years, she would have her house paid off

17    to enjoy her retirement.  She had to sell that home.  She had

18    to move in with her daughter, and she had a heart attack from

19    the stress and died.

01:48 20            Your Honor, this is just some of the employees

21    that have suffered from the Jeff Skilling criminal action.

22    Your Honor, I pray that your decision to give Jeff Skilling the

23    maximum for the sentence of his crimes.  And I thank you for

24    your time.

01:48 25            THE COURT:  You're welcome.  And thank you for being

Cheryll K. Barron, CSR, CM, FCRR                    713.250.5585

14

01:48   1  here today.

        2          The Court's records do not indicate any other

        3  potential victim notified the Court of an intent to speak today

        4  but if anybody thinks they did provide proper notice and wishes

01:49   5  to speak, they may come forward and identify yourself and

        6  explain what notice you gave.

        7          MR. TYCHON:  I'm Stephan Tychon.  I filed two requests

        8  by certified mail from --

        9          THE COURT:  Didn't I forbid you from speaking back in

01:49  10  2006?

       11          MR. TYCHON:  Yes.  But I -- you asked me if I notified

       12  the Court, and this time I did.

       13          THE COURT:  Okay.  Are you a -- did you ever work for

       14  Enron?

01:49  15          MR. TYCHON:  I explained in my letter that Enron did

       16  business with Bechtel and Bechtel -- Enron Bechtel --

       17          THE COURT:  Your father worked for Bechtel years ago.

       18  Is that correct?

       19          MR. TYCHON:  My father was first president of the

01:49  20  world's biggest public private partnership, which is Exxon,

       21  Shell, and Dutch Government.

       22          THE COURT:  Well, as I explained to you in 2006,

       23  you're not a victim.  And under the Victims' Rights Act, you

       24  have no right to speak today.

01:50  25          MR. TYCHON:  Well, I think I am a victim.

        Cheryll K. Barron, CSR, CM, FCRR                 713.250.5585

01:50   1          THE COURT:  Well, as between the two of us, it's my

        2    decision; and I say you're not.  So have a seat.

        3          All right.  The Government may now make any

        4    additional arguments it wishes to make.

01:50   5          MR. STOKES:  Thank you, your Honor.  Your Honor, we

        6    are at the end --

        7          THE COURT:  Can the audience hear the Government?

        8          You may want to speak loudly  enough so you can

        9    be heard.

01:50  10          MR. STOKES:  Sorry, your Honor.

       11          Your Honor, we are at the end of a very long

       12    road, the road that this Court has been on certainly far longer

       13    than I have.  And as the Court very well explained, the

       14    sentencing agreement really helps bring this to an end and has

01:51  15    resolved a number of the outstanding issues that helps us bring

       16    finality to this case.

       17          And we appreciate the Court clarifying what the

       18    sentencing agreement said.  And if I may just briefly dwell on

       19    it, there's been a fair amount of confusion, I believe, as to

01:51  20    what that sentencing agreement said.  And I think it's

       21    important for the victims, certainly, to understand what that

       22    agreement did and did not do.  And, certainly, what it did not

       23    do and the department did not do is agree to enter into an

       24    agreement --

01:51  25          THE COURT:  Can everybody hear him?

Cheryll K. Barron, CSR, CM, FCRR                    713.250.5585

01:51   1          Why don't you -- you won't offend me if you are

        2   seated when you make your presentation.  That way, you could

        3   use the microphone.

        4          MR. STOKES:  Absolutely, your Honor.

01:51   5          THE COURT:  It's a large courtroom.  Sometimes our

        6   voice doesn't carry very well.

        7          MR. STOKES:  Your Honor, with regards to the

        8   sentencing agreement, the -- we appreciate the Court clarifying

        9   what the agreement actually said.  There's been a fair amount

01:51  10   of confusion about this.  And the Government thinks -- the

       11   Department thinks it's important for the victims to understand

       12   what the agreement actually did do and what it didn't do.

       13          Some of that confusion has been that the

       14   Government and the defense entered into an agreement to reduce

01:52  15   Mr. Skilling's sentence by 10 years, and that's certainly not

       16   something the Department has agreed to and wouldn't agree to

       17   and wouldn't bring an agreement of that nature to the Court.

       18          As the Court perfectly explained, we are starting

       19   from a place after the Fifth Circuit, the Court of Appeals,

01:52  20   reversed the sentence and reduced it by between eight and a

       21   half and 11 years.  And our agreement provides a one-level

       22   variance, which is in counterpoint to the Fifth Circuit's

       23   four-level reduction.  The sentence we recommended is within

       24   the guidelines range of 168 to 210 months, which overlaps with

01:52  25   the range that would be established by the Fifth Circuit.  This

01:52  1    agreement ends the litigation.  It brings finality.  And

2    importantly, it allows for us to distribute forfeited funds to

3    the victims of Mr. Skilling's crimes, upwards of $40 million,

4    to the victims of Mr. Skilling's crimes and to thereby pay

01:53  5    restitution owed by him.

6              The Court is certainly well aware of the record

7    here, and I don't want to dwell on the facts.  But Congress has

8    mandated that the Government and certainly the Courts consider

9    a number of factors, the 3553(a) factors, in determining an

01:53  10   appropriate sentence.  And we believe that, taken as a whole,

11   the -- these factors and the evidence supports sentencing

12   within this range.

13             In our sentencing agreement, we reserved the

14   right to allocute in order to facilitate the Court in

01:53  15   determining an appropriate sentence in determining -- taking

16   the measure of the whole man, of Mr. Skilling, and coming up

17   with the appropriate sentence.  And under the agreement, we

18   think that -- we take no position as to what specific sentence

19   within that range we would recommend.  Simply, we are

01:54  20   recommending a sentence within that range.

21             In reaching our determination and in coming to

22   the conclusion that a sentence of 168 to 210 months was

23   appropriate, we considered, first and foremost, the need to pay

24   restitution.  This litigation has gone on for years.

01:54  25   Mr. Skilling was convicted more than 10 years ago -- I'm sorry.

01:54   1    These crimes took place more than 10 years ago.  He was

2    convicted more than six years ago.  And due to the lengthy

3    litigation, a substantial amount of forfeited funds from him,

4    more than $41 million worth, have been tied up and we've been

01:54   5    unable to distribute those.

6                And as a result of this agreement, we're now able

7    to promptly cause the distribution of them.  And this will

8    complete the process of stripping Mr. Skilling of his

9    ill-gotten gains and ensuring that those gains are distributed

01:54   10   back to the victims of his crimes.  In total, once these funds

11   are -- the final order of forfeiture is signed and these funds

12   are released, the Government will have forfeited over a hundred

13   million dollars from the perpetrators of the fraud schemes at

14   Enron and distributed those to the victims of these crimes.  In

01:55   15   total, the Government will have distributed more than

16   $560 million, both from the SEC and the Department of Justice,

17   to the victims.

18               Your Honor, we also believe that the Level 35

19   that we've recommended, 168 to 210 months, appropriately

01:55   20   accounts for the conduct that's we have.  The Court sat through

21   a four-month trial and knows the facts far better than I.  But

22   what I would say, your Honor, is that what was true then is

23   true now.  The Enron crimes, Mr. Skilling's crimes, are some of

24   the largest -- represent some of the largest and most

01:56   25   significant corporate frauds ever tried, ever discovered, and

01:56   1   ever brought to a conviction in this country.

2   Mr. Skilling was not only at the pinnacle of

3   Enron, but he was at the pinnacle of these fraud schemes.  He

4   lied to employees, he lied to shareholders, he lied to

01:56   5   auditors, he lied to the investing public, and he lied to the

6   SEC in order to advance his and Enron's cause.  And that was --

7   they did this by essentially accounting hocus pocus.  They hid

8   losses.  They created phantom earnings.  They sought to give

9   the false appearance that Enron was either meeting or

01:56   10   outperforming targets that they had set, in order to meet Wall

11   Street's expectations.

12   But the reality was that Enron was faltering,

13   that key business lines were losing hundreds of millions of

14   dollars, that billions of dollars in assets were overvalued on

01:57   15   Enron's books.  Despite having this information at his -- in

16   his head, at his ready, Mr. Skilling, after retiring from the

17   company in August of 2001, stepping down as CEO and leaving the

18   company, shortly thereafter, in September of 2001, took

19   advantage of his insider knowledge.  He sold over 500,000

01:57   20   shares of his Enron stock and made more than $15.5 million from

21   it.

22   He subsequently was questioned by the SEC about

23   this and lied, in testimony to the SEC, about his reasons for

24   doing so.  And the Court found as much, as well.  Mr. Skilling

01:57   25   was also convicted of insider trading in connection with that.

Cheryll K. Barron, CSR, CM, FCRR                    713.250.5585

01:57  1    And, certainly, the other shareholders, the employees of Enron,

       2    those who didn't have this inside information weren't to lucky

       3    and would have liked to have had the information Mr. Skilling

       4    had and knew, about where Enron actually stood, what it's true

01:58  5    financial condition was.

       6             Now, your Honor, I certainly don't mean to paint

       7    that Enron was a fraudulent business.  It is certainly true

       8    that Mr. Skilling, with the assistance of others, bilked one of

       9    the largest companies in the country.  It was cutting edge.  It

01:58 10    was innovative.  It was widely respected throughout the world.

      11             And I want to make this point, as well, just as

      12    Ms. Peters did, that the vast majority of Enron's 20,000

      13    employees were incredibly talented, incredibly hard working,

      14    incredibly dedicated to Enron.  However, the rottenness of

01:58 15    Enron was at its top, the tone at the top.  Mr. Skilling, along

      16    with others, pushed an agenda of paper profits over real

      17    profits, of manipulating financial numbers in order to meet

      18    Wall Street expectations.

      19             They allowed sound business judgment and sound

01:59 20    business ethics to give way to expediency and greed.  A number

      21    of straw man arguments have been made over the course of this

      22    case.  The Government has never sought to prove that

      23    Mr. Skilling set out to bankrupt Enron or that any of the

      24    individuals convicted in connection with the Enron crimes set

01:59 25    out to bankrupt the company.  We've never sought to prove that

01:59  1    Mr. Skilling sought to line his pockets.

       2               Like many other white collar criminals,

       3    Mr. Skilling, we believe, believed that he could turn things

       4    around, that he could fix the problems at Enron, the accounting

01:59  5    problems, the financial problems at Enron and move on from

       6    this.  But as often happens, when his lies unraveled, when the

       7    accounting fraud unraveled, when Enron unraveled, all of it

       8    came tumbling down.  And thousands of employees were left

       9    without jobs, without pensions, some without life savings,

02:00 10    shareholders wiped out.  And Mr. Skilling, through it all,

      11    profited tremendously from his sale of his own shares before

      12    others were aware.

      13               Your Honor, we also think Level 35, the 168 to

      14    210 months, appropriately accounts for Mr. Skilling's, his own

02:00 15    history and his character.  He's had a remarkable -- he had a

      16    remarkable climb through corporate America, both at McKinsey

      17    and at Enron, at the very top of Enron.  He -- we certainly

      18    acknowledge that he engaged in a number of philanthropic acts,

      19    certainly in part as a result of the lofty position he achieved

02:01 20    and the tremendous wealth that he attained.  Nonetheless, he

      21    certainly gave back to the community, to friends, family, and

      22    others that he didn't know.  And that's something to be lauded.

      23               He had a tremendous work ethic; by all accounts,

      24    is very talented.  He was given advantages that few ever even

02:01 25    understand let alone have in this world.  And that's where the

02:01  1    contradiction arises, contradictions that mar his history.  He
       2    used those talents, starting in 1999, to lie and cheat.
       3    Mr. Skilling -- it appears Mr. Skilling and others at Enron
       4    thought they were above the rules, above the law.  Why they did
02:01  5    it, we never had to prove.  We don't really know.  Was it to
       6    stay on top?  Was it to climb higher in the stratosphere?  Was
       7    it a misguided effort to help Enron?  We just don't know.
       8            But that doesn't change the fact that he
       9    knowingly used lies to hide from the public and his employees
02:02 10    what was actually happening at Enron.  These types of
      11    advantages that Mr. Skilling has enjoyed in his history are the
      12    types of advantages that usually are taken into account at a
      13    sentencing and are considered to make one more culpable that
      14    don't have those advantages, that don't start from such a lofty
02:02 15    perch.
      16            However, we certainly recognize that
      17    post-incarceration, post-conviction, Mr. Skilling has both
      18    suffered tremendous tragedy while he's been in prison for his
      19    crimes, through the loss of his son and his parents.  And
02:02 20    there's simply nothing that can be said about that.  It's a
      21    tragedy.  He's also used his talents in prison.  We've seen the
      22    letters and we've read them and we think it's commendable and
      23    he should be -- he should be commended for that.
      24    Rehabilitation is reflected in his efforts to work with other
02:03 25    prisoners and to assist other prisoners and help them better

23

02:03   1   themselves as well as helping to better Mr. Skilling himself.

2              And yet, your Honor, we have to return to a key

3   aspect of rehabilitation, which is expressing remorse for his

4   own activities.  The Government is simply not aware of a single

02:03   5   instance in the 10 years since he's committed these crimes, in

6   the six years since his conviction, in which he's acknowledged

7   his role, acknowledged remorse for his actions in the crimes

8   that have caused so much harm to thousands.  The litigation is

9   now complete here.  Mr. Skilling, nonetheless, continues to

02:03   10   cast himself as a victim.  And we would just like to make clear

11   that, from the Government's perspective, Mr. Skilling is

12   anything but a victim.

13              He was at the center of the conspiracies that

14   were brought before this Court.  And it was his role in that

02:04   15   that has led to his separation from his friends, from his

16   family, and from the wider community.  We would also point out

17   that the Fifth Circuit itself in 2011 made clear on numerous

18   occasions, in it's review of Mr. Skilling's case, that the

19   evidence of his guilt was overwhelming.

02:04   20              Your Honor, we also were -- we certainly know the

21   Court recognizes deterrence, general deterrence, is an

22   important aspect of sentencing, particularly in corporate

23   crimes and white-collar crimes.  These cases are difficult to

24   detect, incredibly difficult to investigate and to prosecute.

02:04   25   A sentence within the Level 35 guidelines range, 168 to 210

02:04  1    months, we think, will send a strong message that corporate

2    criminals and corporate crime will be punished harshly, and

3    that's the right message to send.

4                Last, your Honor, I want to turn to the victims

02:05  5    in this case and talk a moment about them.  Ms. Peters'

6    eloquent words certainly captured what many victims have

7    expressed to us, have expressed to the Court, and many who are

8    not able to be here today.  Victims have suffered immeasurably.

9    Sure, jobs have been lost, money, financial security, in some

02:05  10   cases life savings have been lost.  Shareholders have been

11   affected.  Small businesses, large businesses have been

12   devastated.  The Houston community after the fall of Enron

13   suffered tremendously.

14                But those sorts of harms we may be able to

02:05  15   measure economically.  It's the many non economic harms that

16   we've read about in victim letters, for example, that, I think

17   it's important for the Court to remember.  Victims have talked

18   about having lost trust, having become deeply cynical about the

19   marketplace, about our economic system, about business leaders,

02:06  20   about corporate America as a result of the Enron crimes, as a

21   result of Mr. Skilling's actions.  People have written

22   eloquently of physical ailments and emotional scars that have

23   lasted years, as a result of these crimes.

24                Now, the reality is that no prison term, no

02:06  25   prison sentence in this case is ever going to bring back

02:06  1   anything that these -- these harms that these victims suffered

2   and that the defendant caused for them.  But we do believe that

3   a sentence within the 168 and 210 month range will be a

4   significant sentence that is both necessary and appropriate in

02:07  5   light of the harms that Mr. Skilling has brought down upon

6   thousands in this community.  And we would ask the Court to

7   impose a sentence in that range.

8            THE COURT:  Thank you.

9            Mr. Petrocelli?

02:07 10   MR. PETROCELLI:  Thank you, Mr. Stokes.

11           Your Honor, I think you can appreciate from my

12   long history in this case that there's much about the

13   Government's allocution with which I disagree; but I need not

14   take issue today and I need not quarrel today.  Because even

02:07 15   accepting everything the Government has said in its allocution

16   and in its sentencing memo, it is the Government's position

17   that that is fully consistent with a sentence within the Level

18   35 range, which includes 168 months.

19           The Government is not making an argument in its

02:08 20   allocution that 168 months is not an appropriate sentence.  To

21   the contrary, the Government specifically agreed that any

22   sentence within Level 35, which includes 168 months, is an

23   appropriate sentence.  And the Court correctly pointed out at

24   the outset that, even without the sentencing agreement, based

02:08 25   on the Fifth Circuit's initial decision, we would be at Level

02:08   1    36.

        2              And when the Court initially sentenced

        3    Mr. Skilling back in -- I think it was October 23rd, 2006 --

        4    the Court applied the low end of the guideline, which called

02:08   5    for a sentence of 292 months.  So were we here without a

        6    sentencing agreement and were the Court to apply the low end of

        7    the guideline, we would be looking at Level 36.  Low end is 188

        8    months.

        9              So with this agreement the low end takes us to a

02:09  10    modest reduction of 20 months, to 168 months, which I submit is

       11    the appropriate sentence in light of all the circumstances.

       12    And we've gone through the Section 3553(a) factors in detail in

       13    the sentencing memo and -- having learned long ago, I know your

       14    Honor reads everything and remembers everything.  So I'm not

02:09  15    going to repeat what we said in the sentencing memo.  I just

       16    want to call out a few things if I may.

       17              For that modest 20-month reduction, as the

       18    sentencing agreement indicates, Mr. Skilling would agree to

       19    waive valuable ongoing litigation rights.  Your Honor knows

02:10  20    that we have been valiantly fighting every step of the way, all

       21    the way up to the Supreme Court and back, a couple of trips to

       22    the Fifth Circuit, and we had plenty of work still to do before

       23    your Honor, including a Rule 33 motion for a new trial,

       24    including a contested sentencing hearing in which the loss

02:10  25    calculation would have to be fought from scratch given the

27

02:10  1  elimination of the honest-service theory by the Supreme Court.

2              We had further appeals from those issues.  We had

3  fights about restitution issues and, then, 2255, perhaps, as

4  well.  So there were lots of litigation work and rights that

02:10  5  remained.  And Mr. Skilling has been willing to surrender those

6  rights in order to obtain the modest 20-month reduction of a

7  168 months' sentence, your Honor.

8              In addition, Mr. Skilling has forfeited virtually

9  all property and assets that he has, which amounts to

02:11 10  approximately $41.8 million.  And after your Honor decides the

11  sentence, we do have to come back to the amount, because the

12  judgment was estimated back in 2006 at 45 million because

13  various properties had not liquidated.  They've now liquidated,

14  and that amount is actually 41.8 million, approximately.  And

02:11 15  we can give you the exact breakdown of that.

16              Mr. Skilling is willing to forego any further

17  challenges to the $41 million, and that money would be made

18  immediately available to the victims.  As I understand, it

19  would be administered through the fund that Judge Harmon has

02:11 20  set up, your Honor, which has other proceeds having to do with

21  the Enron cases.

22              I don't need to talk to you about Jeff's conduct

23  before and during the events in question.  We went over that in

24  exhaustive detail the first time around in 2006.  And I recall,

02:12 25  your Honor, that, on the record before you gave out the

02:12  1    sentence in 2006, you, yourself, noted the good works that
       2    Mr. Skilling had done leading up to the events in question, the
       3    exhaustive charitable work, helping friends, and doing it all
       4    without any need or desire for public recognition, just to help
02:12  5    people, something that he has carried through throughout his
       6    life and during his lengthy stay in prison so far.

       7              You talked about his early success at Enron,
       8    building up this great company before the events in question,
       9    and the love of his family.  And, of course, all that remains
02:13 10    perhaps even more true today.  As far as the conduct of
      11    Mr. Skilling during the events of the trial and the events of
      12    the collapse of Enron, I have no desire to go over all that
      13    again.

      14              I just want to point out, your Honor, that the
02:13 15    record was quite clear, perhaps undisputed, that Mr. Skilling
      16    never once sought to loot the company, to steal money, to line
      17    his pockets with secret deals.  He did not -- he turned down
      18    tens of millions of dollars of compensation increases.  He --
      19    when the company was collapsing, he offered to give back
02:13 20    virtually all of his property and money in order to help save
      21    the company.

      22              And by the end of the trial, the Government,
      23    itself, told the jury that Mr. Skilling was not motivated by
      24    greed.  And I do think that makes a qualitative difference in
02:14 25    determining the appropriate sentence, your Honor, compared to

02:14  1    those convicted defendants who were trying to steal money, hide
       2    money, the kinds of things, for instance, that Andrew Fastow
       3    did.
       4               And on that point, your Honor -- I made these
02:14  5    arguments to you before, so I'm not going to repeat them, the
       6    issue of unwarranted disparities.  Mr. Fastow was supposed to
       7    receive a sentence of 10 years; and, because of his
       8    cooperation, he got six years.  So without regard to any
       9    cooperation, he should have served 10 years.  A sentence of 168
02:14 10    months is 14 years.  It's four years higher than Mr. Fastow,
      11    who, by far, by anybody's account, including the one juror who
      12    wrote in to your Honor, was the most culpable person on the
      13    entire Enron story.  And he received six years and, without any
      14    cooperation, would have received 10 years.
02:15 15               And I also pointed out that Mr. Causey, who ended
      16    up getting five and a half years, based on his cooperation, but
      17    under his agreement he didn't have to cooperate.  And without
      18    any cooperation, he would have received seven years.  And he
      19    was indicted in virtually the same case as Mr. Skilling and
02:15 20    virtually the same allegations.  And so I think that 14 years
      21    is vastly higher than any other Enron defendant and more than
      22    meets all the objectives of Section 3553.
      23               And in particular, your Honor, I want to say few
      24    words about post-incarceration factors and the
02:16 25    post-incarceration conduct.  Mr. Skilling reported to prison on

Cheryll K. Barron, CSR, CM, FCRR                    713.250.5585

30

02:16  1  December 13, 2006.  He's been there some 78 months now.  He

2  served almost two months of home confinement with the

3  electronic monitoring before he served.  And we were going to

4  ask you Honor have your judgment acknowledge the credit he

02:16  5  should receive for his home confinement.

6        THE COURT:  As I mentioned to you, Mr. Skilling,

7  that's really an issue for the Bureau of Prisons.

8        I'm not going to reduce his sentence because of

9  that.  He can pursue his prison remedies to seek a credit if he

02:16 10  wishes.

11        MR. PETROCELLI:  Okay.  And since the time that he has

12  been incarcerated, your Honor, he has, from day one, tried to

13  be a productive, constructive, positive inmate.  He noticed for

14  example that there was -- there were language barriers between

02:17 15  Spanish-speaking inmates and English-speaking inmates.  And so

16  he decided to teach Spanish speaking -- he decided to teach the

17  English-speaking inmates Spanish.  The only problem is

18  Mr. Skilling did not speak Spanish.  So what he did is he

19  learned Spanish while he taught the inmates, and he's been

02:17 20  teaching Spanish throughout.

21        He's been helping inmates with their English,

22  helping them write letters.  He helped head up a job fair or a

23  work fair program in the prison, where people who were about to

24  be released and would be looking for gainful employment, would

02:17 25  need to present résumés, and he helped to explain to them and

02:17  1    teach them how to do that.  And he, as we pointed out in our

2    sentencing memo, does all of this without trying to get any

3    recognition from anybody and, frankly, without anybody really

4    knowing.

02:18  5         The example of the blind man, who's the inmate

6    that serves with Mr. Skilling.  And Mr. Skilling offered to

7    read him the newspaper.  And so every day, he takes this blind

8    man and they go to a different place, where nobody can see

9    them, and the man is not embarrassed -- and Mr. Skilling is not

02:18 10    trying to earn brownie points -- and he reads him the

11    newspaper.

12         He -- he has attended all kinds of courses.  He's

13    attended business courses.  And it caused one of the professors

14    at the local college to remark, you know, "I can't teach you

02:18 15    anything.  You ought to be teaching the students business."

16    And we all know how much Mr. Skilling loves business.  So he,

17    too, has been teaching business.  And, you know, we visit him

18    often, and we talk to him often.  And I am amazed at the

19    remarkable strength, endurance, courage, and character of this

02:19 20    person.

21         And he has lost his mother, he has lost his

22    father, and he has lost his 20-year-old son and he could not

23    even attend his funeral.  And I just cannot imagine the

24    punishment and the pain that he will forever have to experience

02:19 25    of being in a lonely cell while his son was being buried.

02:19    1            And I think it was unfair for the Government to

    2    say he is not ever expressed remorse.  I don't quite know what

    3    they mean by that.  But if you go back to the October 23, 2006,

    4    transcript, at Page 13 -- Mr. Stokes of course, was not here,

02:19    5    so perhaps he hadn't read that.  But Mr. Skilling talked about

    6    the remorse that he felt.  He said, "I can't imagine more

    7    remorse.  I have friends who have died, good men."  And the

    8    collapse of Enron will forever, ever haunt him and damn him;

    9    and he has to live with that the rest of his life, and all the

02:20   10    people he let down, your Honor.

   11            He loved the company and he saw it fail and it

   12    was a failure of enormous proportions.  He loved the people who

   13    worked there.  He didn't want to hurt them.  He loved the

   14    community that he lived in.  He loves Houston.  He loves his

02:20   15    family.  His two children need him more than ever.  His wife

   16    needs him more than ever.  And he wants to come home.  He wants

   17    to come home here.

   18            And if he's given a sentence of 168 months, which

   19    is 14 years, he still has quite a ways to go, your Honor.  But

02:20   20    we will be there.  We will greet him and we will come home with

   21    him and he will have at least an opportunity to have the last

   22    part of his life so that he can play a meaningful role again, a

   23    meaningful role in society, meaningful role in this community,

   24    to be a productive, positive force the way he was before and

02:21   25    the way he has been since his incarceration.

02:21  1            And you have read the letters about people who

2    just are amazed, people, the inmates.  We had what?  Some 15

3    letters from inmates.  We have over a hundred letters from this

4    year alone, for this sentencing hearing alone, from people all

02:21  5    over, including almost 40 from former Enron employees, people

6    who didn't even know Mr. Skilling, who didn't work for

7    Mr. Skilling, who talked about how much he can contribute to

8    society.

9            And I just ask your Honor that you give him that

02:21 10    opportunity, to be a productive person again in this community.

11   And with that, your Honor, I will sit down.

12           THE COURT:  Thank you.  Mr. Petrocelli, this may be

13   your last appearance before me.  So I want to say you've done

14   an excellent job over these years representing your client.

02:22 15   You're a credit to the bar, and I hope Mr. Skilling appreciates

16   the fine work that you and the other attorneys with your firm

17   have done for him these many years.

18           MR. PETROCELLI:  Thank you.

19           THE COURT:  Because the Court certainly acknowledges

02:22 20   it.

21           MR. PETROCELLI:  Thank you.

22           THE COURT:  This is not an easy decision.  Sentencing

23   is the most difficult part of my job and certainly the least

24   pleasant part of my job.

02:22 25           As both counsel have stated, Mr. Skilling has a

34

02:22  1     family and many friends who support him.  It is true that he

2     has contributed to the early growth and success of Enron and

3     that he has helped many people through charitable contributions

4     and other good works and, more recently, by helping other

02:23  5     prison inmates.

6                The advisory guideline range of 168 to 210 months

7     envisions a long period of imprisonment because the sentencing

8     commission and Congress have determined that crimes of this

9     magnitude deserve significant punishment.  The evidence at

02:23 10     trial established that Mr. Skilling repeatedly lied to

11     investors, including Enron's own employees, about various

12     aspects of Enron's business, and that Mr. Skilling illegally

13     sold a large amount of his own Enron stock based on inside

14     information before Enron collapsed.

02:23 15                Title 18 of United States Code, Section 3553,

16     sets forth a number of factors in addition to a defendant's

17     advisory guideline range that Congress instructs Courts to

18     consider in determining a sentence.  In this case, the two most

19     significant factors are the need for the sentence to deter

02:24 20     others from committing similar crimes and the need for the

21     sentence to reflect the seriousness of the offense, to promote

22     respect for the law, and to provide just punishment for the

23     offense.

24                Having carefully considered all of the

02:24 25     information and arguments presented to the Court and based on

02:24  1   the Court's familiarity with the facts of this case, the Court
2   concludes that a sentence of 14 years, or 168 months, in prison
3   adequately addresses all of the relevant sentencing factors.
4   The Court is not persuaded that a longer sentence is necessary
02:25  5   either to provide additional deterrence or to satisfy any other
6   sentencing factors.
7            Mr. Skilling, would you please stand?
8            THE DEFENDANT:  (Complies).
9            THE COURT:  Pursuant to the Sentencing Reform Act of
02:25  10  1984, you are hereby committed to the custody of the Bureau of
11  Prisons for a term of 48 months as to Count 1S, followed by 120
12  months as to all of the remaining counts, to run concurrently
13  with each other and to run consecutive with Count 1S, for a
14  total sentence of 168 months in prison.
02:25  15           The defendant's motion for judicial
16  recommendation, which is Docket Entry 1331, is granted; and the
17  judgment will reflect the recommendation of the Court that the
18  defendant be designated by the Bureau of Prisons to a federal
19  correction facility in either Pensacola, Florida, or
02:26  20  Montgomery, Alabama, and that should the defendant otherwise
21  qualify for participation in the Bureau of Prisons residential
22  drug abuse program that the defendant be placed in such
23  program.
24           Upon release from imprisonment, the defendant
02:26  25  shall be placed on a term of supervised release for three years

Cheryll K. Barron, CSR, CM, FCRR                  713.250.5585

02:26 1    as to each count, to run concurrently.  All of the terms of

2    supervised release in the original judgment will remain in

3    effect.

4              In addition, I would like to propose an

02:26 5    additional term.  The letters indicate that Mr. Skilling has a

6    real talent in helping people find work, even while they're in

7    prison.  So the Court would like to recommend, as an additional

8    condition of supervision, that Mr. Skilling be required to

9    perform 300 hours of community service related to helping

02:27 10   people find employment, during the first year of supervised

11   release under the supervision of the probation officer.  I say

12   "would like to" because I will not impose it if you think it

13   violates the terms of the sentencing agreement.

14             MR. PETROCELLI:  Mr. Skilling?

02:27 15             THE DEFENDANT:  I'm perfectly happy with that, your

16   Honor.

17             THE COURT:  All right.  I take it you think that

18   special condition is consistent with the sentencing agreement.

19   Is that correct?

02:27 20             THE DEFENDANT:  Yes, I do.  Thank you.

21             THE COURT:  All right.  Then, it will be imposed.

22   Also --

23             MR. PETROCELLI:  May I ask for one minor modification?

24   That you add Leavenworth, Kansas, or Yankton, Iowa?

02:27 25             THE COURT:  I've already got this typed out.

37

02:27  1            MR. PETROCELLI:  I know.  It was -- after that
       2  compliment you gave us, I dropped the ball.  But there are two
       3  other -- we want to give them more choices.
       4            THE COURT:  Okay.  Do you have that written down?
02:28  5            MR. PETROCELLI:  Yes.
       6            And I also don't know my geography.  Mr. Skilling
       7  has told me it's Yankton, South Dakota; Leavenworth, Kansas.
       8            THE COURT:  Isn't it cold up there?
       9            THE DEFENDANT:  It is, yes.
02:28 10            THE COURT:  I thought you were finally glad to get out
      11  of Minnesota.
      12            All right.  I'll add Yankton, South Carolina --
      13  Yankton, South Dakota, and Leavenworth, Kansas.
      14            THE DEFENDANT:  Yes, sir.
02:28 15            MR. PETROCELLI:  Thank you.  Sorry about that.
      16            THE COURT:  May I proceed?
      17            MR. PETROCELLI:  Yes, your Honor.
      18            THE COURT:  Pursuant to the Stipulated Forfeiture and
      19  Restitution Settlement Agreement and the Court's October 23rd,
02:28 20  2006, Order of Forfeiture, the Court concludes that the
      21  restitution provided in the agreement and order is
      22  proportionate to the defendant's culpability.  Restitution is
      23  therefore satisfied through the agreement and order, and their
      24  terms will be incorporated into the judgment.
02:28 25            The Government has filed a final -- a motion for

02:29 1    a final order of forfeiture; and that motion, which is Docket

2    Entry 1331, is granted.  The order doesn't reflect a particular

3    amount.  The Court's current information is that the forfeited

4    amount is approximately $42 million.

02:29 5            MR. PETROCELLI:  Yes, 41 million --

6            THE COURT:  Wait just a second.  Has the Government

7    agreed with the figure you're getting ready to read?

8            MR. STOKES:  We haven't, your Honor.  The figure that

9    Mr. Petrocelli is about to read is the figure at the time we

02:29 10   filed the motion.  The funds are held in interest-bearing

11   accounts and so that figure will have changed and so we won't

12   know the final amount until the actual transfer of money takes

13   place.  So, hence, we've requested forfeiture of the amounts in

14   the accounts without designating a specific amount.

02:29 15           THE COURT:  What I would like to do is have the

16   judgment reflect approximately $42 million.  I think the Rules

17   of Criminal Procedure allow forfeiture provisions to be added

18   several months after the judgment.  So you can provide the

19   actual amount of forfeiture once you've agreed upon it, and

02:30 20   we'll incorporate that by amendment in the judgment.

21           MR. PETROCELLI:  Thank you.  That's fine.

22           THE COURT:  All right.  It is further ordered that the

23   defendant pay a special assessment to the United States of $100

24   per count of conviction, for a total special assessment of

02:30 25   $1,900.

02:30  1          Mr. Skilling, pursuant to the sentencing

2  agreement, you have no right to appeal your conviction or

3  sentence.  Do you understand that?

4          THE DEFENDANT:  I understand that, your Honor.

02:30  5         THE COURT:  Does either counsel wish to say anything

6  else?

7          MR. PETROCELLI:  Yes.  The $1,900 was paid.

8          THE COURT:  I know, but the judgment -- the judgment

9  still needs to recite it.

02:30  10         MR. PETROCELLI:  Okay.

11          THE COURT:  It has been paid.  They won't come after

12  him twice.

13          MR. PETROCELLI:  Okay.

14          THE COURT:  I'll ask the probation officer, she's

02:30  15  standing.

16          THE PROBATION OFFICER:  Yes, your Honor.  I believe

17  it's the "second superseding indictment."

18          THE COURT:  It is.

19          THE PROBATION OFFICER:  I believe you read

02:31  20  "superseding indictment."

21          THE COURT:  I was getting tired.  Instead of saying

22  "second superseding" over and over again, I just figured you

23  would know.

24          THE PROBATION OFFICER:  I will reflect that in the

02:31  25  judgment.

40

02:31  1          THE COURT:  Thank you.

2          MR. STOKES:  Nothing further from the Government.

3          THE COURT:  Anything else?

4          MR. PETROCELLI:  Nothing further.

02:31  5          THE COURT:  Counsel are excused.  The defendant is

6     remanded to the custody of the marshal.  Court is adjourned.

7          *(End of requested proceedings)*

8                           * * * * *

9                 COURT REPORTER'S CERTIFICATION

10          I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled cause.

11

12     Date:  June 25, 2013

13                              /s/   Cheryll K. Barron
                           Cheryll K. Barron, CSR, CMR, FCRR
14                         Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

Cheryll K. Barron, CSR, CM, FCRR                    713.250.5585